CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper
Thomas S. Kessler
David Z. Schwartz
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Attorneys for the Foreign Representative*
*of Braskem S.A. and affiliated debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Braskem S.A., *et al.*[1]<br><br>Debtor in a Foreign Proceeding. | Case No. 26-11522 (MEW)<br><br>Chapter 15<br>(Joint Administration Requested) |

**DECLARATION OF ANA ELISA LAQUIMIA**
**PURSUANT TO  28 U.S.C. § 1746 IN SUPPORT OF THE**
**VERIFIED  PETITION FOR  RECOGNITION OF THE BRAZILIAN**
**PROCEEDING AND MOTION FOR ORDER GRANTING RELATED**
**RELIEF PURSUANT TO 11 U.S.C. §§ 105(A), 1515, 1517, 1520, AND 1521**

I, Ana Elisa Laquimia, partner at E. Munhoz Advogados, a law firm located in São Paulo,

Brazil ("E. Munhoz"), and a lawyer admitted to the practice of law in Brazil, pursuant to 28 U.S.C.

§ 1746, hereby declare under penalty of perjury under the laws of the United States that the

following is true and correct:

---

[1]    The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Braskem S.A. (01-70 – Brazil); Braskem Netherlands B.V. (6B01 – Netherlands); Braskem Netherlands Inc., B.V. (9B01 – Netherlands); Braskem Netherlands Finance B.V. (5B01 – Netherlands); Braskem Trading & Shipping B.V. (7B01 – Netherlands); and Braskem America Finance Co. (1581 – US).

1.      E. Munhoz represents Braskem S.A.; Braskem Netherlands B.V.; Braskem Netherlands Finance B.V.; Braskem Netherlands Inc. B.V.; Braskem Trading & Shipping B.V.; and Braskem America Finance Co. (collectively, the "Debtors") in the jointly-administered protective injunction proceeding in support of a court supervised mediation process (the "Brazilian Proceeding"), [2]-[3] that is in furtherance or in preparation of either an extrajudicial proceeding (*recuperação extrajudicial*) (the "Brazilian EJ") or a judicial reorganization (*recuperação judicial*) (the "Brazilian RJ"), commenced pursuant to Federal Law No. 11.101 of February 9, 2005 (as modified, the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil"), and pending before the 2nd Bankruptcy and Reorganization Division of the São Paulo State Court of Justice (the "Brazilian Bankruptcy Court").   I am familiar with the petition commencing the Brazilian Proceeding and the exhibits thereto[4] (the "Brazilian Petition") filed in the Bankruptcy Court.   A true and correct copy of the Brazilian Petition is attached hereto as **Exhibit A**, with a certified translation in English attached hereto as **Exhibit B**.

2.      I submit this declaration (the "Declaration") in support of the (a) *Petitioner's Declaration and Verified Petition For Recognition Of The Brazilian Proceeding And Motion For Order Granting Related Relief Pursuant To 11 U.S.C. §§ 105(A), 1515, 1517, 1520, and 1521* (the "Verified Petition") filed contemporaneously herewith, which seeks entry of an order (i) granting the Petition[5] in these Chapter 15 cases and recognizing the Brazilian Proceeding as the "foreign main proceeding" for each of the Debtors pursuant to section 1517 of the Bankruptcy Code or, in the alternative, as a "foreign nonmain proceeding," (ii) finding that the Petitioner is the duly

---

[2]      For ease of reference, the term "Brazilian Proceeding" refers to both the protective injunction proceeding and the mediation process collectively.

[3]      The case number for the Brazilian Proceeding before the Bankruptcy Court is 4113246-86.2026.8.26.0100.

[4]      Copies of the exhibits can be made available upon request.

[5]      Capitalized terms used but not defined herein have the same meaning ascribed to them in the Verified Petition.

appointed "foreign representative" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each of the Debtors, and (iii) granting such other and further relief as the Court deems just and proper, and (b) *Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 105(a), and 362* (the "Provisional Relief Motion") filed contemporaneously herewith, which seeks entry of an order (i) providing that section 362 of the Bankruptcy Code applies with respect to each of the Debtors and its property within the territorial jurisdiction of the United States and (ii) granting such other and further relief as the Court deems just and proper.

## BACKGROUND AND QUALIFICATIONS

3.      I obtained my bachelor's degree in law from the Universidade de São Paulo, USP School of Law in 2015.  I hold a PhD in Commercial Law from USP Law School.  I specialize in corporate, litigation, and bankruptcy matters, with a particular emphasis on corporate and large-scale restructurings.  I am a Professor at the university INSPER Instituto de Ensino e Pesquisa for post-graduate and executive courses.  I have been recognized as a leader in my practice area by Chambers Brazil, Legal 500 Brazil, and Latin Lawyer's LACCA Approved rankings.  I am an expert in bankruptcy in Brazil, and I am fully familiar with the Brazilian Bankruptcy Law and with the Brazilian RJ proceeding.

4.      I have been advising the Brazilian Debtors on all Brazilian law aspects of their liquidity challenges since 2025. To assist the Court's consideration of the Verified Petition and Provisional Relief Motion, I submit this Declaration describing the relevant features of the Brazilian Mediation, Brazilian EJ, and Brazilian RJ under the Brazilian Bankruptcy Law and other applicable laws as well as certain actions taken to date in connection therewith. Where the matters stated in this Declaration are statements of legal opinion, such statements reflect Brazilian law based on my education and years of experience practicing Brazilian law in Brazil. The matters

3

stated in this Declaration are statements of fact, based on my personal knowledge and are known to me to be true and accurate to the best of my knowledge, information, and belief.

**OVERVIEW OF BRAZILIAN REORGANIZATION PROCEEDINGS**

5.      Insolvency proceedings and certain mediations involving corporate entities in distress in Brazil are governed by the Brazilian Bankruptcy Law.  The Brazilian Bankruptcy Law focuses on facilitating faster and more efficient restructuring processes[6] and seeks to foster direct collaboration and participation of creditors and other relevant stakeholders in the company's reorganization.    Moreover, the Brazilian Bankruptcy Law encourages a viable company's successful reorganization, rather than its liquidation.  It recognizes that the preservation of the company is not merely a private concern, but a matter of broader economic and social relevance – it aims, therefore, to maintain the productive source, the employment of workers, and the interests of creditors, thereby promoting the company's social function and the stimulation of economic activity as expressly set out in Article 47 of the Brazilian Bankruptcy Law.

6.      The Brazilian Bankruptcy Law provides for two (2) forms of reorganization proceedings that are comparable to chapter 11 proceedings in the United States and serve as collective mechanisms to restructure debts under the control and supervision of a competent Brazilian court that is (in most cases) specialized in Bankruptcy (a "Bankruptcy Court"): (1) a court-supervised reorganization proceeding known as *recuperação judicial* (*i.e.*, the Brazilian RJ); and (2) an expedited reorganization proceeding known as *recuperação extrajudicial* (*i.e.*, the Brazilian EJ).  It also allows a company to initiate a mediation proceeding that is administered by a specialized mediation chamber prior to or in furtherance of a Brazilian RJ or Brazilian EJ (the

---

[6]      Brazilian Bankruptcy Law also provides for a liquidation proceeding known as *falência*, and since 2020, a transnational insolvency proceeding for recognition of foreign insolvencies.  Since the Debtors are first and foremost pursuing a Brazilian Mediation in furtherance or preparation of a restructuring proceeding (a Brazilian EJ, or, alternatively, a Brazilian RJ), the procedures and requirements of all such proceedings will be discussed herein.

"Brazilian Mediation"). Once a Brazilian Mediation is commenced, the debtor may request an injunction from the Bankruptcy Court to suspend or stay creditor enforcement or collection actions initiated by creditors that are invited to the mediation for a period of sixty (60) days.

7. On June 24, 2026, the Debtors commenced the Brazilian Proceeding by filing a request to commence a Brazilian Mediation with the *Wind Chamber of Mediation* ("Mediation Chamber") and to invite their financial creditors to participate. In parallel, the Debtors filed the protective injunction proceeding before the Brazilian Bankruptcy Court in furtherance of its financial restructuring efforts, which was granted by the Brazilian Bankruptcy Court on June 26, 2026.

## ELIGIBILITY REQUIREMENTS FOR DEBTORS UNDER THE BRAZILIAN BANKRUPTCY LAW

8. The Brazilian Bankruptcy Law provides for certain requirements for companies to be eligible to be debtors in any of the restructuring proceedings, including the Brazilian Mediation, the Brazilian EJ and the Brazilian RJ (each, a "Voluntary Proceeding").

9. As an initial matter, only the debtor itself may commence a Voluntary Proceeding. Creditors are not permitted to do so, as such proceedings may not commence on an involuntary basis. A debtor must be a business company or a businessman. The debtor, at the time that the application is made, is also required to have been doing business regularly for over two (2) years and must meet certain subjective and objective requirements, as described below.

10. Brazilian case law has evolved to allow foreign companies to file a Voluntary Proceeding. For example, filing in Brazil has been accepted on a variety of different independent bases, including in cases where the foreign debtor (a) is a subsidiary of a Brazilian holding company that does not develop independent business activities and is jointly filing the petition with such Brazilian holding company, (b) is merely a financial vehicle of the Brazilian holding

debtor or constituted for finance or for corporate organizational purposes, (c) is part of a corporate conglomerate under financial crisis having Brazil as its center of main interests, and/or the facts in connection to such crisis are primarily related with Brazil, or (d) has its operations and activities in Brazil, among others.

11.     Moreover, the petition for a Voluntary Proceeding must be filed in the appropriate Bankruptcy Court in the jurisdiction where the Brazilian debtor's (or debtors' group's) principal place of business (*principal estabelecimento*) is located.  The appropriate Bankruptcy Court has exclusive jurisdiction over matters relating to the claims being restructured.

12.     In order to commence a Voluntary Proceeding in Brazil, the following requirements must be met: the debtor shall not (a) already be subject to a bankruptcy liquidation proceeding, and if it has been in the past, the resulting liabilities shall have been discharged by a final court order; (b) have any pending judicial reorganization case, nor have been granted a judicial reorganization within the last five (5) years and, exclusively with respect to the commencement of a Brazilian EJ, have been granted court confirmation of an EJ Plan (as defined below) in the last two (2) years; and (c) have been convicted nor have a senior manager or controlling shareholders who have been convicted for any bankruptcy crime set forth in the Brazilian Bankruptcy Law.

## THE BRAZILIAN MEDIATION PROCEEDING

13.     The Brazilian Bankruptcy Law permits a company debtor to commence a Brazilian Mediation proceeding before the same Bankruptcy Court that would adjudicate any future Brazilian RJ or Brazilian EJ of the debtor (i.e., the court in the jurisdiction where the debtor or its group maintains its principal place of business).  Provided that the debtor satisfies the legal requirements to commence a Voluntary Proceeding, the debtor can seek an order from the Bankruptcy Court granting a sixty (60)-day stay period to prevent creditors from commencing any collection or enforcement proceedings against its assets or otherwise suspend any proceedings

already initiated by the creditors invited to the mediation (a "Preliminary Stay")[7]. The purpose of the Brazilian Mediation is to create a stable environment that allows parties to negotiate a solution to the affected claims, and allow the debtor to seek certain relief, on a provisional basis, that would otherwise only be available upon the commencement of a reorganization proceeding.

14.    In this sense, the Preliminary Stay has similarities with provisions of Brazilian law that authorize a financially distressed corporate debtor to seek anticipatory judicial relief before formally filing for a Brazilian RJ or a Brazilian EJ ("Anticipatory Judicial Relief")[8]. Like the Preliminary Stay applicable to Brazilian Mediation proceedings, the Anticipatory Judicial Relief is brought before the same court that would have jurisdiction over the future Brazilian RJ or Brazilian EJ, and it involves a request from a debtor for provisional measures designed to preserve assets and stabilize operations while preparing for a Brazilian RJ. Such measures may include a court-ordered suspension of creditor enforcement actions for the statutory period, upon a showing of likelihood of success and risk of irreparable harm. Brazilian courts have relied on this procedural framework in complex restructuring cases, including the case of Oi S.A., whose Anticipatory Judicial Relief proceedings were recognized in the United States under Chapter 15 of the Bankruptcy Code.

15.    The Brazilian Mediation is not a bilateral dispute resolution mechanism between two parties; rather, it is a court-supervised, collective proceeding, which purpose is to create a stable forum in which affected creditors may participate and negotiate a restructuring solution.

---

[7]    *See* Article 20-B, section 1 of the Brazilian Bankruptcy Law and Article 305 of the Brazilian Procedure Code, which provide that the Brazilian courts can grant an injunction for a period of 60 days, provided that the debtors show proof that it: (i) has met all statutory requirements to be eligible to file a Brazilian RJ; (ii) has duly initiated the mediation proceeding; and (iii) has its assets and operations at risk if the injunction is not granted.

[8]    See. Article 6, Paragraph 7-B of the Brazilian Bankruptcy Law and Article 200 of the Brazilian Procedure Code, which provide that the Brazilian courts can anticipate partially or in full the effects of the decision that grants a judicial reorganization proceeding.

7

16.     The Bankruptcy Court possesses significant discretion to maintain the status quo and can grant the Preliminary Stay and other provisional relief when certain requirements are met. One such requirement that the debtor must show is that it is eligible or will be eligible within the statutory period to commence a Brazilian RJ. The debtor must also show prima facie evidence that, absent the provisional relief, its business and assets are at risk of irreparable harm and that granting the relief sought will not irreparably harm the party against whom the relief is sought. The relief sought in a Brazilian Mediation, including a Preliminary Stay, is customary, and courts often grant such relief when necessary to aid a business facing economic and financial distress, and there is a general assumption that the Preliminary Stay is essential for the parties to focus in good-faith negotiation with respect to their claims.

17.     The Brazilian Mediation and the corresponding provisional relief, if granted by the Bankruptcy Court, are effective for a sixty (60)-day period. As a general rule, unless the Bankruptcy Court instructs otherwise, the debtor is able to continue to operate and dispose of assets without need for prior court approval, including continuing to pay creditors that are not subject to the Mediation and Preliminary Stay. Creditors subject to the Mediation and Preliminary Stay, however, may only be paid pursuant to a mediation agreement (which is subject to the approval of the Bankruptcy Court), pursuant to the original contractual terms after the expiration of the Preliminary Stay, or as otherwise provided in a subsequent Brazilian RJ or Brazilian EJ proceeding, as applicable. The Preliminary Stay and other provisional relief may apply to the same creditors that would be subject to and eligible to participate in a restructuring proceeding by the company. The company, however, has the ability to specify which types of claims are included in the Brazilian Mediation so that only such affected claims are included in the scope of the relief granted in connection with the Preliminary Stay. The Bankruptcy Court has exclusive jurisdiction

8

to rule on any matters regarding the provisional relief granted in the Brazilian Mediation, including any request for relief from or enforcement of any Preliminary Stay that is in effect. Similarly, the Bankruptcy Court also has the relevant jurisdiction to rule over any claims and requests for relief creditors might submit in the Brazilian Mediation with respect to the debtors' activities, negotiations, or assets during the mediation. To the extent the parties reach an agreement in the Brazilian Mediation (and the Bankruptcy Court confirms such agreement), their claims must be paid pursuant to the terms thereof. Conversely, their claims may otherwise be restructured in a subsequent Brazilian RJ or EJ proceeding (assuming that the debtors file for any such Voluntary Proceeding), provided that, if the Brazilian EJ or Brazilian RJ is initiated within one year of the conclusion of the mediation, the claims restructured under such mediation agreement are reverted back to their status in amount, validity and priority (as existed prior to the initiation of the Brazilian Mediation).

18.    During a Brazilian Mediation, the debtor retains the right to manage its assets and affairs and to operate its business. The officers and directors of the debtor continue to be fully authorized to act on the debtor's behalf. In general, the Bankruptcy Court is not required to appoint a trustee or professional to oversee the debtor's operations during the Brazilian Mediation, but it may appoint one if deemed necessary or at the request of the debtor or its creditors.

19.    The debtor is not obliged to commence a Brazilian EJ or a Brazilian RJ if provisional relief is granted as part of the Brazilian Mediation. The purpose of the Brazilian Mediation is to give the company sufficient time to proceed with negotiations with its creditors without the looming threat of creditor action or, if needed, time to file a full reorganization case. The company could also use that breathing spell to negotiate an out-of-court resolution with creditors. If all parties included in the Brazilian Mediation reach an agreement within the sixty

9

(60)-day period, the debtor must then submit such agreement for confirmation by the Bankruptcy Court pursuant to Article 20-C of the Brazilian Bankruptcy Law, so the Bankruptcy Court may analyze whether the agreement complies with all applicable legal requirements. Any such agreement will not bind any dissenting or non-party creditors absent the filing of a Brazilian EJ or Brazilian RJ. On the other hand, if no agreement is reached in the Brazilian Mediation and the debtor commences a Brazilian EJ or Brazilian RJ before the expiration of the statutory period of the Preliminary Stay, then such subsequent restructuring proceeding will be presented before the same Bankruptcy Court overseeing the Brazilian Mediation. Upon the acceptance of such reorganization, a stay relating to the proceeding will apply and the duration of the Preliminary Stay will be deducted from the statutory time period for such stay. If, however, the company does not file a proceeding at the end of the statutory period, the Brazilian Mediation and the provisional relief granted therein, including any Preliminary Stay, expire under their own terms and creditors are again free to commence or resume any enforcement actions against the company (assuming no out-of-court agreement is reached and that the debtor did not file for a Brazilian RJ, Brazilian EJ or even its own liquidation).

## THE BRAZILIAN EJ PROCEEDING

20.     Chapter VI of the Brazilian Bankruptcy Law establishes Brazilian EJs as one of the proceedings through which companies can reorganize. A Brazilian EJ is a proceeding before a Bankruptcy Court in which the debtor seeks authorization to implement an agreement negotiated between the debtor and a subset of its creditors (the so-called "EJ Plan") and thus binds all creditors subject to the proceeding. It administers the claims of all creditors whose claims are being restructured in a single proceeding. It can be compared with a scheme of arrangement found in certain jurisdictions (*e.g.*, the U.K., the Cayman Islands, or Bermuda) or a prearranged Chapter 11 case under the U.S. Bankruptcy Code. In a Brazilian EJ, a debtor may negotiate and agree out of

10

court to an EJ Plan with its creditors and then submit that plan to a Bankruptcy Court for consideration and, if deemed acceptable, receive confirmation.  Notably, however, the Brazilian EJ does not necessarily affect "all" of the claims against the company that would otherwise be subject to a Brazilian RJ.  In a Brazilian EJ, the debtor has flexibility to decide which classes and/or groups of similarly situated claims will be impaired by the EJ Plan (*e.g.*, secured financial claims, unsecured financial claims, vendor and supplier claims etc.).

## I.    Requirements for the EJ Plan

21.    The EJ Plan presented with a Brazilian EJ petition must also comply with the following requirements: (a) it cannot accelerate the payment of amounts or contemplate provisions that harm creditors not subject to the proceeding; (b) all similarly situated creditors within the same group of creditors must be treated equally (subject to exceptions, such as where certain creditors are providing new capital or other form of support to the debtor's businesses and operations); (c) only prepetition claims may be subject to the plan; (d) the sale of any asset given as collateral may only occur with the consent of the applicable secured creditor(s) (as prescribed by the relevant financing and/or collateral documentation); and (e) the plan cannot modify currency and the exchange rate variation in the calculation of claims expressed in foreign currency without the express consent of the relevant creditor.

22.    Along with filing the Brazilian EJ petition, the debtor must file an EJ Plan and other ancillary supporting documents such as the description of the causes of its financial distress, its financial statements for the previous year of operations (and the period of the last day covered by the previous year's financial statement through as close as possible to the date of filing), a list of its creditors and claims that are subject to the EJ Plan, and any other pertinent information and documents.

23.     As a general rule, an EJ Plan will become effective only upon confirmation by a competent Bankruptcy Court, as further explained below.  Notwithstanding this, the Brazilian Bankruptcy Law does permit an EJ Plan to become effective upon filing of the EJ Plan before confirmation with respect to the payment and restructuring of impaired claims of those creditors that expressly adhere to the EJ Plan; but if the court ultimately does not confirm such EJ Plan, then those impaired claims will be restored to the *status quo ante*, deducting the amounts paid pursuant to the authorization described above, unless the EJ Plan provides otherwise.

24.     Further, according to the recent modifications to the Brazilian Bankruptcy Law, a debtor may seek confirmation of an EJ Plan if it demonstrates that creditors representing more than half (1/2) of the total principal amount of the debt of  the impaired claims being restructured consented to and executed the EJ Plan.  Alternatively, a debtor may ultimately seek confirmation of an EJ Plan by (a) first demonstrating that creditors representing at least one-third (1/3) of the total principal amount of the impaired claims being restructured consented to the EJ Plan and (b) then soliciting and obtaining, within ninety (90) days from the filing, consent from as many additional impaired creditors as are necessary to achieve the confirmation quorum of creditors representing more than half (1/2) of the total impaired claims being restructured.  In the event a debtor files for a Brazilian EJ with the support of creditors representing at least one-third (1/3) of the impaired claims, case law has authorized such debtor to amend and modify the EJ Plan throughout the ninety (90)-day period until the requisite majority for the EJ Plan confirmation is obtained, provided that the supporting creditors agree and support such amended and modified version of the EJ Plan.

25.     When calculating the aforementioned consent thresholds, the Brazilian Bankruptcy Law provides that (a) claims expressed in foreign currencies will be converted into the local

12

currency as of the day before the EJ Plan was executed; and (b) claims held by related parties listed under Article 43 of the Brazilian Bankruptcy Law will not be considered in any such calculation.

## II.   A Debtor's Operations During the Brazilian EJ Proceeding

26.   In a manner I understand to be similar to a Chapter 11 case, the debtor is a debtor in possession and retains the right to manage its assets and affairs and to operate its business.  The officers and directors of the debtor continue to be fully authorized to act on the debtor's behalf.  In general, the Bankruptcy Court is not required to appoint a trustee or professional to oversee the debtor's operations during the Brazilian EJ, but it may appoint one if deemed necessary or at the request of the debtor or its creditors.

27.   Again, similar to a Chapter 11 proceeding in the U.S., recent modifications to the Brazilian Bankruptcy Law provide for a one hundred eighty (180) day[9] stay of all actions and enforcement proceedings against the debtor related to claims being restructured pursuant to the EJ Plan, irrespective of whether such claims are held by creditors that executed the EJ Plan. [10] However, in order to have the benefit of this stay ratified by the Brazilian Bankruptcy Court, the debtor must demonstrate, *prima facie,* that creditors representing at least one-third (1/3) of the total principal amount of all impaired claims being restructured consented to and executed the EJ Plan. In other words, the stay ratification only depends on a debtor evidencing to the Bankruptcy Court that it has sufficient creditor support in favor of its proposed EJ Plan (*i.e.*, filing an EJ Plan with at least one-third (1/3) creditor support).[11]  The stay commences when the debtor files an EJ Plan

---

[9]     In accordance with Article 189, §1, I, such 180-day stay is counted in calendar days.

[10]     Although formally in force only after Law 14,112/20 was enacted, courts had been granting the stay period for all subject claims during the Brazilian EJ Proceeding.

[11]     *See* Paragraph 7 of Article 163 of the Brazilian Bankruptcy Law.

13

meeting these requirements with the Bankruptcy Court. The Bankruptcy Court also subsequently ratifies the stay pursuant to its order accepting the Brazilian EJ.

28.    Some claims are by nature not subject to the Brazilian EJ, meaning that they cannot be restructured in a Brazilian EJ proceeding. Pursuant to Article 161, §1 of the Brazilian Bankruptcy Law, the following claims (the "EJ Exempt Claims") cannot be subject to a Brazilian EJ proceeding: (i) taxes; (ii) credits secured by "fiduciary liens" (*i.e.*, a fiduciary assignment of contract rights (*cessão fiduciária*) or fiduciary assignment of assets (*alienação fiduciária*), up to the value of the respective right or asset;[12] (iii) credits owned by lessees under leasing transactions; (iv) owner or committed seller of real estate; (v) sellers whose contracts contain "reservation of title" provisions; and (vi) amounts delivered to a debtor, in domestic currency, resulting from advances of monies due in export exchange agreements ( "ACCs").

29.    As noted, EJ Exempt Claims may not be restructured in the EJ Plan, and rights in collateral supporting EJ Exempt Claims are preserved. Further, absent special order of the Bankruptcy Court, creditors holding EJ Exempt Claims may generally enforce their claims even during the Brazilian EJ and despite the stay period.

30.    Article 193 of the Brazilian Bankruptcy Law provides that obligations undertaken within clearing houses or financial settlement systems shall not be affected by any Voluntary Proceeding and must be completed and settled by the relevant clearing institution in accordance with its own rules and regulations.

---

[12]    A fiduciary lien is a particular type of lien defined statutorily by Brazilian law and explicitly exempted from being restructured in an involuntary basis under the Brazilian Bankruptcy Law. Through a fiduciary lien, the debtor and owner of an asset temporarily transfers the property rights in such asset to the creditor as guarantee of an obligation. If the debtor defaults, the creditor, as the owner of the asset, may initiate a proceeding to publicly auction the asset and satisfy its obligation, with the remainder of the proceeds thereof directed toward the debtor. This allows parties to negotiate for stronger lien packages when desirable.

III.     **Confirmation of the EJ Plan**

   A.     **Requirements to Confirm the EJ Plan**

31.     Under Article 163 of the Brazilian Bankruptcy Law, any claims against a debtor (other than the EJ Exempt Claims, which are not relevant to this case) that exist on the date of the Brazilian EJ filing, whether matured or unmatured, may be impaired by an EJ Plan.   An EJ Plan may impair multiple classes of claims or be limited to a single class or group of similarly situated claims against a debtor.   The debtor may classify claims in a single class or group if those claims are of the same nature and subject to similar payment terms and conditions.

32.     Under Article 164 of the Brazilian Bankruptcy Law, following the acceptance of a petition for confirmation of an EJ Plan supported by the majority of the impaired claims, the Bankruptcy Court must order the publication of an electronic notice in the official publication of the judiciary branch (the "Electronic Justice Gazette").   This notice is intended to give notice to all affected creditors of their right to challenge or object to the proposed EJ Plan on various grounds within a statutory 30-day objection period, including objecting on the basis that the EJ Plan does not have the requisite majority consent for confirmation.

33.     After the expiration of the thirty (30)-day objection period, a debtor has five (5) days to answer any timely-filed objections to the proposed EJ Plan.   Afterwards, the Bankruptcy Court is required to decide on the proposed EJ Plan and any objections filed by creditors.   The EJ Plan will be confirmed so long as (a) it has been executed by creditors representing more than half (1/2) of the total amount of the debt of each class or group of impaired claims being restructured and (b) certain other specific requirements have been met (as further explained below).   The Bankruptcy Court will consider whether notice of the EJ Plan was properly published, whether all other related administrative requirements were properly completed, and whether the EJ Plan has no illegal clauses, was not the result of (and will not result in) any fraudulent conduct, and is not

15

a harmful action to creditors.  A Bankruptcy Court's decision on approval and confirmation of a plan (in any Voluntary Proceeding) is subject to appeal, but any appeals that are filed do not automatically stay the proceeding or the confirmation order of an EJ Plan.

34.    Creditors are given notice of every decision in the Brazilian EJ, and generally creditors have fifteen (15) business days to file an appeal.  This timeline starts running from the date creditors are directly notified of the applicable decision or the date of publication of each decision in the Electronic Justice Gazette, depending on which method of notification the court will use.  The Bankruptcy Court supervises the entire Brazilian EJ proceeding and assesses whether all the parties in interest were given proper notice and proper means of defending their rights pursuant to the due process requirements of Brazil's Federal Constitution.

**B.    Effects of the Confirmation of the EJ Plan**

35.    If the EJ Plan is confirmed as described above, the debtor will continue its ordinary-course activities without further supervision by the Bankruptcy Court.  Upon confirmation, the claims subject to impairment under the EJ Plan will be novated in accordance with its terms, such that the pre-petition obligations of the debtor with respect to those claims will be extinguished and replaced by the new rights and obligations established under the EJ Plan.  Pursuant to Article 161 of the Brazilian Bankruptcy Law, the EJ Plan's confirmation order is considered a judicially enforceable instrument.  Therefore, if the debtor or any other implicated party fails to perform any obligation provided thereunder, a creditor may judicially seek the enforcement of the terms of the EJ Plan, including by seeking specific performance pursuant to Articles 536 to 538 of the Brazilian Civil Procedure Code.

36.    If the EJ Plan is not confirmed, the original terms and conditions of the debt instruments pertaining to the creditors remain in force and the debtor is not prevented from seeking, upon the rejection order, a Brazilian RJ or the confirmation of a new EJ Plan that gathers the

minimum necessary support through a new Brazilian EJ, subject to the provisions of the Brazilian Bankruptcy Law. The Brazilian EJ is not converted into liquidation by means of law if the debtor violates the terms of the confirmed EJ Plan, as happens in a Brazilian RJ proceeding.

## THE BRAZILIAN RJ PROCEEDING

37.     A Debtor may file a Brazilian RJ. Once the Brazilian RJ petition is filed, the Bankruptcy Court will review the petition and determine whether it is appropriate to admit the debtor into a Brazilian RJ. If a debtor entity satisfies all the requirements mentioned above with respect to the Brazilian EJ and certain other additional eligibility requirements, the Bankruptcy Court will issue a decision commencing the Brazilian RJ (the "Acceptance Order"). In addition, the Bankruptcy Court also appoints a judicial administrator (the "Judicial Administrator"). The Judicial Administrator monitors the Brazilian RJ, provides reports on the debtor's activities, promptly provides pertinent information requested by interested creditors, assists in the verification of claims, and complies with other mandates. Creditors receive notice of the Acceptance Order and the debtor's list of creditors through a publication in the Electronic Justice Gazette. The Judicial Administrator also notifies all creditors listed alongside the Brazilian RJ petition about the Acceptance Order.

38.     Upon entry of the Acceptance Order and similar to a Brazilian EJ, all collection actions or enforcement proceedings commenced against the debtor before or after the Brazilian RJ filing are stayed for 180 days (the "RJ Stay"). The RJ Stay is subject to extension by the Bankruptcy Court order for one (1) additional term of 180 days. Accordingly, upon entry of the Acceptance Order, creditors become barred from seeking payment of their prepetition claims. Any preferential payment on account of prepetition claims that are subject to the Brazilian RJ and to the detriment of other creditors is deemed an offense, and the Bankruptcy Court has authority to claw back any such payments.

17

**I.      Claims Subject to a Brazilian RJ**

39.      The debtor is required to file a list of liabilities and creditors together with its Brazilian RJ petition.  The creditors have fifteen (15) days from the publication of proper notice in the Electronic Justice Gazette to file proofs of claims with the Judicial Administrator.  The Judicial Administrator is then responsible for compiling and submitting a revised list of liabilities and creditors subject to the Brazilian RJ classifying them according to their statutory priorities.  Creditors receive notice of the revised list of creditors through a publication in the Electronic Justice Gazette and then have another ten (10) days to file proofs of claims directly with the Bankruptcy Court in case of any objections to the revised list of liabilities and creditors.  Any and all allowed claims admitted to the list of creditors before confirmation of the Brazilian RJ Plan are considered for purposes of calculating the plan approval thresholds under the Brazilian Bankruptcy Law (as described below).

40.      While, as a general rule, claims existing at the date of the Brazilian RJ petition (*i.e.*, prepetition claims) are subject to the Brazilian RJ, there are certain exceptions under the Brazilian Bankruptcy Law.   In addition to post-petition claims, there are claims (collectively, the "RJ Exempt Claims") that are not subject to the Brazilian RJ.  For example (i) taxes; (ii) claims secured by "fiduciary liens" granted by the debtors (*i.e.*, a fiduciary assignment of contract rights (*cessão fiduciária*) or fiduciary sale of assets (*alienação fiduciária*) up to the value of the respective right or asset; (iii) claims owned by lessees under leasing transactions (*arrendamento mercantil*); (iv) claims held by an owner or committed seller of real estate; and (v) claims deriving from advances in export or currency exchange agreements.

41.      Article 193 of the Brazilian Bankruptcy Law provides that obligations undertaken within clearing houses or financial settlement systems shall not be affected by any Voluntary

Proceeding and must be completed and settled by the relevant clearing institution in accordance with its own rules and regulations.

42.    RJ Exempt Claims are not subject to and cannot be involuntarily restructured by the Brazilian RJ.  Further, absent a special order of the Bankruptcy Court, creditors holding RJ Exempt Claims technically may enforce their claims against the debtor in parallel with the Brazilian RJ notwithstanding the RJ Stay.  For the duration of the RJ Stay, however, creditors holding RJ Exempt Claims may not seize or dispose of any of the debtor's assets that are essential to its business operations, regardless of whether such RJ Exempt Claims are secured by liens over any of those assets.  Accordingly, the Bankruptcy Court has exclusive jurisdiction to determine which assets may be considered essential and, therefore, be prevented from being attached and seized by creditors to satisfy RJ Exempt Claims while the RJ Stay is effective.

## II.    A Debtor's Operations Throughout the Brazilian RJ Proceeding

43.    Similar to a Brazilian EJ, the assets of the debtor are also subject to the control and supervision of the Bankruptcy Court in a Brazilian RJ.  Once the Acceptance Order is entered, the debtor is subject to oversight by the Judicial Administrator and is prevented from disposing or encumbering hard assets without prior authority by either the Bankruptcy Court or under the terms of a confirmed Brazilian RJ Plan.  And while the Judicial Administrator is responsible for, among other things, monitoring and providing reports on the debtor's management of its day-to-day affairs, the Judicial Administrator does not interfere with the debtor's ongoing operations and business decisions.  Accordingly, the officers and directors of a debtor remain duly authorized to act on the debtor's behalf in the Brazilian RJ, in a manner I understand to be similar to the authorities of officers, directors, or authorized representatives of a debtor in possession under the Bankruptcy Code in the United States.  Furthermore, a debtor (or its agents) is authorized under the Brazilian Bankruptcy Law and other applicable laws to act as a foreign representative in a

19

foreign proceeding in support of a Brazilian RJ, irrespective of whether a court order appointing such foreign representative has been obtained.[13]

44.     The Brazilian Bankruptcy Law also allows creditors to form a committee composed of one (1) representative from each of the determined class of creditors (as explained below).  The creditors' committee serves as an overseeing body that ensures the interests of the creditors are represented throughout the proceeding.[14]  The main responsibilities of the creditors' committee include to inspect and monitor compliance with the Brazilian Bankruptcy Law, to inform the judge of any violation of legal provisions by the debtor, to request that the judge call a General Creditors' Meeting (as defined below), and to issue opinions as applicable.  The Brazilian Bankruptcy Law provides that members of the committee may be liable for losses caused to the estate, the debtor or the creditors due to willful misconduct or negligence.  In practice, creditors rarely seek the formation of a creditors' committee.

## III.     Confirmation of the RJ Plan

### A.     Requirements to Confirm the RJ Plan

45.     After filing the Brazilian RJ petition and following entry of an Acceptance Order, the debtor must submit a plan of reorganization within sixty (60) days of the publication of the Acceptance Order in the Electronic Justice Gazette (the so-called "RJ Plan").  This 60-day period, as a general rule, is not extendable.  If a debtor does not comply with this obligation, the Brazilian

---

[13]     *See* Article 167-E of the Brazilian Bankruptcy Law ("The following are authorized to act in other countries, regardless of a court order, as a representative of the Brazilian proceeding, so long as such act is permitted under the law of the country in which the foreign proceedings are pending: (I) the debtor, in a judicial and extrajudicial reorganization proceeding . . . .").

[14]     The Judicial Administrator and Public Prosecutor provide additional oversight over a debtor's operations and affairs as well as their restructuring efforts and behavior in the judicial reorganization, thereby ensuring accurate information is disseminated to the creditors.

20

RJ may be converted into a liquidation (*falência*) unless creditors vote to allow the submission of an alternative RJ Plan, as explained below.

46.     Upon filing of an RJ Plan by the debtor, the Brazilian Bankruptcy Law requires that notice be given to all impaired creditors and parties in interest, through a publication in the Electronic Justice Gazette.  The creditors have 30 days to object to such plan before the Bankruptcy Court.  Should any creditor object to the RJ Plan proposed by the debtor, the Bankruptcy Court is required to call a general meeting of creditors (the "General Meeting of Creditors" or "GMC") to vote on the RJ Plan.[15]  Creditors receive notice of the GMC through a publication in the Electronic Justice Gazette, which shall occur at least fifteen (15) days in advance of such meeting.

47.     The Bankruptcy Court, however, may analyze and approve a proposed RJ Plan *without* requiring a GMC if certain conditions are present.  Specifically, the GMC shall not be required if the debtor is able to obtain sufficient creditor support via adhesion terms, *i.e.*, a written confirmation from creditors that they support the RJ Plan (each, an "Adhesion Term"), to meet the plan approval thresholds under the Brazilian Bankruptcy Law, up to five (5) days before the scheduled date of the GMC.  As a result thereof, the Bankruptcy Court may cancel the GMC (if one has been scheduled) and issue a notice to all creditors of the presentation of the Adhesion Terms.  Creditors may challenge the Adhesion Terms within ten (10) days on the following grounds: (a) insufficient support to meet the legal thresholds for RJ Plan approval; (b) nonfulfillment of procedural requirements; (c) that the Adhesion Terms violate the law; or (d) that the terms and conditions of the RJ Plan are illegal.

---

[15]     At the GMC, the debtor and the creditors in attendance are allowed to discuss the terms of the RJ Plan and may negotiate modifications.  As described below, if these negotiations require additional time, the debtor and its creditors can agree to adjourn the GMC for further continued discussions.  The RJ Plan may be submitted for voting in its modified form at the GMC.

48.    If (a) no objections to the RJ Plan are raised by any creditor or (b) the RJ Plan is approved by the requisite majority of creditors (i) at the GMC or (ii) through Adhesion Terms, the Bankruptcy Court may confirm the RJ Plan and grant the Brazilian RJ of the debtor.

49.    Alternatively, at a GMC the debtor and creditors representing more than a simple majority (more than fifty percent (50%)) of creditors present and voting at such meeting may agree to adjourn the meeting to allow negotiations to continue with the debtor towards a consensual RJ Plan, as is customary in many complex Brazilian RJ cases.  In such an instance, the debtor may adapt or modify a RJ Plan to meet the creditors' expectations.  Creditors will vote on the amended RJ Plan in a following GMC.

50.    Creditors may also agree to propose an alternative RJ Plan under certain circumstances.  If (a) the 180-day stay period, as extended, expires before the approval of the RJ Plan presented by the debtor; or (b) the RJ Plan presented by the debtor is rejected.  In this case, creditors may still decide on whether to allow a competing RJ Plan to be formulated by creditors (an "Alternative Plan").  If, however, creditors decide not to allow for an Alternative Plan to be proposed, or if such Alternative Plan fails to obtain sufficient support to meet the statutory approval thresholds, the Bankruptcy Court may decide to convert the Brazilian RJ into a liquidation proceeding.[16]

51.    A RJ Plan must contain the following: (a) a thorough description of the measures to be taken to successfully reorganize the debtor's business; (b) a demonstration of the economic feasibility of the RJ Plan; (c) a financial expert's valuation of the debtor's assets; and (d) the proposed treatment of claims subject to the Brazilian RJ.  In general, claims of the same class must

---

[16]    Once a Brazilian RJ is converted into liquidation, the officers and directors of the debtor are no longer allowed to manage its affairs, and the assets of the debtor are collected and sold by the Judicial Administrator.

be treated equally absent an economic and legal justification for treating a subgroup of claims differently.

52.     For purposes of voting on a RJ Plan, claims are divided into the following four classes: (a) labor-related claims (Class I); (b) secured claims, up to the value of the respective collateral (Class II); (c) unsecured claims, claims entitled to general and special privilege, and subordinated claims (Class III); and (d) claims held by "small business companies" (Class IV). Equity holders' acceptance of the RJ Plan is not required for its approval by the GMC.  In fact, certain shareholders, subsidiaries, affiliates, and certain other parties related to the debtor may attend the GMC  but are not allowed to vote on RJ Plans[17].  Furthermore, RJ Exempt Claims are not affected by the RJ Plan and are not entitled to vote on the RJ Plan.  In addition, holders of unimpaired claims are also not entitled to vote on the RJ Plan.  Each impaired creditor holds the right to vote on the RJ Plan *pro rata* to the value of its claim, unless such creditor is a partner or shareholder of the debtor company, or of a party related to the debtor company.

53.     Approval of a RJ Plan may be obtained in one of two ways: (a) through a "regular creditor majorities" procedure; or (b) through a "cramdown" procedure.

54.     Approval of a RJ Plan through the regular creditor majorities procedure at the GMC or through Adhesion Terms requires the RJ Plan to be approved by the majority of each class of claims.  Specifically, in Classes I and IV, the requirement for approval of the RJ Plan is a simple majority, *i.e.*, more than fifty percent (50%) of the number of creditors within each respective class who are present and voting at the GMC, regardless of the amount of the claims held.  In Classes II

---

[17]     Under Article 43 of the Brazilian Bankruptcy Law, "The debtor's shareholders, as well as affiliated companies, controlling companies, controlled companies, or companies that have a partner or shareholder holding more than ten percent (10%) of the debtor's capital stock, or in which the debtor or any of its shareholders holds more than ten percent (10%) of the capital stock, may attend the general meeting of creditors, without voting rights, and shall not be counted for purposes of determining the quorum for commencement or deliberation".

and III, however, the RJ Plan must be approved by both (a) more than fifty percent (50%) of the number of creditors within each respective class who are present and voting at the GMC and, cumulatively (b) creditors holding more than fifty percent (50%) in principal amount of the allowed claims in each respective class who are present and voting at the GMC.

55.     If the required majorities are not met in a class of claims, the RJ Plan may still be approved via *cramdown* (cross-class cramdown).  Approval of a RJ Plan through *cramdown* requires the Bankruptcy Court to approve the RJ Plan if all of the following criteria are met:

(a)     holders of a simple majority (more than 50%) of the total allowed claims present at the GMC vote to approve the RJ Plan;

(b)     the required majorities are met in three of the four voting classes of claims (if there are four voting classes of claims), or the required majorities are met in two of the three voting classes of claims (if there are three voting classes of claims), or in one voting class of claims (if there are only two voting classes of claims);

(c)     for the creditors' class voting to reject the RJ Plan, more than 1/3 (one third) of creditors present and voting at the GMC in such class vote to approve the RJ Plan (following the voting thresholds for each class set forth above); and

(d)     the RJ Plan does not discriminate against creditors of the class that rejected it – claims of the same class must be treated equally absent proper justification for treating a subgroup of claims differently.

56.     If a RJ Plan has been approved by the requisite majority of creditors, the Bankruptcy Court must confirm the RJ Plan, unless the approved RJ Plan – or part of it – violates Brazilian law, in which case the Bankruptcy Court is afforded discretion to deem such illegal provisions void or order a revised version thereof to be submitted ("Confirmation Order").  The Brazilian Bankruptcy Law provides that a judicially confirmed RJ Plan novates and discharges all affected prepetition claims and binds the debtor as well as all the impaired creditors to the RJ Plan.

57.     Brazilian law provides for a robust appeal process to dispute the Confirmation Order.  Upon entry of the plan Confirmation Order, any dissenting creditor (including creditors

24

that have not submitted an Adhesion Term) affected by the RJ Plan as well as the office of the public prosecutor (the "Public Prosecutor") may (a) file a motion for clarification with the Bankruptcy Court within five (5) days of publication of the RJ Plan Confirmation Order and/or (b) file an interlocutory appeal with the State Court of Appeals (the "Court of Appeals") within fifteen (15) days of publication of the RJ Plan Confirmation Order (or the decision on a motion for clarification, if one is filed). After the Court of Appeals renders its decision, the parties may appeal such decision within fifteen (15) days to the Brazilian Superior Court of Justice (the "Superior Court of Justice"), the highest court with jurisdiction over matters related to the Brazilian Bankruptcy Law, if the challenged issue is not a matter of fact, but any aspect related to the effectiveness of a statutory rule.

58.    Throughout the entire process, creditors and other parties in interest are given proper notice through electronic publication in the Electronic Justice Gazette of every order and notice entered by the Bankruptcy Court, the Court of Appeals, and the Superior Court of Justice. Accordingly, the deadline to file appeals against any court orders only begins after the parties have received proper notice of such order, including through the Bankruptcy Court's official website, which is available for public consultation.

**B.    Supervision Period After Plan Confirmation**

59.    Under the Brazilian Bankruptcy Law, once a Bankruptcy Court confirms a RJ Plan, the debtor remains in Brazilian RJ until such time as the debtor's Brazilian RJ is complete or up to two (2) years from the entry of the RJ Plan Confirmation Order, which period the Bankruptcy Court, considering what is provided under the approved RJ Plan has discretion to decrease or extend (the "Supervision Period"). During the Supervision Period, the Bankruptcy Court and the Judicial Administrator continue to monitor and supervise the debtor's performance and compliance with all obligations provided under the RJ Plan as they become due.

25

60.     If, at the end of the Supervision Period, the debtor has complied with all obligations under the RJ Plan that became due until that point, the Bankruptcy Court may issue an order formally closing the debtor's Brazilian RJ.  By contrast, if the debtor fails to comply with any of its obligations under the RJ Plan during the Supervision Period, the Bankruptcy Court must either (a) convert the Brazilian RJ into a liquidation; or (b) at its discretion and absent an order closing a debtor's Brazilian RJ, grant the debtor the opportunity to propose amendments or revisions to the RJ Plan.

61.     During the Supervision Period, the restrictions imposed on the debtor due to the commencement of the Brazilian RJ persist, unless authorized in the RJ Plan, such as the prohibition on the disposal of assets without prior approval from the Bankruptcy Court or as authorized under the RJ Plan as well as the obligation to present monthly reports on the debtor's activities and financial results.  Similarly, the Judicial Administrator continues to supervise the operations and financial and legal affairs of the debtor for the duration of the Supervision Period and submit reports in connection therewith.  In addition, the Bankruptcy Court retains its jurisdiction over assets of the debtor until the Brazilian RJ is formally closed.

**BRAZILIAN BANKRUPTCY LAW:**
**RELEVANT FACTORS FOR GRANTING ADDITIONAL RELIEF SET FORTH IN**
**SECTIONS 1507 AND 1521 OF THE BANKRUPTCY CODE**

**I.      Brazilian Bankruptcy Law Provides Just Treatment to All Holders of Claims Against or Interests in the Debtors' Property**

62.     As outlined above, the procedural safeguards for creditors under the Brazilian Bankruptcy Law are robust.  For example, with respect to the Brazilian Mediation, absent a Brazilian EJ or Brazilian RJ, creditors are required to consent to any mediation agreement proposed by the debtor in order to be bound by such agreement (and such agreement must also be approved by the Bankruptcy Court as having been negotiated in good faith and in compliance with

26

the applicable rules).  Similarly, with respect to Brazilian EJs, the requisite majority consents discussed above help ensure that creditors are treated fairly.  *See supra* ¶¶ 24-25.  More specifically, consent thresholds help ensure just treatment to all impaired creditors because in order for a debtor to obtain the significant level of consensus needed to be able to submit an EJ Plan executed by a majority of creditors in each class of claims impaired under the EJ Plan, the debtors must have actively negotiated an EJ Plan with creditors representing at least 1/3 of claims impaired under the EJ Plan before such plan is even submitted to the Bankruptcy Court.  Moreover, as noted above, creditors may challenge or object to a debtor's proposed EJ Plan or RJ Plan.  *See supra* ¶¶ 32, 46-50.

63.     Brazilian RJs also have requisite majority consents for the approval of an RJ Plan, which ensure the fair treatment of all impaired creditors.  *See supra* ¶¶ 53-55.  The Brazilian Bankruptcy Law also provides additional protection to creditors in a Brazilian RJ through the appointment of a Judicial Administrator or the possible appointment of a committee of creditors, each of which carries out an oversight role in the proceeding that ensures a fair and orderly resolution of the claims against the debtor's estate.  *See supra* ¶¶ 43-44.

64.     Although the Brazilian Bankruptcy Law does not govern avoidance actions in the context of any Voluntary Proceeding, creditors are generally permitted to bring actions to avoid transfers made by the debtor under the Brazilian Civil Code, which provides that certain actions can be considered fraud against creditors, as stated above.

65.     In any of the Voluntary Proceedings, creditors may seek reversal of any orders – including a confirmation order with respect to an EJ or RJ Plan or an order that grants or extends the applicable stay period.  Within five (5) days after notice that the Bankruptcy Court has rendered an order, creditors may present to the Bankruptcy Court a motion for clarification, seeking the

correction of any material errors, or clarification of omitted or contradictory points in the corresponding order, eventually leading to the amendment of such order by a supplemental order from the Bankruptcy Court (the "Supplemental Order"). In addition, within fifteen (15) days after notice that the Bankruptcy Court has rendered an order, or after notice of such Supplemental Order, creditors may file an appeal with the relevant Court of Appeals, seeking the reversal of the order (as supplemented by the Supplemental Order, if applicable). The filing of such appeal does not automatically stay the effects of the order, however, that appeal may request that the Court of Appeals order stay the effects of the order until the appeal is ruled on a final basis by the Court of Appeals. Likewise, a debtor may appeal any order within fifteen (15) days after notice, addressed to the Court of Appeals, and that appeal will not automatically stay the order (same as described above). *See supra* ¶¶ 34, 57. Finally, after the Court of Appeals hears any such appeal, the creditors and the debtor will be afforded the chance to file new appeals, within fifteen (15) days from notice of such decision, addressed to the Superior Court of Justice (for any violation of federal law) and an extraordinary appeal to the Brazilian Supreme Court (for any violation of Brazil's Federal Constitution). As reported above, creditors receive notice of court decisions through an electronic notice issued by the state court's website or a publication in the Electronic Justice Gazette, which is publicly available. The deadlines for filing appeals run from the date of the receipt of the electronic notice or of the publication in the Electronic Justice Gazette, as applicable.

## II. Interests of Creditors and Other Interested Parties Are Sufficiently Protected by the Brazilian Bankruptcy Law

66. As discussed throughout this Declaration, Brazilian Bankruptcy Law sufficiently protects the interests of creditors and other interested parties through a variety of means. Specifically, the Brazilian Bankruptcy Law maintains a robust set of procedural safeguards that must be provided for within any Voluntary Proceeding.

A.    **United States Claimholders Will Not Be Prejudiced or Inconvenienced in Processing Claims**

67.    Foreign creditors, including creditors organized or located in the United States, have the same status as local creditors under the Brazilian Bankruptcy Law. Accordingly, foreign creditors enjoy the same procedural safeguards and substantive rights as Brazilian creditors, including the right to participate fully and on equal footing in any Brazilian Mediation, Brazilian EJ or Brazilian RJ, to engage in negotiations concerning the treatment of their claims, and to benefit from (or be bound by) any relief granted in the proceeding on the same terms as similarly situated domestic creditors. Article 167-G of the Brazilian Bankruptcy Law, which was introduced by Law 14,112/20, reinforces this principle of equal treatment.[18]

68.    The Brazilian Bankruptcy Law provides creditors with adequate notice of timing and procedures for any Voluntary Proceeding. As a general rule, all orders entered by the Bankruptcy Court are published in the Electronic Justice Gazette. In addition, except for voting purposes, an EJ or RJ Plan may not convert claims denominated in foreign currency to Brazilian *reais* without the specific consent of each affected creditor. As such, no significant burdens are placed upon U.S. creditors that are inconsistent with those placed upon domestic creditors.

69.    In a Brazilian Mediation, the creditors included in the mediation and subject to the Preliminary Stay receive notice from the mediation chamber directly, and are only bound to a potential mediation agreement if such creditor voluntarily consents to its terms.

70.    In a Brazilian EJ or Brazilian RJ, as mentioned above, upon confirming the debtor's eligibility and accepting the Brazilian EJ or Brazilian RJ petition, as part of the acceptance order, the Bankruptcy Court will also determine that notice of the proceeding, addressed to all impaired

---

[18]    *See* Article 167-G of the Brazilian Bankruptcy Law ("Foreign creditors are afforded the same rights that are afforded to national creditors in judicial reorganization, extrajudicial reorganization, or bankruptcy liquidation proceedings").

creditors, be sent via letter and published in the Electronic Justice Gazette. Accordingly, all of the debtor's creditors are given notice of the proceeding, of the EJ Plan or RJ Plan presented therewith, and the deadline for any eventual objections.

71.   The Brazilian EJ does not require filing proofs of claim in order to receive any payment; instead, all creditors with obligations being restructured under the EJ Plan will be paid pursuant thereto.

72.   For Brazilian RJs, the filing a proof of claims by each creditor is also not a requirement for payment. Additionally, Brazilian Bankruptcy Law gives creditors adequate notice of timing and procedures for filing claims in case they disagree with the list prepared by the Debtors, and such procedures do not impose any additional burdens for foreign creditors to file a claim. Upon accepting the debtor into a Brazilian RJ, the Bankruptcy Court orders the publication of the list of creditors presented by the debtor. Creditors receive notice of the list of creditors submitted by the debtor once the Brazilian RJ is commenced and have the opportunity to file proofs of claims with the Judicial Administrator to include or correct their claims affected by the proceeding. The Judicial Administrator then files its own list of creditors, which is again published, and creditors receive another opportunity to file proofs of claims, this time with the Bankruptcy Court.

**B.   Prevention of Preferential or Fraudulent Dispositions of a Debtors' Property**

73.   Any creditor, the Brazilian Public Attorney's Office, or the Judicial Administrator appointed by the Bankruptcy Court within the Brazilian RJ, bankruptcy liquidation or, if required by the Bankruptcy Court, within the Brazilian EJ, may bring actions to avoid transfers made to third parties by the debtor with the intent of defrauding creditors or damaging the debtor's estate if such debtor is declared bankrupt and goes into liquidation. In this instance, a plaintiff would be required to show that the following elements of fraud under Brazilian law are satisfied: (a) a claim

30

already existed when the transfer was made; (b) the transfer left the debtor without sufficient assets to cover such claim; and (c) the debtor and the third-party transferee acted in bad faith. A transfer is presumed to have been made in bad faith where the debtor made gratuitous transfers, forgave debts, paid unsecured creditors before maturity date to the detriment of senior creditors, granted collateral to creditors when the debtor was already insolvent, or where the transferee already knew that the debtor was insolvent when the transfer was made. The Bankruptcy Court is also entitled to declare those transfers void *sua sponte* if the intent to defraud is not a disputed question of fact.

74. In addition, any creditor may bring a fraudulent conveyance action to avoid a transfer made by a debtor under Brazilian EJ or Brazilian RJ to third parties. In such action, the creditor is required to show similar elements to those mentioned above with respect to transfers that result in the insolvency of the debtor or that were made by a debtor that is notoriously insolvent.

75. Moreover, some transfers are subject to avoidance as a matter of Brazilian Bankruptcy Law if they were made during the "legal term," a period set by the Bankruptcy Court and beginning not more than ninety (90) days before the liquidation petition, the judicial reorganization request or the date of the first protest (official declaration of default) by a creditor, during which such transfers by the debtor are subject to scrutiny. Such transfers include payments of debts not yet due, payments of debts that were due but were enforceable in any way not provided for in the agreement memorializing the debt, and the creation of liens or any other *in rem* property interest in connection with a previously incurred debt.

C. **Distribution of Proceeds of a Debtor's Property Is Substantially in Accordance with the Bankruptcy Code**

76. I understand that, in substance, the distribution scheme prescribed in a liquidation proceeding under the Brazilian Bankruptcy Law is comparable to the one prescribed in the United

States Bankruptcy Code, as priority is granted to certain administrative claims and, importantly, secured claims rank senior to unsecured claims.

77.     First, under a liquidation proceeding under the Brazilian Bankruptcy Law, administrative claims are given superpriority over the claims of the other creditors.   Those administrative claims include the following: (a) expenses that are essential to the management of the estate; (b) labor-related claims of a strict salary nature, as opposed to other labor benefits due to workers (e.g., social security contributions), arising during the three (3) months prior to the date the petition for the Voluntary Proceeding is filed, up to an amount equal to five (5) months of the Brazilian monthly minimum wage per relevant employee; (c) labor-related claims or claims related to occupational accidents arising post-petition; (d) any financing of the debtor provided during a Brazilian RJ proceeding, pursuant to Section IV-A of the Brazilian Bankruptcy Law; (e) specific claims requiring restitution pursuant to Article 86 of the Brazilian Bankruptcy Law, such as claims related to ACCs; (f) fees of the judicial administrator and its staff, reimbursement to the creditors' committee expenses  and labor-related claims or claims related to occupational accidents arising after the liquidation was initiated; (g) any obligations performed during a Brazilian RJ proceeding, pursuant to  Article 67 of the Brazilian Bankruptcy Law, or after the commencement of the liquidation; (h) sums provided to the estate by creditors during the liquidation; (i) expenses related to the disbursement of proceeds of the estate and the costs related to the bankruptcy proceeding; (j) Bankruptcy Court costs for actions brought against the estate in which the estate was defeated; and (k) taxes incurred after the liquidation was initiated.

78.     Following the payment of the above-referenced claims, the various classes of claims are paid, within a bankruptcy liquidation proceeding, in the following order: First, each holder of a labor-related claim is entitled to a priority claim capped at an amount equal to one

hundred fifty (150) months of the Brazilian national monthly minimum wage (any portion of a labor-related claim exceeding that amount is a deficiency claim and is classified within the unsecured creditors' class). Second, secured claims up to the value of the assets securing such claims. Third, tax claims, exclusive of tax fines or taxes paid within the senior classes mentioned before. Fourth, unsecured claims, which include deficiency secured claims, deficiency labor claims and fines arising from contracts and applied as a result of criminal or administrative enforcement actions, including tax fines or penalties. Fifth, claims subordinated by law or contract, and those claims held by shareholders and by directors that have no employment relationship with the debtor, provided that those claims do not derive from arm's-length transactions and reflect market conditions. Sixth, interest due after the liquidation has been initiated.

79. In a Brazilian EJ, creditors' impaired claims under the plan (and only such claims) are paid pursuant to the provisions of a confirmed EJ Plan, and other claims are generally not affected by the EJ Plan. However, as previously mentioned, an EJ Plan (a) shall not provide for early repayment of claims subject to the EJ Plan and cannot provide treatment that harms creditors not impaired by the EJ Plan; (b) shall not suppress the exchange rate variation in the calculation of claims denominated in foreign currency without the express consent of the relevant creditor; (c) shall not provide for the sale of any asset given as collateral without the consent of the applicable secured creditors (as prescribed by the relevant financing and/or collateral documentation); and (d) all similarly situated creditors within the same class must be treated equally (subject to narrow exceptions).

80. One of the exceptions under Brazilian Bankruptcy Law to the equal treatment of similarly situated creditors within the same class applies to so-called "*supporting creditors*" who

33

shoulder additional burdens to assist the debtor in its restructuring, such as by providing additional credit, capital investment or critical supplies, thereby increasing their exposure to the debtor. Brazilian case law has been consistent in ratifying the different treatment of supporting creditors by an interpretation of the underlying principles of Article 67 of the Brazilian Bankruptcy Law, which now expressly provides for such a possibility.

81. In a Brazilian RJ, the claims of affected creditors are paid pursuant to the confirmed RJ Plan. The RJ Plan has similar protections as the EJ Plan. In addition, the RJ Plan, may not provide (a) a period longer than two (2) years for the payment of labor-related claims upon approval (the payment of labor-related claims of a strictly salary nature, up to the limit of five (5) monthly minimum wages per worker, must be paid within 30 days and there are further assurances to be presented to the courts for payment periods longer than one (1) year); and (b) for the suppression or the replacement of any security interest, when the asset covered by such security interest is disposed of, without the express approval of the relevant secured creditor.

**THE DEBTORS' BRAZILIAN PROCEEDING**

82. On June 24, 2026, the Debtors' corporate governance bodies approved the initiation of the Brazilian Mediation and the appointment of Antonio Reinaldo Rabelo Filho as foreign representative of the Debtors (the "Foreign Representative"). On the same date, the Debtors requested to commence a mediation with the Mediation Chamber, which accepted such request. A true and correct copy of the Mediation Chamber's acceptance letter is attached hereto as **Exhibit C**, with a certified English translation attached hereto as **Exhibit D**. Concurrently, the Debtors filed a petition before the Bankruptcy Court seeking a Preliminary Stay in furtherance of the mediation procedure.

83. On June 26, 2026, the Bankruptcy Court entered an interlocutory order that: (i) confirmed the Debtors' eligibility to file for the Brazilian Proceeding; (ii) accepted the filing of

34

the Brazilian Proceeding; and (iii) granted the requested preliminary stay of collection and enforcement proceedings commenced by creditors holding claims subject to the Brazilian Proceeding against the Debtors (the "Initial Court Order"). A true and correct copy of the Initial Court Order is attached hereto as **Exhibit E**, with an English machine translation[19] attached hereto as **Exhibit F**. On the following day, prior to the opening of trading, the Debtors published a material fact notice to the market announcing the acceptance of the Brazilian Proceeding in accordance with applicable corporate and securities laws (the "Press Release"). A true and correct copy of the Press Release is attached hereto as **Exhibit G**.

84.    The officers and directors of the Debtors continue to be duly authorized to act on the Debtors' behalf throughout the Brazilian Proceeding without the need for court authorization.

85.    Under the terms of the Initial Court Order, the Preliminary Stay was granted and Debtors' creditors that are impaired under the Brazilian Proceeding are now barred from (a) continuing any enforcement proceedings against the Debtors for claims subject to the Brazilian Proceeding, for a non-extendable period of 60 (sixty) days, in terms I understand to be comparable with the automatic stay imposed in the United States upon a chapter 11 bankruptcy filing, and (b) exercising set-off, withholding, or other acts of satisfaction of such claims for the period of suspension.

86.    The Initial Court Order will be published in the Electronic Justice Gazette, providing notice of the Brazilian Proceeding to all creditors subject thereto. Creditors will also receive invitations to the mediation sessions to be conducted before the Mediation Chamber.

---

[19]    A machine translation of the Initial Court Order is attached. The Foreign Representative has requested a certified translation and will file it in these Chapter 15 cases as soon as it is finalized.

**CHAPTER 15 CASES**

87.     To ensure the Brazilian Proceeding is fully implemented and enforceable in the United States, the Debtors commenced these Chapter 15 cases.  Given the applicable contacts in the United States (described in the Verified Petition), the Debtors and their supporting stakeholders determined the restructuring is more efficiently and effectively accomplished with recognition of the Brazilian Proceeding and recognition and enforcement of the Brazilian Proceeding in the United States through these Chapter 15 cases.

**I.      Brazilian Proceeding Is A Foreign Main Proceeding For The Debtors**

88.     As previously discussed, the Brazilian Proceeding is a judicial proceeding under Brazilian law relating to the adjustment of debts of a multitude of creditors, the purpose of which is a corporate reorganization that allows the Debtors to restructure their obligations and continue operating as a going concern.  The Brazilian Proceeding allows for participation by all affected creditors.  Each creditor whose interests are affected by the Brazilian Proceeding (the "Affected Parties") is entitled to support, object to, and be heard with respect to the Brazilian Proceeding.  To the extent the parties reach an agreement in the Brazilian Mediation (and the Bankruptcy Court confirms such agreement), their claims must be paid pursuant to the terms thereof.  Accordingly, the Brazilian Proceeding considers the rights of all of the Affected Parties.

89.     The Brazilian Proceeding is judicial in nature.  Pursuant to the Brazilian Bankruptcy Law, the Bankruptcy Court has jurisdiction over the Brazilian Proceeding.  The Bankruptcy Court is instrumental to the implementation of the Brazilian Proceeding.  Absent the Bankruptcy Court's acceptance order and oversight, the Debtors cannot implement or enforce the Brazilian Proceeding.

**CONCLUSION**

90.     The issuance by the Court of an order recognizing and enforcing the Brazilian Proceeding in the United States under Chapter 15 of the United States Bankruptcy Code is

36

necessary to ensure that the Brazilian Proceeding is given full effect in the United States and to protect the Debtors and their assets from any actions in contravention of the Brazilian Proceeding, including potential actions brought by holders of debts governed by U.S. law. Accordingly, the relief requested by the Foreign Representative will help secure an economical, expeditious, fair, and efficient administration of the Brazilian Proceeding that protects the interests of the Debtors and their creditors. This Court should therefore grant the relief requested in the Verified Petition and the Provisional Relief Motion.

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

*[Remainder of Page Left Intentionally Blank]*

Executed on June 24, 2026, São Paulo

Respectfully submitted,

_____

**Ana Elisa Laquimia**

**EXHIBIT A**

**As-Filed Petition for a Preliminary Stay (Portuguese)**

**PÁGINA DE SEPARAÇÃO**
*(Gerada automaticamente pelo sistema.)*

# Documento 1

**Tipo documento:**
 PETIÇÃO INICIAL
**Evento:**
 DISTRIBUÍDO POR SORTEIO
**Data:**
 24/06/2026 19:07:56
**Usuário:**
 SP126764 - EDUARDO SECCHI MUNHOZ
**Processo:**
 4113246-86.2026.8.26.0100
**Sequência Evento:**
 1



**EXCELENTÍSSIMO SENHOR JUIZ DE DIREITO DA _ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS DA COMARCA DA CAPITAL DO ESTADO DE SÃO PAULO**

**DISTRIBUIÇÃO URGENTE**
**PEDIDO LIMINAR**

(1) **BRASKEM S.A.**, sociedade anônima de capital aberto, inscrita no CNPJ/MF sob o nº 42.150.391/0001-70, com sede na Rua Eteno, nº 1.561, Polo Industrial de Camaçari, Camaçari, Bahia, CEP 42816-200 ("Braskem"); **(2) BRASKEM NETHERLANDS B.V.**, sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, Países Baixos, na Weena 240, 9th Floor, Tower C, 3012NJ, registrada na Câmara de Comércio holandesa sob o número 24401995 ("Braskem Netherlands"); **(3) BRASKEM NETHERLANDS INC. B.V.**, sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, Países Baixos, na Weena 240, 9º andar, Torre C, 3012NJ, registrada na Câmara de Comércio holandesa sob o número 62115081 ("Braskem Netherlands Inc."); **(4) BRASKEM TRADING & SHIPPING B.V.**, sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, Países Baixos, na Weena 240, 9º andar, Torre C, 3012NJ, registrada na Câmara de Comércio holandesa sob o número 90073614 ("BT&S"); **(5) BRASKEM NETHERLANDS FINANCE B.V.**, sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, na Weena 240, 4º andar, Torre C, 3012NJ, Países Baixos, registrada na Câmara de Comércio holandesa sob o número 61905771 ("Braskem Netherlands Finance"); e **(6) BRASKEM AMERICA FINANCE COMPANY,** sociedade constituída e existente de acordo com as leis de Delaware, Estados Unidos da América, em 251 Little Falls Drive, Wilmington, Condado de New Castle, Delaware, 19808, Estados Unidos da América, registrada no Departamento de Estado de Delaware, Divisão de Corporações, sob o número 5007185 ("Braskem America Finance" e, em conjunto com as sociedades numeradas de (1) a (6), "Requerentes" ou "Grupo Braskem") vêm, por seus advogados (**doc. 1**), ajuizar a presente

**TUTELA CAUTELAR ANTECEDENTE**

nos termos dos arts. 305 e seguintes do Código de Processo Civil ("CPC") e do art. 20-B, § 1º, da Lei nº 11.101/05 ("LFR"), solicitando, desde já, a imediata concessão da tutela com o objetivo de preservar as atividades das Requerentes e assegurar o resultado útil do procedimento de mediação instaurado perante a Câmara Wind de Mediação, em 24 de junho de 2026, pelas razões a seguir expostas.

1



# I.
## OBJETO DESTA AÇÃO:
## ESTABILIDADE DURANTE O PROCESSO DE MEDIAÇÃO

1.        O Grupo Braskem vem analisando, junto aos seus principais *stakeholders*, alternativas econômico-financeiras para otimização de sua estrutura de capital e mitigação de impactos decorrentes do prolongado ciclo de baixa do setor petroquímico. Esse processo vem sendo conduzido com troca de informações e discussões de boa-fé entre as Requerentes e os seus principais credores financeiros.

2.        O objetivo do Grupo Braskem é chegar a um acordo com seus principais credores financeiros, possibilitando assim uma reestruturação global do seu passivo em uma solução holística que permita, de maneira definitiva, equilibrar a estrutura de capital, garantindo sua sustentabilidade financeira no longo prazo. Dentro do planejamento das Requerentes, uma solução que permitisse atender os credores financeiros do Grupo Braskem, alinhada com a disponibilidade de caixa das Requerentes, deveria ser concluída antes dos vencimentos das obrigações financeiras previstos para o mês de julho de 2026.

3.        Contudo, eventos imprevisíveis ocorridos durante este primeiro semestre de 2026 impediram que o planejamento inicialmente traçado pudesse ser cumprido sem expor o Grupo Braskem a um grande risco de constrição patrimonial.

4.        A guerra entre o Irã e os Estados Unidos eliminou qualquer previsibilidade no mercado petroquímico, setor de atuação do Grupo Braskem. A volatilidade dos preços e *spreads* provocados pelo fechamento do Estreito de Ormuz obrigou o Grupo Braskem (e todos os demais *players* do mercado) a refazerem as suas projeções, modelos e *business plan*. Afinal, os números apresentados aos credores em 2025 não eram mais aplicáveis, obrigando todos os envolvidos a reavaliar as premissas para construção de uma solução estruturante.

5.        A própria composição acionária da Braskem atravessou alterações. Conforme amplamente divulgado pela Braskem em fatos relevantes e comunicados ao mercado[1], a governança do Grupo Braskem foi alterada com a transferência da participação societária antes detida pela NSP Investimentos S.A. – Em Recuperação Judicial (veículo de investimento do antigo Grupo Odebrecht) para o fundo de investimento Shine I Fundo de Investimento em Participações Responsabilidade Limitada ("Fundo Shine").

---

[1] Confira o Fato Relevante de 20 de abril de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/d0ea332a-b346-84ba-f626-7cf92a319e53?origin=2 acesso em 23 de junho de 2026; o Comunicado ao Mercado de 5 de junho de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/6fd5c493-9b3c-784c-422f-6c026a97d3fa?origin=2 acesso em 23 de junho de 2026; e no Fato Relevante de 5 de junho de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/2cdea9b1-be43-700f-1854-ee0eddba5d79?origin=2 acesso em 23 de junho de 2026.

2



6.      A complexidade da transferência – que exigiu não só a aprovação de órgãos governamentais, como múltiplas autoridades antitruste[2], mas também a aprovação judicial concedida no âmbito do Processo nº 4071017-14.2026.8.26.0100 – demandou, para sua conclusão, mais tempo do que se esperava inicialmente. A transferência só foi concluída em 5 de junho de 2026[3] e veio acompanhada de uma reforma significativa da governança do Grupo Braskem, com a celebração de um novo acordo de acionistas entre o Fundo Shine e a Petróleo Brasileiro S.A. ("Petrobras")[4], a eleição de um novo conselho de administração e de uma nova diretoria estatutária[5].

7.      Da mesma forma, a alta dispersão das obrigações financeiras do Grupo Braskem – das quais aproximadamente **R$ 40 bilhões** referem-se a títulos emitidos no mercado de capitais, amplamente pulverizados entre centenas de milhares de credores – é um fator que dificulta o avanço das negociações em um cronograma tão curto.

8.      Assim, muito embora o Grupo Braskem e seus credores tenham dedicado o primeiro semestre para avançar nas trocas de informações e diligência, não há mais tempo hábil para concluir a reestruturação antes de vencimentos de obrigações em valores relevantes que ocorrerão a partir de 1º de julho de 2026, que podem causar um completo desbalanceamento da estrutura de capital das Requerentes, necessária para suas operações. De outro lado, caso não sejam pagas, ocorrerá o vencimento antecipado de todas as dívidas financeiras do Grupo Braskem, gerando uma situação de descontrole e instabilidade.

9.      Os primeiros vencimentos relevantes do Grupo Braskem estão previstos para o dia 1º de julho de 2026, no valor de **R$ 1.392.144.302,93,** referentes a dívidas financeiras no mercado financeiro nacional e cartas de créditos emitidas com instituições financeiras *(documentary letter of credits)*. Em seguida, até o dia 10 de julho de 2026, vencem mais cartas de créditos emitidas com instituições financeiras e as parcelas de juros dos títulos de dívida emitidos no mercado internacional (*bonds*), no montante de **R$ 324.299.316,64.** Após essa data e até o dia 31 de julho de 2026, vencem mais **R$ 927.610.319,27,** também oriundos dos mesmos instrumentos. Destaca-se que os *bonds* são títulos dispersos no mercado

---

[2] Confira o Fato Relevante de 6 de março de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/f4d07809-fdcc-1ffb-70fe-aa111afd7d05?origin=2 acesso em 23 de junho de 2026. Confira a matéria "Superintendência-Geral do CADE aprova entrada da IG4 como acionista da Braskem" no jornal Valor Econômico. Disponível em: https://valor.globo.com/empresas/noticia/2026/03/06/superintendncia-geral-do-cade-aprova-entrada-da-ig4-como-acionista-da-braskem.ghtml acesso em 23 de junho de 2026.

[3] Confira o Fato Relevante de 20 de abril de 2026., disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/d0ea332a-b346-84ba-f626-7cf92a319e53?origin=2, acesso em 23 de junho de 2026.

[4]      Confira o Comunicado ao Mercado, de 5 de junho de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/6fd5c493-9b3c-784c-422f-6c026a97d3fa?origin=2, acesso em 23 de junho de 2026; e o Fato Relevante de 5 de junho de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/2cdea9b1-be43-700f-1854-ee0eddba5d79?origin=2, acesso em 23 de junho de 2026.

[5]      Confira o Comunicado ao Mercado de 15 de junho de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/69749a64-d68d-89ca-239a-46edf9861dd2?origin=2, acesso em 23 de junho de 2026, e o Fato Relevante de 09 de junho de 2026, disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/3fed951c-31d1-56d1-510b-8fdf9b60e80a?origin=2, acesso em 23 de junho de 2026.

3

Processo 4113246-86.2026.8.26.0100, Evento 1, INIC1, Página 4



internacional, pulverizados entre inúmeros credores, em que é simplesmente impossível obter uma proteção (um *standstill*) que não passe por uma decisão judicial.

10.    O desembolso de tais valores pelo Grupo Braskem, como dito acima, reduziria a posição de caixa do Grupo Braskem para abaixo do mínimo operacional, o que poderia causar interrupções na cadeia produtiva naquela que é a maior petroquímica das Américas e desempenha papel fundamental – e praticamente insubstituível – na indústria brasileira.

11.    Em caso de não pagamento das parcelas vincendas em julho de 2026, haveria o vencimento antecipado de todas as dívidas financeiras e obrigações de pagamento no âmbito de cartas de crédito do Grupo Braskem, que somam mais de **R\$ 54 bilhões**. O Grupo Braskem ficaria, portanto, exposto a uma corrida desenfreada dos credores que buscariam ajuizar no Brasil e no exterior medidas constritivas contra seus ativos.

12.    Por essas razões, a única alternativa para o Grupo Braskem para a continuidade das negociações fora de um ambiente de recuperação judicial é a instauração de procedimento de mediação, associada à tutela cautelar acessória prevista pela LFR nestas circunstâncias.

13.    A mediação permitirá que o Grupo Braskem continue com o esforço de composição com os seus principais credores, cumprindo exatamente o espírito da LFR, nos termos do art. 20-A e 20-B, inciso IV, introduzidos pela Lei nº 14.112/20. A mediação será fundamental para facilitar a coordenação das negociações com um grupo tão disperso de credores.

14.    Nesse sentido, o Grupo Braskem instaurou mediação perante a Câmara Wind de Mediação ("Mediação"). Foram convidados a participar da Mediação todos os credores financeiros do Grupo Braskem (conforme listados no **doc. 3**, os "Credores Financeiros Sujeitos"[6]). Confia-se que a Mediação dará continuidade às negociações e permitirá uma solução organizada para o passivo do Grupo Braskem – potencialmente, por meio da construção de uma solução consensual com esses credores financeiros, a ser submetida à homologação judicial oportunamente, nos termos da LFR.

15.    Contudo, a Mediação não é, por si só, suficiente para criação de um ambiente estável e controlado de negociações, sobretudo diante do risco iminente de vencimento antecipado de todas as dívidas financeiras do Grupo Braskem. O resultado útil das negociações em curso depende da concessão de tutela cautelar antecedente de que trata o § 1º do art. 20-B da LFR, consistente na suspensão da exigibilidade de obrigações e na proibição de qualquer forma de retenção, arresto, penhora, sequestro, busca e apreensão e constrição judicial ou extrajudicial sobre os bens das Requerentes que sejam oriundas de demandas judiciais ou extrajudiciais relativas aos Credores Financeiros Sujeitos.

---

[6] Sendo os seus respectivos créditos designados "Créditos Financeiros Sujeitos".

4



16.      A seguir, as Requerentes passam a detalhar as razões pelas quais este MM. Juízo, competente para processar esta ação, deverá conceder os pedidos cautelares formulados nesta petição, na forma do art. 20-B, § 1º, da LFR e em linha com o art. 47 da LFR.

## II.
## CONTEXTUALIZAÇÃO FÁTICA: O GRUPO BRASKEM, A CRISE ECONÔMICO-FINANCEIRA E A VIABILIDADE DE SUAS ATIVIDADES

### II.A.    Histórico do Grupo Braskem

17.      As Requerentes integram o Grupo Braskem, maior produtor de resinas termoplásticas (PE, PP e PVC) das Américas e sétimo maior do mundo. Suas atividades produtivas, embora desempenhadas principalmente no Brasil, têm expressão e impacto global. As Requerentes atendem clientes situados em mais de 70 países, geram mais de R$ 70 bilhões de receita anual e empregam diretamente, hoje, mais de oito mil integrantes.

18.      A história do Grupo Braskem começou em 2002, quando seis grandes empresas brasileiras – Copene, OPP, Trikem, Proppet, Polialden e Nitrocarbono – se integraram para formar uma única sociedade, destinada a liderar o mercado petroquímico nacional. Desde sua fundação, a Braskem já era a maior indústria petroquímica da América Latina.

19.      Entre 2007 e 2009, Braskem e a Petrobras celebraram um acordo de investimento por meio do qual a Petrobras transferiu à Braskem ações de diversas sociedades e, em troca, recebeu participação expressiva no capital social da Braskem.

20.      Em 2010, o Grupo Braskem adquiriu outra gigante do setor petroquímico brasileiro, que era, à época, sua principal concorrente: a Quattor, *joint venture* criada em 2008 pela Unipar e pela Petrobras. Com isso, o Grupo Braskem integrou em seu portfólio os polos petroquímicos localizados em Mauá/SP e em Duque de Caxias/RJ e, assim, consolidou sua posição de destaque na indústria petroquímica brasileira. Em razão disso, a Petrobras é hoje titular de ações representativas de 47% do capital votante da Braskem.

21.      Ainda em 2010, a Braskem inaugurou no Polo de Triunfo, no Rio Grande do Sul, a primeira planta industrial do mundo voltada à produção de "eteno verde", para produção de resina plástica feita de cana-de-açúcar, com processo produtivo inovador.

22.      A consolidação da Braskem no mercado nacional fortaleceu o setor químico e petroquímico brasileiro e permitiu ao Grupo Braskem atingir um novo patamar de escala para enfrentar os desafios do mercado internacional. E, sem perder de vista o mercado brasileiro, iniciou seu processo de expansão externa.



23.    Esse processo começou em 2010, durante uma baixa histórica da indústria petroquímica mundial causada pela crise de 2008. O Grupo Braskem aproveitou a oportunidade para adquirir ativos relevantes da Sunoco Chemicals e da Dow Chemical, nos Estados Unidos e na Alemanha.

24.    Nos Estados Unidos, foram adquiridas unidades industriais de polipropileno no Texas, que totalizam uma capacidade de produção de 2 milhões de toneladas por ano. Já os ativos adquiridos na Alemanha se situam em Wesseling e Schkopau e possuem, juntos, capacidade anual de produção de 625 mil toneladas de resinas plásticas.

25.    Em 2010, o Grupo Braskem e o Grupo Idesa criaram a *joint venture* Braskem Idesa – que, em 2016, inaugurou um grande complexo petroquímico em Veracruz, no México, voltado à produção de polietileno. Desde então, a Braskem Idesa é a maior produtora de polietileno da região e exerce posição de destaque na indústria petroquímica mexicana.

26.    No ano seguinte, o Grupo Braskem iniciou a construção de uma nova planta industrial em sua unidade de La Porte, no Texas, com capacidade de produção de 450 mil toneladas por ano. A inauguração da planta, em 2020, foi um marco relevante para a consolidação do Grupo Braskem como um dos maiores produtores de plásticos do mercado norte-americano.

27.    Ao longo dos anos, as Requerentes passaram a ter uma capilaridade cada vez maior em mercados internacionais. Mas, mesmo após a expansão internacional, é no Brasil que está a principal fonte de receita e geração de caixa e o principal centro de atividades do Grupo Braskem, conforme se verá em detalhes mais adiante.

28.    As atividades operacionais desenvolvidas no país respondem por cerca de 70% da receita líquida consolidada do Grupo Braskem. Também é no Brasil que está concentrada a estrutura administrativa do Grupo Braskem, e onde residem os membros de seus principais órgãos de governança, de onde partem as principais decisões estratégicas que orientam os negócios das Requerentes mundo afora.

29.    A partir de 2020, o Grupo Braskem deu início a projetos de investimento para promover a economia circular e a transição climática. As Requerentes estabeleceram objetivos para ampliar a comercialização de produtos com conteúdo reciclado, expandir sua capacidade de bioprodutos, elevar o uso de energia renovável e buscar a neutralidade de carbono até 2050, dentre outras medidas.

30.    Nesse sentido, algumas iniciativas recentes do Grupo Braskem, no Brasil e no exterior, têm sido **(i)** a expansão da capacidade de produção de eteno verde no complexo de Triunfo, **(ii)** a parceria com Lummus para desenvolvimento e licenciamento de tecnologia de eteno verde (2021-2022), **(iii)** a criação da *joint venture* Sustainea, nos Estados Unidos, com foco na produção de bioMEG e bioMPG; **(iv)** a constituição da *joint venture* Braskem Siam, na Tailândia, com foco na produção de eteno verde no continente asiático; e **(v)** a realização

6



de investimento para aumentar sua capacidade de produção de eteno e polietileno no Rio de Janeiro em 220 mil toneladas por ano, condicionada à obtenção de financiamento.

31.     Em síntese, o Grupo Braskem ocupa, atualmente, uma posição central no mercado químico e petroquímico brasileiro e global, com expressiva geração de receita, circulação de produtos e geração de empregos. A preservação de suas atividades interesse a dezenas de milhares de pessoas, incluindo acionistas, integrantes, fornecedores, prestadores de serviços em geral, clientes e parceiros comerciais, dentre outras. E interesse também ao próprio Estado brasileiro, seja pela participação relevante da Petrobras na Braskem[7] – que conta, inclusive, com direitos de governança significativos, garantidos pelo novo acordo de acionistas da Braskem –, seja pelos vultosos tributos recolhidos em virtude de suas atividades operacionais.

32.     Ocorre que, recentemente, o Grupo Braskem vem sendo acometido por uma severa crise de liquidez. Essa situação decorre, sobretudo, de um prolongado ciclo de baixa no mercado petroquímico que se arrasta desde 2022, recentemente agravado por uma combinação inoportuna de fatores externos e imprevisíveis, detalhados no capítulo II.C.

33.     No entanto, não há dúvida de que as Requerentes são sociedades plenamente viáveis do ponto de vista financeiro e operacional. A capacidade produtiva do Grupo Braskem e sua posição relevante no mercado de resinas termoplásticas são indiscutíveis, e têm potencial de se expandir ainda mais no futuro, como se verá no capítulo II.D abaixo. E, uma vez superado o atual momento de instabilidade financeira, com a estabilização do mercado petroquímico global, é evidente a possibilidade de pleno soerguimento do Grupo Braskem.

34.     Com esta medida, as Requerentes pretendem negociar com os Credores Financeiros Sujeitos uma solução estruturante para a atual conjuntura financeira do Grupo Braskem. Assim, será possível fornecer um tratamento efetivo para a sua atual crise de liquidez, de modo a viabilizar a continuidade das atividades do Grupo Braskem no longo prazo e gerar valor para todos os seus *stakeholders*.

## II.B.    Estrutura e atividades desenvolvidas pelo Grupo Braskem

35.     As atividades das Requerentes são estruturadas em um grupo de sociedades, que desempenham funções complementares e interdependentes. Todas elas se submetem ao controle comum da Braskem, situada no Brasil. A estrutura societária do Grupo Braskem pode ser sintetizada no seguinte organograma simplificado[8]:

---

[7] Confiram-se os Fatos Relevantes de 3 de junho de 2026 e 5 de junho de 2026. Disponíveis em: <https://www.braskem-ri.com.br/divulgacoes-documentos/avisos-comunicados-ao-mercado-e-fatos-relevantes/>.
[8] As sociedades Braskem America Inc. e Braskem Europe GmbH, embora sejam parte da estrutura societária das Requerentes, não integram o polo ativo deste pedido, por não serem emissoras ou garantidoras de dívidas relevantes frente ao endividamento total do Grupo Braskem, nem partes de contratos *intercompany*.

7





36.      A Braskem é uma companhia aberta brasileira, com ações listadas na B3 – Brasil, Bolsa e Balcão, na Bolsa de Valores de Nova York (*NYSE*) e na Bolsa de Valores Latibex, na Espanha. É da Braskem que partem as principais decisões estratégicas do grupo. Também é a sociedade que concentra os ativos mais relevantes, os principais contratos e, consequentemente, a maior parte da receita do Grupo Braskem.

37.      Justamente por seu papel central na condução dos negócios das Requerentes, a Braskem contraiu dívidas substanciais ao longo dos últimos anos, por meio de emissões de debêntures, financiamentos com instituições financeiras públicas e privadas e linhas de crédito concedidas por fornecedores e clientes, dentre outras. Parte das suas atividades também envolve a realização de aportes em sociedades controladas direta e indiretamente.

38.      Além disso, a Braskem é garantidora das principais dívidas contraídas por outras sociedades do Grupo Braskem, com destaque para as notas emitidas pela Braskem Netherlands Finance e pela Braskem America Finance. Essas operações, ainda que realizadas por entidades controladas internacionais, foram previamente aprovadas pelos órgãos de governança da Braskem, responsável pelas deliberações estratégicas do Grupo Braskem.

39.      A Braskem Netherlands controla o segmento de sociedades estrangeiras do Grupo Braskem e atua na coordenação da distribuição de resinas termoplásticas na Europa e na Ásia. A sociedade também é parte de operações estruturadas contratadas com agências de crédito para a exportação e figura como credora e devedora de dívidas *intercompany* com outras Requerentes, como a Braskem Netherlands Finance, a BT&S e a Braskem Netherlands Inc.

40.      A BT&S atua na logística e na aquisição de matérias-primas para atender à demanda interna do Grupo Braskem e na distribuição de produtos químicos no mercado internacional.

8



Essa entidade controla diversas sociedades de propósito específico destinadas à gestão de embarcações usadas para o abastecimento e à distribuição internacional de matéria-prima e produtos químicos.

41.     Por fim, a <u>Braskem America Finance</u>, a <u>Braskem Netherlands Finance</u> e a <u>Braskem Netherlands Inc</u>. são sociedades de propósito específico voltadas à captação e à gestão de recursos financeiros no mercado internacional para financiar as atividades das outras sociedades do Grupo Braskem. Nenhuma delas desempenha atividade industrial, comercial ou de aplicação intensiva de mão-de-obra. As três sociedades são partes de contratos *intercompany* celebrados com outras Requerentes, e as duas primeiras são emissoras de títulos de dívida no mercado de capitais internacional, de valor bilionário.

42.     Além das sociedades indicadas como Requerentes neste procedimento, o Grupo Braskem concentra participações em diversas outras sociedades controladas e investidas, que desenvolvem operações petroquímicas em outros países – ou atuam em segmentos distintos, como geração de energia elétrica, logística, dentre outros. Embora não estejam expostas patrimonialmente aos Créditos Financeiros Sujeitos, essas sociedades controladas e investidas contam com o Grupo Braskem para desenvolvimento de suas operações, por meio de contratos vigentes, prestação de garantias, aportes e outros mecanismos.

### II.C.    Razões da crise enfrentada pelo Grupo Braskem

43.     A crise enfrentada pelas Requerentes decorre de uma conjunção de fatores imprevisíveis e extraordinários que ocasionaram mudanças drásticas na indústria petroquímica global e, portanto, nas operações e nas finanças do Grupo Braskem.

44.     As principais razões da crise das Requerentes são, em resumo, **(i)** um ciclo prolongado de baixa na indústria petroquímica global, especialmente para os produtores base nafta, que resultou em uma redução substancial da margem dos produtos comercializados pelo Grupo Braskem e, consequentemente, na sua geração de caixa; **(ii)** o surgimento de obrigações vultosas e desvinculadas do curso normal dos negócios das Requerentes, relacionadas ao evento geológico ocorrido em Maceió; e **(iii)** as incertezas econômicas decorrentes da escalada das tensões geopolíticas no Oriente Médio, cuja duração é imprevisível e que, desde o começo deste ano, vem afetando os preços das matérias-primas, dos fretes marítimos internacionais e das resinas termoplásticas no mercado global.

45.     A seguir, passa-se a expor cada um desses fatores em maior detalhe.



### i.    *Ciclo de baixa prolongado da indústria petroquímica e compressão de* **spreads**

46.    Desde 2022, a indústria petroquímica global enfrenta um intenso e prolongado ciclo de baixa[9]. Esse ciclo resulta, de um lado, de um aumento substancial da oferta de resinas termoplásticas no mercado global, sobretudo por parte da China e dos Estados Unidos; e, de outro lado, da desaceleração do crescimento da demanda global, impactando a demanda por esses produtos no mercado quando comparado com o histórico.

47.    Nesse contexto, o *spread* das resinas termoplásticas no mercado internacional – ou seja, a diferença entre o preço do produto e o custo de sua matéria-prima nos mercados internacionais – sofreu redução significativa[10]. Isso ocorreu não só no mercado brasileiro, que concentra as principais atividades e a maior parte da receita do Grupo Braskem, como nos mercados dos Estados Unidos, da Europa e da Ásia, onde as Requerentes também têm atuação relevante. Confiram-se os seguintes gráficos com as referências internacionais no mercado internacional, a título ilustrativo[11]:





48.    Esse cenário, naturalmente, impactou toda a dinâmica operacional das Requerentes e comprometeu sua capacidade de geração de caixa de forma significativa.

49.    Nesse sentido, o EBITDA Recorrente do segmento Brasil/América do Sul do Grupo Braskem no quarto trimestre de 2025 foi de US\$ 143 milhões – 30% inferior ao do trimestre anterior[12]. Já no segmento Estados Unidos e Europa, registrou-se EBITDA Recorrente

---

[9] Disponível em: https://valor.globo.com/empresas/noticia/2025/09/23/alongamento-de-crise-no-setor-petroqumico-aumenta-riscos-para-companhias-diz-fitch.ghtml. Acesso em: 24 de junho de 2026.
[10] Disponível em: https://valor.globo.com/empresas/noticia/2026/03/26/analistas-esperam-resultados-fracos-da-braskem-no-4o-tri.ghtml. Acesso em: 24 de junho de 2026.
[11] Cf. dados de consultorias externas.
[12] Disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/8609c855-6bc0-cafc-588a-b533f163e2a0?origin=2. Acesso em: 24 de junho de 2026.

10



negativo de US$ 32 milhões no mesmo período[13]. No agregado, a receita líquida consolidada das Requerentes no 4º trimestre de 2025 foi de R$ 16,1 bilhões, o que representa uma redução de 16% em comparação com o mesmo período do ano anterior[14].

50.    O fluxo de caixa das Requerentes também reflete essa conjuntura. A título de exemplo, o consumo recorrente de caixa consolidado do Grupo Braskem aumentou de R$ 493 milhões, em 2024, para R$ 5,9 bilhões, em 2025. Em outras palavras, os gastos das Requerentes apenas para manter suas atividades operacionais aumentaram mais de dez vezes de um ano para o outro, e alcançaram cifras bilionárias. E, nesse mesmo período, os custos com juros da dívida também aumentaram. O Grupo Braskem dispendeu R$ 4,23 bilhões com pagamentos de juros ao longo de 2025, contra R$ 3,88 bilhões em 2024.

51.    É evidente, portanto, a profundidade do impacto do ciclo de baixa da indústria petroquímica, associada ao alto custo da dívida do Grupo Braskem, nas suas operações e na geração de receita. Inclusive, em razão de uma combinação de fatores, o Grupo Braskem apurou prejuízo consolidado de mais de R$ 10 bilhões no último trimestre de 2025[15].

52.    Mas isso não é tudo. Essa conjuntura desfavorável foi agravada por uma conjunção inoportuna de eventos recentes que comprometeram ainda mais a situação econômico-financeira das Requerentes. É o que se verá a seguir.

### ii.    O evento geológico de Alagoas

53.    Em 2019, o Serviço Geológico do Brasil – CPRM divulgou relatório indicando que o fenômeno geológico identificado em bairros de Maceió, Alagoas, estaria relacionado às atividades de exploração de poços de sal-gema desenvolvidas pela Braskem na região.

54.    A partir desse momento, a Braskem imediatamente encerrou sua operação de extração de sal gema. Também passou a empreender esforços para compreender de forma aprofundada o fenômeno geológico e todos os seus impactos, e a implementar medidas voltadas à proteção das pessoas afetadas pelo evento, sempre em conjunto com a Agência Nacional de Mineração ("ANM") e as demais autoridades pertinentes.

55.    Nesse contexto, e dado o compromisso da Braskem com a cidade de Maceió e seus moradores, diversos acordos foram firmados com as autoridades competentes a partir de 2020 com o objetivo de mitigar, reparar e compensar os danos decorrentes do evento, incluindo a realocação preventiva das pessoas, indenização aos moradores impactados, reparação ambiental, medidas de fechamento das cavidades e monitoramento da área, além da

---

[13] Disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/8609c855-6bc0-cafc-588a-b533f163e2a0?origin=2. Acesso em: 24 de junho de 2026.

[14] Disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/8609c855-6bc0-cafc-588a-b533f163e2a0?origin=2. Acesso em: 24 de junho de 2026.

[15] Disponível em: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/8609c855-6bc0-cafc-588a-b533f163e2a0?origin=2. Acesso em: 24 de junho de 2026.

11



implementação de ações socio urbanísticas. Também foram celebrados acordos com o Município de Maceió e com o Estado de Alagoas, em 2023 e 2025, respectivamente, a título de indenização, compensação e ressarcimento integral.

56.      As obrigações decorrentes do evento geológico são vultosas e dissociadas do curso normal dos negócios do Grupo Braskem, de modo que passaram a consumir parcela relevante de seu caixa nos últimos anos. Ao final de 2025, a Braskem já havia dispendido mais de R$ 14 bilhões em decorrência do evento geológico de Alagoas, e o saldo atual da provisão para despesas futuras referentes ao cumprimento das obrigações é de aproximadamente R$ 3,5 bilhões ao final do primeiro trimestre de 2026.

57.      Trata-se de passivo relevante, com efeitos concretos sobre a gestão de caixa, a percepção de risco do mercado e a condução dos negócios do Grupo Braskem. E, em uma conjuntura de ciclo de baixa prolongado da indústria petroquímica, as obrigações relacionadas ao evento geológico passaram a comprometer ainda mais o fluxo de caixa das Requerentes.

### iii.      *As incertezas sobre a duração das tensões geopolíticas internacionais e o aumento de despesas operacionais*

58.      No começo de 2026, as Requerentes passaram a enfrentar novos desafios em razão da escalada das tensões geopolíticas no Oriente Médio, relacionadas ao conflito envolvendo Irã, Estados Unidos e Israel e, em especial, aos impactos da guerra nas operações do Estreito de Ormuz – passagem marítima estratégica entre o Golfo Pérsico e o Golfo de Omã, crucial para o transporte global de petróleo e seus derivados e de outros produtos.

59.      Conflitos geopolíticos dessa magnitude produzem efeitos imediatos sobre o preço do petróleo e de seus derivados, bem como dos fretes marítimos. Ainda, os efeitos futuros diante da incerteza da duração de tais tensões colocam os mercados em constante alerta. Desde o começo da guerra, o preço do petróleo no mercado internacional aumentou significativamente[16]. Com isso, o preço da nafta, derivada do petróleo, também disparou. Confira-se[17]:

---

[16]      MONEY TIMES. *Cotação Petróleo Bruto Brent (Ukoil).* Disponível em: https://www.moneytimes.com.br/cotacao/ukoil/. Acesso em: 24 de junho de 2026.

[17] Disponível em: https://pt.tradingeconomics.com/commodity/naphtha. Acesso em: 24 de junho de 2026.

Processo 4113246-86.2026.8.26.0100, Evento 1, INIC1, Página 13





60.      A nafta é a principal matéria-prima da indústria petroquímica. Também é o insumo mais utilizado pelo Grupo Braskem na produção de resinas termoplásticas. Logo, a elevação de seu preço impacta diretamente os custos da produção das Requerentes. Mesmo um pequeno aumento no preço da nafta pode importar custos bilionários para o Grupo Braskem, considerando a magnitude de sua produção industrial.

61.      Ao mesmo tempo, muitos dos produtores internacionais de resinas termoplásticas que competem com as Requerentes utilizam como matéria-prima o etano – insumo que apresenta condições competitivas muito melhores que as da nafta neste momento. Assim, o Grupo Braskem se vê obrigado a arcar não só com um aumento no custo de matérias-primas no mercado, como também com uma desvantagem concorrencial relevante decorrente da natureza dos insumos utilizados em sua produção industrial.

62.      As repercussões de longo prazo da atual situação geopolítica global para o Grupo Braskem ainda são desconhecidas. Em meio a um ciclo prolongado de baixa no mercado petroquímico global, a incerteza generalizada gerada pela guerra no Oriente Médio agrava ainda mais a já sensível situação econômica e financeira das Requerentes.

63.      No entanto, a crise de liquidez do Grupo Braskem está longe de ser irreversível. Como se verá no capítulo seguinte, as Requerentes são sociedades plenamente viáveis do ponto de vista financeiro e operacional. Seu soerguimento é decorrência natural da reestruturação a ser negociada durante o curso da Mediação.

## II.D.    Viabilidade financeira e operacional

64.      As Requerentes lideram o mercado petroquímico brasileiro há mais de vinte anos. Com quarenta unidades industriais, situadas em quatro países e cinco estados brasileiros, que

13



atendem <u>clientes em mais de 70 países</u>, o Grupo Braskem se consolidou como um dos maiores produtores de resinas termoplásticas (PE, PP e PVC) do mundo, e o maior das Américas.

65.    Hoje, o Grupo Braskem emprega diretamente mais de <u>oito mil pessoas</u> e – mesmo em um período de dificuldades econômicas – gera mais de <u>R$ 70 bilhões</u> de receita anual. Isso sem falar nos milhares de postos de trabalho indiretos gerados por toda a cadeia produtiva relacionada às atividades das Requerentes, no Brasil e no mundo. Por isso mesmo, em períodos de condições econômicas mais favoráveis, o Grupo Braskem sempre contou com expressiva geração de caixa e alta rentabilidade.

66.    Assim, uma vez superada a atual conjuntura de restrição de caixa das Requerentes, com o esperado retorno à normalidade na indústria química e petroquímica global, não deverá haver obstáculos para a retomada da saúde financeira e a manutenção operacional do Grupo Braskem. Como explicado no capítulo anterior, a crise pela qual as Requerentes passam é circunstancial e poderá ser superada por meio de uma solução estruturante atingida em conjunto com seus credores financeiros no âmbito deste processo.

67.    Essa conclusão é reforçada por uma série de iniciativas que visaram a fortalecer a posição competitiva do Grupo Braskem, preservar sua geração de receita no longo prazo e preparar as Requerentes para o futuro do mercado petroquímico.

68.    As iniciativas promovidas pelas Requerentes incluíram iniciativas como o "*Programa de Resiliência*", que abrangeu medidas com impacto em EBITDA e geração de caixa de curto prazo, além de ações de defesa da competitividade da indústria química brasileira; e o "*Programa de Transformação*", com foco na otimização da base nafta, no aumento e flexibilidade da base gás e na migração para produtos com fontes renováveis. Tais medidas, que permanecem sob constante avaliação e revisão da administração das Requerentes, se inserem na preocupação constante do Grupo Braskem com ações e investimentos de longo prazo em segmentos menos sensíveis aos impactos de eventuais outros ciclos de baixa do setor petroquímico no futuro.

69.    Por fim, a viabilidade do Grupo Braskem é corroborada por diversas medidas regulatórias de incentivo à indústria petroquímica que entrarão em vigor a partir deste ano.

70.    Uma dessas medidas é a Lei nº 15.294, de 19 de dezembro de 2025, que instituiu o Programa Especial de Sustentabilidade da Indústria Química ("<u>PRESIQ</u>"). Trata-se de "*um programa de incentivos fiscais para modernizar e descarbonizar a indústria química brasileira entre 2027 e 2031*", conforme consta da plataforma do Congresso Nacional[18].

---

[18] Disponível em: https://www25.senado.leg.br/web/atividade/materias/-/materia/171482. Acesso em: 24 de junho de 2026.

14



71.     Além disso, em março deste ano, a Lei Complementar nº 228 majorou para o ano de 2026 o benefício do Regime Especial da Indústria Química ("REIQ"), programa que desonera alíquotas tributárias na compra de matérias-primas da indústria petroquímica.

72.     O REIQ é um incentivo fundamental para as atividades do Grupo Braskem – e de toda a indústria petroquímica brasileira – desde sua instituição, em 2013. A majoração dos benefícios decorrentes do programa, sem dúvida, tem papel relevante na mitigação parcial dos efeitos do ciclo prolongado de baixa do setor nos próximos anos.

73.     Em síntese, o Grupo Braskem conta com diversas iniciativas concretas voltadas à manutenção de suas atividades operacionais e à expansão de sua participação de mercado no longo prazo. Essas iniciativas são amparadas por políticas governamentais relevantes de incentivo à indústria petroquímica, e estão perfeitamente alinhadas com tendências mundiais de transformação, segurança energética e desenvolvimento sustentável.

74.     Por todos esses motivos, a viabilidade do Grupo Braskem é indubitável.

## III.
## JURISDIÇÃO E COMPETÊNCIA DESTE MM. JUÍZO

75.     No caso concreto, são inequívocas a jurisdição brasileira e a competência deste MM. Juízo para processar esta tutela cautelar, tanto com relação à Braskem quanto com relação às Requerentes constituídas e sediadas fora do Brasil – no caso, Braskem Netherlands, Braskem Netherlands Inc., BT&S, Braskem Netherlands Finance e Braskem America Finance ("Sociedades Estrangeiras").

76.     Nos termos do art. 21, III, do CPC[19], compete ao Judiciário brasileiro julgar as ações cujo fundamento seja fato ocorrido ou ato praticado no Brasil. Em procedimentos previstos na LFR, o *"fato ocorrido ou ato praticado"* que enseja o ajuizamento do processo – em termos processuais, causa de pedir da ação – é justamente a crise econômico-financeira enfrentada pelas devedoras.

77.     Ou seja, a jurisdição brasileira pode ser acessada por qualquer sociedade, nacional ou estrangeira, cuja crise remonte ao Brasil, sobretudo quando integrar grupo empresarial brasileiro. Nesse sentido, a professora Sheila Neder Cerezetti explica que "[a] *autorização para que o juízo brasileiro se debruce sobre fatos ocorridos no Brasil não pode, nesse novo cenário de regramento da crise grupal, fechar os olhos para as situações em que esses fatos ocorridos no Brasil não se esgotem no território nacional exatamente por conta de a crise que fundamenta a demanda atingir todo um 'grupo sob controle societário comum'"*[20].

---

[19] "Art. 21. Compete à autoridade judiciária brasileira processar e julgar as ações em que: [...] III - o fundamento seja fato ocorrido ou ato praticado no Brasil".
[20] CEREZETTI, Sheila Neder. Parecer jurídico. Processo nº 1111483-72.2024.8.26.0100. Fls. 3.715-3.729.

15



78. Em atenção a essa lógica, o Poder Judiciário brasileiro já processou tutelas cautelares acessórias à mediação, recuperações judiciais e recuperações extrajudiciais que incluíram ao menos 35 sociedades sediadas no exterior[21]. Em todos esses casos, os limites da jurisdição brasileira foram cuidadosamente analisados, e prevaleceu a possibilidade de inclusão das entidades estrangeiras sem filial no País.

79. E tais entidades nacionais e estrangeiras que compõem grupo empresarial brasileiro devem ter o seu procedimento processado no juízo do local do principal estabelecimento do grupo empresarial, nos termos dos arts. 3o[22] e 69-G, § 2º, da LFR[23], aplicáveis no caso de tutelas cautelares acessórias à mediação, por força do art. 20-C da LFR[24].

80. Conforme entendimento consolidado na doutrina[25], o principal estabelecimento de um grupo de empresas corresponde ao centro de tomada das principais decisões econômicas

---

[21] Nesse sentido, **(i)** na RJ do Grupo Oi (Processo nº 0203711-65.2016.8.19.0001), as sociedades Oi Brasil Holdings Coöperatief U.A. e Portugal Telecom International Finance B.V., ambas com sede na Holanda; **(ii)** na RJ do Grupo Americanas (Processo nº 0803087-20.2023.8.19.0001), as sociedades B2W Digital Lux S.À.R.L e JSM Global S.À.R.L, ambas com sede em Luxemburgo; **(iii)** na RJ do Grupo Aralco (Processo nº 1001985-03.2014.8.26.0032), a sociedade Aralco Finance S/A, com sede em Luxemburgo; **(iv)** na RE do Grupo Ocyan (Processo nº 0121854-60.2017.8.19.0001), as sociedades Odebrecht Drilling Norbe VIII/IX LTD e Odebrecht Offshore Drilling Finance LTD, com sede em Ilhas Cayman, e Odebrecht Drilling Norbe Eight GMBH, Odebrecht Drilling Norbe Nine GMBH, ODNIGMBH, Odebrecht Drilling Norbe Six GMBH e ODN TAY IV GMBH, com sede na Áustria; **(v)** na RJ do Grupo OEC (Processo nº 1100438-71.2024.8.26.0100), as sociedades Odebrecht HoldCo Finance Limited e OEC Finance Limited com sede em Ilhas Cayman, e Odebrecht Overseas Limited, com sede em Bahamas; **(vi)** na RJ do Grupo OGX (Processo nº 0377620-56.2013.8.19.0001), as sociedades OGX International GMBH e OGX Áustria GMBH, ambas com sede na Áustria; **(vii)** na RE do Grupo OOG (Processo nº 0121854-60.2017.8.19.0001), as sociedades Odebrecht Oil & Gas GMBH, Odebrecht Drilling Norbe Eight GMBH, Odebrecht Drilling Norbe Nine GMBH e ODN Tay IV GMBH, com sede na Áustria, e Odebrecht Oil & Gas Finance Limited, Odebrecht Oil Services LTD, Odebrecht Drilling Norbe VIII/IX LTD e Odebrecht Offshore Drilling Finance LTD, com sede em Ilhas Cayman; **(viii)** na RJ do Grupo Sete Brasil (Processo nº 0142307-13.2016.8.19.0001), as sociedades Sete Holding GMBH, Sete International One GMBH e Sede International Two GMBH, com sede na Áustria; **(ix)** na Tutela Cautelar, na RE e na RJ do Grupo Intercement (Processos nº 1111483-72.2024.8.26.0100 e 1192002-34.2024.8.26.0100), as sociedades Intercement Trading e Inversiones S.A. e Intercement Trading e Inversiones Argentina S.A., com sede na Espanha, e Intercement Financial Operations B.V., com sede na Holanda; **(x)** na RJ do Grupo OAS (Processo nº 1030812-77.2015.8.26.0100), as sociedades OAS Investments GMBH, com sede na Áustria, OAS Investments Limited e OAS Finance Limited, com sede em Ilhas Virgens Britânicas; e **(xi)** na Tutela Cautelar e na RE do Grupo Unigel (Processo nº 1174558-22.2023.8.26.0100), as sociedades Unigel Luxembourg S.A., com sede em Luxemburgo, e Plastiglas de México S.A. de C.V., com sede no México.

[22] "Art. 3º É competente para homologar o plano de recuperação extrajudicial, deferir a recuperação judicial ou decretar a falência o juízo do local do principal estabelecimento do devedor ou da filial de empresa que tenha sede fora do Brasil".

[23] "Art. 69-G, §2º. O juízo do local do principal estabelecimento entre os dos devedores é competente para deferir a recuperação judicial sob consolidação processual, em observância ao disposto no art. 3º desta Lei".

[24] "Art. 20-C. O acordo obtido por meio de conciliação ou de mediação com fundamento nesta Seção deverá ser homologado pelo juiz competente conforme o disposto no art. 3º desta Lei".

[25] "[A]tualmente o estabelecimento principal é compreendido como aquele em que se localiza o centro decisório do devedor, ou seja, o local de onde partem as ordens e em que se organizam as relações externas traçadas entre a sociedade e terceiros. [...] [F]irmou-se o entendimento de que o mesmo critério aplicável para pedidos individuais deve prevalecer no caso do grupo. Assim, a competência se estabelece com base no local de onde emanam as principais decisões estratégicas, financeiras e operacionais do grupo. Há que se destacar que este critério tem sido entendido como prevalente não apenas sobre o da sede estatutária de uma ou outra sociedade, mas inclusive sobre eventual comarca em que o grupo concentrar a maior parte dos ativos e o maior número de funcionários" (CEREZETTI, Sheila Christina Neder. Grupos de sociedade e recuperação judicial: o indispensável encontro entre os direitos societário, processual e concursal. In. YARSHEL, Flávio. PEREIRA, Guilherme Setoguti J. Processo Societário II. São Paulo: Quartier Latin, 2015. pp. 760-761, g.n.).

16



e administrativas desse grupo, frequentemente referido como "*centro nevrálgico*", "*núcleo de comando*" ou "*centro de governança*"[26].

81.     Ou seja, independentemente de onde estiver a sede estatutária de cada sociedade (no Brasil ou no exterior), é preciso identificar o local do centro decisório do grupo. Para tanto, deve ser definido o local onde **(i)** emanam as diretrizes gerais seguidas pelo grupo empresarial; **(ii)** são firmados os principais contratos e investimentos; e **(iii)** encontra-se o corpo administrativo e técnico do grupo, com funcionários-chave (das áreas de contabilidade, tecnologia da informação, comunicação, gestão financeira etc.).

82.     No caso, o Grupo Braskem é um grupo empresarial brasileiro, cuja crise – embora também tenha repercussões significativas sobre todas as Sociedades Estrangeiras – está centrada no Brasil.

83.     Primeiro, porque o centro decisório do Grupo Braskem está no Brasil. É na cidade de São Paulo que estão o conselho de administração e a diretoria estatutária da Braskem – sociedade que controla, direta ou indiretamente, todas as demais Requerentes e orienta as principais decisões estratégicas do grupo.

84.     A Braskem tem como função garantir a atuação coordenada do Grupo, por meio da gestão de recursos, direcionamento estratégico e realização de aportes em favor de suas controladas diretas e indiretas.

85.     Muitas das Sociedades Estrangeiras também possuem administradores brasileiros domiciliados na cidade de São Paulo, que participam dos atos decisórios e contribuem para a aplicação coesa das diretrizes definidas pela Braskem.

86.     Os co-controladores do Grupo Braskem, que detêm, em conjunto, mais de 97% do capital social votante da Braskem, são brasileiros. O Fundo Shine é um veículo de investimento ligado à gestora brasileira IG4 Capital. A Petrobras dispensa apresentações – sociedade de economia mista controlada pelo Governo Federal.

87.     Por isso mesmo, as principais obrigações financeiras contratadas pelas Requerentes, seja no Brasil ou no mercado internacional, são **(i)** negociadas sob orientação da equipe financeira da Braskem, situada no Brasil; **(ii)** formalizadas com apoio da área jurídica da Braskem, também situada no Brasil; e **(iii)** autorizadas por órgãos deliberativos compostos por administradores brasileiros, que se reúnem na cidade de São Paulo – por exemplo, as próprias emissões de títulos de dívida internacionais por Sociedades Estrangeiras foram apreciadas e autorizadas pelo conselho de administração da Braskem. Pela mesma razão, as principais decisões estratégicas e negociações com credores relacionadas ao processo de

---

[26] Empregando todas essas expressões, confira-se, por exemplo: STJ, Conflito de Competência nº 183.402/MG, Rel. Min. Humberto Martins, 2ª Seção, j. em 27.09.2023.

17

Processo 4113246-86.2026.8.26.0100, Evento 1, INIC1, Página 18



reestruturação das Requerentes também partiram do Brasil, com apoio de administradores e funcionários da Braskem, além de assessores jurídicos e financeiros externos no Brasil.

88.     Segundo, porque as atividades produtivas mais expressivas do Grupo Braskem estão concentradas no Brasil. A Braskem conta com vinte e oito plantas industriais no país, espalhadas por cinco estados, que empregam, direta ou indiretamente, mais de seis mil pessoas. Também está no Brasil o maior volume de contratos com clientes, fornecedores, operadores e financiadores do grupo. Por todos esses motivos, as operações nacionais foram responsáveis por cerca de 70% da receita líquida consolidada do Grupo Braskem em 2025.

89.     Terceiro, porque os principais fatores da crise que justificam este pedido remontam ao Brasil, incluindo crise prolongada no setor petroquímico – que, embora tenha contornos globais, vem afetando as operações brasileiras da Braskem de forma particularmente pronunciada nos últimos anos – e obrigações decorrentes do evento geológico de Alagoas, como visto no capítulo II.C acima.

90.     Em complemento, a análise das Requerentes sob uma *perspectiva individual* também revela que todas as Sociedades Estrangeiras (e suas respectivas crises econômico-financeiras, que constituem causa de pedir deste procedimento) têm nexos substanciais com a jurisdição brasileira, que ensejam sua inclusão no polo ativo deste pedido.

91.     As sociedades Braskem Netherlands Inc., Braskem Netherlands Finance e Braskem America Finance, em específico, são entidades não operacionais, voltadas à captação de recursos no mercado internacional destinados especialmente às atividades brasileiras do Grupo Braskem.

92.     O cumprimento de suas obrigações, portanto, depende essencialmente dos resultados das atividades operacionais brasileiras. E, consequentemente, a crise que afeta as atividades da Braskem no Brasil inviabiliza o pagamento integral dos credores dessas Sociedades Estrangeiras nas condições originalmente estabelecidas.

93.     Já a Braskem Netherlands – em conjunto com BT&S, sua controlada – desempenha atividades comerciais instrumentais às operações da Braskem.

94.     Essas duas sociedades não têm atuação independente no mercado. Sua função é garantir a compra internacional de matéria-prima, viabilizar a logística e a comercialização de químicos e de resinas termoplásticas produzidas pelas Requerentes e por outras controladas – especialmente pela Braskem, no Brasil – ao redor do mundo.

95.     Além disso, a Braskem Netherlands também exerce papel relevante na captação de recursos financeiros para financiar as atividades da Braskem no Brasil. Também nesse caso, o pagamento de seus credores depende do resultado das operações da Braskem. Sua crise, portanto, é indissociável da situação financeira do segmento brasileiro do Grupo Braskem.

18



96.     Assim, o ajuizamento deste pedido representa, em relação a todas essas Sociedades Estrangeiras, o único mecanismo factível de promoção das negociações acerca da recuperação de crédito por parte dos respectivos Credores Financeiros Sujeitos. Muito por isso, a possibilidade de esse tipo de sociedade participar de procedimentos previstos na LFR é livre de dúvida e já foi reconhecida repetidas vezes pela jurisprudência brasileira[27].

97.     O Grupo Braskem é, portanto, um grupo empresarial brasileiro com ramificações em outros países, mas que não são capazes de desnaturar a sua origem e seu centro de principais interesses. Nesse sentido, é importante reiterar a importância ímpar do Grupo Braskem para a indústria petroquímica nacional. O Grupo Braskem é o líder absoluto na produção de resinas termoplásticas no Brasil e, sem as suas operações, toda a cadeia de produção de plásticos, embalagens e insumos industriais nacional pode ser afetada.

98.     Afastar a jurisdição da justiça brasileira e a competência das varas de recuperação judicial e falência da Comarca da Capital do Estado de São Paulo significa, em última instância, abrir mão de uma indústria estratégica para soberania nacional e que tem, como principal acionista indireto, o Governo Federal.

99.     Diante disso, devem ser reconhecidas a jurisdição da Justiça Brasileira para processar a presente tutela cautelar como processo principal para todo o Grupo Braskem e a competência das varas de recuperação judicial e falência da Comarca da Capital, nos termos dos arts. 21, III, do CPC e dos arts. 3º, 20-C e 69-G, § 2º, da LFR.

## IV.
## PREENCHIMENTO DOS REQUISITOS LEGAIS PARA O AJUIZAMENTO DA TUTELA CAUTELAR ANTECEDENTE

100.    Nos termos do art. 20-B, § 1º da LFR e do art. 305 do CPC, o deferimento da tutela cautelar antecedente requer a demonstração **(i)** da probabilidade do direito, decorrente (i.a) da existência de procedimento de mediação já instaurado e (i.b) do preenchimento dos requisitos subjetivos de elegibilidade para requerer a instauração dos procedimentos recuperacionais – i.e., enquadramento como empresa em dificuldade que preenche os requisitos do art. 48 da LFR; e **(ii)** do perigo de dano ao resultado útil da mediação instaurada. No caso, todos os requisitos foram preenchidos, como se verá a seguir, de forma objetiva.

101.    Em função do preenchimento desses requisitos, ficará demonstrada a necessidade de concessão de tutela cautelar consistente na suspensão, em relação aos Credores Financeiros Sujeitos, da exigibilidade de obrigações e na proibição de "*qualquer forma de retenção,*

---

[27] Nesse sentido, cf. TJRJ, AI nº 0046867-46.2023.8.19.0000, Rel. Des. Leila Santos Lopes, 18ª Câmara de Direito Privado, j. em 16.11.2023; e TJSP, AI nº 2084379-15.2015.8.26.0000, Rel. Des. Carlos Alberto Garbi, 2ª CRDE, j. em 31.08.2015.

Processo 4113246-86.2026.8.26.0100, Evento 1, INIC1, Página 20



*arresto, penhora, sequestro, busca e apreensão e constrição judicial ou extrajudicial*" (art. 6º, III, da LFR) sobre os bens das Requerentes, por atos judiciais ou extrajudiciais, inclusive compensação de créditos.

### IV.A.   Probabilidade do direito

102.     Primeiro, as Requerentes comprovaram a instauração de procedimento de mediação perante a Câmara Wind de Mediação (**doc. 2**), para o qual todos os Credores Financeiros Sujeitos foram listados para recebimento de convites de participação, preenchendo, portanto, o requisito do art. 20-B, § 1º, da LFR.

103.     Segundo, as Requerentes também preenchem os requisitos subjetivos para requerer a instauração de procedimentos recuperacionais, conforme exigido pelo art. 20-B, § 1º da LFR.

104.     De acordo com o entendimento consolidado na jurisprudência, tal requisito é demonstrado pela exposição das razões da crise enfrentada pela devedora, e pela comprovação do preenchimento dos requisitos elencados no art. 48 da LFR[28].

105.     Nesse sentido, em linha com o Enunciado nº 10 do Fórum Nacional de Recuperação Empresarial e Falências ("FONAREF")[29], vinculado ao Conselho Nacional de Justiça, a jurisprudência deste E. TJSP reconhece que a concessão da tutela prevista pelo art. 20-B, § 1º, da LFR exige apenas a apresentação dos documentos previstos pelo art. 48 da LFR. Confira-se:

> "O ajuizamento do pedido de tutela de urgência cautelar antecedente, consistente na suspensão das execuções movidas pelos credores contra a devedora pelo prazo de 60 dias, pressupõe a demonstração pela empresa autora do seu direito para requerer recuperação judicial. Nesse sentido, a petição inicial do pedido cautelar deve ser instruída com os documentos previstos no art. 48 da Lei n. 11.101/2005. Dispensa-se a apresentação dos documentos previstos no art. 51 da Lei n. 11.101/2005 que devem

---

[28] "Art. 48, da LFR. Poderá requerer recuperação judicial o devedor que, no momento do pedido, exerça regularmente suas atividades há mais de 2 (dois) anos e que atenda aos seguintes requisitos, cumulativamente: I – não ser falido e, se o foi, estejam declaradas extintas, por sentença transitada em julgado, as responsabilidades daí decorrentes; II – não ter, há menos de 5 (cinco) anos, obtido concessão de recuperação judicial; III – não ter, há menos de 5 (cinco) anos, obtido concessão de recuperação judicial com base no plano especial de que trata a Seção V deste Capítulo; IV – não ter sido condenado ou não ter, como administrador ou sócio controlador, pessoa condenada por qualquer dos crimes previstos nesta Lei".

[29] Durante o 1º Congresso do FONAREF, foi aprovado o Enunciado nº 10, segundo o qual "[o]s documentos demonstradores de que a empresa em dificuldade preenche os requisitos legais para requerer recuperação judicial, para os fins do art. 20-B, § 1º, da Lei n. 11.101/2005, são aqueles previstos no art . 48 da Lei n. 11.101/2005". Na justificativa para aprovação do Enunciado, pontuou-se que tais documentos são suficientes para "demonstração pela empresa autora do seu direito para requerer recuperação judicial", "dispensa[ndo]-se a apresentação dos documentos previstos no art. 51 da Lei n. 11.101/2005".

20



instruir a petição inicial somente no caso de ajuizamento da ação principal de recuperação judicial"[30].

106.   O mesmo entendimento é seguido pelas Varas Especializadas deste E. TJSP:

"[...] [O] artigo 20-B, § 1º da LRF adota como legitimados a pleitear a tutela de urgência cautelar as empresas que preenchem os requisitos para requerer a recuperação judicial (Art. 48 da LRF), que não se confundem com a documentação necessária para instrução do pedido de recuperação judicial (Art. 51 da LRF)"[31].

107.   Assim, em cumprimento ao art. 20-B, § 1º da LFR, as Requerentes apresentaram as causas concretas da sua atual situação patrimonial e as razões da crise econômico-financeira (**item II** acima) e, nos termos do art. 48 da LFR, comprovam que:

(i)     exercem regularmente suas atividades há mais do que os dois anos exigidos por lei (art. 48, *caput*, da LFR) (**doc. 4**);

(ii)    nunca foram falidas (art. 48, I, da LFR) (**doc. 5**);

(iii)   nunca obtiveram a concessão de recuperação judicial (art. 48, II, da LFR) (**doc. 5**); e

(iv)    não foram condenadas – e não têm administradores ou controladores que tenham sido condenados – pela prática de crimes falimentares (art. 48, IV, da LFR) (**doc. 6**).

108.   As Requerentes entendem, assim, que não é necessário apresentar os documentos que devem instruir o pedido de recuperação judicial, previsto no art. 51 da LFR. Afinal, o art. 20-B, §1º, da LFR exige a comprovação de que as requerentes preenchem os requisitos para "*requerer pedido de recuperação judicial*", em clara referência ao art. 48 da LFR, que estabelece os requisitos subjetivos que devem ser demonstrados pelo devedor. O art. 20-B, §1º, da LFR não se refere ao art. 51 da LFR, que não estabelece nenhum requisito subjetivo que deve ser comprovado pelo devedor, mas tão somente apresenta a lista documental que deve ser apresentada em caso de pedido de recuperação judicial.

---

[30] TJSP, AI nº 2093561-44.2023.8.26.0000, Rel. Des. J.B. Paula Lima, 1ª Câmara Reservada de Direito Empresarial, j. em 31.01.2024, g.n. No mesmo sentido: TJSP, AI nº 2260863-64.2024.8.26.0000, Rel. Des. J.B. Paula Lima, 1ª Câmara Reservada de Direito Empresarial, j. em 27.11.2024.

[31] TJSP, Processo nº 1018493-62.2024.8.26.0100, Juiz Ralpho Waldo de Barros Monteiro Filho, 2ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo/SP, j. em 11.03.2024, g.n. No mesmo sentido: TJSP, Processo nº 1024422-42.2025.8.26.0100, Juiz Paulo Furtado de Oliveira Filho, j. em 25.02.2025; TJSP, Processo nº 1018493-62.2024.8.26.0100, Juiz José Guilherme di Rienzo Marrey, 1ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo/SP, j. em 23.02.2024; TJSP, Processo nº 1018493-62.2024.8.26.0100, Juiz Marcello do Amaral Perino, 1ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo/SP, j. em 23.02.2024; TJSP, Processo nº 1008721-75.2024.8.26.0100, Juiz Adler Batista Oliveira Nobre, 1ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo/SP, j. em 30.01.2024; TJSP, Processo nº 1018493-62.2024.8.26.0100, Juiz João de Oliveira Rodrigues Filho, 1ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo/SP, j. em 25.07.2022.

21



109.    Essa diferença é importante, já que exigir a apresentação dos documentos do art. 51 da LFR cria um ônus desproporcional para a devedora. Afinal, caso a mediação seja bem-sucedida, o objetivo é justamente evitar o ajuizamento de pedido de recuperação judicial. E, do lado dos credores, não há qualquer prejuízo – se a recuperação judicial tiver que ser ajuizada, os documentos do art. 51 da LFR serão apresentados.

110.    De todo modo, caso o entendimento deste MM. Juízo seja diverso, as Requerentes requerem que a não apresentação dos documentos do art. 51 da LFR não impeça a concessão da tutela cautelar, dado ao alto risco de constrição patrimonial a que as Requerentes estão expostas. Neste cenário, as Requerentes se comprometem a apresentar os documentos no menor prazo possível.

**IV.B.    Perigo de dano**

111.    O perigo de dano irreversível para o deferimento da tutela de urgência prevista no art. 20-B, § 1º, da LFR depende da comprovação de que, se a tutela não for deferida, a mediação existente será prejudicada[32].

112.    As Requerentes preenchem esse requisito, sobretudo em função **(i)** da proximidade de vencimentos muito significativos referentes aos Créditos Financeiros Sujeitos e **(ii)** da adoção de medidas concretas que demonstram inequivocamente a disposição de credores de adotar medidas constritivas, mesmo quando ausente inadimplemento financeiro ou não-financeiro.

113.    Primeiro, com relação ao **vencimento iminente de Créditos Financeiros Sujeitos**, já no mês de julho, a Braskem estará exposta a compromissos financeiros de **(i) mais de R$ 750 milhões** em pagamentos de juros devidos aos titulares de notas estrangeiras denominadas em dólares, **(ii) mais de R$ 1,3 bilhão** em vencimentos de cartas de crédito e **(iii) mais de R$ 450 milhões** em vencimentos devidos em dívidas denominadas em reais.

114.    De um lado, o pagamento de dívida financeira em valor superior a **R$ 2,6 bilhões**, apenas no próximo mês, comprometeria significativamente a posição de caixa das Requerentes. O caixa do Grupo Braskem seria reduzido para além do mínimo operacional.

115.    A operação do Grupo Braskem sem disponibilidade de caixa mínimo operacional acarretaria impactos concretos às atividades das Requerentes, transformando um contexto de descompasso no cronograma de pagamentos da dívida financeira em uma crise mais grave,

---

[32] "Por meio de decisão judicial cautelar a devedora passa a ter a proteção típica do *stay period* concedido em sede de recuperação judicial. Trata-se de mecanismo inovador, que contempla a criação de um *breathing space*, indispensável à efetividade de uma negociação coletiva" (MONTEIRO, André Luis; VERÇOSA, Fabiane; FONSECA, Geraldo. Arbitragem, mediação, falência e recuperação: resolução de disputas na empresa em crise. 1ª edição. São Paulo: Thomson Reuters Brasil, 2022, p. 37).



que atingiria a liquidez necessária para manutenção das operações e relações com contrapartes operacionais.

116.    Na prática, isso significa que o Grupo Braskem ficaria sem caixa suficiente para honrar seus compromissos de compra de matérias-primas, pagamento de fornecedores e colaboradores e investimentos em manutenção e segurança. Enfim, tudo o que é necessário para gerir a empresa que é a maior produtora de resinas termoplásticas (PE, PP e PVC) das Américas.

117.    E os impactos não se restringiriam ao Grupo Braskem, já que toda a cadeia produtiva seria afetada em caso de dificuldade das Requerentes em honrar as suas obrigações. Clientes sofreriam atraso na entrega de mercadoria e, assim, uma das principais indústrias de base nacional seria afetada em um grande *efeito dominó*, até atingir os próprios consumidores. O risco de dano certamente reverberaria na cadeia produtiva nacional e na sociedade civil.

118.    De outro lado, em caso de não realização de pagamentos, todo o endividamento financeiro do Grupo Braskem no valor total de **R$ 54.802.166.474,06** será acelerado, com vencimento antecipado cruzado.

119.    A conclusão é que o Grupo Braskem precisa de algum tipo de renegociação para tratar os referidos pagamentos. E, diante da pulverização de credores e do curtíssimo prazo até os vencimentos bilionários, não há como prosseguir com a renegociação sem proteção judicial.

120.    Como apontado, as Requerentes já vinham se engajando com os titulares de Créditos Financeiros Sujeitos, por meio da assinatura de acordos de confidencialidade para troca de informações, realização de reuniões e envios de propostas que promoveriam, de forma organizada, a extensão de linhas de cartas de crédito e o pagamento dos Créditos Financeiros Sujeitos em um cronograma mais alongado, preservando a estabilidade operacional. Apesar das interações promovidas pelo Grupo Braskem, não foi possível obter, de todos os Credores Financeiros Sujeitos, um compromisso extrajudicial de suspensão de atos de cobrança ou execução, de modo que o risco persiste.

121.    Ademais, o ambiente organizado e controlado da mediação instaurada e a tutela de urgência aqui requerida permitirão a continuidade das negociações com esses credores financeiros, que terão a oportunidade de sugerir e propor soluções a serem analisadas pelas Requerentes no contexto da sua reestruturação.

122.    Por outro lado, em caso de não concessão da tutela requerida, a atuação dos Credores Financeiros Sujeitos certamente não estaria focada na construção da melhor solução coletiva estruturante, por meio da participação nas sessões no âmbito da Mediação. Haveria, na verdade, uma movimentação dos Credores Financeiros Sujeitos para satisfazer seus créditos de forma individual e imediata, com o ajuizamento de medida de cobrança – ou, pior,

23



exercício de medidas extrajudiciais de constrição imediata de caixa, como a compensação de valores mantidos pelo Grupo Braskem junto a instituições financeiras.

123.    Portanto, estaria deflagrada uma corrida desenfreada pelos ativos do Grupo Braskem[33], com cada Credor Financeiro Sujeito buscando a satisfação de seu crédito individual, sem adoção de qualquer esforço para uma solução global e construtiva para o seu endividamento. Como nenhum Credor Financeiro Sujeito aceitaria ser individualmente prejudicado por não participar de tal corrida, a Mediação proposta pelo Grupo Braskem restaria totalmente esvaziada, instalando-se um cenário de tragédia dos comuns[34].

124.    Segundo, como demonstração concreta de condutas agressivas já emplacadas por parte dos Credores Financeiros Sujeitos antes mesmo da configuração de inadimplementos pecuniários ou não pecuniários, vale destacar o comportamento do Banco Safra S.A. ("Safra"). Mesmo sem qualquer fundamento contratual, o Safra vem articulando explicações genéricas para buscar a cobrança acelerada de **R$ 348.101.177,30**, inclusive sob ameaça de compensação de saldos mantidos pelo Grupo Braskem junto à instituição financeira e adoção de outras medidas constritivas (conforme notificações enviadas pelo Safra – **doc. 7**).

125.    Assim, se mesmo sem qualquer evento de vencimento antecipado, já há credores iniciando a corrida pelos ativos do Grupo Braskem, não há dúvidas de que, sem proteção judicial, mais credores irão aderir à corrida, em caso de não pagamento dos vencimentos de julho. Essas rotas individuais de satisfação de seus créditos, desvinculadas da negociação coletiva (e dos interesses amplos que são tutelados a partir de uma perspectiva coletiva, como a preservação da atividade empresarial, em benefício de todos os *stakeholders*) não devem ser permitidas.

126.    Trata-se de situação contrária a todo o espírito da LFR, que tem como fundamento primordial o princípio da preservação da empresa, previsto no art. 47. Vale dizer que referido princípio não se aplica ao caso concreto de forma abstrata ou difusa, mas justamente para preservar a atividade empresarial na modalidade de *going concern* de uma empresa cuja atividade econômica é plenamente viável. Ou seja, aplica-se para garantir o equilíbrio entre os diversos interesses que permeiam a existência da empresa e impedir que ataques de credores isolados destruam valor relevante para pagamento de toda a coletividade de

---

[33] "A medida cautelar em apreço visa proteger o patrimônio da devedora em crise da "corrida de credores", viabilizando seja equacionada uma conjuntura dotada de gravidade com o uso dos instrumentos próprios à conciliação e à mediação, e não ostenta um caráter autônomo. Ela está sempre vinculada ao planejamento da solução desta situação de crise empresarial, que pode resultar da celebração de transações gerais ou parciais, conjugado, eventualmente, um pleito de homologação de recuperação extrajudicial, ou, alternativamente, o ajuizamento de um requerimento de recuperação judicial" (TJSP, AI n° 2246437- 52.2021.8.26.0000, Rel. Des. Fortes Barbosa, 1ª CRDE, j. em 24.03.2022).

[34] A tragédia dos comuns é o quadro em que os credores se encontram incentivados a agir de forma unilateral para garantir a preservação de seus interesses individuais. A atuação difusa e desenfreada dos credores para satisfação imediata dos seus respectivos créditos ocasiona a "tragédia" consistente na disputa pelos ativos da companhia sendo que a maioria dos credores restaria sem pagamento ou sem pagamento integral. Sobre o conceito de tragédia dos comuns ("*tragedy of the commons*") cf. G. HARDIN, The Tragedy of the Commons, in Science, v. 162, 1968, pp. 1.243-1.248.

24



credores, além de consumidores, fornecedores e toda a comunidade beneficiada pela atividade da empresa em crise[35].

127.     Diante do exposto, fica evidente que, em caso de não concessão de tutela de urgência, a Mediação estaria concretamente prejudicada. Afinal, o risco de adoção de medidas constritivas e executivas por credores foi o fundamento central para concessão de tutelas cautelares acessórias a procedimentos de mediação, conforme deferidas aos Grupos Mover[36], Unigel[37] e Bio Fuels[38] por Varas Especializadas deste E. TJSP.

128.     A concessão da medida, por outro lado, não gera perigo de dano reverso, tendo em vista que a suspensão de que trata o art. 20-B, § 1º, da LFR é temporária, limitada a 60 (sessenta) dias, e os Credores Financeiros Sujeitos manterão íntegros seus créditos – restando protegidos, ainda, contra efeitos deletérios que decorreriam da corrida desordenada de ativos, como a quebra da paridade de credores e a menor recuperabilidade de créditos em cenário de impacto operacional.

**IV.C.   Escopo da tutela cautelar**

*i.        Suspensão de atos de satisfação dos Créditos Financeiros Sujeitos, incluindo compensações*

129.     No caso da tutela cautelar de que trata o art. 20-B, § 1º, da LFR, "*a suspensão das execuções daqueles que estão envolvidos na mediação ou conciliação é absolutamente necessária para a criação de um ambiente saudável e eficiente de negociação*". Ou seja, deve-se conferir às devedoras, em relação aos credores abrangidos, a proteção típica do *stay period* da recuperação judicial ou da recuperação extrajudicial, criando o *breathing space* indispensável à efetividade de uma negociação coletiva.

130.     Por isso, ao longo do prazo de 60 (sessenta) dias, para que se permita o bom andamento da Mediação, é impositiva a suspensão de todas as execuções ajuizadas contra as Requerentes pelos Credores Financeiros Sujeitos, bem como de qualquer medida constritiva judicial ou extrajudicial sobre os bens das Requerentes.

---

[35] "[...] Cabe dizer que o intuito de preservação da empresa estaria vinculado ao resguardo de uma organização, que abrange inúmeros interesses e cujo fundamento de existência refere-se exatamente ao respeito a esses mesmos interesses. Em outras palavras, a preservação da empresa é alcançada por meio de respeito, equilíbrio e integração entre os interesses por ela influenciados." (CEREZETTI, Sheila Christina Neder. A recuperação judicial de sociedade por ações: o princípio da preservação da empresa na Lei de Recuperação e Falência. São Paulo: Malheiros, 2012).

[36] "[A] propositura de ações executivas pode dificultar ou prejudicar a evolução das propostas materiais, além do embaraço que constrições patrimoniais ocasionam à atividade regular do empresário e da incerteza que podem suscitar junto aos credores das demais classes" (Processo nº 1111483-72.2024.8.26.0100).

[37] "Diante da crise notada pelos credores, há o sério risco de que eles passem a ajuizar ações de execução e promovam a penhora de bens, com grave prejuízo à atividade empresarial e à solução negociada mais benéfica para todos" (Processo nº 1174558-22.2023.8.26.0100).

[38] Processo nº 1018493-62.2024.8.26.0100.

25



131.    Neste ponto, cumpre ressaltar que, no contexto da Mediação, determinadas instituições financeiras credoras do Grupo Braskem poderiam buscar aplicar a imposição de cláusulas contratuais que autorizam a apropriação de valores depositados em contas bancárias ou outros ativos pertencentes às Requerentes para amortização de Créditos Financeiros Sujeitos. Confiram-se alguns exemplos de cláusulas desse tipo[39]:

> 2.1.    Ocorrendo um Evento de Crédito previsto Cláusula 2.2 abaixo, as Operações Ativas e Passivas serão consideradas imediata e automaticamente vencidas e as Operações de Derivativos e de Compra e Venda serão consideradas liquidadas antecipadamente, independentemente da data original de vencimento dessas operações. O valor de cada operação será considerado automaticamente devido e exigível, nos termos da Cláusula 1.1.1, acima, sendo objeto de compensação, nos termos deste Acordo.

> **13.3    Right of Setoff**
>
> If an Event of Default under Section 13.1 (*Events of Default*) shall have occurred and be continuing, each Obligor hereby authorizes each Lender and each Affiliate of each Lender to proceed, to the extent permitted by applicable law, without prior notice, by right of setoff, banker's lien or counterclaim, against any assets of the Borrower (or the Guarantor, as the case may be) in any currency that may at any time be in the possession of such Lender or Affiliate, at any branch or office, to the full extent of all amounts payable to the Lenders hereunder. Any Lender that so proceeds against any Obligor or that has an Affiliate that so proceeds against any Obligor, the Lender shall forthwith give notice to the Facility Agent of any action taken by such Lender or Affiliate pursuant to this Section 13.3; provided that the failure to give such notice shall not affect the validity of such setoff and application.

132.    No total, estima-se que **a incidência de cláusulas desse tipo poderia resultar na apropriação de mais de R$ 200 milhões depositados em contas bancárias de titularidade das Requerentes**. Nessa hipótese, os esforços de reestruturação empreendidos pelo Grupo Braskem e o resultado útil da Mediação seriam comprometidos de forma irreversível, na medida em que a compensação **(i)** privaria as Requerentes de recursos essenciais ao desenvolvimento de suas operações, usados para arcar com o pagamento de colaboradores, fornecedores e outras despesas essenciais às atividades do Grupo Braskem; e **(ii)** implicaria, ainda, a satisfação dos créditos de determinados Credores Financeiros Sujeitos de forma distinta e privilegiada em relação à solução coletiva que seria discutida ao longo da Mediação – o que, na prática, significaria conferir tratamento privilegiado a tais credores em detrimento de todos os demais.

---

[39] Segue tradução livre da segunda cláusula: "Na hipótese de ocorrência e continuidade de um Evento de Inadimplemento nos termos da Cláusula 13.1 (*Eventos de Inadimplemento*), cada Devedor autoriza, desde já, cada Credor e cada Afiliada de cada Credor a proceder, na medida permitida pela legislação aplicável, sem notificação prévia, pelo direito de compensação, privilégio bancário ou reconvenção, contra quaisquer ativos do Mutuário (ou do Garantidor, conforme o caso) em qualquer moeda que se encontrem, a qualquer tempo, em poder de referido Credor ou Afiliada, em qualquer agência ou escritório, até o limite integral de todos os valores devidos aos Credores nos termos deste instrumento. Qualquer Credor que assim proceda contra qualquer Devedor, ou que possua uma Afiliada que assim proceda contra qualquer Devedor, deverá prontamente notificar o Agente da Linha de Crédito (*Facility Agent*) a respeito de qualquer medida adotada por referido Credor ou Afiliada nos termos desta Cláusula 13.3; ressalvado que a ausência de tal notificação não afetará a validade da referida compensação e de sua aplicação."

Processo 4113246-86.2026.8.26.0100, Evento 1, INIC1, Página 27



133.    Destaca-se que tal tratamento privilegiado, em violação flagrante ao princípio da *par conditio creditorum* (arts. 49 e 59 da LFR), não decorreria de qualquer garantia (real ou fiduciária) ou mecanismo de trava bancária a que o credor faria jus, mas tão somente da circunstância de o Credor Financeiro Sujeito ter acesso a recursos do Grupo Braskem depositados em conta – e, assim, dispor de meios para satisfação individual de seu crédito, desvinculada do procedimento coletivo.

134.    Permitir, nessas circunstâncias, a compensação de um Crédito Financeiro Sujeito "***implicaria o pagamento imediato de parte dos credores de determinada classe, enquanto o restante se submeteria aos termos do plano*** [...]. *A compensação outrossim poderia até mesmo levar à* **hipótese absurda de que aqueles que estão em mora frente ao grupo empresarial em recuperação (e, portanto, ainda tem um débito) recebam indiretamente seu crédito por meio da compensação**, *ao passo que outros credores, em dia com suas obrigações frente às recuperandas, ostentado apenas o status de credores, devam aguardar todo o trâmite recuperacional para receber seu crédito, o qual ademais será submetido a reduções oriundas do deságio previsto no plano*"[40].

135.    É evidente, portanto, que as restrições decorrentes da tutela cautelar prevista no art. 20-B, § 1º, da LFR também atingem a compensação de Créditos Financeiros Sujeitos, por se tratar de meio de satisfação do crédito, equivalente ao pagamento, cuja exigibilidade está suspensa. E, no caso concreto, o reconhecimento expresso da vedação à apropriação de recursos para satisfação de Créditos Financeiros Sujeitos é essencial para preservar o caixa das Requerentes – já comprometido por sua atual situação econômico-financeira – e, assim, assegurar a continuidade de suas atividades produtivas e resguardar o resultado útil da Mediação.

136.    Assim, como decorrência da concessão desta tutela cautelar acessória à Mediação, deve-se reconhecer a suspensão de todas as execuções, constrições patrimoniais e/ou compensações de Créditos Financeiros Sujeitos das Requerentes, pelo prazo de 60 dias.

### *ii.    Impossibilidade de vencimento antecipado dos Créditos Financeiros Sujeitos*

137.    Grande parte dos contratos celebrados entre o Grupo Braskem e os Credores Financeiros Sujeitos prevê a possibilidade de resilição ou declaração de vencimento antecipado em razão do mero ajuizamento de procedimentos previstos na LFR, bem como do não pagamento de créditos que, agora, são objeto da Mediação.

138.    Isso, é claro, **ameaça o resultado útil da Mediação** e **prejudica diretamente os esforços de reestruturação do Grupo Braskem**, o que vai de encontro à finalidade dos arts.

---

[40] TJSP, AI nº 2260720-90.2015.8.26.0000, Rel. Des. Fabio Tabosa, 2ª Câmara Reservada de Direito Empresarial, j. em 12.05.2016.

27



20-B, §1º e 47 da LFR – pautados na continuidade da empresa, o que, logicamente, demanda a preservação da teia de contratos que a estrutura.

139.    Justamente em razão da incompatibilidade entre previsões contratuais como essas e os objetivos da LFR, a jurisprudência deste E. TJSP tem restringido a aplicação das chamadas cláusulas *ipso facto* em uma série de processos de recuperação judicial e extrajudicial. Confira-se:

> "Recuperação judicial. **Suspensão da cláusula de vencimento antecipado de contratos durante o stay period. Possibilidade**. Condição que atende a finalidade do processo de recuperação judicial, assegurando a preservação da função social da empresa e da sua atividade econômica"[41].

> "Direito Empresarial. Agravo de Instrumento. Recuperação judicial. Recurso desprovido. Agravo de instrumento interposto contra decisão que deferiu tutela para declarar a impossibilidade de resolução contratual e vencimento antecipado dos contratos devido ao pedido de recuperação judicial. **A propositura da recuperação judicial não implica extinção automática do vínculo contratual, especialmente sem demonstração clara de impossibilidade de cumprimento ou risco iminente de inadimplemento**. A cláusula resolutiva expressa limita a aplicação da Lei 11.101/2005, que visa à preservação da empresa, sendo prematura a revogação da tutela concedida devido ao perigo de dano reverso"[42].

140.    O mesmo entendimento vem sendo adotado também em casos envolvendo tutelas cautelares antecedentes ajuizadas com base nos arts. 6º, §12º ou 20-B, §1º da LFR.

141.    Exemplificativamente, no caso do Grupo Rio Alto, o MM. Juízo da 2ª Vara de Recuperação Judicial e Falências determinou a *"impossibilidade de rescisão, vencimento antecipado ou imposição de sanções"* em contratos essenciais celebrados pelas devedoras, *"quer em razão do eventual não pagamento de créditos cuja exigibilidade se encontrar suspensa, quer em razão do simples início da Mediação ou do ajuizamento desta Cautelar"*[43], e foi mantida pelo E. TJSP[44]. O mesmo entendimento também foi aplicado e ratificado no caso do Grupo Unigel[45].

142.    Entendimento semelhante foi adotado pelo MM. Juízo da 3ª Vara de Falências e Recuperações Judiciais de São Paulo/SP na tutela cautelar ajuizada pela Gold Energia, e

---

[41] TJSP, AI nº 2220864-70.2025.8.26.0000, Rel. Des. Rui Cascaldi, 1ª Câmara Reservada de Direito Empresarial, j. em 30.10.2025.
[42] TJSP, AI nº 2131465-30.2025.8.26.0000, Rel. Des. J.B. Paula Lima, 1ª Câmara Reservada de Direito Empresarial, j. em 30.07.2025.
[43] TJSP, Processo nº 1024422-42.2025.8.26.0100, Juiz Paulo Furtado de Oliveira Filho, decisão de 18.07.2025.
[44] TJSP, AI nº 2078729-35.2025.8.26.0000, Rel. Des. Fortes Barbosa, 1ª Câmara Reservada de Direito Empresarial, j. em 11.06.2025.
[45] TJSP, Processo nº 1105782-96.2025.8.26.0100, Juiz Paulo Furtado de Oliveira Filho, decisão de 13.08.2025.

28



também pelo E. TJSP no caso da <u>Polimport</u>[46], em uma tutela cautelar ajuizada com base no art. 6º, § 12, da LFR, visando à antecipação dos efeitos do *stay period*. Confira-se:

> "**Defiro, ainda, a tutela requerida para a declaração de impossibilidade de resolução contratual e declaração de vencimento antecipado dos contratos em razão do pedido de tutela e suas circunstâncias inerentes.** Ressalto que, embora a liberdade contratual seja a regra, referida cláusula resolutiva expressa contraria a função social do contrato nos termos do art. 421 do Código Civil, uma vez que limita a aplicação e o alcance das disposições da Lei 11.101/2005, mormente preservação da empresa. Assim, considerando o interesse social, é hipótese de revisão excepcional do contrato"[47].

> "**Fato é que o vencimento antecipado de obrigações**, com constrições em valores expressivos realizadas pelos bancos credores logo no início do processo de recuperação judicial, antes mesmo de qualquer análise sobre cada crédito pelo Juízo recuperacional, **poderia inviabilizar a continuidade do procedimento, exterminando no nascedouro uma recuperação considerada inicialmente viável.** Portanto, trata-se de medida regularmente determinada pelo competente Juízo da recuperação judicial, à luz do princípio de preservação da empresa (art. 47 da Lei Federal n.º 11.101/2005), frente à análise das medidas que poderiam atingir irreversivelmente o patrimônio, as atividades essenciais e os negócios jurídicos substanciais da empresa devedora"[48].

143.    No caso concreto, a decretação de vencimento antecipado por Credores Financeiros Sujeitos, em razão do início deste procedimento ou do não pagamento de valores com exigibilidade suspensa, poderia repercutir em outras relações contratuais (inclusive operacionais) mantidas pelo Grupo Braskem e por suas subsidiárias, cujas contrapartes poderiam buscar a rescisão ou a aceleração de obrigações com fundamento em previsões de *cross-default* ou *cross-acceleration*.

144.    Essas consequências contratuais em cadeia levariam ao estrangulamento das atividades operacionais do Grupo Braskem, contrariando o escopo desta tutela cautelar acessória à mediação, pautada no equacionamento do endividamento financeiro em ambiente de estabilidade, com preservação do curso normal das operações do Grupo Braskem.

145.    Por outro lado, a suspensão deste direito não causa qualquer prejuízo às contrapartes. Quanto aos Credores Financeiros Sujeitos, a proteção decorrente da tutela cautelar abarca créditos vencidos e vincendos, não havendo qualquer prejuízo decorrente da vedação à declaração de vencimento antecipado para sua posição creditória.

---

[46] Polimport Comércio e Exportação Ltda.
[47] TJSP, Processo nº 1021294-14.2025.8.26.0100, juiz Leonardo Fernandes dos Santos, decisão de 20.02.2025.
[48] TJSP, AI nº 2132785-52.2024.8.26.0000, 1ª Câmara Reservada de Direito Empresarial, Rel. Des. Alexandre Lazzarini, j. 27.11.2024.



146.     Igualmente, com relação aos demais credores (inclusive operacionais) que, por efeito cascata, poderiam aplicar disposições de *cross-default* ou de *cross-acceleration*, também não há qualquer prejuízo. Afinal, o Grupo Braskem está adimplente com todos os seus fornecedores e assim pretende continuar. E, em caso de inadimplemento futuro no âmbito dos instrumentos, as prerrogativas contratuais das contrapartes não estarão afetadas. Não se busca aqui uma tutela ampla e geral, mas apenas que os Credores Financeiros Sujeitos não declarem o vencimento antecipado apenas em função do presente pedido e/ou do não pagamento de créditos que serão objeto de negociação na Mediação.

147.     Assim, ante o cenário de iminente vencimento de dívidas dos Credores Financeiros Sujeitos – que poderia implicar, por efeito dominó, resolução unilateral de contratos essenciais operacionais e busca desenfreada pelos ativos das Requerentes –, o deferimento da medida cautelar ora requerida é fundamental para a continuidade das operações das Requerentes e para resguardar o resultado útil da Mediação.

## V.
## SEGREDO DE JUSTIÇA TEMPORÁRIO,
## APENAS ATÉ O DEFERIMENTO DA TUTELA CAUTELAR

148.     Ao longo dos últimos seis meses, após anunciar o engajamento em negociações com credores a respeito de sua estrutura de capital, a situação financeira do Grupo Braskem vem sendo intensamente acompanhada pela mídia nacional e internacional, bem como por seus milhares de credores e *stakeholders*.

149.     Como narrado ao longo desta petição, as Requerentes passam por um momento especialmente delicado, com vencimentos de obrigações em valores substanciais no curto prazo que podem comprometer de forma grave a sua posição de caixa ou, em caso de descumprimento, ensejar vencimentos cruzados da ordem de R$ 55 bilhões.

150.     O objetivo desta tutela cautelar é justamente proteger o Grupo Braskem dessa situação, viabilizando um ambiente seguro para as negociações com os Credores Financeiros Sujeitos, evitando corrida desenfreada pelos seus ativos e, assim, preservando o resultado útil da Mediação.

151.     Ocorre que, entre o ajuizamento deste pedido e o efetivo deferimento da tutela por este MM. Juízo, o Grupo Braskem estará temporariamente exposto a medidas agressivas de seus credores, que podem, inclusive, ocorrer em outras jurisdições. Embora se espere que tal período seja curto, credores hostis terão tempo suficiente para declarar o vencimento antecipado de dívidas, compensar valores depositados em contas bancárias ou outras medidas constritivas em geral, o que pode frustrar o resultado útil da Mediação.

30



152.    E essas medidas não poderão ser revertidas posteriormente, mesmo que assim seja determinado por este MM. Juízo. Afinal, parte dos ativos e passivos do Grupo Braskem não estão localizados no Brasil, mas em outras jurisdições. Assim, apenas com o deferimento da tutela cautelar tais comportamentos oportunistas poderão ser evitados.

153.    Por essa razão, o Grupo Braskem pede a este MM. Juízo que, excepcionalmente, mantenha o segredo de justiça destes autos **apenas** até o deferimento da tutela cautelar pretendida, como exercício do poder geral de cautela. Trata-se da medida mais razoável e adequada para, simultaneamente, preservar o resultado útil da Mediação e proteger as Requerentes.

154.    Afinal, nos termos do art. 297 do CPC, "*o juiz poderá determinar as medidas que considerar adequadas para efetivação da tutela provisória*", o que, naturalmente, pode compreender a atribuição de sigilo temporariamente.

155.    As Requerentes esclarecem que não pretendem que esta tutela cautelar permaneça em segredo de justiça durante todo o seu processamento. Muito pelo contrário: após o deferimento por este MM. Juízo, o Grupo Braskem não se opõe a que o sigilo seja levantado, observando o princípio geral da publicidade, como já decidido em outros casos de tutelas cautelares processadas neste E. TJSP[49].

156.    De forma objetiva, o pedido trazido a este MM. Juízo não consiste em tentativa de violação do princípio geral da publicidade que deve reger os procedimentos regulados pela LFR. Trata-se, na verdade, de medida acautelatória, requerida de forma temporária, tão somente para preservar o resultado útil da Mediação.

157.    Pelo exposto, requer-se que os autos deste processo sejam mantidos em segredo de justiça **apenas** até a apreciação e deferimento da tutela cautelar pretendida, nos termos do art. 297 do CPC.

## VI.
## PEDIDOS

158.    Por todo o exposto, uma vez comprovado que as Requerentes preenchem todos os requisitos necessários ao deferimento de seu pedido, conforme previstos no art. 20-B, § 1º, da LFR e do art. 305 e seguintes do CPC, requer-se que esta tutela cautelar seja **recebida** e **deferida** em caráter liminar, *inaudita altera parte*. Nesse ponto, requer-se que seja mantido o **segredo de justiça** destes autos apenas até o deferimento da tutela cautelar, nos termos do art. 297 do CPC.

---

[49] TJSP, Processo n° 1008721-75.2024.8.26.0100, 2ª Vara de Falências e Recuperações Judiciais, Juiz Adler Batista Oliveira Nobre, decisão de 30.01.2024; TJSP, Processo n° 1069126-48.2022.8.26.0100, 1ª Vara de Falências e Recuperações Judiciais, Juiz João de Oliveira Filho, decisão de 12.07.2022.

31



159.    Com o deferimento da tutela cautelar, requer-se que este MM. Juízo expeça ofício a ser encaminhado pelas Requerentes aos Credores Financeiros Sujeitos convidados à Mediação (**doc. 2**), para determinar, pelo prazo de 60 (sessenta) dias, **(i)** a suspensão das ações e execuções ajuizadas contra as Requerentes para a cobrança dos Créditos Financeiros Sujeitos; **(ii)** a impossibilidade de adoção, por parte de seus titulares, de medidas judiciais ou extrajudiciais de execução, constrição ou arresto dos bens das Requerentes; e **(iii)** a vedação à compensação de Créditos Financeiros Sujeitos, nos termos do art. 20-B, § 1º da LFR, bem como o vencimento antecipado e/ou rescisão de contratos mantidos com os Credores Financeiros Sujeitos, em razão do protocolo da presente tutela cautelar, da instauração da Mediação ou do não pagamento de valores cuja exigibilidade encontra-se suspensa.

160.    Requer-se que todas as intimações relativas a este processo sejam feitas exclusiva e cumulativamente em nome dos advogados **Eduardo Secchi Munhoz**, **OAB/SP nº 126.764**, e **Ana Elisa Laquimia de Souza**, **OAB/SP nº 373.757,** sob pena de nulidade.

161.    As Requerentes protestam pela juntada de tradução juramentada dos documentos em línguas estrangeiras no prazo de 15 dias contados desta data.

162.    Atribui-se à causa o valor de R$ 55.688.794.079,95, que corresponde à soma do valor total dos Créditos Financeiros Sujeitos (R$ 54.802.166.474,06) com o valor total das dívidas *intercompany* (R$ 886.627.605,89).

Termos em que pedem deferimento.
São Paulo, 24 de junho de 2026

Eduardo Secchi Munhoz
OAB/SP nº 126.764

Ana Elisa Laquimia de Souza
OAB/SP nº 373.757

Danilo Domingues Guimarães
OAB/SP nº 422.993

Raphael Maldi Mendes
OAB/SP nº 439.913

Lucas Pereira Calmon
OAB/SP nº 508.290

Caio de Magalhães Brega
OAB/SP nº 545.784

32

Processo 4113246-86.2026.8.26.0100, Evento 1, INIC1, Página 33



## Lista de Documentos

| Documento | Descrição |
|---|---|
| **Doc. 1** | Procurações e documentos para comprovação de poderes |
| **Doc. 2** | Comprovação de instauração do procedimento de mediação perante a Câmara Wind de Mediação, incluindo a lista de credores abrangidos pela Mediação |
| **Doc. 3** | Relação de Créditos Abrangidos pela Mediação |
| **Doc. 4** | Certidões e declarações que comprovam o exercício regular das atividades das Requerentes há mais de dois anos (art. 48, *caput*, da LFR) |
| **Doc. 5** | Certidões e declarações que comprovam que as Requerentes nunca foram falidas ou ajuizaram pedido de recuperação judicial (art. 48, I, II e III, da LFR) |
| **Doc. 6** | Certidões e declarações que comprovam que as Requerentes, os administradores e controladores das Requerentes nunca foram condenados pela prática de crimes falimentares (art. 48, IV, da LFR) |
| **Doc. 7** | Notificações enviadas pelo Banco Safra S.A. à Braskem S.A. |

33

## EXHIBIT B

**Certified Translation of the Brazilian Petition for a Preliminary Stay**

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                          CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                 RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 48*

I, Cristina Gonzales, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that a document written in PORTUGUESE was submitted to me, the translation of which is as follows:

[*Logo of eMunhoz ADVOGADOS*]

**TO THE HONORABLE LAW JUDGE OF THE _ BANKRUPTCY AND REORGANIZATION COURT OF THE JUDICIAL DISTRICT OF THE STATE OF SÃO PAULO, CAPITAL**

<u>**URGENT DISTRIBUTION**</u>
<u>**PETITION FOR PRELIMINARY INJUNCTION**</u>

**(1) BRASKEM S.A.**, a publicly-held corporation, enrolled with the CNPJ/MF [National Register of Legal Entities] under No. 42.150.391/0001-70, with its principal place of business at Rua Eteno, nº 1561, Polo Industrial de Camaçari, Camaçari, Bahia, CEP 42816-200 ("Braskem"); **(2) BRASKEM NETHERLANDS B.V.**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the city of Rotterdam, the Netherlands, at Weena 240, 9th Floor, Tower C, 3012NJ, registered with the Dutch Trade Chamber under No. 24401995 ("Braskem Netherlands"); **(3) BRASKEM NETHERLANDS INC. B.V.**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the city of Rotterdam, the Netherlands, at Weena 240, 9º andar, Torre C, 3012NJ, registered with the Dutch Trade Chambers under No. 62115081 ("Braskem Netherlands Inc."); **(4) BRASKEM TRADING & SHIPPING B.V.**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the city of Rotterdam, the Netherlands, at Weena 240, 9º andar, Torre C, 3012NJ, registered with the Dutch Trade Chambers under No. 90073614 ("BT&S"); **(5) BRASKEM NETHERLANDS FINANCE B.V.**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the city of Rotterdam, at Weena 240, 4º andar, Torre C, 3012NJ, the Netherlands, registered with the Dutch Trade Chambers under No. 61905771 ("Braskem Netherlands Finance"); and **(6) BRASKEM AMERICA FINANCE COMPANY**, a company organized and existing under the laws of Delaware, United States of America, at 251 Little Falls Drive, Wilmington, New Castle County, Delaware, 19808, the United States of America, registered with the Delaware State Department, Corporations Division, under number 5007185 ("Braskem America Finance" and when jointly named with the companies from (1) to (6), designated "Petitioners" ou "BraskemGroup") respectfully come before Your Honor by their lawyers (**exhibit 1**) to file this

<u>**PETITION FOR PROVISIONAL INJUNCTION**</u>

pursuant to articles 305 et seq. of the Brazilian Code of Civil Procedure ("CPC") and article 20-B, § 1º, of Law 11,101/05 (the Brazilian Law on Bankruptcy and Reorganization - "LFR"), we hereby petition for the immediate injunction to preserve Petitioners' business activities and ensure a useful outcome from the mediation procedure initiated at the Câmara Wind de Mediação on June 24, 2026, based on the reasons below.

**I.**
**SUBJECT MATTER OF THIS LAWSUIT:**
**STABILITY DURING THE MEDIATION PROCESS**

1.      Braskem Group, together with its main stakeholders, has been considering financial-economic alternatives to optimize its capital structure and mitigate impacts arising from a longstanding downcycle in the petrochemical industry. Such process is being conducted with the trading of information and good faith discussions among Petitioners and their main financial creditors.

2.      Braskem Group's goal is to reach an agreement with its main financial creditors to enable a global restructuring of its liabilities in one holistic solution that allows a definite balance of its capital structure to

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*　　　　　　　　*Livro nº 337*　　　　　　　　*Folha nº 49*

ensure its financial sustainability in the long run. Within Petitioners' plan, a solution that would allow the accommodation of Braskem Group's financial creditors aligned with Petitioners' availability of cash should be completed before their financial obligations expected for July 2026 mature.

3.　　　Nevertheless, unforeseeable events occurred during this first half of 2026 which prevented the plan they had first designed from being fulfilled without exposing the Braskem Group to a major risk of having its assets restricted.

4.　　　The war between Iran and the United States obliterated any predictability in the petrochemical market - the industry Braskem Group does business. Price and spread volatility caused by Iran's closing the Strait of Hormuz made the Braskem Group (and all of the other industry players) redo its projections, and business models and plans. After all, the numbers reported to creditors in 2025 were no longer applicable, and all of the involved parties were forced to re-evaluate their premises to build a structuring solution.

5.　　　Braskem's ownership composition suffered some changes. As Braskem broadly released in its relevant facts and communication to the market[1], the Braskem Group's governance was changed with the transfer of the equity that used to be held by NSP Investimentos S.A. – under Judicial Reorganization (an investment vehicle of former Odebrecht Group) to the investment fund Shine I Fundo de Investimento em Participações Responsabilidade Limitada ("Shine Fund").

6.　　　The complexity of the transfer – which demanded not only ratification by governmental bodies, such as multiples antitrust authorities[2], but also a court ratification that was granted within the scope of Proceeding No. 4071017-14.2026.8.26.0100 – demanded more time than expected at first for its completion. The transfer was only completed on June 05, 2026[3] and along with it came a significant change to the Braskem Group's governance with the execution of a new shareholders' agreement between Shine Fund and Petróleo Brasileiro S.A. ("Petrobras")[4], the election of a new board of directors and a new statutory executive office[5].

---

[1] See Relevant Fact on April 20, 2026 available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/d0ea332a-b346-84ba-f626-7cf92a319e53?origin=2 accessed on June 23, 2026; Communication to the Market on June 05, 2026, available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/6fd5c493-9b3c-784c-422f-6c026a97d3fa?origin=2 accessed 23 June 2026; and the Material Fact of June 05, 2026, available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/2cdea9b1-be43-700f-1854-ee0eddba5d79?origin=2 accessed June 23, 2026.

[2] Check the Material Fact of March 06, 2026, available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/f4d07809-fdcc-1ffb-70fe-aa111afd7d05?origin=2 accessed on June 23, 2026. See the article "*Superintendência-Geral do CADE aprova entrada da IG4 como acionista da Braskem*" [CADE general superintendence approves IG4 as Braskem's shareholder] published by *Valor Econômico* newspaper. Available at: https://valor.globo.com/empresas/noticia/2026/03/06/superintendncia-geral-do-cade-aprova-entrada-da-ig4-como-acionista-da-braskem.ghtml accessed June 23, 2026.

[3] See Relevant Fact on April 20, 2026 available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/d0ea332a-b346-84ba-f626-7cf92a319e53?origin=2 accessed June 23, 2026.

[4] Check out the Communication to the Market on June 5, 2026, available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/6fd5c493-9b3c-784c-422f-6c026a97d3fa?origin=2, accessed June 23, 2026; and the Material Fact of June 5, 2026, available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/2cdea9b1-be43-700f-1854-ee0eddba5d79?origin=2, accessed June 23, 2026.

[5] Check out the Communication to the Market of June 15, 2026, available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/69749a64-d68d-89ca-239a-46edf9861dd2?origin=2, accessed June 23, 2026, and the Material Fact on June 9, 2026, available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/3fed951c-31d1-56d1-510b-8fdf9b60e80a?origin=2, accessed June 23, 2026.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                           RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                          *Livro nº 337*                          *Folha nº 50*

7.      Likewise, the high dissemination of the Braskem Group's financial obligations – of which approximately **BRL 40 billion** concern bonds issued to capital market that are broadly pulverized among hundreds of thousands of creditors – is a factor that makes it difficult to make progress in the negotiations in a short time schedule.

8.      Therefore, even though Braskem Group and its creditors have dedicated time in the first half of the year to make progress in the trade of information and due diligence, there is no more enough time for a restructure before such obligations of some relevant values mature starting July 01, 2026, which may cause a complete unbalance to the Petitioner's capital structure, which is needed for their operations. On the other hand, if unpaid, maturity of the Braskem Group's financial debts will be accelerated causing a situation of instability and lack of control.

9.      The first to mature relevant for Braskem Group are expected for July 01, 2026, in the amount of **BRL 1,392,144,302.93** concerning financial debts in the domestic financial market and documentary letters of credit issued by financial institutions. Next, up to July 10, 2026, additional credit letters issued with financial institutions and the installments of interest on debt bonds issued in the international market mature, in the amount of **BRL 324,299,316.64.** After said date and by July 31, 2026, **BRL 927,610,319.27,** also arising from the same instruments, become due. It is highlighted that the aforementioned are bonds disseminated in the international market, pulverized among countless creditors, in which is simply impossible to reach a standstill other than through a court decision.

10.     Braskem Group disbursing such amounts, as mentioned above, would diminish its cash position to a balance below its operational threshold, which could cause the productive chain of the greatest petrochemical corporation in the Americas - that plays a fundamental, and irreplaceable, role in the Brazilian industry - to shutdown.

11.     If unpaid, the installments coming due July 2026, maturity of all of the financial debts and payment obligations in the scope of Braskem Group's letters of credit, which amount to over **BRL 54 billion**, would be accelerated. Braskem Group would, thereupon, be exposed to a rush race of creditors seeking to sue for measures to restrict its assets in Brazil and abroad.

12.     For the foregoing, the only alternative for Braskem Group to continue its negotiations outside a judicial reorganization sphere is to initiate a mediation process associated to filing for an ancillary provisional injunction under the LFR in such circumstances.

13.     Mediation will allow Braskem Group to continue with its efforts to reach a settlement with its main creditors and comply with the exact intention designed in the LFR, under articles 20-A and 20-B, item IV, implemented by Law No. 14,112/20. Mediation will be fundamental to enable the coordination of negotiations with such a diverse group of creditors.

14.     In this vein, Braskem Group initiated mediation before the Câmara Wind de Mediação ("Mediation"). All of the Braskem Group's financial creditors (as listed in **exhibit 3**, the "Subject Financial Creditors"[6]) were invited to participate in such Mediation. We trust that the Mediation will allow continuity of the negotiations and allow an organized solution for the liabilities of Braskem Group – potentially by building a solution consensual with such financial creditors, which will be submitted to court ratification in its due time, under the terms of the LFR.

15.     Nevertheless, Mediation in not, per se, sufficient to create a stable and controlled atmosphere for negotiations, especially considering the imminent risk of all of Braskem Group's financial debts being accelerated. The useful outcome of the negotiations in course depends on this court granting a provisional injunction in advance, which is dealt under article 20-B, paragraph 1, of the LFR, consisting of the

---

[6] And their respective credits are designated "Subject Financial Credits".

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                           RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                     *Livro nº 337*                        *Folha nº 51*

suspension of enforceability of the obligations and in an order barring any form of withholding, arresting, pledging, sequestration, search and seizure and in- or out-of-court order to restrict assets concerning the Subject Financial Creditors.

16.    Petitioners detail below the reasons this honorable Court, which holds jurisdiction to take this lawsuit into advisement, should grant their petition for provisional injunction described herein pursuant to article 20-B, paragraph 1, of the LFR and in line with article 47 of the LFR.

## II.
### FACTUAL CONTEXTUALIZATION: THE BRASKEM GROUP, THE ECONOMIC-FINANCIAL CRISIS AND FEASIBILITY OF ITS ACTIVITIES

### II.A.    Background on the Braskem Group

17.    Petitioners compose the Braskem Group, the greatest thermoplastic resins (PE, PP and PVC) producers in the Americas and ranks as the 7th greatest producer in the world. Its production activities, although mainly performed in Brazil, have a global expression and impact. Petitioners' clients are located in more than 70 countries and earn more than BRL 70 billion in annual revenue and today employ more than eight thousand people.

18.    The Braskem Group's history begins in 2002 when six major Brazilian companies – Copene, OPP, Trikem, Proppet, Polialden and Nitrocarbono – joined themselves to organize one single company intended to lead the domestic petrochemical market. From its foundation, Braskem was already the largest petrochemical plant in Latin America.

19.    Between 2007 and 2009, Braskem and Petrobras entered into an investment agreement under which Petrobras transferred to Braskem shares from different companies and, in exchange, received a significant share of Braskem's capital.

20.    In 2010, Braskem Group bought another giant from the Brazilian petrochemical industry which, at the time, was its main competitor: Quattor, a joint venture created in 2008 by Unipar and by Petrobras. As a consequence, Braskem Group incorporated in its portfolio the petrochemical industrial park located in the city of Mauá, state of São Paulo, and in the city of Duque de Caxias, state of Rio de Janeiro and, therefore, Braskem consolidated its leading position in the Brazilian petrochemical industry. Because of the foregoing, today Petrobras holds shares representing 47% of Braskem's voting capital.

21.    Also in 2010, Braskem inaugurated in the Industrial Park of Triunfo, in the state of Rio Grande do Sul, the first industrial plant in the world intended for the production of "green ethene", sugar-cane-based plastic resin, by using an innovative production process.

22.    Braskem's consolidation in the national market made the Brazilian chemical and petrochemical segment stronger and allowed Braskem Group to reach a new level to face the challengers of the international market. And, without losing sight of the Brazilian market, Braskem begun its expansion abroad.

23.    This process began in 2010 during a historical downcycle of the petrochemical industry worldwide caused by the 2008 crisis. Braskem Group took the opportunity to buy some relevant assets from Sunoco Chemicals and Dow Chemical, in the United States and Germany.

24.    In the United States, Braskem bought some industrial polypropylene units in Texas, which made up a production capacity of 2 million tons per year. The assets bought in Germany, in turn, are located in Wesseling and Schkopau and together they reach an annual production capacity of 625 thousand tons of plastic resins.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                          RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 52*

25.      In 2010, Braskem Group and Idesa Group created Braskem Idesa joint venture, which, in 2016, inaugurated a major petrochemical industrial complex in Veracruz, in Mexico, intended for the production of polypropylene. Since then, Braskem Idesa is the greatest polypropylene producer in the region and holding a leading position in the Mexican petrochemical industry.

26.      In the following year, Braskem Group began building a new industrial plant at its La Porte unit, in Texas, with a production capacity of 450 thousand tons per year. The plant inaugurated in 2020 was a relevant milestone to consolidate Braskem Group as one of the largest plastic producers in the US market.

27.      Over the years, Petitioners started to increasingly gain capillarity in international markets. Nevertheless, even after its international expansion, it in Brazil that Braskem Group finds its main source of revenue and generates its cash and main center of activities, as we shall demonstrate below.

28.      Its operational activities developed in the country concentrates about 70% of the Braskem Group consolidated net income. Brazil also concentrates Braskem Group administrative structure, where the members of its main governance bodies live, and the location from which the main strategic decisions guiding Petitioners' business worldwide are made.

29.      From 2020 on, Braskem Group began its investment projects to promote circular economy and climate transition. Petitioners set goals to expand the commercialization of its products made of recycled content, expand its bio-based products capacity, increase its use of renewable energy and pursue zero carbon by 2050, among other measures.

30.      Accordingly, some recent initiatives by Braskem Group in Brazil and abroad have been **(i)** the expansion of its green ethene production capacity in the industrial complex of Triunfo, **(ii)** a partnership with  Lummus to develop and license green ethene technology (2021-2022), **(iii)** the creation of Sustainea joint venture in the United States focused on the production of bioMEG and bioMPG;  **(iv)** the creation of Braskem Siam joint venture in Thailand focused on the green ethene production in Asia; and **(v)** making investment to increase its ethene and polyethylene production capacity in Rio de Janeiro by 220 thousand tons per year on the condition that funding is raised.

31.      In summary, Braskem Group currently ranks as the central player in the Brazilian and global chemical and petrochemical market with an expressive generation of revenue, circulation of products and creation of jobs. Preserving its activities is of the interest of dozens of thousands of people including shareholders, employees, suppliers, vendors in general, clients and business partners among others. And such activities are also of the interest of the Brazilian State, either because of Petrobras relevant equity interest in Braskem[7] – which account for significant governance rights backed by the new Braskem shareholders' agreement –, or because of the high taxes paid as a result of its operational activities.

32.      Nonetheless, Braskem Group has recently been facing a severe liquidity crisis. Such situation arises from a long standing downcycle of the petrochemical market that has been dragging since 2022 and was recently aggravated by a unfortunate combination of outside and unpredictable factors detailed in chapter II.C below.

33.      However, there is no doubt that Petitioners are companies completely and economically viable from a financial and operational perspective. Braskem Group's production capacity and its relevant position in the thermoplastic resin market are beyond discussion and has a potential to grow even more in the future, as we shall demonstrate in chapter II.D below. And, once Braskem Group overcomes this current situation

---

[7]  Check the Relevant Facts of June 3, 2026 and June 5, 2026. Available at: <https://www.braskem-ri.com.br/divulgacoes-documentos/avisos-comunicados-ao-mercado-e-fatos-relevantes/>.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                *Livro nº 337*                *Folha nº 53*

of financial instability when the global petrochemical market stabilizes, Braskem Group will evidently have an opportunity to fully recover.

34.    With this injunction, Petitioners intend to negotiate with its Subject Financial Creditors a structuring solution for Braskem Group's current financial situation. Thereupon, Braskem Group will be able to effectively address its current liquidity crises to enable the continuity of its activities on the long run and bring value to all of its stakeholders.

**II.B.    Structure and activities Braskem Group develops**

35.    Petitioners' activities are structured in a group of companies that have complementary and interdependent roles. All of them subject to the common control by Braskem, located in Brazil. Braskem Group's ownership structure can be synthesized  with the following simplified organizational chart[8]:



36.    Braskem is a Brazilian publicly-held corporation and its shares are listed at B3 – Brasil, Bolsa e Balcão, the New York Stock Exchange (NYSE) and the Latibex Stock Exchange in Spain. The main strategic decision of the group are made by Braskem. It is also the company that concentrates its most relevant assets, its main contracts and, consequently, the major part of Braskem Group's revenue.

37.    Precisely because of its central role in conducting Petitioners' business, Braskem incurred in substantial debts throughout the last years by issuing debentures, financings taken out with public and private financial institutions and credit facilities granted by vendors and clients, among others. A portion of its activities also involves making contributions to companies that are controlled directly and indirectly.

38.    Furthermore, Braskem is guarantor to the main debts incurred by other companies of the Braskem Group, of which we highlight the bills the Braskem Netherlands Finance and Braskem America Finance issued. Such transactions, even though made by international controlled entities, were previously approved by Braskem's governance bodies responsible for the resolutions strategic for Braskem Group.

39.    <u>Braskem Netherlands</u> controls the segment of foreign companies of Braskem Group and coordinates the distribution of thermoplastic resins in Europe and Asia. The company is also part of the

---

[8] Braskem America Inc. and Braskem Europe GmbH, even though they are part of Petitioners' ownership structure, they are not petitioners to this petition because they did not issue or guaranteed relevant debts in view of Braskem Group's total indebtedness nor are they parties to any intercompany agreements.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 54*

structured transactions contracted with credit agencies for exportation and stands as creditor and debtor to some intercompany debts with other Petitioners, such as Braskem Netherlands Finance, BT&S and Braskem Netherlands Inc.

40.     BT&S does business in the logistics and acquisition of raw materials to supply Braskem Group's internal demand and in the distribution of chemical products in the international market. Such entity controls many specific-purpose companies (sociedades de propósito específico) intended for the management of vessels used to supply and for the international distribution of raw materials and chemicals.

41.     Lastly, Braskem America Finance, Braskem Netherlands Finance and Braskem Netherlands Inc. are specific-purpose companies (sociedades de propósito específico) intended to raise and manage funds in the international market to finance the activities of other companies of the Braskem Group. None of the aforementioned companies play an industrial or commercial activity or any activity that demands resorting to intense workforce. Those three companies are part of the intercompany agreements entered into with other Petitioners, and the two main ones are issuers of debt instruments in the international capital market that are worth billions.

42.     Further to the companies named as Petitioners hereto, Braskem Group concentrates interest in many other controlled and invested companies that engage in petrochemical operations in other countries – or engage in distinct segments, such as electric power generation, logistics, among others. Even though their assets are not exposed to the Subject Financial Credits, such controlled and invested companies count on Braskem Group to run their operations by means of contracts in force, posting guaranties, making capital contributions and other mechanisms.

**II.C.    Reasons for the crisis Braskem Group faces**

43.     The crisis Petitioners face result from a conjunction of unpredictable and extraordinary factors that caused drastic changes in the global petrochemical industry and, consequently, in the operations and finances of Braskem Group.

44.     The main reasons for the crisis Petitioners face are, shortly, **(i)** a long standing downcycle in the global petrochemical industry, especially for the naphtha base producers that resulted in a substantial reduction of margin from products Braskem Group trades and, consequently, in generating cash;  **(ii)** the arise of substantial obligations unconnected to Petitioners' normal course of business and related to the geological event occurred in Maceió;  and **(iii)** economic uncertainties arising from the geopolitical escalating tension in the Middle East, whose duration is unpredictable and that since the beginning of this year has been impacting the prices of raw materials, international maritime freights and thermoplastic resins in the global market.

45.     We demonstrate below each one of such factors in further details.

*i.     **Long standing downcycle of the petrochemical industry and spreads compression***

46.     Since 2022, the global petrochemical industry has been facing an intense and long downcycle[9]. Such cycle results, on one hand, in a substantial raise of thermoplastic resins offer, specially from China and the United States; and, on the other hand, a slower growth of global demand, thus impacting demand for such products in the market when compared to its history.

47.     In such context, the spread of thermoplastic resins in the international market – i.e., the difference between the product price and the cost of its raw material in the international markets – dropped

---

[9]  Available at: https://valor.globo.com/empresas/noticia/2025/09/23/alongamento-de-crise-no-setor-petroqumico-aumenta-riscos-para-companhias-diz-fitch.ghtml. Accessed on: June 24, 2026.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                           RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 55*

significantly[10]. This happened not only in the Brazilian market, which concentrates the main activities and the most part of the Braskem Group's revenue, such as the markets in the United States, Europe and Asia, where Petitioners also play a relevant role. See the charts below with the international references in the international market, for the sake of illustration[11]:





48.    This scenario naturally impacted the operational dynamics of Petitioners and significantly compromised its capacity to generate cash.

49.    Accordingly, the Recurring EBITDA of the Brazil/South America segment of the Braskem Group in the fourth quarter of 2025 was USD 143 million – 30% lower than the previous quarter[12]. With regard to the United States and Europe segment, the Recurring EBITDA was USD 32 million negative for the same period.[13]  In the aggregate, Petitioner's consolidated net revenue in the 2025 Q4 was BRL 16.1 billion, which represents a 16% decrease in relation to the same period from the previous year[14].

50.    Petitioners' cash flow also reflects this situation. As an example, recurring consumption of consolidated cash of Braskem Group increased by BRL 493 million, in 2024, to BRL 5.9 billion, in 2025. In other words, Petitioners' expenses to keep its operational activities only increased ten times from one year to the other and reached billions. And, in this same period, the costs with interest on the debt also increased. Braskem Group spent BRL 4.23 billion paying interest throughout 2025 against BRL 3.88 billion in 2024.

51.    Therefore, it is evident the deep impact of the downcycle on the petrochemical industry associated to the Braskem Group's high debt costs in its operations and in its generation of revenue. In fact, due to

---

[10]    Available    at:    https://valor.globo.com/empresas/noticia/2026/03/26/analistas-esperam-resultados-fracos-da-braskem-no-4o-tri.ghtml. Accessed on: June 24, 2026.

[11] See date from external advisors.

[12] Available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/8609c855-6bc0-cafc-588a-b533f163e2a0?origin=2. Accessed on: June 24, 2026.

[13] Available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/8609c855-6bc0-cafc-588a-b533f163e2a0?origin=2. Accessed on: June 24, 2026.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                          CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                          RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 56*

such combination of factors, Braskem Group ascertained a consolidated loss of over BRL 10 billion in the last quarter of 2025[15].

52.    But that is not all. This unfavorable situation aggravated due to a unfortunate turn of recent events that compromised even further the economic-financial situation of Petitioners. We shall address this subject below.

### ii.    The geological event in Alagoas

53.    In 2019, Serviço Geológico do Brasil – CPRM [Brazilian Geological Service] released a report indicating that a geological phenomenon was found in districts within Maceió, Alagoas, and which would be connected to Braskem's drilling rock salt wells in the region.

54.    From that moment on, Braskem immediately shutdown its rock salt extraction operations. Braskem also started to endeavor its efforts to deeply understand  such geological phenomenon and all of its impacts, and also started to implement measures intended to protect the people who had been affected by such event at all times together with Agência Nacional de Mineração - "ANM" [Brazilian National Mining Agency] and other relevant authorities.

55.    In this context, and given Braskem's commitment to Maceió and its residents, many agreements were entered into with the competent authorities as from 2020 with the purpose of mitigating, repairing and compensating for the damages arising from such event, including preventive relocation of people, compensation to inhabitants impacted, environmental repair, measures to close cavities and monitor the area, further to implementation of social and urbanistic actions.  The company also entered into agreements with the Municipality of Maceió and the State of Alagoas, in 2023 and 2025, respectively, as indemnity, compensation and full redress.

56.    Obligations arising from the geological event are substantial and unrelated to Braskem Group's normal course of business and began to consummate a relevant portion of its cash for the last years. By the end of 2025, Braskem had already spent over BRL 14 billion as a result of the geological event in Alagoas, and its current balance for provision for future expenses concerning fulfillment with obligations is approximately BRL 3.5 billion at the end of quarter 1 of 2026.

57.    It is a relevant liability with concrete effects on cash management, and the perception of market risk and how Braskem's business is conducted. And, in a situation of a long standing downcycle in the petrochemical industry, the obligations related to the geological event started to comprise even more cash flow from Petitioners.

### iii.    Uncertainties about the duration of the international geopolitical tensions and the increase of operational expenses

58.    At the beginning of 2026, Petitioners started to face some new challenges due to the escalating geopolitical tensions in the Middle East connected to the conflict involving Iran, the United States and Israel and specially the impacts of the war on the Strait of Hormuz operations – a strategic waterway between the Persian Gulf and the Gulf of Oman that is crucial for the global transportation of oil and oil by-products and other products.

59.    Geopolitical conflicts of such magnitude have immediate effects on the price of oil and its by-products and sea freight. Still, the future effects in the face of the uncertainty of the duration of such tensions

---

[15] Available at: https://api.mziq.com/mzfilemanager/v2/d/540b55c5-af99-45f7-a772-92665eb948e9/8609c855-6bc0-cafc-588a-b533f163e2a0?origin=2. Accessed on: June 24, 2026.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 57*

put the markets on constant alert. Since the beginning of the war, the price of oil in the international market has increased significantly[16]. As a result, the price of oil-derived naphtha also skyrocketed. See[17]:



60.      Naphtha is the main raw material for the petrochemical industry. It is also the most used input by the Braskem Group in its production of thermoplastic resins. Therefore, the increase in its price directly impacts Petitioners' production costs. Even a slight increase in the price of naphtha can cause billion-dollar costs for the Braskem Group, considering the magnitude of its industrial output.

61.      At the same time, many of the international producers of thermoplastic resins that compete with Petitioners use ethane as a raw material – an input that presents much better competitive conditions than those of naphtha at the moment. Thus, the Braskem Group is obliged to bear not only an increase in the cost of raw materials in the market, but also a significant competitive disadvantage due to the nature of the inputs used in its industrial production.

62.      The long-term repercussions of the current global geopolitical situation for the Braskem Group are still unknown. Amid a prolonged downward cycle in the global petrochemical market, the widespread uncertainty generated by the war in the Middle East further aggravates Petitioners' already sensitive economic and financial situation.

63.      However, the Braskem Group's liquidity crisis is far from irreversible. As we shall demonstrate in the following chapter, Petitioners are fully viable companies from a financial and operational point of view. Its uplift is a natural result of the restructuring to be negotiated during the course of Mediation.

**II.D.    Financial and operational feasibility**

64.      Petitioners have been leading the Brazilian petrochemical market for over twenty years. With <u>forty industrial units</u>, located in <u>four countries</u> and <u>five Brazilian states</u>, serving <u>customers in more than 70 countries</u>, the Braskem Group has consolidated itself as one of the largest producers of thermoplastic resins (PE, PP and PVC) in the world, and the largest in the Americas.

65.      Today, the Braskem Group directly employs more than <u>8,000 people</u> and – even in a period of economic hardship – generates more than <u>BRL 70 billion</u> in annual revenue. Not to mention the thousands of indirect jobs generated by the entire production chain related to the activities of Petitioners, in Brazil and

---

[16]      MONEY      TIMES.      *Brent      Crude      Oil      Quotation      (Ukoil)*.      Available      at: https://www.moneytimes.com.br/cotacao/ukoil/. Accessed on: June 24, 2026.
[17] Available at: https://pt.tradingeconomics.com/commodity/naphtha. Accessed on: June 24, 2026.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 58*

in the world. For this reason, in periods of more favorable economic conditions, the Braskem Group has always had significant cash generation and high profitability.

66.     Thus, once Petitioners' current situation of cash restriction is overcome and an expected return to normality is seen in the global chemical and petrochemical industry, there should be no obstacles to resume its financial health and to keep Braskem Group's operations. As explained in the previous chapter, the crisis Petitioners are facing is circumstantial and can be overcome through a structuring solution reached jointly with their financial creditors within the scope of this process.

67.     This conclusion is reinforced by a series of initiatives aimed at strengthening Braskem Group's competitive position, preserving its revenue generation in the long run and preparing Petitioners for the future of the petrochemical market.

68.     Petitioners' initiatives included the "*Resilience Program*", which consists of measures with an impact on EBITDA and short-term cash generation and actions to defend the competitiveness of the Brazilian chemical industry; and the "*Transformation Program*" focused on the optimization of the naphtha base, the increase and flexibility of the gas base and the migration to products with renewable sources. Such measures, which Petitioners' management constantly assess and review, are part of the Braskem Group's constant concern with long-term actions and investments in segments that are less sensitive to the impacts of any other downward cycles in the petrochemical sector in the future.

69.     Finally, the viability of the Braskem Group is corroborated by several regulatory measures to encourage the petrochemical industry that will take effect from this year.

70.     One of such measures is Law No. 15,294, of December 19, 2025, which established the Special Program for the Sustainability of the Chemical Industry ("PRESIQ"). It is "*a tax incentive program to modernize and decarbonize the Brazilian chemical industry between 2027 and 2031*," according to the National Congress platform[18].

71.     Also, in March of this year, Complementary Law No. 228 increased to the year 2026 the benefit of the Special Regime of the Chemical Industry ("REIQ"), a program that exempts tax rates on the purchase of raw materials from the petrochemical industry.

72.     REIQ has been a fundamental incentive for the activities of the Braskem Group – and the entire Brazilian petrochemical industry – since its establishment in 2013. The increase in the benefits resulting from the program undoubtedly plays a relevant role in partially mitigating the effects of the sector's prolonged downturn cycle in the coming years.

73.     In summary, the Braskem Group has several concrete initiatives aimed at maintaining its operational activities and expanding its market share long term. Such initiatives are supported by relevant government policies to encourage the petrochemical industry, and are perfectly aligned with global trends in transformation, energy security and sustainable development.

74.     For all these reasons, the viability of the Braskem Group is indubitable.

### III.
### JURISDICTION AND COMPETENCE OF THIS COURT

75.     In this case, the Brazilian jurisdiction and competence of this Honorable Court to conduct this petition are unequivocal, both with respect to Braskem and with respect to Petitioners incorporated and

---

[18] Available at: https://www25.senado.leg.br/web/atividade/materias/-/materia/171482. Accessed on: June 24, 2026.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 59*

headquartered outside Brazil – in this case, Braskem Netherlands, Braskem Netherlands Inc., BT&S, Braskem Netherlands Finance and Braskem America Finance ("Foreign Companies").

76.    Under the terms of art. 21, III, of the CPC[19], it is incumbent upon the Brazilian Judiciary to judge the actions whose basis is a fact occurred or an act practiced in Brazil. In procedures under the LFR, the *"fact occurred or act performed"* that gives rise to a lawsuit – in procedural terms, cause of action – is precisely the economic and financial crisis debtors face.

77.    In other words, Brazilian jurisdiction can be accessed by any company, national or foreign, whose crisis dates back to Brazil, especially when it is part of a Brazilian business group. In this sense, Professor Sheila Neder Cerezetti explains that "the *authorization for the Brazilian court to address facts that occurred in Brazil cannot, in this new scenario of group crisis regulation, turn a blind eye to situations in which such facts that occurred in Brazil are not exhausted in the national territory precisely because the crisis that underlies the demand reaches an entire 'group under common corporate control'*"[20].

78.    In view of such logic, the Brazilian Judiciary Branch has already processed provisional remedies that are ancillary to a given mediation, judicial reorganization and out of court reorganization proceedings that included at least 35 companies headquartered abroad[21]. In all such cases, the limits of Brazilian jurisdiction were carefully analyzed, and the possibility of including foreign entities without a branch in the country prevailed.

79.    And such national and foreign entities composing the Brazilian business group must have their process processed before the court of the business group's principal place of business location, under the

---

[19] "Article 21. It is incumbent upon the Brazilian judicial authority to process and try actions in which: [...] III - its foundation is based on a fact occurred or an act practiced in Brazil".

[20] CEREZETTI, Sheila Neder. Legal opinion. Proceeding No. 1111483-72.2024.8.26.0100. Pp. 3715/3729.

[21] In this regard, **(i)** in the Oi Group's Judicial Reorganization (Proceeding No. 0203711-65.2016.8.19.0001), Oi Brasil Holdings Coöperatief u.a. and Portugal Telecom International Finance B.V. are both headquartered in the Netherlands; **(ii)** in the Americanas Group's Judicial Reorganization (Proceeding No. 0803087-20.2023.8.19.0001), B2W Digital Lux S.à.r.l and JSM Global S.à.r.l are both headquartered in Luxembourg; **(iii)** in the Aralco Group's Judicial Reorganization (Proceeding No. 1001985-03.2014.8.26.0032), Aralco Finance S/A is headquartered in Luxembourg; **(iv)** in the Ocyan Group's Out of Court Reorganization (Proceeding No. 0121854- 60.2017.8.19.0001), Odebrecht Drilling Norbe VIII/IX LTD and Odebrecht Offshore Drilling Finance LTD, with registered office in Cayman Islands, and Odebrecht Drilling Norbe Eight GMBH, Odebrecht Drilling Norbe Nine GMBH, ODNIGMBH, Odebrecht Drilling Norbe Six GMBH and ODN TAY IV GMBH, with registered office in Austria; **(v)** in the OEC Group' Judicial Reorganization (Proceeding No. 1100438-71.2024.8.26.0100), Odebrecht HoldCo Finance Limited and OEC Finance Limited with registered office in the Cayman Islands, and Odebrecht Overseas Limited, with registered office in the Bahamas; **(vi)** in the OGX Group's Judicial Reorganization (Proceeding No. 0377620-56.2013.8.19.0001), OGX International GMBH and OGX Austria GMBH are both headquartered in Austria; **(vii)** in the OOG Group's Out of Court Reorganization (Proceeding No. 0121854-60.2017.8.19.0001), Odebrecht Oil & Gas GMBH, Odebrecht Drilling Norbe Eight GMBH, Odebrecht Drilling Norbe Nine GMBH and ODN Tay IV GMBH, with registered office in Austria, and Odebrecht Oil & Gas Finance Limited, Odebrecht Oil Services LTD, Odebrecht Drilling Norbe VIII/IX LTD and Odebrecht Offshore Drilling Finance LTD, with registered office in the Cayman Islands; **(viii)** in the Sete Brasil Group's Judicial Reorganization (Proceeding No. 0142307-13.2016.8.19.0001), Sete Holding GMBH, Sete International One GMBH and Sede International Two GMBH, with registered office in Austria; **(ix)** in the Petition for Provisional Injunction in the Intercement Group's Out of Court Reorganization and Judicial Reorganization (Proceeding No. 1111483-72.2024.8.26.0100 and 1192002-34.2024.8.26.0100), Intercement Trading and Inversiones S.A. and Intercement Trading and Inversiones Argentina S.A., headquartered in Spain, and Intercement Financial Operations B.V., headquartered in the Netherlands; **(x)** in the OAS Group's Judicial Reorganization (Proceeding No. 1030812-77.2015.8.26.0100), OAS Investments GMBH, with its registered office in Austria, OAS Investments Limited and OAS Finance Limited, with its registered office in the British Virgin Islands; and **(xi)** in the Injunctive Relief in the Unigel Group's Out of Court Reorganization (Proceeding No. 1174558-22.2023.8.26.0100), the companies Unigel Luxembourg S.A., headquartered in Luxembourg, and Plastiglas de México S.A. de C.V., headquartered in Mexico.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                                 CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                                   RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                          *Livro nº 337*                          *Folha nº 60*

terms of articles 3[22] and 69-G, paragraph 2, of the LFR[23], applicable in the case of petition for provisional injunction ancillary to mediation, pursuant to article 20-C of the LFR[24].

80.    According to the consolidated understanding in the case law[25], the main establishment of a group of companies corresponds to the center for making the main economic and administrative decisions of this group, often referred to as "*nerve center*", "*command* center" or "*governance center*"[26].

81.    That is, regardless of where the registered office of each company is (in Brazil or abroad), it is necessary to identify the location of the group's decision-making center. To this end, the place where **(i)** the general guidelines followed by the business group emanate must be defined; **(ii)** the main contracts and investments are signed; and **(iii)** there is the administrative and technical staff of the group, with key employees (in the areas of accounting, information technology, communication, financial management, etc.).

82.    In this case, the Braskem Group is a Brazilian business group, whose crisis – although it also has significant repercussions on all Foreign Companies – is centered in Brazil.

83.    First, because the decision-making center of the Braskem Group is in Brazil. It is in the city of São Paulo that the board of directors and the statutory executive board of Braskem are located, a company that controls, directly or indirectly, all the other Petitioners and guides the main strategic decisions of the group.

84.    Braskem has as its purpose to ensure the coordinated operation of the Group, through resource management, strategic guidance, and the making of capital contributions in favor of its direct and indirect subsidiaries.

85.    Many of the Foreign Companies also have Brazilian managers domiciled in the city of São Paulo, who participate in the decision-making acts and contribute to the cohesive application of the guidelines defined by Braskem.

86.    The co-controllers of the Braskem Group, which together hold more than 97% of Braskem's voting capital stock, are Brazilians. The Shine Fund is an investment vehicle linked to the Brazilian manager IG4 Capital. Petrobras waives presentations – a government-controlled company controlled by the Federal Government.

---

[22] "Art. 3 The Court of the location where the debtor has its main establishment or the company's branch is located - in case of company headquartered outside Brazil -  is competent to ratify the out of court reorganization plan, grant judicial reorganization or decree bankruptcy."

[23] "Article 69-G, paragraph 2. The court of the location where the debtor has its main establishment of all of its establishments location - the main one - is competent to grant judicial reorganization under procedural consolidation, in compliance with the provisions of art. 3 of this Law."

[24] "Art. 20-C. The settlement obtained through conciliation or mediation based on this Section shall be approved by the competent judge in accordance with the provisions of art. 3 of this Law."

[25] "The main establishment means the one in which the debtor's decision-making center is located, that is, the place from which the orders depart and in which the external relations drawn between the company and third parties are organized. [...] It is understood that the same criteria applicable to individual orders should prevail in the case of the group. Thus, competence is established based on the location from which the main strategic, financial and operational decisions of the group emanate. It should be noted that this criterion has been understood as prevailing not only over the registered office of one or another company, but also over any district in which the group concentrates most of the assets and the largest number of employees" (CEREZETTI, Sheila Christina Neder. Company groups and judicial reorganization: the indispensable encounter between corporate, procedural and bankruptcy rights. In: YARSHEL, Flávio. PEREIRA, Guilherme Setoguti J. *Processo Societário II*. São Paulo: Quartier Latin, 2015. pp. 760-761, emphasis added).

[26] Using all these expressions, see, for example: Superior Court of Justice, Conflict of Jurisdiction No. 183.402/MG, Honorable Reporting Justice Humberto Martins, 2nd Section, judged on 09.27.2023.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                              CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                     RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                         *Livro nº 337*                         *Folha nº 61*

87.    For this reason, the main financial obligations contracted by Petitioners, whether in Brazil or in the international market, are **(i)** negotiated under the guidance of Braskem's financial team, located in Brazil; **(ii)** formalized with the support of Braskem's legal department, also located in Brazil; and **(iii)** authorized by deliberative bodies composed of Brazilian managers, who meet in the city of São Paulo – for example, the very issuances of international debt securities by Foreign Companies were reviewed and authorized by Braskem's board of directors. For the same reason, the main strategic decisions and negotiations with creditors related to Petitioners' restructuring process also departed from Brazil, with the support of Braskem's managers and employees, as well as external legal and financial advisors in Brazil.

88.    Second, because the Braskem Group's most significant <u>productive activities</u> are concentrated in Brazil. Braskem has twenty-eight industrial plants in the country, spread over five states, which directly or indirectly employ more than six thousand people. The largest volume of contracts with customers, suppliers, operators and financiers of the group is also in Brazil. For all these reasons, national operations accounted for about <u>70% of Braskem Group's consolidated net revenue</u> in 2025.

89.    Third, because the main <u>factors of the crisis</u> that justify this request go back to Brazil, including a prolonged crisis in the petrochemical sector – which, although having global contours, has been affecting Braskem's Brazilian operations in a particularly pronounced way in recent years – and obligations arising from the geological event in Alagoas, as seen in chapter II.C above.

90.    In addition, Petitioners' analysis ***from an individual perspective*** also reveals that all Foreign Companies (and their respective economic and financial crises, which constitute a cause of action of this procedure) have substantial links with the Brazilian jurisdiction, which give rise to their inclusion as petitioners to this petition.

91.    Braskem Netherlands Inc., Braskem Netherlands Finance and Braskem America Finance, in particular, are <u>non-operational entities</u>, aimed at raising funds in the international market intended especially for the Brazilian activities of the Braskem Group.

92.    The fulfillment of its obligations, therefore, depends essentially on the results of Brazilian operating activities. And, consequently, the crisis that affects Braskem's activities in Brazil makes it impossible to pay in full the creditors of these Foreign Companies under the conditions originally established.

93.    Braskem Netherlands – together with BT&S, its subsidiary – performs commercial activities <u>instrumental</u> to Braskem's operations.

94.    These two companies do not operate independently in the market. Its function is to guarantee the international purchase of raw material, enable the logistics and commercialization of chemicals and thermoplastic resins produced by Petitioners and other subsidiaries – especially by Braskem, in Brazil – around the world.

95.    In addition, Braskem Netherlands also plays a relevant role in raising financial resources to finance Braskem's activities in Brazil. Also in this case, the payment of its creditors depends on the result of Braskem's operations. Its crisis, therefore, is inseparable from the financial situation of the Brazilian segment of the Braskem Group.

96.    Thus, the filing of this petition represents, in relation to all these Foreign Companies, the only feasible mechanism to promote negotiations about the recovery of credit by the respective Subject Financial

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 62*

Creditors. For this reason, the possibility of this type of company participating in procedures provided for in the LFR is free of doubt and has been recognized repeatedly by Brazilian jurisprudence[27].

97.    The Braskem Group is, therefore, a Brazilian business group with branches in other countries, but which are not able to denature its origin and its center of main interests. In this sense, it is important to reiterate the unique importance of the Braskem Group for the national petrochemical industry. Braskem Group is the absolute leader in the production of thermoplastic resins in Brazil and, without its operations, the entire production chain of plastics, packaging and industrial inputs in Brazil may be affected.

98.    Removing the jurisdiction of the Brazilian courts and the jurisdiction of the judicial reorganization and bankruptcy courts of the Judicial District of the Capital of the State of São Paulo means, ultimately, giving up a strategic industry for national sovereignty and whose main indirect shareholder is the Federal Government.

99.    In view of this, the jurisdiction of the Brazilian Court to process this petition for provisional injunction as the main proceeding for the entire Braskem Group and the jurisdiction of the judicial reorganization and bankruptcy courts of the Judicial District of the Capital, pursuant to articles 21, III, of the CPC and articles 3, 20-C and 69-G, paragraph 2, of the LFR, must be recognized.

## IV.
## FULFILLMENT OF THE LEGAL REQUIREMENTS FOR THE FILING OF THIS PETITION FOR PRELIMINARY INJUNCTION

100.    Pursuant to art. 20-B, § 1 of the LFR and art. 305 of the CPC, the granting of preliminary injunction requires the demonstration of **(i)** the probability of the right, arising from (<u>i.a</u>) the existence of mediation proceedings already initiated and (<u>i.b</u>) the fulfillment of the subjective eligibility requirements to request the initiation of reorganization proceedings – i.e., classification as a company in difficulty that meets the requirements of art. 48 of the LFR; and **(ii)** the danger of damage to the useful result of the mediation instituted. In this case, all requirements have been met, as seen below, objectively.

101.    Due to the fulfillment of these requirements, the need to grant injunctive relief will be demonstrated, consisting of the suspension, in relation to the Subject Financial Creditors, of the enforceability of obligations and the prohibition of "*any form of retention, seizure, seizure, sequestration, search and seizure and judicial or out of court constriction*" (article 6, III, of the LFR) on the assets of Petitioners, by judicial or out of court acts, including offsetting of credits.

### IV.A.    Probability of law

102.    <u>First</u>, Petitioners proved the initiation of a mediation process with Câmara Wind de Mediação (**exhibit 2**), for which all Subject Financial Creditors were listed for the receipt of invitations to participate, thus fulfilling the requirement of article 20-B, paragraph 1, of the LFR.

103.    <u>Second</u>, Petitioners also meet the subjective requirements to request the filing of reorganization proceedings, as required by art. 20-B, paragraph 1 of the LFR.

---

[27] On this subject, see TJRJ [Rio de Janeiro Court of Justice], Interlocutory Appeal No. 0046867-46.2023.8.19.0000, Reporting Appellate Judge Leila Santos Lopes, 18th Private Law Chamber, judged on 11.16.2023; and TJSP [São Paulo Court of Justice], AI [Interlocutory Appeal] No. 2084379-15.2015.8.26.0000, Reporting Appellate Judge Carlos Alberto Garbi, 2nd CRDE, judged on 08.31.2015.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                                      RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                              *Livro nº 337*                              *Folha nº 63*

104.    According to the consolidated understanding in the case law, this requirement is demonstrated by the explanation of the reasons for the crisis faced by the debtor, and by the proof of the fulfillment of the requirements listed in art. 48 of the LFR[28].

105.    In this sense, in line with Statement No. 10 of the National Forum for Business Recovery and Bankruptcies ("FONAREF")[29], linked to the National Council of Justice, the jurisprudence of this TJSP [São Paulo Court of Justice] recognizes that the granting of the relief provided for in art. 20-B, paragraph 1, of the LFR requires only the presentation of the documents provided for in art. 48 of the LFR. See below:

"The filing of the request for preliminary injunctive relief, consisting of the suspension of the executions filed by the creditors against the debtor for a period of 60 days, presupposes the demonstration by the plaintiff company of its right to request judicial reorganization. In this sense, the initial petition of the injunction must be supported by the documents provided for in art. 48 of Law No. 11,101/2005. The presentation of the documents provided for in article 51 of Law No. 11,101/2005 is waived, which must instruct the complaint only in the case of the filing of the main action for judicial reorganization"[30].

106.    The same understanding is followed by the Specialized Courts of this TJSP [São Paulo Court of Justice]:

"[...] [The] article 20-B, paragraph 1 of the LRF adopts as legitimate to claim interlocutory relief companies that meet the requirements to request judicial reorganization (Art. 48 of the LRF), which are not to be confused with the documentation necessary for the investigation of the request for judicial reorganization (Art. 51 of the LRF)"[31].

---

[28] "Article 48 of the LFR. The debtor that, at the time of the request, has regularly carried out his activities for more than two (2) years and meets the following requirements, cumulatively, may request judicial recovery: I – not be bankrupt and, if so, are declared extinct, by a final and unappealable judgment, the liabilities arising therefrom; II – not having, for less than five (5) years, obtained the granting of judicial reorganization; III – have not, for less than five (5) years, obtained the granting of judicial reorganization based on the special plan referred to in Section V of this Chapter; IV – not having been convicted or not having, as manager or controlling partner, a person convicted of any of the crimes provided for in this Law".

[29] During the 1st FONAREF Congress, Statement No. 10 was approved, according to which "[t] he documents demonstrating that the company in difficulty meets the legal requirements to request judicial reorganization, for the purposes of article 20-B, paragraph 1, of Law No. 11,101/2005, are those provided for in art . 48 of Law No. 11,101/2005". In the justification for approval of the Statement, it was pointed out that such documents are sufficient for "demonstration by the plaintiff company of its right to request judicial reorganization", "the presentation of the documents provided for in article 51 of Law No. 11,101/2005 is waived".

[30] TJSP [São Paulo Court of Justice], Interlocutory Appeal No. 2093561-44.2023.8.26.0000, Reporting Appellate Judge J.B. Paula Lima, 1st Reserved Chamber of Business Law, judged on 01.31.2024, emphasis added. In the same sense: TJSP [São Paulo Court of Justice], Interlocutory Appeal No. 2260863-64.2024.8.26.0000, Reporting Appellate Judge J.B. Paula Lima, 1st Reserved Chamber of Business Law, judged on 11.27.2024.

[31] TJSP [São Paulo Court of Justice], Proceeding No. 1018493-62.2024.8.26.0100, Judge Ralpho Waldo de Barros Monteiro Filho, 2nd Bankruptcy and Judicial Reorganization Court of the Judicial District of São Paulo/SP, judged on 03.11.2024, emphasis added. In the same sense: TJSP [São Paulo Court of Justice], Proceeding No. 1024422-42.2025.8.26.0100, Judge Paulo Furtado de Oliveira Filho, judged on 02.25.2025; TJSP [São Paulo Court of Justice], Proceeding No. 1018493- 62.2024.8.26.0100, Judge José Guilherme di Rienzo Marrey, 1st Bankruptcy and Judicial Reorganization Court of the Judicial District of São Paulo/SP, judged on  02.23.2024; TJSP [São Paulo Court of Justice], Proceeding No. 1018493-62.2024.8.26.0100, Judge Marcello do Amaral Perino, 1st Bankruptcy and Judicial Reorganization Court of the Judicial District of São Paulo/SP, judged on  02.23.2024; TJSP [São Paulo Court of Justice], Proceeding No. 1008721-75.2024.8.26.0100, Judge Adler Batista Oliveira Nobre, 1st Bankruptcy and Judicial Reorganization Court of the Judicial District of São Paulo/SP, judged on  01.30.2024; TJSP [São Paulo Court of Justice], Proceeding No. 1018493-62.2024.8.26.0100, Judge João de Oliveira Rodrigues Filho, 1st Bankruptcy and Judicial Reorganization Court of the Judicial District of São Paulo/SP, judged on  07.25.2022.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 64*

107.    Thus, in compliance with art. 20-B, paragraph 1 of the LFR, Petitioners presented the concrete causes of their current equity situation and the reasons for the economic and financial crisis (**item II** above) and, pursuant to art. 48 of the LFR, prove that:

**(i)**    regularly carry out their activities for more than the two years required by law (article 48, *caput*, of the LFR) (**exhibit 4**);

**(ii)**    were never bankrupt (art. 48, I, of the LFR) (**exhibit 5**);

**(iii)**    never obtained the granting of judicial reorganization (article 48, II, of the LFR) (**exhibit 5**); and

**(iv)**    have not been convicted – and do not have managers or controllers who have been convicted – for the commission of bankruptcy crimes (art. 48, IV, of the LFR) (**exhibit 6**).

108.    Petitioners understand, therefore, that it is not necessary to present the documents that must instruct the request for judicial reorganization, provided for in art. 51 of the LFR. After all, article 20-B, paragraph1, of the LFR requires proof that Petitioners meet the requirements to "*file for judicial reorganization*", in clear reference to article 48 of the LFR, which establishes the subjective requirements that must be demonstrated by the debtor. Art. 20-B, §1, of the LFR does not refer to art. 51 of the LFR, which does not establish any subjective requirement that must be proven by the debtor, but only presents the documentary list that must be presented in case of a request for judicial reorganization.

109.    This difference is important, since requiring the presentation of the documents of art. 51 of the LFR creates a disproportionate burden for the debtor. After all, if the mediation is successful, the objective is precisely to avoid filing a request for judicial reorganization. And, on the creditors' side, there is no prejudice – if the judicial reorganization has to be filed, the documents of art. 51 of the LFR will be presented.

110.    In any case, if the understanding of this Honorable Court is different, Petitioners require that the non-submission of the documents of art. 51 of the LFR does not prevent the granting of injunctive relief, given the high risk of equity constriction that Petitioners are exposed to. In this scenario, Petitioners undertake to expedite and present the documents as soon as possible.

**IV.B.    Danger of damage**

111.    The danger of irreversible damage to the granting of the interlocutory relief provided for in article 20-B, paragraph 1, of the LFR depends on the proof that, if the relief is not granted, the existing mediation will be impaired[32].

112.    Petitioners fulfill this requirement, mainly due to **(i)** the proximity of very significant maturities related to the Subject Financial Credits and **(ii)** the adoption of concrete measures that unequivocally demonstrate the willingness of creditors to adopt constrictive measures, even when there is no financial or non-financial default.

113.    First, with respect to the **imminent maturity of Subject Financial Credits**, as early as the month of July, Braskem will be exposed to financial commitments of **(i) more than BRL 750 million** in interest payments due to holders of foreign dollar-denominated notes, **(ii) more than BRL 1.3 billion** in letter of credit maturities, and **(iii) more than BRL 450 million** in maturities due on BRL-denominated debt.

---

[32] "By means of a precautionary court decision, the debtor now has the typical protection of the stay period granted in the context of judicial reorganization. It is an innovative mechanism, which contemplates the creation of a breathing space, indispensable to the effectiveness of a collective bargaining " (MONTEIRO, André Luis; VERÇOSA, Fabiane; FONSECA, Geraldo. *Arbitragem, mediação, falência e recuperação*: resolução de disputas na empresa em crise. 1st edition. São Paulo: Thomson Reuters Brasil, 2022, p. 37).

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                     *Livro nº 337*                     *Folha nº 65*

114.     *On the one hand*, the payment of financial debt in an amount **exceeding BRL 2.6 billion**, only next month, would significantly compromise Petitioners' cash position. The Braskem Group's cash would be reduced beyond the operational minimum.

115.     The Braskem Group's operation without the availability of minimum operating cash would have concrete impacts on Petitioners' activities, transforming a context of mismatch in the payment schedule of the financial debt into a more serious crisis, which would reach the necessary liquidity to maintain operations and relations with operating counterparties.

116.     In practice, this means that the Braskem Group would run out of cash to honor its commitments to purchase raw materials, pay suppliers and employees, and invest in maintenance and safety. Finally, everything necessary to manage the company that is the largest producer of thermoplastic resins (PE, PP and PVC) in the Americas.

117.     And the impacts would not be restricted to the Braskem Group, since the entire production chain would be affected in case of difficulty of Petitioners in honoring their obligations. Customers would suffer a delay in the delivery of goods and, thus, one of the main national-based industries would be affected in a great *domino effect*, until it reached the consumers themselves. The risk of damage would certainly reverberate in the national production chain and in civil society.

118.     On the other hand, in case of non-payments, all financial indebtedness of the Braskem Group in the total amount of **BRL 54,802,116,474.06 will** be accelerated, with early cross maturity.

119.     The conclusion is that the Braskem Group needs some kind of renegotiation to deal with said payments. And, given the pulverization of creditors and the very short term until the billionaire maturities, there is no way to proceed with the renegotiation without judicial protection.

120.     As pointed out, Petitioners had already been engaging with the holders of Subject Financial Credits, by signing confidentiality agreements for the exchange of information, holding meetings and sending proposals that would promote, in an organized manner, the extension of lines of letters of credit and the payment of Subject Financial Credits on a longer schedule, preserving operational stability. Despite the interactions promoted by the Braskem Group, it was not possible to obtain, from all Subject Financial Creditors, an out of court commitment to suspend acts of collection or execution, so that the risk persists.

121.     In addition, the organized and controlled environment of the mediation instituted and the urgent relief required herein will allow the continuity of negotiations with these financial creditors, who will have the opportunity to suggest and propose solutions to be analyzed by Petitioners in the context of their restructuring.

122.     On the other hand, in case the requested relief is not granted, the performance of the Subject Financial Creditors would certainly not be focused on building the best collective structuring solution, through participation in the sessions within the scope of Mediation. There would, in fact, be a movement of the Subject Financial Creditors to satisfy their credits individually and immediately, with the filing of a collection measure – or, worse, the exercise of out of court measures of immediate cash constriction, such as the offsetting of amounts held by the Braskem Group with financial institutions.

123.     Therefore, an unbridled rush would be triggered by the assets of the Braskem Group[33], with each Subject Financial Creditor seeking the satisfaction of its individual credit, without adopting any effort for

---

[33] "The provisional injunction in question aims to protect the assets of the debtor in crisis from the "race of creditors", making it possible to equate a serious situation with the use of the instruments proper to conciliation and mediation,

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                    RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 66*

a global and constructive solution to its indebtedness. As no Subject Financial Creditor would accept to be individually harmed for not participating in such a race, the Mediation proposed by the Braskem Group would remain totally emptied, installing a scenario of tragedy of the commons[34].

124.    Second, as a concrete demonstration of aggressive conduct already committed by parts of the Subject Financial Creditors even before the configuration of pecuniary or non-pecuniary defaults, it is worth highlighting the behavior of Banco Safra S.A. ("Safra"). Even without any contractual basis, Safra has been articulating generic explanations to seek the accelerated collection of **BRL 348,101,177.30**, including under threat of offsetting balances maintained by the Braskem Group with the financial institution and adopting other constrictive measures (according to notifications sent by Safra – **exhibit 7**).

125.    Thus, if even without any early maturity event, there are already creditors starting the race for the assets of the Braskem Group, there is no doubt that, without judicial protection, more creditors will join the race, in case of non-payment of July maturities. These individual credit satisfaction routes, unrelated to collective bargaining (and broad interests that are protected from a collective perspective, such as the preservation of business activity, for the benefit of all stakeholders) should not be allowed.

126.    This is contrary to the entire spirit of the LFR, which is based primarily on the principle of preservation of the company, provided for in art. 47. It is worth mentioning that this principle does not apply to the specific case in an abstract or diffuse way, but precisely to preserve the business activity in the modality of *going concern* of a company whose economic activity is fully viable. That is, it applies to ensure the balance between the various interests that permeate the company's existence and prevent attacks by isolated creditors from destroying relevant value for payment of the entire group of creditors, as well as consumers, suppliers and the entire community benefited by the activity of the company in crisis[35].

127.    In view of the foregoing, it is evident that, in case of non-granting of urgent injunction, the Mediation would be concretely impaired. After all, the risk of adopting constrictive and executive measures by creditors was the central basis for granting provisional injunctions ancillary to mediation procedures, as granted to the Mover[36], Unigel[37] and Bio Fuels Groups[38] by Specialized Courts of this TJSP [São Paulo Court of Justice].

---

and does not have an autonomous character. It is always linked to the planning of the solution of this business crisis situation, which may result from the execution of general or partial transactions, eventually combined with a request for ratification of out of court reorganization, or, alternatively, the filing of a request for judicial reorganization" (TJSP [São Paulo Court of Justice], AI [Interlocutory Appeal] No. 2246437- 52.2021.8.26.0000, Reporting Appellate Judge Fortes Barbosa, 1st CRDE, judged on  03.24.2022).

[34] The tragedy of the commons is the framework in which creditors are encouraged to act unilaterally to ensure the preservation of their individual interests. The diffuse and unbridled action of creditors to immediately satisfy their respective credits causes the "tragedy" consisting of the dispute over the company's assets, and most creditors would remain unpaid or without full payment. On the concept of tragedy of the commons ("*tragedy of the commons*") see G. HARDIN, The Tragedy of the Commons, in Science, v. 162, 1968, pp. 1,243-1,248.

[35] "[...] It should be said that the intention of preserving the company would be linked to the protection of an organization, which covers numerous interests and whose foundation of existence refers exactly to respect for these same interests. In other words, the preservation of the company is achieved through respect, balance and integration between the interests influenced by it." (CEREZETTI, Sheila Christina Neder. *A recuperação judicial de sociedade por ações*: o princípio da preservação da empresa na Lei de Recuperação e Falência. São Paulo: Malheiros, 2012).

[36] "The filing of executive actions may hinder or impair the evolution of material proposals, in addition to the embarrassment that equity constraints cause to the regular activity of the entrepreneur and the uncertainty that may arise with the creditors of the other classes" (Proceeding No. 1111483-72.2024.8.26.0100).

[37] "In view of the crisis noted by the creditors, there is a serious risk that they will file enforcement actions and promote the seizure of assets, with serious damage to business activity and the most beneficial negotiated solution for all" (Proceeding No. 1174558-22.2023.8.26.0100).

[38] Proceeding No. 1018493-62.2024.8.26.0100.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*          *Livro nº 337*          *Folha nº 67*

128.    The granting of the measure, on the other hand, does not generate a danger of reverse damage, considering that the suspension referred to in article 20-B, paragraph 1, of the LFR is temporary, limited to sixty (60) days, and the Subject Financial Creditors will keep their credits intact – also remaining protected against deleterious effects that would result from the disorderly run of assets, such as the <u>breach of the creditors' parity</u> and the <u>lower recoverability of credits in a scenario of operational impact</u>.

**IV.C.   Scope of the provisional injunction**

*i.      Suspension of acts of satisfaction of the Subject Financial Credits, including compensations*

129.    In the case of the injunction referred to in article 20-B, paragraph 1, of the LFR, "*the suspension of the executions of those who are involved in mediation or conciliation is absolutely necessary for the creation of a healthy and efficient negotiating environment*". That is, the debtors must be granted, in relation to the covered creditors, the typical protection of the *stay period* of the judicial reorganization or out of court reorganization, creating the *breathing space* indispensable to the effectiveness of a collective bargaining.

130.    Therefore, over the period of sixty (60) days, in order to allow the good progress of the Mediation, it is mandatory to suspend all executions filed against Petitioners by the Subject Financial Creditors, and any judicial or out of court restrictive measure on the assets of Petitioners.

131.    At this point, it should be noted that, in the context of the Mediation, certain financial institutions that are creditors of the Braskem Group could seek to apply the imposition of contractual clauses that authorize the appropriation of amounts deposited in bank accounts or other assets belonging to Petitioners for amortization of Subject Financial Credits. Here are some examples of such clauses[39]:

> 2.1.    Ocorrendo um Evento de Crédito previsto Cláusula 2.2 abaixo, as Operações Ativas e Passivas serão consideradas imediata e automaticamente vencidas e as Operações de Derivativos e de Compra e Venda serão consideradas liquidadas antecipadamente, independentemente da data original de vencimento dessas operações. O valor de cada operação será considerado automaticamente devido e exigível, nos termos da Cláusula 1.1.1, acima, sendo objeto de compensação, nos termos deste Acordo.

Legend:
2.1.    In the event of a Credit Event provided for in Clause 2.2 below, the Active and Passive Transactions will be considered immediately and automatically due and the Derivative and Purchase and Sale Transactions will be considered settled in advance, regardless of the original maturity date of these transactions. The amount of each transaction will be considered automatically due and payable, under the terms of Clause 1.1.1, above, being subject to compensation, under the terms of this Agreement.

---

[39] The following is a free translation of the second clause: "In the event of the occurrence and continuation of an Event of Default pursuant to Clause 13.1 (*Events of Default*), each Debtor hereby authorizes each Lender and each Affiliate of each Lender to proceed, to the extent permitted by applicable law, without prior notice, by right of set-off, banking privilege or counterclaim, against any assets of the Borrower (or the Guarantor, as the case may be) in any currency that are, at any time, in the possession of said Lender or Affiliate, in any agency or office, up to the full limit of all amounts due to the Lenders hereunder. Any Lender so proceeding against any Obligor, or having an Affiliate so proceeding against any Obligor, shall promptly notify the *Facility Agent* of any action taken by such Lender or Affiliate under this Clause 13.3; provided that the absence of such notification shall not affect the validity of said compensation and its application."

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                          CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                  RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 68*

**13.3    Right of Setoff**

If an Event of Default under Section 13.1 (*Events of Default*) shall have occurred and be continuing, each Obligor hereby authorizes each Lender and each Affiliate of each Lender to proceed, to the extent permitted by applicable law, without prior notice, by right of setoff, banker's lien or counterclaim, against any assets of the Borrower (or the Guarantor, as the case may be) in any currency that may at any time be in the possession of such Lender or Affiliate, at any branch or office, to the full extent of all amounts payable to the Lenders hereunder. Any Lender that so proceeds against any Obligor or that has an Affiliate that so proceeds against any Obligor, the Lender shall forthwith give notice to the Facility Agent of any action taken by such Lender or Affiliate pursuant to this Section 13.3; provided that the failure to give such notice shall not affect the validity of such setoff and application.

132.    In total, it is estimated that **the incidence of such clauses could result in the appropriation of more than BRL 200 million deposited in bank accounts held by Petitioners**. In this case, the restructuring efforts undertaken by the Braskem Group and the useful result of the Mediation would be irreversibly compromised, to the extent that the compensation **(i)** would deprive Petitioners of resources essential to the development of their operations, used to bear the payment of employees, suppliers and other expenses essential to the activities of the Braskem Group; and **(ii)** would also imply the satisfaction of the credits of certain Subject Financial Creditors in a distinct and privileged manner in relation to the collective solution that would be discussed throughout the Mediation – which, in practice, would mean granting privileged treatment to such creditors to the detriment of all others.

133.    It should be noted that such privileged treatment, in flagrant violation of the principle of *par conditio creditorum* (articles 49 and 59 of the LFR), would not result from any guarantee (real or fiduciary) or bank locking mechanism to which the creditor would be entitled, but only from the circumstance that the Subject Financial Creditor has access to resources of the Braskem Group deposited in an account – and, thus, has means for the individual satisfaction of its credit, unrelated to the collective procedure.

134.    Allowing, in these circumstances, the offset of a Subject Financial Credit "*would imply the immediate payment of part of the creditors of a certain class, while the rest would be subject to the terms of the plan* [...]. *Compensation could even lead to the **absurd hypothesis that those who are in arrears with the business group in reorganization (and, therefore, still have a debt) indirectly receive their credit through compensation**, while other creditors, in compliance with their obligations to the companies under reorganization, bearing only the status of creditors, must wait for the entire reorganization process to receive their credit, which will also be subject to reductions arising from the discount provided for in the plan*"[40].

135.    It is evident, therefore, that the restrictions arising from the injunctive relief provided for in article 20-B, paragraph 1, of the LFR also affect the offsetting of Subject Financial Credits, as it is a means of credit satisfaction, equivalent to payment, the enforceability of which is suspended. And, in this specific case, the express recognition of the prohibition of the appropriation of resources to satisfy Subject Financial Credits is essential to preserve Petitioners' cash – already compromised by their current economic and financial situation – and, thus, ensure the continuity of their productive activities and safeguard the useful result of the Mediation.

136.    Thus, as a result of the granting of this injunction ancillary to the Mediation, the suspension of all executions, equity constrictions and/or compensations of Subject Financial Credits of Petitioners must be recognized, for a period of 60 days.

---

[40] TJSP [São Paulo Court of Justice], Interlocutory Appeal No. 2260720-90.2015.8.26.0000, Reporting Appellate Justice Fabio Tabosa, 2nd Reserved Chamber of Business Law, judged on 05.12.2016.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                           RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                  *Livro nº 337*                  *Folha nº 69*

---

*ii.    **Impossibility of early maturity of the Subject Financial Credits***

137.    Most of the contracts entered into between the Braskem Group and the Subject Financial Creditors provide for the possibility of termination or declaration of early maturity due to the mere filing of procedures provided for in the LFR, as well as the non-payment of credits that are now the subject of Mediation.

138.    This, of course, **threatens the useful result of the Mediation** and **directly impairs the restructuring efforts of the Braskem Group**, which goes against the purpose of articles 20-B, §1 and 47 of the LFR – based on the continuity of the company, which, of course, requires the preservation of the web of contracts that the structure.

139.    Precisely because of the incompatibility between contractual provisions such as these and the objectives of the LFR, the jurisprudence of this TJSP [São Paulo Court of Justice] has restricted the application of the so-called *ipso facto* clauses in a series of judicial and out of court reorganization proceedings. See below:

"Judicial Reorganization **Suspension of the early maturity clause of contracts during the stay period. Possibility**. Condition that meets the purpose of the judicial reorganization process, ensuring the preservation of the company's social function and its economic activity"[41]

"Business Law. Interlocutory Appeal. Judicial Reorganization. Appeal denied. Interlocutory appeal filed against a decision granting relief to declare the impossibility of contractual termination and early expiration of the contracts due to the request for judicial reorganization. **The filing of the judicial reorganization does not imply automatic termination of the contractual relationship, especially without clear demonstration of impossibility of compliance or imminent risk of default**. The express resolution clause limits the application of the Law 11,101/2005, which aims at the preservation of the company, being premature the revocation of the relief granted due to the danger of reverse damage"[42].

140.    The same understanding has also been adopted in cases involving preliminary injunctions filed based on articles 6, paragraph 12, or 20-B, paragraph1 of the LFR.

141.    For example, in the case of the Rio Alto Group, the Honorable Court of the 2nd Court of Judicial Reorganization and Bankruptcy determined the *"impossibility of termination, early maturity or imposition of sanctions"* in essential contracts entered into by the debtors*, "either due to the possible non-payment of credits whose enforceability is suspended, or due to the simple beginning of Mediation or the filing of this Injunction"*[43], and was maintained by TJSP [São Paulo Court of Justice][44]. The same understanding was also applied and ratified in the case of the Unigel Group[45].

142.    A similar understanding was adopted by the Honorable Court of the 3rd Bankruptcy and Judicial Reorganization Court of São Paulo/SP in the provisional injunction filed by Gold Energia, and also by TJSP

---

[41] TJSP [São Paulo Court of Justice], Interlocutory Appeal No. 2220864-70.2025.8.26.0000, Reporting Appellate Justice Rui Cascaldi, 1st Reserved Chamber of Business Law, judged on 10.30.2025.
[42] TJSP [São Paulo Court of Justice], Interlocutory Appeal No. 2131465-30.2025.8.26.0000, Reporting Appellate Judge J.B. Paula Lima, 1st Reserved Chamber of Business Law, judged on 07.30.2025.
[43] TJSP [São Paulo Court of Justice], Proceeding No. 1024422-42.2025.8.26.0100, Judge Paulo Furtado de Oliveira Filho, decision of 07.18.2025.
[44] TJSP [São Paulo Court of Justice], Interlocutory Appeal No. 2078729-35.2025.8.26.0000, Reporting Appellate Justice Fortes Barbosa, 1st Reserved Chamber of Business Law, judged on 06.11.2025.
[45] TJSP [São Paulo Court of Justice], Proceeding No.1105782-96.2025.8.26.0100, Judge Paulo Furtado de Oliveira Filho, decision of 08.13.2025.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*          *Livro nº 337*          *Folha nº 70*

[São Paulo Court of Justice] in the case of <u>Polimport</u>[46], in a provisional injunction filed based on art. 6, § 12, of the LFR, aiming at anticipating the effects of the *stay period*. See below:

"**I also grant the relief required for the declaration of impossibility of contractual termination and declaration of early maturity of the contracts due to the request for relief and its inherent circumstances.** I emphasize that, although contractual freedom is the rule, said express resolutive clause contravenes the social function of the contract under art. 421 of the Civil Code, since it limits the application and scope of the provisions of Law 11,101/2005, especially preservation of the company. Thus, considering the corporate interest, it is a hypothesis of exceptional review of the contract"[47].

"**The fact is that the early maturity of obligations**, with constrictions in significant amounts carried out by the creditor banks at the beginning of the judicial reorganization process, even before any analysis of each credit by the reorganization court, **could make it impossible to continue the procedure, exterminating at birth a reorganization considered initially feasible.** Therefore, it is a measure regularly determined by the competent Court of the judicial reorganization, in the light of the principle of preservation of the company (article 47 of Federal Law No. 11,101/2005), in view of the analysis of the measures that could irreversibly affect the assets, the essential activities and the substantial legal business of the debtor company"[48].

143.    In this case, the decree of early maturity by Subject Financial Creditors, due to the initiation of this procedure or the non-payment of amounts with suspended enforceability, could have repercussions on other contractual relationships (including operational ones) maintained by the Braskem Group and its subsidiaries, whose counterparties could seek the termination or acceleration of obligations based on *cross-default* or *cross-acceleration* forecasts.

144.    These chain contractual consequences would lead to the strangulation of the Braskem Group's operational activities, contrary to the scope of this provisional injunction ancillary to mediation, based on the equation of financial indebtedness in an environment of stability, with preservation of the normal course of the Braskem Group's operations.

145.    On the other hand, the suspension of this right does not cause any prejudice to the adversary parties. As for the Subject Financial Creditors, the protection arising from the injunction covers overdue and maturing credits, with no loss arising from the prohibition of the declaration of early maturity for their credit position.

146.    Likewise, in relation to the other creditors (including operational ones) who, due to a cascade effect, could apply *cross-default* or *cross-acceleration* provisions, there is also no loss. After all, the Braskem Group is in compliance with all its suppliers and intends to continue doing so. And, in the event of future default under the instruments, the contractual prerogatives of the adversary parties will not be affected. It is not sought here a broad and general protection, but only that the Subject Financial Creditors do not declare the early maturity only due to the present request and/or the non-payment of credits that will be subject to negotiation in the Mediation.

147.    Thus, in view of the scenario of imminent maturity of debts of the Subject Financial Creditors – which could imply, by domino effect, unilateral resolution of essential operational contracts and unbridled search for Petitioners' assets –, the granting of the provisional injunction required herein is fundamental for the continuity of Petitioners' operations and to safeguard the useful result of the Mediation.

---

[46] Polimport Comércio e Exportação Ltda.
[47] TJSP [São Paulo Court of Justice], Proceeding No. 1021294-14.2025.8.26.0100, Judge Leonardo Fernandes dos Santos, decision of 02.20.2025.
[48] TJSP [São Paulo Court of Justice], Interlocutory Appeal No. 2132785-52.2024.8.26.0000, 1st Reserved Business Law Chamber, Reporting Appellate Judge Alexandre Lazzarini, judged on 11.27.2024.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                           RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                     *Livro nº 337*                        *Folha nº 71*

**V.**
**ORDER TO HOLD THE CASE IN SECRECY TEMPORARILY ONLY UNTIL THE GRANTING OF PROVISIONAL INJUNCTION**

148.    Over the last six months, after announcing the engagement in negotiations with creditors regarding its capital structure, the financial situation of the Braskem Group has been intensely monitored by the national and international media, as well as by its thousands of creditors and *stakeholders*.

149.    As narrated throughout this petition, Petitioners are going through a particularly delicate moment, with maturities of obligations in substantial amounts in the short term that may seriously compromise their cash position or, in the event of non-compliance, give rise to cross-maturities in the order of BRL 55 billion.

150.    The purpose of this injunction is precisely to protect the Braskem Group from this situation, providing a safe environment for negotiations with Subject Financial Creditors, avoiding unbridled competition for their assets and, thus, preserving the useful result of the Mediation.

151.    It turns out that, between the filing of this request and the effective granting of relief by this Honorable Court, the Braskem Group will be temporarily exposed to aggressive measures by its creditors, which may even occur in other jurisdictions. Although such a period is expected to be short, hostile creditors will have sufficient time to declare the early maturity of debts, offset amounts deposited in bank accounts or other constrictive measures in general, which may frustrate the useful outcome of the Mediation.

152.    And these measures cannot be reversed later, even if so determined by this Honorable Court. After all, part of Braskem Group's assets and liabilities are not located in Brazil, but in other jurisdictions. Thus, only with the granting of injunctive relief can such opportunistic behaviors be avoided.

153.    For this reason, the Braskem Group asks this Honorable Court to, exceptionally, maintain the secrecy of justice of these records **only** until the granting of the intended provisional remedy, as an exercise of the general power of caution. It is the most reasonable and appropriate measure to simultaneously preserve the useful outcome of the Mediation and protect Petitioners.

154.    After all, under the terms of art. 297 of *the CPC, "the judge may determine the measures he deems appropriate to effect the provisional relief"*, which, of course, may include the assignment of secrecy temporarily.

155.    Petitioners clarify that they do not intend this injunction to remain a secret of justice throughout its processing. Quite the contrary: after the granting by this Honorable Court, the Braskem Group does not oppose that secrecy be lifted, subject to the general principle of publicity, as already decided in other cases of provisional injunction processed in this TJSP [São Paulo Court of Justice][49].

156.    Objectively, the request brought to this Court does not consist of an attempt to violate the general principle of publicity that must govern the procedures regulated by the LFR. It is, in fact, a provisional injunction, required temporarily, only to preserve the useful result of the Mediation.

157.    In view of the foregoing, it is required that the records of this case be kept secret from the courts **only** until the appraisal and granting of the intended provisional remedy, pursuant to art. 297 of the CPC.

**VI.**
**REQUESTS**

---

[49] TJSP [São Paulo Court of Justice], Proceeding No.1008721-75.2024.8.26.0100, 2nd Lower Bankruptcy and Judicial Reorganization Court, Judge Adler Batista Oliveira Nobre, decision of 01.30.2024; TJSP [São Paulo Court of Justice], Proceeding No.1069126-48.2022.8.26.0100, 1st Lower Bankruptcy and Judicial Reorganization Court, Judge João de Oliveira Filho, decision of 07.12.2022.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                *Livro nº 337*                *Folha nº 72*

158.    For all of the foregoing, once it is proven that Petitioners meet all the necessary requirements for the granting of their request, as provided for in article 20-B, paragraph 1, of the LFR and article 305 et seq. of the CPC, it is required that this injunction be **received** and **granted** on an injunction basis, *unprecedented alters part*. At this point, it is required that the order for this proceeding to be held in **secrecy** be maintained only until the granting of injunctive relief, pursuant to article 297 of the CPC.

159.    With the granting of injunctive relief, this Honorable Court is required to issue an official letter to be sent by Petitioners to the Subject Financial Creditors invited to Mediation (**exhibit 2**), to determine, for a period of sixty (60) days, **(i)** the suspension of the actions and executions filed against Petitioners for the collection of the Subject Financial Credits; **(ii)** the impossibility of adoption, by its holders, of judicial or out of court measures of execution, constriction or seizure of Petitioners' assets; and **(iii)** the prohibition of the offsetting of Subject Financial Credits, pursuant to art. 20-B, paragraph 1 of the LFR, as well as the early maturity and/or termination of contracts maintained with the Subject Financial Creditors, due to the protocol of this provisional injunction, the establishment of Mediation or the non-payment of amounts whose enforceability is suspended.

160.    It is required that all notices relating to this proceeding be made exclusively and cumulatively on behalf of attorneys **Eduardo Secchi Munhoz**, **OAB/SP [Brazilian Bar Association/São Paulo Chapter] No. 126.764**, and **Ana Elisa Laquimia de Souza**, **OAB/SP No. 373.757,** under penalty of nullity.

161.    Petitioners protest the attachment of a sworn translation of the documents in foreign languages within 15 days from this date.

162.    The amount of BRL 55,688,794,079.95 is attributed to the case, which corresponds to the sum of the total amount of Subject Financial Credits (BRL 54,802,166,474.06) with the total amount of *intercompany* debts (BRL 886,627,605.89).

Granting is hereby requested.
São Paulo, June 25, 2026

Eduardo Secchi Munhoz
OAB/SP No. 126.764

Ana Elisa Laquimia de Souza
OAB/SP No. 373.757

Danilo Domingues Guimarães
OAB/SP No. 422.993

Raphael Maldi Mendes
OAB/SP No. 439.913

Lucas Pereira Calmon
OAB/SP No. 508.290

Caio de Magalhães Brega
OAB/SP No. 545.784

### List of Exhibits

| Exhibit | Description |
| --- | --- |
| **Exhibit 1** | Powers of Attorney and documents evidencing powers |
| **Exhibit 2** | Proof of initiation of the mediation process with the Câmara Wind de Mediação, including the list of creditors covered by the Mediation |
| **Exhibit 3** | List of Credits Covered by Mediation |
| **Exhibit 4** | Certificates and declarations proving Petitioners have been for over two years in good standing to do business (article 48, main provision, of the LFR) |
| **Exhibit 5** | Certificates and declarations proving that Petitioners were never bankrupt or filed for judicial reorganization (art. 48, I, II and III, of the LFR) |
| **Exhibit 6** | Certificates and declarations proving that Petitioners, their managers and controlling shareholders have never been convicted for bankruptcy crimes (art. 48, IV, of the LFR) |
| **Exhibit 7** | Notices sent by Banco Safra S.A. to Braskem S.A. |

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22706*                    *Livro nº 337*                    *Folha nº 73*

---

IN WITNESS WHEREOF, I hereunto set my hand and seal.

São Paulo, June 25, 2026

Rec. Nº.: 10769
Talão Nº.: 63
Emol.: R$ 6.985,18
Nº de caracteres: 63519 (sem espaço)

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código DC8A-40D2-9C7B-C9DC.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# PROTOCOLO DE ASSINATURA(S)

O documento acima foi proposto para assinatura digital na plataforma Certisign Assinaturas. Para verificar as assinaturas clique no link: http://assinaturas.certisign.com.br/Verificar/DC8A-40D2-9C7B-C9DC ou vá até o site http://assinaturas.certisign.com.br e utilize o código abaixo para verificar se este documento é válido.

## Código para verificação: DC8A-40D2-9C7B-C9DC



**Hash do Documento**

B76CB74AEAEFB7FE80800E53D2A4D9AB023535A8AC06F728E05BC8D7FBFA5041

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 25/06/2026 é(são) :

☑ Cristina Gonzales (Signatário) - 108.911.608-09  em 25/06/2026 16:21 UTC-03:00
**Tipo:** Certificado Digital

**Evidências**

**Geolocation:** Latitude: -23.617959750093874 Longitude: -46.63802166321228 Accuracy: 84
**IP:** 172.16.4.37
**AC:** AC Certisign Multipla G7



**EXHIBIT C**

**Original Mediation Chambers Acceptance Letter**



Rio de Janeiro, 24 de junho de 2026

Ao Grupo BRASKEM
A/c: Dr. Raphael Maldi Mendes – E. Munhoz Advogados
(rmaldi@emunhoz.com.br)

Ref: Instauração de Procedimento de Mediação - PROC 26B40

Prezados,

Considerando o pedido de instauração de procedimento de mediação, nos termos do art. 20-B da Lei 11.101/05, formulado pelas empresas (1) **BRASKEM S.A**., sociedade anônima de capital aberto, inscrita no CNPJ/MF sob o nº 42.150.391/0001-70, com sede na Rua Eteno, nº 1.561, Polo Industrial de Camaçari, Camaçari, Bahia, CEP 42816-200; (2) **BRASKEM NETHERLANDS B.V**., sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, Países Baixos, na Weena 240, 9th Floor, Tower C, 3012NJ, registrada na Câmara de Comércio holandesa sob o número 24401995; (3) **BRASKEM NETHERLANDS INC. B.V**., sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, Países Baixos, na Weena 240, 9º andar, Torre C, 3012NJ, registrada na Câmara de Comércio holandesa sob o número 62115081; (4) **BRASKEM TRADING & SHIPPING B.V**, sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, Países Baixos, na Weena 240, 9º andar, Torre C, 3012NJ, registrada na Câmara de Comércio holandesa sob o número 90073614; (5) **BRASKEM NETHERLANDS FINANCE B.V**., sociedade constituída e existente de acordo com as leis dos Países Baixos, com sede na cidade de Rotterdam, na Weena 240, 4º andar, Torre C, 3012NJ, Países Baixos, registrada na Câmara de Comércio holandesa sob o número 61905771; e (6) **BRASKEM AMERICA FINANCE COMPANY**, sociedade constituída e existente de acordo com as leis de Delaware, Estados Unidos da América, em 251 Little Falls Drive, Wilmington, Condado de New Castle, Delaware, 19808, Estados Unidos da América, registrada no Departamento de Estado de Delaware, Divisão de Corporações, sob o número 5007185, informamos que o procedimento de mediação foi instaurado pela Câmara Wind de Mediação, inscrita no CNPJ sob o nº 42.381.158/0001-07 e especializada em resolução de conflitos empresariais.

Nos termos do Regulamento da Câmara, as custas foram pagas pelas Requerentes e as informações iniciais prestadas.

A mediadora indicada para conduzir a mediação é a Dra. Samantha Longo[1], OAB/RJ 104.119, que informou ter disponibilidade e não vislumbrar conflito para atuar (https://camarawind.com.br/mediadora-lider/).

O procedimento será conduzido de forma online, sem prejuízo de serem realizadas sessões de mediação presenciais, se as partes assim desejarem.

As Requerentes indicaram os seguintes credores para participarem do procedimento:

| CREDOR | CNPJ |
|---|---|
| BANCO LATINOAMERICANO DE COMERCIO EXTERIOR S.A. | N/A |
| BANCO SAFRA S.A. | 58.160.789/0001-28 |
| BANCO SANTANDER S.A. | N/A |
| BANK OF AMERICA, N.A. | 62.073.200/0001-21 |
| BARCLAYS BANK PLC | N/A |
| BNP PARIBAS SECURITIES CORP | N/A |
| BNP PARIBAS FORTIS NV/SA | N/A |
| BNP PARIBAS | N/A |
| BRASKEM NETHERLANDS B.V. | N/A |
| BRASKEM NETHERLANDS INC. B.V. | N/A |
| BRASKEM NETHERLANDS FINANCE B.V. | N/A |
| CITIBANK | N/A |
| CITIBANK N.A. | 33.042.953/0001-71 |
| CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK | N/A |
| DEUTSCHE BANK AG | N/A |
| DEUTSCHE BANK AKTIENGESELLSCHAFT | N/A |
| DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBAN, FRANKFURT AM MAIN | N/A |
| ECO SECURITIZADORA DE DIREITOS CREDITÓRIOS DO AGRONEGÓCIO S.A. | 10.753.164/0001-43 |
| ING BANK N.V. | N/A |
| ING CAPITAL LLC | N/A |
| ITAU UNIBANCO S.A. | 60.701.190/4816-09 |
| KFW | N/A |
| KFW IPEX-BANK GMBH | N/A |
| MIZUHO BANK, LTD | N/A |
| NATIXIS | N/A |
| PENTÁGONO S.A. DISTRIBUIDORA DE TÍTULOS E VALORES MOBILIÁRIOS | 17.343.682/0001-38 |
| STANDARD CHARTERED BANK | N/A |
| SUMITOMO MITSUI BANKING CORPORATION | N/A |
| TERMINAL QUÍMICA PUERTO MEXICO S.A.P.I. DE C.V | N/A |
| THE BANK OF NEW YORK MELLON | N/A |

---

[1] Advogada. Mediadora. Professora. Doutoranda e Mestre em Direito Empresarial e Cidadania. LLM. em Direito Empresarial. Capacitada em Negociação e Liderança pela Universidade de Harvard. Membro do FONAREF- Fórum Nacional de Recuperação Empresarial e Falência e Membro do Comitê Gestor de Conciliação, ambos do Conselho Nacional de Justiça. Presidente da Comissão de Mediação da OAB/RJ. Coordenadora da Coluna Migalhas Consensuais. Autora de livros e artigos.

A mediação é um eficaz instrumento de pacificação social, sendo regida pelos seguintes princípios, nos termos do art. 2º da Lei 13.140/2015: (i) imparcialidade do mediador; (ii) isonomia entre as partes; (iii) oralidade; (iv) informalidade; (v) autonomia da vontade das partes; (vi) consensualidade; (vii) confidencialidade; e (viii) boa-fé. Trata-se de procedimento voluntário, não sendo obrigatória a participação de nenhum convidado.

Agradecendo a escolha da Câmara para administrar o referido procedimento de mediação, estamos à disposição para prestar qualquer esclarecimento.

Cordialmente,

**Câmara Wind de Mediação**
**Especializada em Resolução de Conflitos**
Gerente de Casos

Samantha Longo
Mediadora

## **EXHIBIT D**

**Certified Translation of Mediation Chambers Acceptance Letter**

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22709*                    *Livro nº 337*                    *Folha nº 96*

I, Cristina Gonzales, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that a document written in PORTUGUESE was submitted to me, the translation of which is as follows:

[*logo of Wind MEDIATION CHAMBER*]

Rio de Janeiro, June 24, 2026

To the BRASKEM Group
Attn: Mr. Raphael Maldi Mendes - E. Munhoz Advogados
(rmaldi@emunhoz.com.br)

Ref.: Initiation of Mediation Procedure - PROC 26B40

Dear Sirs,

Considering the request to initiate a mediation procedure, pursuant to art. 20-B of Law 11,101/05, filed by the companies (1) **BRASKEM S.A.**, a publicly-held corporation, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/MF) under No.42.150.391/0001-70, with its principal place of business at Rua Eteno, 1.561, Polo Industrial de Camaçari, Camaçari, Bahia, CEP42816-200; (2) **BRASKEM NETHERLANDS B.V.**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the City of Rotterdam, the Netherlands, at Weena 240, 9th Floor, Tower C, 3012NJ, registered with the Dutch Chamber of Commerce under No**. 24401995; (3) BRASKEM NETHERLANDS INC.** 24401995 **B.V.**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the City of Rotterdam, the Netherlands, at Weena 240, 9th floor, Tower C, 3012NJ, registered with the Dutch Chamber of Commerce under number 62115081; (4) **BRASKEM TRADING & SHIPPING B.V**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the City of Rotterdam, the Netherlands, at Weena 240, 9th floor, Tower C, 3012NJ, registered with the Dutch Chamber of Commerce under number 90073614; (5) **BRASKEM NETHERLANDS FINANCE B.V.**, a company organized and existing under the laws of the Netherlands, with its principal place of business in the City of Rotterdam, at Weena 240, 4th floor, Tower C, 3012NJ, the Netherlands, registered in the Dutch Chamber of Commerce under number 61905771; and (6) **BRASKEM AMERICA FINANCE COMPANY**, a company organized and existing under the laws of Delaware, United States of America, at 251 Lifle Falls Drive, Wilmington, New Castle County, Delaware, 19808, the United States of America, registered in the Department of State of Delaware, Division of Corporations, under number 5007185, we hereby inform you that the mediation procedure was instituted by the Wind Mediation Chamber, enrolled in the CNPJ under number 42.381.158/0001-07, which specializes in corporate dispute resolution.

Pursuant to the Rules of the Chamber, the Claimants paid the costs and provided the initial information.

**Wind Mediation Chamber**
www.camarawind.com.br • contato@camarawind.com.br

The mediator appointed to conduct the mediation is Samantha Longo, Esq.[1], enrolled in the Brazilian Bar Association/Rio de Janeiro Section (OAB/RJ) under No. 104.119, who informed that she was available and did not see any conflict to act (https://camarawind.com.br/mediadora-lider/).

---

[1] Attorney. Mediator. Professor. PhD student and Master in Business Law and Citizenship. LLM in Business Law. Trained in Negotiation and Leadership by Harvard University. Member of FONAREF – National Forum for Corporate Restructuring and Bankruptcy, and Member of the Conciliation Management Committee, both of the National Council of Justice. Chairperson of the Mediation Committee of OAB/RJ. Coordinator of the 'Migalhas Consensuais' Column. Author of books and articles.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22709*            *Livro nº 337*            *Folha nº 97*

---

The procedure will be conducted online, without prejudice to face-to-face mediation sessions, if the parties so wish.

The Claimants indicated the following creditors to participate in the procedure:

| CREDITOR | CNPJ |
|---|---|
| BANCO LATINOAMERICANO DE COMERCIO EXTERIOR S.A. | N/A |
| BANCO SAFRA S.A. | 58.160.789/0001-28 |
| BANCO SANTANDER S.A. | N/A |
| BANK OF AMERICA, N.A. | 62.073.200/0001-21 |
| BARCLAYS BANK PLC | N/A |
| BNP PARIBAS SECURITIES CORP | N/A |
| BNP PARIBAS FORTIS NV/SA | N/A |
| BNP PARIBAS | N/A |
| BRASKEM NETHERLANDS B.V. | N/A |
| BRASKEM NETHERLANDS INC. B.V. | N/A |
| BRASKEM NETHERLANDS FINANCE B.V. | N/A |
| CITIBANK | N/A |
| CITIBANK N.A. | 33.042.953/0001-71 |
| CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK | N/A |
| DEUTSCHE BANK AG | N/A |
| DEUTSCHE BANK AKTIENGESELLSCHAFT | N/A |
| DZ BANK AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBAN, FRANKFURT AM MAIN | N/A |
| ECO SECURITIZADORA DE DIREITOS CREDITÓRIOS DO AGRONEGÓCIO S.A. | 10.753.164/0001-43 |
| ING BANK N.V. | N/A |
| ING CAPITAL LLC | N/A |
| ITAU UNIBANCO S.A. | 60.701.190/4816-09 |
| KFW | N/A |
| KFW IPEX-BANK GMBH | N/A |
| MIZUHO BANK, LTD | N/A |
| NATIXIS | N/A |
| PENTÁGONO S.A. DISTRIBUIDORA DE TÍTULOS E VALORES MOBILIÁRIOS | 17.343.682/0001-38 |
| STANDARD CHARTERED BANK | N/A |
| SUMITOMO MITSUI BANKING CORPORATION | N/A |
| TERMINAL QUÍMICA PUERTO MEXICO S.A.P.I. DE C.V | N/A |
| THE BANK OF NEW YORK MELLON | N/A |

Mediation is an effective instrument of social pacification, being governed by the following principles, pursuant to article 2 of Law 13,140/2015: (i) impartiality of the mediator; (ii) isonomy between the parties; (iii) orality; (iv) informality; (v) autonomy of the parties; (vi) consensuality; (vii) confidentiality; and (viii) good faith. This is a voluntary procedure, and the participation of any invited party is non-mandatory.

We appreciate your choice of the Chamber to administer this mediation procedure and remain available for any further information.

Best Regards,

[*signature*]                                      [*signature*]
**Wind Mediation Chamber**                **Samantha Longo**

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código 7858-5B41-6C0D-C582.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 22709*                    *Livro nº 337*                    *Folha nº 98*

| **Specialist in Dispute Resolution** | Mediator |
|---|---|
| Case Manager | |

IN WITNESS WHEREOF, I hereunto set my hand and seal.

São Paulo, June 25, 2026

Rec. Nº.: 10770
Talão Nº.: 63
Emol.: R$ 481,23
Nº de caracteres: 4376 (sem espaço)

Este documento foi assinado digitalmente por Cristina Gonzales.
Para verificar as assinaturas vá ao site http://assinaturas.certisign.com.br e utilize o código 7858-5B41-6C0D-C582.

Rua Pereira Estéfano, nº 114 - conjunto 103
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# PROTOCOLO DE ASSINATURA(S)

O documento acima foi proposto para assinatura digital na plataforma Certisign Assinaturas. Para verificar as assinaturas clique no link: http://assinaturas.certisign.com.br/Verificar/7858-5B41-6C0D-C582 ou vá até o site http://assinaturas.certisign.com.br e utilize o código abaixo para verificar se este documento é válido.

## Código para verificação: 7858-5B41-6C0D-C582



### Hash do Documento

D7B1AEE8F74DB52F093E64873B28320822C2B07DBDD4C66A485F1C21A05C80F2

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 25/06/2026 é(são) :

☑ Cristina Gonzales - 108.911.608-09  em 25/06/2026 17:01 UTC-03:00
**Tipo:** Certificado Digital

**Evidências**

**Geolocation:** Latitude: -23.617953699141683 Longitude: -46.63794590622597 Accuracy: 87
**IP:** 172.16.4.37
**AC:** AC Certisign Multipla G7



## EXHIBIT E

**As-Filed Initial Court Order**



## Poder Judiciário
## JUSTIÇA ESTADUAL
## Cível - Tribunal de Justiça do Estado de São Paulo
## Juízo Titular II - 2ª Vara de Falências e Recuperações Judiciais - Foro Central Cível

Praça João Mendes, s/n, Salas 1813/1815 - 18º andar - Bairro: Centro - CEP: 1501900 - Fone: (11) 3538-9313 - Email: sp2falencias@tjsp.jus.br

**TUTELA CAUTELAR ANTECEDENTE Nº 4113246-86.2026.8.26.0100/SP**

# DESPACHO/DECISÃO

Trata-se de pedido de tutela de urgência cautelar ajuizada pelo Grupo Braskem, composto por Braskem S.A. e algumas de suas controladas estrangeiras, com base no artigo 20-B, parágrafo 1º, da Lei nº 11.101/2005 e no artigo 305 do Código de Processo Civil, objetivando resguardar a viabilidade das atividades das requerentes e garantir o resultado útil da mediação extrajudicial instaurada em 24 de junho de 2026 perante a Câmara Wind de Mediação (evento 1, DOCUMENTACAO5).

Esclarecem as requerentes que, em razão de severa crise econômico-financeira, decorrente do prolongado ciclo de baixa do setor petroquímico global, do vultoso passivo relacionado ao evento geológico de Alagoas e das incertezas geradas pelas tensões geopolíticas no Oriente Médio, encontram-se expostas a iminentes vencimentos de obrigações financeiras no valor de R$ 2,6 bilhões em julho de 2026, sob risco de vencimento antecipado cruzado de todo o seu passivo financeiro de R$ 54,8 bilhões. Aduzem que, nesse cenário, o credor Banco Safra S.A. notificou unilateralmente a cobrança acelerada de Notas de Crédito à Exportação e realizou a compensação indevida de saldos decorrentes de operações de derivativos (evento 1, DOCUMENTACAO5).

Sustentam que, como a receita do Grupo Braskem provém da regular operação petroquímica e de sua cadeia de suprimentos, a retenção ou compensação unilateral de recursos essenciais e a corrida de credores financeiros comprometeriam as despesas operacionais básicas e salários, o que inviabilizaria qualquer tentativa de reestruturação na mediação recém-instalada.

Pleiteiam, em caráter liminar, as seguintes providências: a suspensão das ações e execuções promovidas pelos credores financeiros sujeitos abrangidos pela mediação, com a vedação a qualquer medida constritiva sobre seus bens; determinação para que o credor Banco Safra S.A. se abstenha de realizar compensações unilaterais ou reter ativos das requerentes, sob pena de multa diária; e a proibição de que os credores rescindam contratos bilaterais, declarem o vencimento antecipado de obrigações ou apliquem sanções motivadas pelo inadimplemento ou pelo simples ajuizamento desta demanda.

É o que importa relatar.

Por ora, reconheço a competência para processamento do feito. Pelas informações constantes nos autos, trata-se de grupo cuja atuação se dá principalmente no território nacional. Na análise da competência interna, verifico que a atuação se dá em

**4113246-86.2026.8.26.0100**                                                                                     **610012324477 .V11**



# Poder Judiciário
## JUSTIÇA ESTADUAL
### Cível - Tribunal de Justiça do Estado de São Paulo
### Juízo Titular II - 2ª Vara de Falências e Recuperações Judiciais - Foro Central Cível

diversos Estados da Federação, inclusive São Paulo. Neste contexto, é adequada a manutenção da competência no local do centro decisório, onde estão situados o conselho de administração e a diretoria estatutária da Braskem. Sem prejuízo, a questão poderá ser reavaliada quando do deferimento do processamento da recuperação, principalmente se forem aportados novos elementos de fato aos autos.

**Suspensão das execuções e exigibilidade dos créditos sujeitos à recuperação**

A documentação juntada indica, ao menos em cognição sumária, o exercício de atividade empresarial da requerente pelo prazo legal. Não há notícia da existência de algum dos impedimentos indicados nos incisos do art. 48 da Lei 1.101/2005. A documentação completa só é exigida quando do pedido definitivo de recuperação judicial.

Foi comprovada a instauração de procedimento de mediação (evento 1, DOCUMENTACAO5).

A suspensão das ações e execuções em face de devedores que buscam a autocomposição prévia é medida expressamente prevista no art. 20-B, § 1º, da LFR.

Assim dispõe o art. 20-B, parágrafo 1º, da Lei 11.101/2005:

*Art. 20-B. Serão admitidas conciliações e mediações antecedentes ou incidentais aos processos de recuperação judicial, notadamente: (Incluído pela Lei nº 14.112, de 2020) (Vigência)*

*§ 1º Na hipótese prevista no inciso IV do caput deste artigo, será facultado às empresas em dificuldade que preencham os requisitos legais para requerer recuperação judicial obter tutela de urgência cautelar, nos termos do art. 305 e seguintes da Lei nº 13.105, de 16 de março de 2015 (Código de Processo Civil), a fim de que sejam suspensas as execuções contra elas propostas pelo prazo de até 60 (sessenta) dias, para tentativa de composição com seus credores, em procedimento de mediação ou conciliação já instaurado perante o Centro Judiciário de Solução de Conflitos e Cidadania (Cejusc) do tribunal competente ou da câmara especializada, observados, no que couber, os arts. 16 e 17 da Lei nº 13.140, de 26 de junho de 2015. (Incluído pela Lei nº 14.112, de 2020) (Vigência)*

A medida pleiteada busca resguardar a solução da crise por autocomposição entre devedor e credores, pela via da mediação. Se exitosa, poderá evitar uma recuperação judicial, poupando recursos do devedor e dos credores, além de não sobrecarregar o Poder Judiciário.

No caso concreto, o perigo de dano ou risco ao resultado útil do processo decorre da iminência de vencimento de obrigações financeiras no montante de R$ 2,6 bilhões em julho de 2026. O inadimplemento ou a ausência de proteção judicial dispararia cláusulas de vencimento antecipado cruzado do passivo de R$ 54,8 bilhões, expondo as requerentes a uma corrida desordenada de credores e a medidas constritivas que inviabilizariam o caixa mínimo operacional e a própria continuidade das atividades empresariais.

**4113246-86.2026.8.26.0100**                                                                                 **610012324477 .V11**



## Poder Judiciário
## JUSTIÇA ESTADUAL
### Cível - Tribunal de Justiça do Estado de São Paulo
### Juízo Titular II - 2ª Vara de Falências e Recuperações Judiciais - Foro Central Cível

Portanto, o deferimento da suspensão das execuções é medida que se impõe para os créditos sujeitos.

Também ficam vedados outros atos de satisfação, a exemplo das compensações e retenções.

O deferimento do processamento da recuperação judicial do devedor (ou sua antecipação, na forma dos arts. 6º, § 12 e 20-B, § 1º, da Lei 11.101/2005) acarreta diversos efeitos que atingem a esfera jurídica dos sujeitos que titularizam créditos submetidos ao processo recuperacional (créditos concursais). Alguns desses efeitos têm natureza processual (a exemplo da suspensão das execuções individuais art. 6º, II, Lei 11.101/2005), outros têm natureza material e portanto, atingem o próprio crédito, a exemplo da suspensão da prescrição (art. 6º, I, Lei 11.101/2005).

Um dos efeitos materiais aos quais os créditos concursais estão submetidos é a suspensão da exigibilidade durante o prazo do *stay period*. Sobre a inexigibilidade da dívida como efeito do deferimento do processamento da recuperação judicial, ensinam Pedro Rebello Bortolini e Renata Mota Maciel:

> *Já na recuperação judicial, a suspensão das ações e execução (agora pelo prazo limitado de 180 dias) concede ao devedor um "fôlego" para organizar a sua atividade e discutir o plano de recuperação com os credores em posição um pouco mais confortável. Vale dizer, obsta a própria exigibilidade das suas dívidas. (BORTOLINI, Pedro Rebello; MACIEL, Renata Mota. Efeitos da recuperação judicial sobre as garantias prestadas por terceiros. Cadernos Jurídicos, São Paulo, ano 16, nº 39, p. 33-58, Janeiro-Março/2015, p. 34)*

Inclusive, o pagamento a credor concursal fora das condições impostas pelo processo de recuperação pode caracterizar o crime de favorecimento de credores (art. 172 da Lei 11.101/2005), do que se extrai que o devedor não pode pagar obrigações concursais durante o prazo de suspensão.

Diante da inexigibilidade das obrigações sujeitas a este procedimento, ficam, por consequência, vedadas quaisquer formas de satisfação das obrigações, inclusive compensações e retenções.

### Do requerimento de proibição de resilições contratuais unilaterais e vencimento antecipado por ajuizamento de procedimentos previstos na LRF

Cuida-se de hipótese de indeferimento.

Não é lícita a invalidação, modificação ou negação de efeitos a cláusulas contratuais de resilição unilateral ou vencimento antecipado como consequência do pedido de recuperação judicial ou de antecipação de seus efeitos.

**4113246-86.2026.8.26.0100**                                    **610012324477 .V11**



## Poder Judiciário
## JUSTIÇA ESTADUAL
### Cível - Tribunal de Justiça do Estado de São Paulo
### Juízo Titular II - 2ª Vara de Falências e Recuperações Judiciais - Foro Central Cível

Cuida-se de relações jurídicas empresariais, que, em razão de sua natureza, presumem-se paritárias e são protegidas pela lógica da intervenção mínima e da excepcionalidade da revisão judicial. É o que se extrai dos arts. 421 e 421-A do Código Civil:

*Art. 421, parágrafo único: Nas relações contratuais privadas, prevalecerão o princípio da intervenção mínima e a excepcionalidade da revisão contratual.*

*Art. 421-A. Os contratos civis e empresariais presumem-se paritários e simétricos até a presença de elementos concretos que justifiquem o afastamento dessa presunção, ressalvados os regimes jurídicos previstos em leis especiais, garantido também que:*

*III - a revisão contratual somente ocorrerá de maneira excepcional e limitada.*

Nos contratos empresariais, a tomada de decisão equivocada pelo empresário, que o leva a uma situação desvantajosa, não obsta os efeitos do contrato. Posição contrária privilegiaria o empresário ineficiente, em detrimento do eficiente. Afastar-se-ia o diferencial competitivo enquanto fator de evolução do mercado e aumentar-se-ia o nível de insegurança e imprevisibilidade das relações econômicas. É o que ensina Paula Forgioni:

*"Um terceiro aspecto inerente ao funcionamento do sistema de direito comercial está relacionado ao erro do empresário. Os agentes econômicos algumas vezes adotam estratégias equivocadas, e esses enganos são previstos e desejados pelo sistema jurídico, na medida em que, diferenciando os agentes, permitem o estabelecimento do jogo concorrencial.*

*[...]*

*Nenhuma interpretação de um contrato empresarial será coerente e adequada se retirar o fator erro do sistema, neutralizando os prejuízos (ou lucros) que devem ser suportados pelos agentes econômicos, decorrentes de sua atuação no mercado.*

*[...]*

*Não fosse assim o sistema (i) estaria cometendo equívoco metodológico bastante semelhante ao da análise microeconômica clássica, porque anularia ou desconsideraria o necessário diferencial entre os agentes econômicos ou (ii) desestimularia as contratações. ."* (FORGIONI, Paula. A interpretação dos negócios empresariais. In: ULHOA, Fábio Coelho. *Tratado de direito comercial - Volume 5: Obrigações e contratos empresariais. São Paulo: Saraiva, 2015)*

A análise da validade das cláusulas contratuais, notadamente nas relações empresariais, não pode ser regida pela lógica do lucro x prejuízo, mas pela lógica do lícito x ilícito. Por vezes, o prejuízo pode compor os pressupostos de norma que prevê causa de invalidade, como no caso do instituto da lesão (Art. 157, Código Civil). Contudo, a invalidade, enquanto sanção jurídica, decorre da norma, não do prejuízo isoladamente considerado.

O deferimento do processamento da recuperação judicial não exclui a incidência das normas próprias dos contratos empresariais, notadamente os arts. 420 e 421-A do Código Civil. A recuperação não torna a empresa imune às vinculações que fez por

**4113246-86.2026.8.26.0100**                                                              **610012324477 .V11**



## Poder Judiciário
## JUSTIÇA ESTADUAL
### Cível - Tribunal de Justiça do Estado de São Paulo
### Juízo Titular II - 2ª Vara de Falências e Recuperações Judiciais - Foro Central Cível

manifestação de vontade, ainda que essas vinculações tornem mais difícil o processo de soerguimento.

O deferimento do processamento da recuperação não subverte as premissas próprias dos contratos empresariais e não torna o juiz tutor das opções contratuais da empresa em recuperação.

A recuperação judicial produz diversos efeitos, de ordem material e processual, que potencializam as chances de soerguimento da empresa. São exemplos a suspensão das execuções individuais e a novação promovida pelo plano aprovado pelos credores. Não há, contudo, o direito de recusar validade ou eficácia às normas de origem negocial pelo só fato de seus efeitos serem prejudiciais à empresa em recuperação.

Tal postura traria insegurança jurídica e imprevisibilidade ao ambiente de negócios, pois possibilitaria que posterior pedido de recuperação gerasse reavaliação das cláusulas contratuais firmadas pela recuperanda, negando-se validade/eficácia àquelas consideradas prejudiciais ao soerguimento.

Nos termos do art. 47 da Lei 11.101/2005, a recuperação judicial tem como um dos objetivos o estímulo à atividade econômica. Nesse sentido, suas normas não podem ser interpretadas de modo a trazer insegurança para as relações contratuais, pois tal postura geraria desincentivo às atividades econômicas.

Não à toa, o art. 49, § 2º, da Lei 11.101/2005 estabelece que as obrigações da recuperanda observarão as condições originalmente contratadas, salvo previsão distinta no plano. Desse dispositivo se extrai que não há um direito genérico de negar vigência às normas de origem negocial às quais está vinculada a recuperanda, ainda que seu efeito não seja o de facilitar o processo de soerguimento.

Todo contrato empresarial passa pela alocação de riscos entre os contratantes. As cláusulas de rescisão contratual são uma das formas de alocação desses riscos, que acabam por influenciar na decisão de contratação e na fixação do preço de contratação. Quanto maiores os riscos assumidos, maior tende a ser o benefício econômico exigido para a contratação.

A previsão de rescisão contratual em caso de recuperação judicial compôs a alocação de riscos do contrato, diminuindo os riscos do contratante ao autorizar a extinção do contrato em caso de crise financeira geradora de pedido recuperacional. Ao diminuir os riscos do outro contratante, essa cláusula tende a ter gerado condições benéficas para a requerente, a exemplo de contraprestação mais vantajosa. Essa alocação de riscos é lícita e a intervenção judicial que lhes negue vigência é contrária às normas extraídas dos arts. 420 e 421-A do Código Civil.

Não há norma na Lei 11.101/2005 que imponha a continuidade de contratos contra as suas disposições negociais. Inexiste a qualificação jurídica de "contratos essenciais". A essencialidade prevista na Lei 11.101/2005 é qualidade que pode ser atribuída

**4113246-86.2026.8.26.0100**                                                                 **610012324477 .V11**



## Poder Judiciário
## JUSTIÇA ESTADUAL
## Cível - Tribunal de Justiça do Estado de São Paulo
## Juízo Titular II - 2ª Vara de Falências e Recuperações Judiciais - Foro Central Cível

aos bens de capital, como limite às constrições efetivadas em benefício de credores extraconcursais, não a contratos. No mais, a imposição de continuidade de contratos contra as suas disposições expressas e contra a vontade dos contratantes violaria a liberdade contratual.

Sobre a licitude de cláusula de rescisão contratual por pedido de recuperação judicial, já decidiu o Tribunal de Justiça do Estado de São Paulo:

*"CONTRATO – Prestação de serviços – Rescisão unilateral – Admissibilidade – Cláusula que admite a rescisão na hipótese de recuperação judicial – Cláusula válida – Princípios da boa-fé contratual e da liberdade de contratar – Reajuste pelos serviços prestados indevido em razão da ausência de previsão contratual – Ausência, ademais, de cláusula proibitiva de contratação de funcionários da outra contratante – Recurso nesta parte improvido. HONORÁRIOS DE ADVOGADO – Fixação – Fixação dos honorários em 10% do valor atualizado da causa – Impossibilidade – Percentual que resultará em importe excessivo – Atendimento aos princípios da razoabilidade e proporcionalidade - Art. 8º do CPC/15 – Obediência aos critérios objetivos do Art. 85, §2º do CPC/15 – Verba honorária reduzida para R$ 10.000,00 - Recurso nesta parte provido."(TJSP; Apelação Cível 1006848-84.2017.8.26.0100; Relator (a): J. B. Franco de Godoi; Órgão Julgador: 23ª Câmara de Direito Privado; Foro Central Cível - 18ª Vara Cível; Data do Julgamento: 07/03/2018; Data de Registro: 08/03/2018)*

No que se refere ao vencimento antecipado, não obstante nada impeça a sua efetivação, a exigibilidade das obrigações sujeitas a este procedimento ficará suspensa pelo período determinado nesta decisão, como efeito da antecipação dos efeitos do deferimento do processamento.

Ante o exposto, **DEFIRO EM PARTE** a tutela de urgência de natureza cautelar requerida pelas requerentes e, por conseguinte:

a) Determino a suspensão das execuções contra as autoras, por créditos sujeitos a este procedimento, pelo prazo improrrogável de 60 (sessenta) dias, bem como o curso dos respectivos prazos prescricionais, permanecendo os autos nos juízos onde se processam, ressalvadas as disposições dos parágrafos 1º, 2º, 7º-A e 7º-B do artigo 6º, parágrafos 3º e 4º do artigo 49, parágrafo 1º do artigo 199 e inciso III do artigo 52 da Lei nº 11.101/2005;

b) Defiro a vedação a atos de compensação, retenção ou outros atos de satisfação de créditos sujeitos, pelo período de suspensão estabelecido nesta decisão;

c) Indefiro o requerimento de suspensão da eficácia das cláusulas de vencimento antecipado, resilição contratual ou aplicação de sanções comerciais e contratuais como consequência do pedido de recuperação judicial.

Tendo em vista a certidão contida no evento 5, CERT1, providencie a requerente o recolhimento das custas.

Determino o levantamento do segredo de justiça destes autos.

Habilite-se o Banco Safra S.A., conforme requerido no evento 6, PET1.

**4113246-86.2026.8.26.0100** **610012324477 .V11**



# Poder Judiciário
## JUSTIÇA ESTADUAL
### Cível - Tribunal de Justiça do Estado de São Paulo
### Juízo Titular II - 2ª Vara de Falências e Recuperações Judiciais - Foro Central Cível

Retire-se o sigilo.

Caberá à autora a comunicação da suspensão aos juízos competentes. Para tanto, servirá cópia da presente decisão como OFÍCIO a ser encaminhado pela autora ao MM. Juízo e órgãos competentes.

---

Documento eletrônico assinado por **GUILHERME CAVALCANTI LAMÊGO, Juiz de Direito**, na forma do artigo 1º, inciso III, da Lei 11.419, de 19 de dezembro de 2006. A conferência da **autenticidade do documento** está disponível no endereço eletrônico https://eproc1g.tjsp.jus.br/eproc/externo_controlador.php?acao=consulta_autenticidade_documentos, mediante o preenchimento do código verificador **610012324477v11** e do código CRC **6a1040fe**.

Informações adicionais da assinatura:
Signatário (a): GUILHERME CAVALCANTI LAMÊGO
Data e Hora: 26/06/2026, às 11:21:43

---

**4113246-86.2026.8.26.0100**                                    **610012324477 .V11**

## EXHIBIT F

**Machine Translation of Initial Court Order**



# Judiciary STATE
## COURTS
### Civil - Court of Justice of the State of São Paulo
### Presiding Judge II - 2nd Bankruptcy and Judicial Reorganization Court - Central Civil Jurisdiction

Praça João Mendes, s/n, Rooms 1813/1815 - 18th floor - Neighborhood: Centro - ZIP Code: 1501900 - Phone: (11) 3538-9313 - Email: sp2falencias@tjsp.jus.br

**PRELIMINARY INJUNCTION No. 4113246-86.2026.8.26.0100/SP**

# ORDER/DECISION

This is a motion for an urgent preliminary injunction filed by the Braskem Group, consisting of Braskem S.A. and some of its foreign subsidiaries, pursuant to Article 20-B, paragraph 1, of Law No. 11,101/2005 and Article 305 of the Code of Civil Procedure, with the aim of safeguarding the viability of the petitioners' operations and ensuring a successful outcome of the out-of-court mediation initiated on June 24, 2026, before the Wind Chamber of Mediation (Event 1, DOCUMENTATION5).

The petitioners clarify that, due to a severe economic and financial crisis resulting from the prolonged downturn in the global petrochemical sector, the substantial liabilities related to the geological event in Alagoas, and the uncertainties generated by geopolitical tensions in the Middle East, they are facing imminent maturities of financial obligations totaling R$ 2.6 billion in July 2026, with the risk of cross-acceleration of all their financial liabilities amounting to R$ 54.8 billion. They argue that, in this scenario, the creditor Banco Safra S.A. unilaterally notified the accelerated collection of Export Credit Notes and improperly offset balances arising from derivative transactions (Event 1, DOCUMENTATION5).

They maintain that, since the Braskem Group's revenue derives from its regular petrochemical operations and its supply chain, the unilateral withholding or setoff of essential funds and the rush by financial creditors would jeopardize basic operating expenses and salaries, which would render any attempt at restructuring in the recently initiated mediation unfeasible.

They seek, as a preliminary injunction, the following measures: the suspension of lawsuits and enforcement actions brought by the financial creditors subject to the mediation, with a prohibition on any enforcement measures against their assets; an order requiring the creditor Banco Safra S.A. to refrain from making unilateral setoffs or withholding assets from the petitioners, under penalty of a daily fine; and a prohibition against creditors terminating bilateral contracts, declaring obligations due in advance, or imposing penalties based on default or merely on the filing of this lawsuit.

That is what needs to be reported.

For now, I acknowledge jurisdiction over this case. Based on the information in the case file, this is a group that operates primarily within the national territory. In analyzing internal jurisdiction, I find that the group's operations take place in

4113246-86.2026.8.26.0100                                                                 610012324477 .V11



## Judiciary STATE
## COURT
### Civil—Court of Justice of the State of São Paulo
### Presiding Judge II—2nd Bankruptcy and Judicial Reorganization Court—Central Civil Jurisdiction

various states of the Federation, including São Paulo. In this context, it is appropriate to maintain jurisdiction at the location of the decision-making center, where Braskem's board of directors and executive management are situated. Without prejudice, the issue may be reevaluated upon approval of the reorganization proceedings, particularly if new factual elements are added to the case file.

### Suspension of Enforcement Proceedings and Enforceability of Claims Subject to Reorganization

The attached documentation indicates, at least upon preliminary review, that the petitioner has been conducting business activities for the statutory period. There is no indication of the existence of any of the impediments listed in the subparagraphs of Article 48 of Law 1,101/2005. Complete documentation is only required upon filing the definitive petition for judicial reorganization.

The initiation of mediation proceedings has been substantiated (Event 1, DOCUMENTATION5).

The suspension of lawsuits and enforcement proceedings against debtors seeking prior voluntary settlement is a measure expressly provided for in Article 20-B, paragraph 1, of the LFR.

Article 20-B, paragraph 1, of Law No. 11,101 of 2005 provides as follows:

*Art. 20-B. Settlements and mediations that precede or are incidental to judicial reorganization proceedings shall be permitted, notably: (Included by Law No. 14,112, of 2020) (Effective Date)*

*§ 1 In the case provided for in subparagraph IV of the main text of this article, companies in financial distress that meet the legal requirements to file for judicial reorganization shall be entitled to seek urgent injunctive relief, pursuant to Article 305 et seq. of Law No. 13,105, of March 16, 2015 (Code of Civil Procedure), in order to suspend enforcement proceedings brought against them for a period of up to 60 (sixty) days, to attempt to reach a settlement with their creditors through mediation or conciliation proceedings already initiated before the Judicial Center for Conflict Resolution and Citizenship (Cejusc) of the competent court or specialized chamber, subject, where applicable, to Articles 16 and 17 of Law No. 13,140, of June 26, 2015. (Added by Law No. 14,112, of 2020) (Effective Date)*

The requested measure seeks to safeguard the resolution of the crisis through voluntary settlement between the debtor and creditors, via mediation. If successful, it may prevent judicial reorganization, saving resources for both the debtor and the creditors, in addition to avoiding an undue burden on the Judiciary.

In this specific case, the danger of harm or risk to the outcome of the proceedings stems from the imminent maturity of financial obligations totaling R$ 2.6 billion in July 2026. Default or the absence of judicial protection would trigger cross-default clauses on liabilities totaling R$ 54.8 billion, exposing the petitioners to a chaotic rush of creditors and enforcement measures that would jeopardize the minimum operating cash flow and the very continuity of business operations.

**4113246-86.2026.8.26.0100**                                                                **610012324477 .V11**



## Judiciary STATE COURT
### Civil - Court of Justice of the State of São Paulo
### Presiding Judge II - 2nd Bankruptcy and Judicial Reorganization Court - Central Civil Jurisdiction

Therefore, granting the suspension of enforcement proceedings is a necessary measure for the claims in question.

Other acts of satisfaction are also prohibited, such as set-offs and setoffs.

The approval of the debtor's judicial reorganization proceedings (or its early initiation, pursuant to Articles 6, § 12, and 20-B, § 1, of Law 11.101/2005) entails various effects that impact the legal sphere of the parties holding claims subject to the reorganization proceedings (reorganization claims). Some of these effects are procedural in nature (such as the suspension of individual enforcement proceedings under Article 6, II, of Law 11.101/2005), while others are substantive and therefore affect the claim itself, such as the suspension of the statute of limitations (Article 6, I, of Law 11.101/2005).

One of the substantive effects to which reorganization claims are subject is the suspension of enforceability during the *stay period*. Regarding the unenforceability of the debt as an effect of the approval of the judicial reorganization proceedings, Pedro Rebello Bortolini and Renata Mota Maciel explain:

> *In judicial reorganization, the suspension of lawsuits and enforcement proceedings (now for a limited period of 180 days) grants the debtor "breathing room" to organize its operations and negotiate the reorganization plan with creditors from a slightly more comfortable position. In other words, it prevents the very enforceability of its debts. (BORTOLINI, Pedro Rebello; MACIEL, Renata Mota. Effects of judicial reorganization on guarantees provided by third parties. Cadernos Jurídicos, São Paulo, vol. 16, no. 39, pp. 33–58, January–March 2015, p. 34)*

Furthermore, payment to a creditor involved in the reorganization proceedings outside the conditions imposed by the reorganization process may constitute the crime of favoring creditors (Art. 172 of Law 11.101/2005), from which it follows that the debtor may not pay obligations subject to the reorganization proceedings during the suspension period.

Given that obligations subject to this proceeding are unenforceable, any form of satisfaction of such obligations—including set-offs and withholdings—is consequently prohibited.

**Regarding the request to prohibit unilateral contract terminations and early maturity due to the filing of proceedings provided for in the Fiscal Responsibility Law (LRF)**

This is a case for dismissal.

It is not lawful to invalidate, modify, or deny the effects of contractual clauses regarding unilateral termination or early maturity as a consequence of a petition for judicial reorganization or the early application of its effects.

4113246-86.2026.8.26.0100                                             610012324477 .V11



## Judiciary STATE COURTS
### Civil - Court of Justice of the State of São Paulo
### Presiding Judge II - 2nd Bankruptcy and Judicial Reorganization Court - Central Civil Jurisdiction

This concerns business legal relationships, which, by their very nature, are presumed to be on an equal footing and are protected by the principles of minimal intervention and the exceptional nature of judicial review. This is derived from Articles 421 and 421-A of the Civil Code:

> *Art. 421, sole paragraph: In private contractual relationships, the principle of minimal intervention and the exceptional nature of contractual review shall prevail.*

> *Art. 421-A. Civil and business contracts are presumed to be on an equal footing and symmetrical until concrete evidence justifying a departure from this presumption is presented, subject to the legal regimes provided for in special laws, and ensuring that:*

> *III - Contractual revision will occur only in exceptional and limited circumstances.*

In business contracts, a wrong decision by the business owner that places him or her at a disadvantage does not invalidate the contract. A contrary position would favor the inefficient business owner at the expense of the efficient one. This would eliminate competitive advantage as a driver of market evolution and increase the level of uncertainty and unpredictability in economic relations. As Paula Forgioni explains:

> *"A third aspect inherent to the functioning of the commercial law system relates to the entrepreneur's error. Economic agents sometimes adopt misguided strategies, and these errors are anticipated and intended by the legal system, insofar as they differentiate among agents and thereby enable the establishment of competition.*

> *[...]*

> *No interpretation of a business contract will be coherent or adequate if it removes the element of error from the system, thereby neutralizing the losses (or profits) that economic agents must bear as a result of their market activities.*

> *[...]*

> *Were this not the case, the system (i) would be committing a methodological error quite similar to that of classical microeconomic analysis, because it would nullify or disregard the necessary differentiation among economic agents, or (ii) would discourage the formation of contracts." (FORGIONI, Paula. The Interpretation of Business Transactions. In: ULHOA, Fábio Coelho. Treatise on Commercial Law—Volume 5: Business Obligations and Contracts. São Paulo: Saraiva, 2015)*

The analysis of the validity of contractual clauses, particularly in business relationships, cannot be governed by the logic of profit versus loss, but rather by the logic of lawful versus unlawful. At times, loss may constitute one of the prerequisites of a legal provision establishing grounds for invalidity, as in the case of the doctrine of undue prejudice (Art. 157, Civil Code). However, invalidity, as a legal sanction, stems from the legal provision itself, not from the loss considered in isolation.

The granting of judicial reorganization does not preclude the application of the provisions specific to business contracts, notably Articles 420 and 421-A of the Civil Code. Reorganization does not render the company immune to the obligations it has assumed through

4113246-86.2026.8.26.0100                                                                 610012324477 .V11



## Judiciary STATE
## COURT
### Civil Division – Court of Justice of the State of São Paulo
### Presiding Judge II - 2nd Bankruptcy and Judicial Reorganization Court - Central Civil Jurisdiction

expression of intent, even if such obligations make the recovery process more difficult.

The granting of the reorganization proceeding does not undermine the fundamental premises of business contracts and does not make the judge the guardian of the contractual options of the company undergoing reorganization.

Judicial reorganization produces various effects, both substantive and procedural, that enhance the company's chances of recovery. Examples include the suspension of individual enforcement proceedings and the novation brought about by the plan approved by the creditors. There is, however, no right to deny the validity or effectiveness of contractually agreed terms merely because their effects are detrimental to the company undergoing reorganization.

Such an approach would create legal uncertainty and unpredictability in the business environment, as it would allow a subsequent petition for judicial reorganization to trigger a reassessment of contractual clauses entered into by the company undergoing reorganization, denying validity or effectiveness to those deemed detrimental to its recovery.

Under Article 47 of Law 11.101/2005, one of the objectives of judicial reorganization is to stimulate economic activity. In this regard, its provisions cannot be interpreted in a way that creates uncertainty in contractual relationships, as such an approach would discourage economic activity.

Not surprisingly, Article 49, paragraph 2, of Law 11.101/2005 establishes that the obligations of the company undergoing judicial reorganization shall comply with the terms originally agreed upon in the contract, unless otherwise provided for in the reorganization plan. It follows from this provision that there is no general right to deny the validity of the contractual terms to which the company undergoing reorganization is bound, even if their effect is not to facilitate the recovery process.

Every business contract involves the allocation of risks among the contracting parties. Contract termination clauses are one means of allocating these risks, which ultimately influence the decision to enter into the contract and the setting of the contract price. The greater the risks assumed, the greater the economic benefit typically required to enter into the contract.

The provision for contract termination in the event of judicial reorganization formed part of the contract's risk allocation, reducing the contracting party's risks by authorizing the termination of the contract in the event of a financial crisis leading to a petition for reorganization. By reducing the other contracting party's risks, this clause tends to have created beneficial conditions for the petitioner, such as more advantageous consideration. This allocation of risks is lawful, and judicial intervention that invalidates it is contrary to the provisions set forth in Articles 420 and 421-A of the Civil Code.

There is no provision in Law 11.101/2005 that requires the continuation of contracts contrary to their contractual terms. There is no legal classification of "essential contracts." The "essentiality" provided for in Law 11.101/2005 is a characteristic that may be attributed

4113246-86.2026.8.26.0100                                                           610012324477 .V11



# Judiciary STATE COURT
## Civil - Court of Justice of the State of São Paulo
## Presiding Judge II - 2nd Bankruptcy and Judicial Reorganization Court - Central Civil Jurisdiction

to capital assets, as a limit on attachments executed for the benefit of non-bankruptcy creditors, not to contracts. Furthermore, requiring the continuation of contracts contrary to their express provisions and against the will of the contracting parties would violate contractual freedom.

Regarding the legality of a contractual termination clause triggered by a petition for judicial reorganization, the São Paulo State Court of Justice has already ruled as follows:

> *"CONTRACT – Provision of services – Unilateral termination – Admissibility – Clause permitting termination in the event of judicial reorganization – Valid clause – Principles of contractual good faith and freedom of contract – Adjustment for services rendered is improper due to the absence of a contractual provision – Furthermore, absence of a clause prohibiting the hiring of employees of the other contracting party – Appeal denied on this point. ATTORNEY'S FEES – Determination – Setting fees at 10% of the case's updated value – Impossibility – Percentage that would result in an excessive amount – Compliance with the principles of reasonableness and proportionality – Art. 8 of CPC/15 – Compliance with the objective criteria of Art. 85, §2 of CPC/15 – Fees reduced to R$ 10,000.00 – Appeal granted on this point." (TJSP; Civil Appeal 1006848-84.2017.8.26.0100; Reporting Judge: J. B. Franco de Godoi; Adjudicating Body: 23rd Chamber of Private Law; Central Civil Court – 18th Civil Court; Date of Judgment: March 7, 2018; Date of Registration: March 8, 2018)*

With regard to early maturity, although nothing prevents its implementation, the enforceability of the obligations subject to this procedure shall be suspended for the period determined in this decision, as a result of the advance application of the effects of granting the request.

In light of the foregoing, **I PARTIALLY GRANT** the request for urgent injunctive relief filed by the petitioners and, consequently:

a) I order the suspension of enforcement proceedings against the plaintiffs, for claims subject to this proceeding, for a non-extendable period of 60 (sixty) days, as well as the running of the respective statutes of limitations, with the case files remaining in the courts where they are pending, subject to the provisions of paragraphs 1, 2, 7-A, and 7-B of Article 6, paragraphs 3 and 4 of Article 49, paragraph 1 of Article 199, and subparagraph III of Article 52 of Law No. 11,101/2005;

b) I grant the prohibition on acts of set-off, withholding, or other acts of satisfaction of subject claims for the period of suspension established in this decision;

c)  I deny the request to suspend the effectiveness of clauses regarding early maturity, contract termination, or the application of commercial and contractual penalties as a result of the petition for judicial reorganization.

In view of the certificate contained in Exhibit 5, CERT1, the petitioner shall be responsible for paying the court costs.

I hereby order the lifting of the seal of secrecy on this case file.

Banco Safra S.A. is hereby authorized to appear, as requested in Event 6, PET1.

4113246-86.2026.8.26.0100                                                      610012324477 .V11



# Judiciary STATE
# COURT
## Civil - Court of Justice of the State of São Paulo
## Presiding Judge II - 2nd Bankruptcy and Judicial Reorganization Court - Central Civil Jurisdiction

Lift the confidentiality.

The plaintiff shall be responsible for notifying the competent courts of the suspension. To this end, a copy of this decision shall serve as an OFFICIAL LETTER to be forwarded by the plaintiff to the respective courts and competent authorities.

---

Electronic document signed by **GUILHERME CAVALCANTI LAMÊGO, Judge**, pursuant to Article 1, subsection III, of Law No. 11,419, dated December 19, 2006. The **authenticity of this document** can be verified at https://eproc1g.tjsp.jus.br/eproc/externo_controlador.php?acao=consulta_autenticidade_documentos by entering the verification code **610012324477v11** and the CRC code **6a1040fe**.

Additional signature information:
Signatory: GUILHERME CAVALCANTI LAMÊGO
Date and Time: June 26, 2026, at 11:21:43

---

**4113246-86.2026.8.26.0100**                                    **610012324477 .V11**

# EXHIBIT G

**Press Release**

   

**BRASKEM S.A.**

**Corporate Taxpayer ID (C.N.P.J.) No. 42.150.391/0001-70**

**State Registration (NIRE) 29300006939**

**Publicly-held company**

**MATERIAL FACT**

Braskem S.A. ("Braskem" or "Company") (Ticker B3: BRKM3, BRKM5 and BRKM6; NYSE: BAK; LATIBEX: XBRK), further to the Material Fact disclosed on September 26, 2025, hereby informs its shareholders and the market in general that the Company and certain of its subsidiaries have initiated a mediation proceeding before the Wind Mediation Chamber (*Câmara Wind de Mediação*) ("Mediation") and have filed a request for Precautionary Injunctive Relief (*Tutela de Urgência Cautelar*) before the 2nd Bankruptcy and Judicial Reorganization Court of the Judicial District of the Capital of the State of São Paulo (*2ª Vara de Falências e Recuperações Judiciais da Comarca da Capital do Estado de São Paulo*) ("PTU"), pursuant to paragraph 1 of Article 20-B of Law No. 11,101/05, as approved by the Company's Board of Directors ("Board").

The measures involve only the Company's financial creditors and have been filed with the purpose of preserving a stable environment for the continuity of the negotiations currently underway exclusively with such creditors in pursuit of a consensual, structural, and orderly solution for its capital structure, aligned with the Company's liquidity position and the conditions of the global petrochemical industry ("Restructuring"). The Board has also approved, if and when necessary, the adoption and/or validation of any protective measures abroad.

Braskem clarifies and reiterates that the Mediation and the PTU have a limited scope, strictly financial in nature, and do not encompass any obligations of the Company with its suppliers, customers, and other stakeholders, which remain in full force and effect and continue to be performed in the ordinary course, pursuant to the terms of the respective agreements.

The Company will keep the market informed of any material developments on this matter, in compliance with applicable laws and regulations.

1

    **IBOVESPA** B3    **ISE**B3    **ICO2** B3    **IGCT** B3    **IBRX100** B3

Additional information may be obtained from the Investor Relations Department by telephone at +55 (11) 3576-9531 or by e-mail at braskem-ri@braskem.com.br.


São Paulo, June 25, 2026

Carlos Augusto Machado Pereira de Almeida Brandão

Chief Financial and Investor Relations Officer

**Braskem S.A.**

   

# FORWARD-LOOKING STATEMENTS

This Material Fact may contain forward-looking statements. These statements are not historical facts, but rather are based on the current view and estimates of the Company's management regarding future economic and other circumstances, industry conditions, financial performance and results, including any potential or projected impact regarding the geological event in Alagoas and related legal procedures on the Company's business, financial condition and operating results. The words "project," "believe," "estimate," "expect," "plan", "objective" and other similar expressions, when referring to the Company, are used to identify forward-looking statements. Statements related to the possible outcome of legal and administrative proceedings, implementation of operational and financing strategies and investment plans, guidance on future operations, the objective of expanding its efforts to achieve the sustainable macro objectives disclosed by the Company, as well as factors or trends that affect the financial condition, liquidity or operating results of the Company are examples of forward-looking statements. Such statements reflect the current views of the Company's management and are subject to various risks and uncertainties, many of which are beyond the Company's control. There is no guarantee that the events, trends or expected results will actually occur. The statements are based on various assumptions and factors, including, but not limited to, general economic and market conditions, industry conditions and operating factors, availability, development and financial access to new technologies. Any change in these assumptions or factors, including the projected impact from the joint venture and its development of technologies, from the geological event in Alagoas and related legal procedures and the unprecedented impact on businesses, employees, service providers, shareholders, investors and other stakeholders of the Company could cause effective results to differ significantly from current expectations. For a comprehensive description of the risks and other factors that could impact any forward-looking statements in this document, especially the factors discussed in the sections, see the reports filed with the Brazilian Securities and Exchange Commission (CVM). This Material Fact does not constitute any offer of securities for sale in Brazil. No securities may be offered or sold in Brazil without being registered or exempted from registration, and any public offer of securities carried out in Brazil must be made through a prospectus, which would be made available by Braskem and contain detailed information on Braskem and its management, as well as its financial statements.