CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper
Thomas S. Kessler
David Z. Schwartz
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) Case No. 26-11522 (MEW) |
| Braskem S.A., *et al.*,[1] | ) ) Chapter 15 |
| Debtors in a Foreign Proceeding. | ) (Jointly Administered) ) |

**NOTICE OF AMENDED VERIFIED PETITION**

**PLEASE TAKE NOTICE** that, on June 26, 2026, Antonio Reinaldo Rabelo Filho (the "Petitioner" or "Foreign Representative"), in his capacity as the duly-authorized foreign representative (as such term is defined in section 101(24) of title 1 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code")) of the above-captioned debtors (the "Debtors"), commenced the above-captioned cases under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases") by filing the *Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(A), 1515, 1517, 1520, and 1521* (ECF No. 2) (the "Verified Petition") and the forms of voluntary petition (ECF No. 1) (collectively, the "Forms of Voluntary Petition" and, together with the Verified Petition, the "Petition") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on June 29, 2026, the Foreign Representative filed the *Amended Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(A), 1515, 1517, 1520, and 1521* (the "Amended Verified Petition"), attached hereto as Exhibit 1. A blackline of the Amended Verified Petition against the Verified Petition is attached hereto as Exhibit 2.

---

[1] The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Braskem S.A. (01-70–Brazil); Braskem Netherlands B.V. (6B01–Netherlands); Braskem Netherlands Inc., B.V. (9B01–Netherlands); Braskem Netherlands Finance B.V. (5B01–Netherlands); Braskem Trading & Shipping B.V. (7B01–Netherlands); and Braskem America Finance Co. (1581–US).

Dated:  June 29, 2026
        New York, New York

Respectfully submitted,

CLEARY  GOTTLIEB  STEEN  &  HAMILTON LLP

/s/ *Thomas S. Kessler*
Richard J. Cooper
Thomas S. Kessler
David Z. Schwartz
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*

**Exhibit 1**

**Amended Verified Petition**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper
Thomas S. Kessler
David Z. Schwartz
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Braskem S.A.,[1]<br><br>        Debtor in a Foreign Proceeding. | Case No. 26-11522 (MEW)<br><br>Chapter 15 |

---

[1] The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Braskem S.A. (01-70 – Brazil); Braskem Netherlands B.V. (6B01 – Netherlands); Braskem Netherlands Inc., B.V. (9B01 – Netherlands); Braskem Netherlands Finance B.V. (5B01 – Netherlands); Braskem Trading & Shipping B.V. (7B01 – Netherlands); and Braskem America Finance Co. (1581 – US).

| | |
|---|---|
| In re:<br><br>Braskem Netherlands B.V.,<br><br>    Debtor in a Foreign Proceeding. | Case No. 26-11523 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem Netherlands Inc., B.V.,<br><br>    Debtor in a Foreign Proceeding. | Case No. 26-11524 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem Netherlands Finance B.V.,<br><br>    Debtor in a Foreign Proceeding. | Case No. 26-11526 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem Trading & Shipping B.V.,<br><br>    Debtor in a Foreign Proceeding. | Case No. 26-11527 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem America Finance Co.,<br><br>    Debtor in a Foreign Proceeding. | Case No. 26-11528 (MEW)<br><br>Chapter 15 |

**AMENDED VERIFIED PETITION FOR RECOGNITION OF THE
BRAZILIAN PROCEEDING AND MOTION FOR ORDER GRANTING
RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 105(A), 1515, 1517, 1520, AND 1521**

2

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................2

BACKGROUND.....................................................................................................................6

    I.      GENERAL BACKGROUND AND HISTORY .......................................................6

          A.    An Overview of the Company's Business .......................................................6

          B.    Connections to the United States....................................................................12

          C.    The Company's Financial Situation ...............................................................13

    II.     EVENTS PRECIPITATING COMMENCEMENT OF THE BRAZILIAN
          PROCEEDING .........................................................................................................17

          A.    Global Pressures on the Petrochemical Industry...........................................17

          B.    Geological Event in Alagoas, Brazil..............................................................18

          C.    International Tensions Driven by Recent Geopolitical Developments..........19

          D.    Imminent Maturities and Negotiation Efforts with Financial Creditors........20

JURISDICTION, ELIGIBILITY, AND VENUE ..................................................................22

RELIEF REQUESTED ...........................................................................................................23

REQUIRED DISCLOSURES .................................................................................................23

BASIS FOR RELIEF ..............................................................................................................24

    I.      THE DEBTORS ARE ELIGIBLE TO BE DEBTORS UNDER SECTION 109(a)
          OF THE BANKRUPTCY CODE, AND THIS COURT IS THE PROPER
          VENUE FOR THE CASES ....................................................................................24

    II.     THE REQUIREMENTS OF SECTION 1517(a) OF THE BANKRUPTCY CODE
          ARE SATISFIED .....................................................................................................27

          A.    The Brazilian Proceeding is a "Foreign Proceeding"....................................27

              1.    The Brazilian Proceeding is a Judicial Process Pending in a
                   Foreign Country, Authorized Under a Law Related to
                   Insolvency, for the Purpose of Reorganizing..................................28

              2.    The Brazilian Proceeding is Collective in Nature............................30

              3.    The Debtors' Assets and Affairs Are Subject to the
                     Brazilian Court's Supervision..........................................................31

          B.    The Brazilian Proceeding Satisfies the Requirements for Recognition
              as a "Foreign Main Proceeding"....................................................................32

              1.    The Debtors are Part of the Economically and
                     Operationally Integrated Braskem Group........................................34

              2.    The COMI for Braskem Parent is Brazil .........................................37

3.    The COMI for Each of the Other Debtors is Brazil..........................37

    a.    Netherlands Finance's COMI is in Brazil.................................40

    b.    America Finance's COMI is in Brazil......................................42

    c.    BNI's COMI is in Brazil.........................................................43

    d.    Braskem Netherlands's COMI is in Brazil..............................44

    e.    BT&S's COMI is in Brazil .......................................................45

C.    The Petitioner is a Proper "Foreign Representative" ...................................46

D.    The Petition was Properly Filed Under Sections 1504 and 1509 and
Meets the Requirements of Section 1515 and Bankruptcy Rule 1007(a)
(4)...........................................................................................................48

III.    ALTERNATIVELY, THE COURT SHOULD FIND THAT THE BRAZILIAN
PROCEEDING IS A FOREIGN NONMAIN PROCEEDING FOR EACH OF
THE DEBTORS OTHER THAN BRASKEM PARENT AND GRANT
DISCRETIONARY RELIEF ............................................................................49

A.    The Brazilian Proceeding Satisfies the Requirements for Recognition
as a "Foreign Nonmain Proceeding".............................................................50

B.    Discretionary Relief Under Section 1521 of the Bankruptcy Code is
Warranted......................................................................................................52

NOTICE .........................................................................................................................55

NO PRIOR REQUEST....................................................................................................55

CONCLUSION................................................................................................................55

VERIFICATION OF CHAPTER 15 PETITION.............................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*,
  470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012)................. 47, 48

*CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*,
  482 B.R. 96 (Bankr. S.D.N.Y. 2012) ..................................................................... 53

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
  737 F.3d 238 (2d Cir. 2013)................................................................. 23, 25, 27

*In re ABC Learning Ctrs. Ltd.*,
  728 F.3d 301 (3d Cir. 2013) ............................................................................... 27

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016)..................................................................... 30

*In re Agro Santino, OOD*,
  653 B.R. 79 (Bankr. S.D.N.Y. 2023) .................................................................. 46

*In re Americanas S.A.*,
  No. 23-10092 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023)....................................... 47

*In re Andrade Gutierrez Engenharia S.A.*,
  645 B.R. 175 (Bankr. S.D.N.Y. 2022)................................................................. 46

*In re Artimm, S.r.l.*,
  335 B.R. 149 (Bankr. C.D. Cal. 2005) ................................................................ 53

*In re Ascot Fund Ltd.*,
  603 B.R. 271 (Bankr. S.D.N.Y. 2019)................................................................. 37

*In re Ashapura Minechem Ltd.*,
  480 B.R. 129 (S.D.N.Y. 2012)............................................................................. 27

*In re Avanti Commc'ns Grp. PLC*,
  582 B.R. 603 (Bankr. S.D.N.Y. 2018)................................................................. 23

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*,
  389 B.R. 325 (S.D.N.Y. 2008)............................................................................. 50

iii

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
   374 B.R. 122 (Bankr. S.D.N.Y. 2007)......................................................................... 48, 50

*In re Berau Cap. Res. Pte Ltd.*,
   540 B.R. 80 (Bankr. S.D.N.Y. 2015) ........................................................................ 23, 25

*In re Betcorp Ltd.*,
   400 B.R. 266 (Bankr. D. Nev. 2009).............................................................................. 30

*In re Brit. Am. Ins. Co. Ltd.*,
   425 B.R. 884 (Bankr. S.D. Fla. 2010) ................................................................ 40, 50, 51

*In re Cell C Proprietary Ltd.*,
   571 B.R. 542 (Bankr. S.D.N.Y. 2017) ........................................................................... 26

*In re Creative Fin., Ltd.*,
   543 B.R. 498 (Bankr. S.D. N.Y. 2016)...................................................................... 50, 51

*In re Culligan Ltd.*,
   No. 20-12191, 2021 WL 278926 (Bankr. S.D.N.Y. 2021) .......................................... 36, 37

*In re Gerova Fin. Grp., Ltd.*,
   482 B.R. 86 (Bankr. S.D.N.Y. 2012) ............................................................................. 50

*In re Giftcraft Ltd.*,
   No. 25-11030, 2025 WL 1583480 (Bankr. S.D.N.Y. June 4, 2025)............................. 36, 37

*In re InterCement S.A.*,
   668 B.R. 802 (Bankr. S.D.N.Y. 2025)...................................................................... passim

*In re Inversora Eléctrica de Buenos Aires S.A.*,
   560 B.R. 650 (Bankr. S.D.N.Y. 2016)............................................................................ 26

*In re Iovate Health Scis. Int'l Inc.*,
   673 B.R. 516 (Bankr. S.D.N.Y. 2025)....................................................................... 37, 38

*In re Mega Newco Ltd.*,
   No. 24-12031, 2025 WL 601463 (Bankr. S.D.N.Y. Feb. 24, 2025).................................. 36

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
   458 B.R. 63 (Bankr. S.D. N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012).................... 50, 51

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
   474 B.R. 88 (S.D.N.Y. 2012) ................................................................................... 33, 50

*In re Mina Tucano Ltda.*,
   No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022)................................................   47

*In re Modern Land (China) Co., Ltd.*,
   641 B.R. 768 (Bankr. S.D.N.Y. 2022)...................................................... 36, 42, 43, 51

*In re Mood Media Corp.*,
   569 B.R. 556 (Bankr. S.D.N.Y. 2017)................................................................   51

*In re Netia Holdings, S.A.*,
   277 B.R. 571 (Bankr. S.D.N.Y. 2002)............................................................   30, 32

*In re OAS S.A.*,
   533 B.R. 83 (Bankr. S.D.N.Y. 2015) ...................................................   *passim*

*In re OAS S.A.*,
   No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015).......................................   29

*In re Odebrecht Engenharia e Construção S.A.*,
   No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020).....................................   29

*In re Oi Brasil Holdings Coöperatief U.A.*,
   578 B.R. 169 (Bankr. S.D.N.Y. 2017)......................................................38, 42, 43, 47

*In re Oi Brasil Holdings Coöperatief U.A.*,
   No. 23-10193 (JPM) (Bankr. S.D.N.Y. Mar. 29, 2023)......................................   30

*In re Olinda Star Ltd.*,
   614 B.R. 28 (Bankr. S.D.N.Y. 2020) ....................................................   32, 37

*In re Oversight & Control Comm'n of Avánzit, S.A.*,
   385 B.R. 525 (Bankr. S.D.N.Y. 2008).................................................................   27

*In re Prince Glob. Holdings Ltd.*,
   No. 26-10769 (MG) (Bankr. S.D.N.Y. June 11, 2026)......................................   30

*In re PT Bakrie Telecom Tbk*,
   601 B.R. 707 (Bankr. S.D.N.Y. 2019).................................................................   25

*In re Raízen S.A.*,
   No. 26-10528 (LGB) (Bankr. S.D.N.Y. Apr. 8, 2026) .....................................   37, 38

*In re Rede Energia S.A.*,
   No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014).....................................   29

*In re Samarco Mineracão S.A. - Em Recuperação Judicial*,
No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 13, 2021) ................................................. 29, 31

*In re Serviços de Petróleo Constellation S.A.*,
600 B.R. 237 (Bankr. S.D.N.Y. 2019)..................................................................... *passim*

*In re Serviços de Petróleo Constellation S.A.*,
613 B.R. 497 (Bankr. S.D.N.Y. 2019)........................................................................ 33

*In re Serviços de Petróleo Constellation S.A.*,
No. 18-13952 (MG) (Bankr. S.D.N.Y. May 9, 2019)..................................................... 29

*In re SPhinX, Ltd.*,
351 B.R. 103 (Bankr. S.D.N.Y. 2006)........................................................ 32, 33, 39, 52

*In re Standing Order of Reference Re: Title 11*,
12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) ..................................................................... 22

*In re Suntech Power Holdings Co., Ltd.*
520 B.R. 399 (Bankr. S.D.N.Y. 2014)....................................................... 23, 33, 36, 39

*In re Toft*,
453 B.R. 186 (Bankr. S.D.N.Y. 2011)......................................................................... 53

*In re U.S.J. – Açúcar e Álcool S.A., et al.*,
No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022)................................................ 29

*In re U.S. Steel Can. Inc.*,
571 B.R. 600 (Bankr. S.D.N.Y. 2017)......................................................................... 25

*In re Usina de Açúcar Santa Terezinha Ltda.*,
No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019)............................................. 29

*Jaffe v. Samsung Elecs. Co.*,
737 F.3d 14 (4th Cir. 2013)........................................................................................ 53

*Kelly v. U.S. Steel Corp.*,
284 F.2d 850 (3d Cir. 1960) ................................................................................. 35, 46

*Lavie v. Ran (In re Ran)*,
607 F.3d 1017 (5th Cir. 2010) .................................................................................... 50

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
714 F.3d 127 (2d Cir. 2013)............................................................................... *passim*

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
446 F.Supp.2d. 205 (S.D.N.Y. 2006).............................................................. 35, 46

**Rules and Statutes**

11 U.S.C. § 101.............................................................................................. *passim*

11 U.S.C. § 105.............................................................................................. 1, 2, 23

11 U.S.C. § 109.............................................................................................. *passim*

11 U.S.C. § 304.............................................................................................. 29

11 U.S.C. § 362.............................................................................................. 5, 49, 52, 54

11 U.S.C. § 1502............................................................................................ 27, 32, 49, 50

11 U.S.C. § 1504............................................................................................ 22, 48

11 U.S.C. § 1509............................................................................................ 2, 22, 48

11 U.S.C. § 1515............................................................................................ *passim*

11 U.S.C. § 1516............................................................................................ 32, 37

11 U.S.C. § 1517............................................................................................ *passim*

11 U.S.C. § 1520............................................................................................ 1, 2, 23, 54

11 U.S.C. § 1521............................................................................................ *passim*

11 U.S.C. § 1522............................................................................................ 53

28 U.S.C. § 157.............................................................................................. 22

28 U.S.C. § 1334............................................................................................ 22

28 U.S.C. § 1410............................................................................................ 22, 26

Fed. R. Bankr. P. 1007................................................................................... 23, 24, 48, 49

Fed. R. Bankr. P. 7007................................................................................... 49

**Other Authorities**

H.R. No. 109-31, pt. 1 (2005)........................................................................ 32, 53

vii

I, Antonio Reinaldo Rabelo Filho (the "Petitioner" or "Foreign Representative"), the duly-authorized foreign representative of Braskem S.A. ("Braskem"); Braskem Netherlands B.V.; Braskem Netherlands Inc., B.V.; Braskem Netherlands Finance B.V.; Braskem Trading & Shipping B.V.; and Braskem America Finance Company (collectively, the "Debtors") in the jointly-administered protective injunction proceeding in support of a court-supervised interim mediation process (the "Brazilian Mediation", and together with the protective injunction proceeding, the "Brazilian Proceeding") that is in furtherance or in preparation of either an extrajudicial proceeding (*recuperação extrajudicial*) (the "Brazilian EJ") or a judicial reorganization (*recuperação judicial*) (the "Brazilian RJ") of the Debtors, which commenced on June 24, 2026, pursuant to Federal Law No. 11.101 of February 9, 2005 (as modified, the "Brazilian Bankruptcy Law"), of the laws of the Federative Republic of Brazil ("Brazil"), pending before the 2nd Bankruptcy and Reorganization Division of the São Paulo State Court of Justice (the "Brazilian Court"). [2] By and through its undersigned counsel, the Foreign Representative respectfully submits this *Amended Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* (the "Verified Petition"). This Verified Petition is filed in furtherance of each voluntary petition [ECF No. 1] (collectively, the "Voluntary Petition" and, together with this Verified Petition, the "Petitions") filed on June 26, 2026, by each of the Debtors. The Petitioner hereby requests that the Court enter an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") pursuant to sections 105(a), 1515, 1517, 1520, and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"):[3]

---

[2]    The case number for the Brazilian Proceeding before the Brazilian Court is 4113246-86.2026.8.26.0100.

[3]    Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

1

(a)   granting the Petitions in these chapter 15 cases (the "Chapter 15 Cases") and recognizing the Brazilian Proceeding as the "foreign main proceeding" for each of the Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, as a "foreign nonmain proceeding" for each of the Debtors other than Braskem S.A.;

(b)   finding that the Petitioner is the duly-appointed "foreign representative" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each of the Debtors for purposes of these proceedings; and

(c)   granting such other and further relief as the Court deems just and proper.

In support of this Verified Petition, the Petitioner relies upon and incorporates by reference the *Declaration of Ana Elisa Laquimia Pursuant to 28 U.S.C. § 1746 in Support of the Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(A), 1509, 1515, 1517, 1520, and 1521* (the "Brazilian Counsel Declaration") filed contemporaneously herewith. In further support of the relief requested herein, the Petitioner respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    The Debtors and certain of their non-debtor affiliates (the "Braskem Group" or the "Company") are Brazil's largest producers of thermoplastic resins and petrochemical products. The Company serves over seventy countries, employs nearly 8,000 employees, and generated nearly R$80[4] billion in annual revenue in 2024. Brazil is the Company's most critical market, and it accounts for nearly 70% of the Company's net revenue.

2.    The Braskem Group comprises a network of operating and financing companies, each of which performs complementary and interdependent functions to support the Company's overall business. With respect to the operating companies, these functions include the production and sale of various petrochemical products as well as domestic and international product

---

[4]   "R$" denotes the Brazilian *real* or BRL.

2

distribution.   The financing companies provide separate financing ventures for those operations. To support these functions, the Company has operational facilities in four countries (Brazil, the United States, Mexico, and Germany), with significant concentration in five Brazilian states (Alagoas, Bahia, Rio de Janeiro, São Paulo, and Rio Grande do Sul).

3.       Recently, the Braskem Group has implemented a series of strategic initiatives aimed at strengthening its competitive position, preserving revenue generation, and preparing the Company for the future of the petrochemical market.  In order to facilitate the success of these initiatives, the Company and certain stakeholders have engaged in various measures to mitigate factors negatively affecting its financial situation and have engaged in discussions with certain creditors with the goal of developing a comprehensive out-of-court realignment of the Company's capital structure.  Although productive, these measures have not yet achieved the results necessary in the timeframe required to address the Company's liquidity needs.  Accordingly, on June 24, 2026, the Company commenced the Brazilian Mediation under the Brazilian Bankruptcy Law and asked (i) for a preliminary judicial stay to prevent the accelerated maturity of certain obligations and creditor enforcement actions, and (ii) to formally mediate with key financial creditors.

4.       As explained further herein, despite the Company's best efforts, several recent events accelerated the Company's ongoing restructuring efforts and led to the commencement of the Brazilian Proceeding.

5.       First, since 2022, there has been a downturn in the global petrochemical industry, exacerbated by macroeconomic uncertainty and rising levels of idle capacity.  This downturn worsened in 2025, which saw the lowest consumption of thermoplastic resins in recent history and the worst operating rate in decades.  The spread on thermoplastic resins—the difference between a product's price and the cost of raw materials used to make it—has decreased significantly in

3

recent years, affecting revenue in the Brazilian, European and U.S. markets. Because of this reduced spread, the Braskem Group adjusted its production levels, leading to a drop in the utilization rate of its petrochemical plants from 72% in 2024 to 59% by the end of 2025. This has negatively impacted the Company's recurring EBITDA and consolidated revenues. *See infra* ¶¶ 27-30.

6. <u>Second</u>, in 2019, the Geological Survey of Brazil released a report linking geological issues in Maceió, Alagoas to Braskem's prior rock salt extraction activities in the area. Since then, the Company ceased rock salt mining in the region and implemented measures to mitigate and remediate the damage. These measures have required significant ongoing investment and the associated liabilities, which are unrelated to Braskem's normal course of business, have consumed significant cash flow, and against the backdrop of the petrochemical industry downturn, have increasingly compromised the Company's finances. *See infra* ¶¶ 31-34.

7. <u>Third</u>, in early 2026, the Debtors began to face new financial and operational challenges due to the escalation of geopolitical tensions in the Middle East related to the conflict involving Iran and the United States. This conflict has driven up the price of oil and its derivatives, including naphtha—the main raw material in the petrochemical industry—directly impacting the Braskem Group's production costs. Given the scale of the Group's operations, even small increases in naphtha costs can result in billions in additional operating expenses. International freight rates have also risen substantially, affecting both raw material imports and international distribution costs, while trade route restrictions caused by the closure and blockade of the Strait of Hormuz have further disrupted operations and strained the Company's financial condition. *See infra* ¶¶ 35-38.

4

8.      As a result, the Company commenced the Brazilian Proceeding to benefit from a preliminary stay of collection and enforcement actions while it engages in discussions with its key financial stakeholders and with the goal of developing a restructuring solution for the Company's capital structure.  To aid and support these restructuring efforts in Brazil, the Petitioner seeks recognition of the Brazilian Proceeding under Chapter 15 of the Bankruptcy Code to protect the Debtors from potential creditor actions in the United States.  This relief is imperative to the Company's restructuring objectives.  The Braskem Group's value is derived in large part from its significant competitive advantages in the thermoplastic resin industry in Brazil and abroad.  These advantages are based in large part on its national platform that allows it to benefit from its substantial domestic operations across Brazil.  Those advantages must be preserved if the Braskem Group is to maximize its go-forward value in any restructuring.

9.      Given the Debtors' meaningful assets in the United States, and the current lack of agreement among creditors on a path forward, pending the recognition of the Brazilian Proceeding, the Petitioner is also seeking provisional relief to stay the commencement or continuation of any actions or proceedings concerning the Debtors or their assets, rights, obligations, or liabilities in the United States, as provided under the *Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 105(a), and 362* (the "Provisional Relief Motion") filed contemporaneously herewith, again in an attempt to procure an immediate stay of collection and enforcement actions for the benefit of all creditors consistent with the stay provided for in the Brazilian Proceeding.

10.     In spite of its recent financial difficulties, the Braskem Group's operations are sustainable and viable.  The Company is therefore well positioned for a path to recovery if it can preserve its operations and eventually implement a holistic restructuring solution through the Brazilian Proceeding.  Accordingly, the Petitioner respectfully requests that the Court enter the

Order granting the Petition in these Chapter 15 Cases, recognizing the Brazilian Proceeding, and authorizing such other relief that the Court deems appropriate.

## BACKGROUND

### I. GENERAL BACKGROUND AND HISTORY

#### A. An Overview of the Company's Business

11. The Braskem Group was created in 2002 when six major Brazilian petrochemical companies—Copene, OPP, Trikem, Proppet, Polialden, and Nitrocarbono—merged to create a single company. Once formed, Braskem became the largest petrochemical company in Latin America. The Company is registered with the Brazilian Securities and Exchange Commission and its stock trades on Brazil's stock exchange market (Brasil, Bolsa, Balcão, or "B3"). The Company's Class A preferred shares are listed on the New York Stock Exchange ("NYSE"). In 2003, the Company also began listing its stock on the Stock Exchange of Madrid ("LATIBEX").

12. The Company continued to consolidate Brazil's petrochemical industry since forming. Between 2007 and 2009, through partnerships with other petrochemical producers and subsequent acquisitions, the Company consolidated production operations across its southern complex and acquired Quattor, a joint venture of Unipar and Petróleo Brasileiro S.A. ("Petrobras") and a regional petrochemical producer with significant assets in São Paulo and Rio de Janeiro. From 2009 on, the Braskem Group continued to expand and consolidate its Brazilian operations, quickly becoming the leader of the Brazilian petrochemical market.

13. As a result, the Braskem Group is the largest producer in the petrochemical plastic resins industry in the Americas. Its primary business segments are the production of various plastic resins, as well as certain sustainable "green" products such as "green polyethylene"—a sustainable plastic resin made from sugarcane using innovative technologies. The Company serves hundreds of customers worldwide and is one of the largest plastics producers in the North and South

American markets.   It has a diverse portfolio of petrochemical and thermoplastic products, including polyethylene ("PE"), polypropylene ("PP") and polyvinyl chloride ("PVC").   The Company has the capacity to produce nearly 20,325 kilotons ("ktons") of basic chemicals and polymers per year.   Its chemical products are used primarily in the manufacturing of intermediate second-generation petrochemical products, while its plastic resin products are used in a variety of industrial and commercial settings, including food packaging, household furniture, industrial and automotive components, and paints and coatings.   In 2025 alone, the Company had an approximately 37% share of the Brazilian PVC market and 11% share of the Brazilian caustic soda market[5] by sales volume.

14.     The Braskem Group's most recent efforts have focused on long-term sustainability. After consolidating its operations in Brazil for several years and expanding into the North American and European markets, the Braskem Group has continued to position itself to adapt to the changing needs of the thermoplastics market.  The Braskem Group has set ambitious long-term sustainable development objectives, aiming to achieve an absolute 15% reduction in greenhouse gas emissions by 2030.  In pursuit of these efforts, the Braskem Group has (i) expanded the production of its green ethylene production; (ii) entered into a partnership with Lummus Technology LLC, a company that develops and licenses process technologies for the refining, petrochemical, gas processing, and renewable energy industries, for further development and licensing of its green ethylene technology; (iii) created the Sustainea joint venture, which is focused on the production of two plant-based chemicals, bioMEG and bioMPG; (iv) established a Thai joint venture, Braskem Siam Company Limited, dedicated entirely to the production of green

---

[5]     This figure excludes consumption of alumina by companies located in the North and Northeast regions of Brazil.

7

ethylene; and (v) invested to increase its ethylene and polyethylene production capacity in Rio de Janeiro. These efforts continue to consolidate the Braskem Group's position as a leading thermoplastics producer, both domestically and internationally.

15. The Braskem Group has also implemented a series of strategic initiatives aimed at strengthening its competitive position, preserving revenue generation, and preparing the Company for the future of the petrochemical market. These initiatives are organized into two major programs: the "Resilience Program" and the "Transformation Program" (the "Programs"). The Resilience Program encompasses a comprehensive set of seventy action plans effectuated through more than 700 initiatives, which include strategic investments, cost optimization, commercial strategy, operational efficiency, and supplier negotiations. This Resilience Program is designed to increase earnings and improve short-term cash flow generation in the near term, and to help the Company maintain its long-term competitiveness in the Brazilian chemical industry. The Transformation Program is focused on: (i) optimizing the naphtha feedstock base,[6] (ii) increasing and expanding the flexibility of the Company's gas feedstock base, and (iii) transitioning to products derived from renewable sources. These measures complement the Company's other long-term initiatives and investments in renewable energy, recycling, combating climate change, and promoting the circular economy.

16. For administrative ease, the Braskem Group's operations are largely split into geographic segments, focusing on domestic operations in Brazil (the "Brazil Segment") and operations abroad, including the United States, Europe, and Mexico. The Brazil Segment, which covers Debtor Braskem S.A., mainly focuses on (i) the production and sale of various chemicals,

---

[6]     Naphtha is an intermediate hydrocarbon liquid stream derived mainly from the refining of crude oil and is used by the Company to manufacture a wide variety of petrochemicals in Brazil.

(ii) the supply of electricity and other inputs produced in the Company's petrochemical complexes, and (iii) the production and sale of PVC and caustic soda. For 2025, the Brazil Segment's operations generated net revenue of R$51.77 billion, representing about 72% of the net revenue of all of the Company's reportable segments. Most of the Brazil Segment's production operations take place across four different production plants sites across Brazil.

17. The Braskem Group's European and U.S. operations are recorded together (the "U.S. and Europe Segment"). The U.S. and Europe Segment includes the remaining Debtors, including Debtor Braskem Netherlands B.V., which facilitates the production, distribution, and sale of PP between Brazil and the rest of the world. The Netherlands arm of the segment largely handles the logistics of product distribution from Brazil to Europe and Asia. The U.S. portion of the segment is largely dedicated to the production of PP and ultra-high molecular polyethylene. In 2025, the total sales volume of the U.S and Europe Segment was approximately 1,938 kton, serving 370 customers. The resulting combined operations of the U.S. and Europe Segment generated R$ 16.4 billion (or US$3.1 billion as of June 18, 2026) during 2025. This segment comprises nearly 23% of the Company's net revenue across its reportable segments.

18.     A simplified organizational chart is set forth below.



19.     Each Chapter 15 Debtor plays an indispensable role in the Company:

(a)     Braskem S.A. ("Braskem Parent"), which is incorporated in Brazil and has its registered office and headquarters in Bahia and São Paulo, Brazil, respectively, is the ultimate parent company for the Braskem Group. It engages in capitalization and financing activities for the Braskem Group, acts as the Company's face to the market, and is responsible for concentrating the operations and investments across the Company's segments. It serves as a guarantor on the majority of the Braskem Group's financial debt, including all of the Notes (as defined below). Braskem Parent's principal assets are located in Brazil. It is responsible for providing centralized business management and support for the entire Braskem Group, including providing strategic direction on key financial matters across the globe. Moreover, investor relations and creditor communications for the Braskem Group are prepared by Braskem Parent in São Paulo, including earning calls and the recent restructuring efforts.

10

(b)     Braskem Netherlands B.V. ("Braskem Netherlands") is a wholly-owned, private limited liability Dutch-incorporated subsidiary of Braskem S.A. It is an international holding and trading company of the Braskem Group. Braskem Netherlands performs sales, marketing, and distribution of petrochemical products to European and Asian markets on behalf of Braskem Parent It has a Managing Board of three directors, two of whom are Brazilian citizens located in the Netherlands and the third is a Dutch citizen located in the Netherlands. It also has a Supervisory Board of three directors—two Brazilian citizens and one Israeli citizen—all located in Brazil. The Supervisory Board supervises the Managing Board and advises it on the Company's affairs and long-term interests and strategy. The Managing Board manages the business of Braskem Netherlands, including the setting and executing the business plan. Although the Managing Board meets at least three times per year in the Netherlands, the two boards hold meetings together, usually as hybrid meetings in both the Netherlands and Brazil offices of Braskem and by simultaneous video conference or conference call. Its debt is primarily governed by Dutch law. Braskem Netherlands is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

(c)     Braskem Netherlands Finance B.V. ("Netherlands Finance") is an indirect, wholly-owned subsidiary of Braskem S.A. It is a special purpose vehicle ("SPV") formed by the Braskem Group for the sole purpose of raising and managing funds on international markets to fund the activities of the operational components of the Braskem Group. Netherlands Finance has no operations of its own, owns no physical assets and has only four employees. It has two managing directors—one a Brazilian citizen and the other a dual Brazilian and Spanish citizen—both located in the Netherlands. Its debt is primarily governed by New York law. Netherlands Finance is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

(d)     Braskem Netherlands Inc. B.V. ("BNI") is an SPV formed by the Braskem Group for the sole purpose of providing intercompany loans and financial support to other group entities and has no operations of its own. BNI has two directors—one is a Brazilian citizen and the other is a dual Brazilian and Spanish citizen—both located in the Netherlands. Its debt is primarily governed by New York law. It is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

(e)     Braskem Netherlands Trading & Shipping ("BT&S") is an indirect subsidiary of Braskem Parent and holding company of several SPVs dedicated to the management of vessels used for supply and distribution of raw materials and chemical products. BT&S supports the logistics and procurement of raw materials on international markets to meet the Company's Brazilian demand. BT&S has three directors—two Brazilian citizens and one Dutch citizen—all located in the Netherlands. Its debt is

11

primarily governed by English and New York law. It is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

(f)    Braskem America Finance Company ("America Finance") is a wholly owned subsidiary of non-debtor, Braskem America, Inc., and an SPV incorporated under the laws of the United States. It was formed for the sole purpose of raising and managing funds on international markets to fund the activities of the operational components of the Braskem Group. America Finance has no operations of its own, has no employees, and owns no physical assets of its own. It has two directors—one is Brazilian and located in Brazil and the other is a dual citizen of Argentina and the U.S., located in the U.S. America Finance's debt is primarily governed by New York law. It is incorporated in Delaware and has its registered office in Wilmington, Delaware.

A detailed organizational chart of the Braskem Group and other affiliated entities is attached hereto as **Exhibit C**.

B.    **Connections to the United States**

20.    Although a significant portion of the Debtors' assets and interests are located in Brazil and abroad, some of their assets and obligations are also located in or connected to the United States. All of the Debtors have debt obligations governed by New York law and/or cash accounts in the United States. New York law governs the majority of the debt held by BNI, Netherlands Finance, BT&S, and America Finance. Braskem Parent also holds debt governed by New York law.

21.    The Indentures (as defined below) are governed by New York law and contain a forum selection clause that provides that the parties have consented to the jurisdiction of the courts in any state or federal court located in the Borough of Manhattan, New York, with respect to any action that may be brought in connection with the Indentures or the Notes (as defined below).

22.    In addition, all of the Debtors have bank accounts in the United States totaling more than USD$292 million as of June 26, 2026.

12

23. One of the Debtors, Braskem America Finance Co. is incorporated in Delaware and has its registered office in Wilmington, Delaware.

### C. The Company's Financial Situation

24. As of June 19, 2026, the Debtors have approximately R$55 billion in consolidated gross debt (approximately US$11 billion as of June 19, 2026), with R$55 billion and US$11 billion in principal amounts outstanding on account of their funded debt obligations, which is comprised of the following instruments:

(a) **4.50% Notes due 2028.** Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$1.25 billion at 4.5% (the "2028 Notes") pursuant to that certain indenture dated October 4, 2017 (the "2028 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee. The 2028 Notes Indenture is governed by New York law. As of the date hereof, US$1.2 billion remains outstanding, and the 2028 Notes are set to mature on January 10, 2028.

(b) **4.5% Notes due 2030.** Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$1.5 billion at 4.5% (the "2030 Notes") pursuant to that certain indenture dated October 29, 2019 (the "2030 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee. The 2030 Notes Indenture is governed by New York law. As of the date hereof, US$1.5 billion remains outstanding, and the 2030 Notes are set to mature on January 31, 2030.

(c) **8.5% Senior Notes due 2031.** Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$850 million at 8.5% (the "2031 Notes") pursuant to that certain indenture dated September 7, 2023 (the "2031 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee. The 2031 Notes Indenture is governed by New York law. As of the date hereof, US$882 million remains outstanding, and the 2031 Notes are set to mature on January 12, 2031.

(d) **7.25% Senior Notes due 2033.** Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$1 billion at 7.25% (the "2033 Notes") pursuant to that certain indenture dated February 8, 2023 (the "2033 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee. The 2033 Notes Indenture is governed by New York law. As of the date hereof, US$1.0 billion remains outstanding, and the 2033 Notes are set to mature on February 13, 2033.

13

(e)  ***8% Senior Notes due 2034.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$850 million at 8% (the "2034 Notes") pursuant to that certain indenture dated October 9, 2024 (the "2034 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2034 Notes Indenture is governed by New York law.  As of the date hereof, US$862 million remains outstanding, and the 2034 Notes are set to mature on October 15, 2034.

(f)  ***7.125% Notes due 2041.***  Braskem America Finance Company issued unsecured notes in the aggregate principal amount of US$500 million at 7.125% (the "2041 Notes") pursuant to that certain indenture dated July 19, 2011 (the "2041 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2041 Notes Indenture is governed by New York law.  As of the date hereof, US$582 million remains outstanding, and the 2041 Notes are set to mature on July 22, 2041.

(g)  ***5.875% Notes due 2050.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$750 million at 5.875% (the "2050 Notes") pursuant to that certain indenture dated October 29, 2019 (the "2050 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2050 Notes Indenture is governed by New York law.  As of the date hereof, US$767 million remains outstanding, and the 2050 Notes are set to mature on January 31, 2050.

(h)  ***8.5% Subordinated Resettable Fixed Rate Notes due 2081.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$600 million at a fixed rate of 8.5% (the "2081 Notes", and together with the 2028 Notes, 2030 Notes, 2031 Notes, 2033 Notes, 2034 Notes, 2041 Notes, and the 2050 Notes, the "Notes") beginning January 23, 2026, pursuant to that certain indenture dated July 20, 2020 (the "2081 Notes Indenture", and together with the 2028 Notes Indenture, 2030 Notes Indenture, 2031 Notes Indenture, 2033 Notes Indenture, 2034 Notes Indenture, 2041 Notes Indenture, and the 2050 Notes Indenture, the "Indentures"),[7] with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2081 Notes Indenture is governed by New York law.  As of the date hereof, US$251 million remains outstanding, and the 2081 Notes are set to mature on January 23, 2081.

(i)  ***Debentures.***  Braskem Parent issued unsecured debentures in the aggregate principal amount of approximately US$428 million.  The debentures were all issued in 2025, are governed by Brazilian law, and mature between May 2029 and November 2032.  As of the date hereof, US$433 million (denominated in Brazilian Real) remains outstanding under the debentures.

---

[7]  Copies of the indentures governing the Notes can be made available upon request.

(j)   ***2018 SACE Loan.***   Braskem Netherlands, as borrower, entered into a unsecured SACE-covered[8] term loan agreements with Braskem Parent as guarantor (the "2018 SACE Loan") pursuant to an agreement dated November 18, 2018, with an aggregate principal amount of US$295 million.  The 2018 SACE Loan is governed by New York law and as of the date hereof, US$74 million remains outstanding under the facility.

(k)   ***2019 SACE Loan.***   Netherlands Finance, as borrower, entered into a unsecured SACE-covered term loan agreements with Braskem Parent as guarantor (the "2019 SACE Loan") pursuant to an agreement dated December 10, 2019, with an aggregate principal amount of US$150 million.  The 2019 SACE Loan is governed by New York law and as of the date hereof, US$53 million remains outstanding under the facility.

(l)   ***2020 Nexi Loan.***   Braskem Netherlands, as borrower, entered into a NEXI loan agreement with Braskem Parent as guarantor dated August 4, 2020 (the "2020 Nexi Loan") in the amount of US$225 million to finance the construction of a polypropylene production facility in the U.S.  The 2020 Nexi Loan is governed by New York law, and as of the date hereof, US$115 million remains outstanding under the facility.

(m)   ***Revolving Credit Facility.***   Non-Debtor Braskem America Inc. and Debtor Braskem Netherlands as borrowers, entered in an unsecured revolving credit facility (the "RCF") in the amount of US$1 billion on December 13, 2021, with a five-year maturity.  Under the RCF, Braskem America Inc. has an outstanding balance of approximately US$50 million, and Braskem Netherlands has an outstanding balance of approximately US$961 million.  The RCF is governed by New York law and is guaranteed by Braskem Parent.

(n)   ***Brazilian Agricultural & Export Debt.***   Braskem Parent has approximately US$100 million in aggregate principal outstanding in *Cédula de Produto Rural* ("CPRs"), US$175 million in aggregate principal outstanding in *Certificados de Recebíveis do Agronegócio* ("Agribusiness Receivables Certificates" or "CRAs"), and US$67 million in aggregate principal outstanding in *Nota de Crédito à Exportação* ("NCEs").  Maturities on this debt range from June 2026 through December 2031.

(o)   ***Letters of Credit.***   BT&S as borrower has letters of credit totaling US$1.3 billion as of the date hereof.  Committed letters of credit comprise approximately US$973 million of the total, with the remaining US$338 million in uncommitted facilities.  The letters of credit are all guaranteed by Braskem S.A. and are governed by New York law.

---

[8]   A "SACE-covered" facility is a debt facility that is guaranteed by SACE S.p.A., Italy's Export Credit Agency.

15

(p)   ***Export Prepayment Facilities.***   Braskem S.A. holds US$241 million in unsecured third-party debt under Export Prepayment Facility Agreements with maturities ranging from October 2026 to July 2027.

25.    The Offering Memoranda for the Notes that were provided to investors prior to their issuance contained information about the Company's operations.  See Exs. D-J, Offering Memoranda.[9]  The Offering Memoranda focus heavily on the risks associated with the Company's location in Brazil.  *See, e.g.*, 2028 Notes OM at 16 (discussing risk of foreign exchange policy of Brazil); 2041 Notes OM at 20 (same); 2028 Notes OM at 16 (judgments in Brazil); 2041 Notes OM at 20 (same); 2028 Notes OM at 15 (Brazilian securities market); 2041 Notes OM at 18 (same). The Offering Memoranda state that the issuer, America Finance for the 2041 Notes and Netherlands Finance for all other Notes, is a "wholly-owned indirect subsidiary of Braskem [S.A.], has no operations other than the issuing and making payments on the notes and other indebtedness." 2041 Notes OM at 18; *see also* 2028 Notes OM at 14; 2030/2050 Notes OM at 15; 2031 Notes OM at 25; 2033 Notes OM at 26; 2034 Notes OM at 16; 2081 Notes OM at 15. Furthermore, the Offering Memoranda all state in similar fashion that "the ability of the [Issuer] to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and result of operations of Braskem [S.A.] and its subsidiaries that are creditors of the [Issuer]." *See* 2030/2050 Notes OM at 15; *see also* 2028 Notes OM at 14; 2031 Notes OM at 25; 2033 Notes OM at 26; 2034 Notes OM at 16; 2041 Notes OM at 18; 2081 Notes OM at 15.  Additionally, the Offering Memoranda state that if the Company is unable to pay

---

9       Excerpts of the offering memoranda for the Notes are attached hereto as **Exhibit D**, Offering Memorandum, 3.50% Notes due 2023 and 4.5% Notes due 2028 ("2028 Notes OM"); **Exhibit E**, Offering Memorandum, 8.5% Senior Notes due 2031 ("2031 Notes OM"); **Exhibit F**, Offering Memorandum, 7.25% Senior Notes due 2033 ("2033 Notes OM"); **Exhibit G**, Offering Memorandum, 8% Senior Notes due 2034 ("2034 Notes OM"); **Exhibit H**, Offering Memorandum, 4.5% Notes due 2030 and 5.875% Notes due 2050 ("2030/2050 Notes OM"); **Exhibit I**, Offering Memorandum, 8.5% Subordinated Resettable Fixed Rate Notes due 2081 ("2081 Notes OM"); **Exhibit J**, Offering Memorandum, 7.125% Notes due 2041 ("2041 Notes OM") (collectively, the "Offering Memoranda").

16

amounts due under the guarantees, then "[the issuer] may become subject to bankruptcy proceedings in Brazil." 2028 Notes OM at 17; 2030/2050 Notes OM at 19; 2041 Notes OM at 21; 2081 Notes OM at 23; *accord* 2031 Notes OM at 29 (issuer may become "subject to insolvency proceedings in Brazil"); 2033 Notes OM at 30 (same); 2034 Notes OM at 20 (same). Furthermore, the Offering Memoranda all provide that the issuer may be replaced and substituted by Braskem Parent "without the consent of the holders of the notes…" *See* 2028 Notes OM at 9; 2030/2050 Notes OM at 10; 2031 Notes OM at 18; 2033 Notes OM at 19; 2034 Notes OM at 8; 2041 Notes OM at 9; 2081 Notes OM at 11. On average, Brazil is referenced more than 240 times in each of the Offering Memoranda.

26. The indentures (*Escritura de Emissão*) governing the Debentures were all made available in Portuguese, and as noted, the Debentures are governed by Brazilian law.[10]

## II. EVENTS PRECIPITATING COMMENCEMENT OF THE BRAZILIAN PROCEEDING

### A. Global Pressures on the Petrochemical Industry

27. Since 2022, there has been a prolonged downturn in the demand for plastic resins, exacerbated, on the one hand, by a substantial increase in supply of thermoplastic resins on the global market, and, on the other hand, a slowdown in global demand impacting market growth for these products. On the production side, these pressures are the result of a confluence of several factors. The spread on thermoplastic resins has drastically expanded. Despite the Braskem Group's global focus and its continued efforts to adapt to the changing global landscape, the increased cost and diminishing returns on goods using thermoplastic resins has significantly

---

[10] Copies of the indentures governing the Debentures can be made available upon request.

17

affected the Brazilian market—which constitutes almost 70% of the Braskem Group's revenues—as well as the United States, European, and Asian markets.

28.     As a result of rising costs and decreased demand, the Braskem Group has experienced a decline in revenue.  The recurring EBITDA of the Brazil/South America segment of the Braskem Group for the fourth quarter of 2025 was US$143 million, a 30% reduction from the previous quarter.  The United States and Europe segment recorded a negative recurring EBITDA of US$32 million for the same period.  The Braskem Group's consolidated net revenue saw a similar decline to R$16.1 billion (or US$3.1 billion as of June 18, 2026) in the fourth quarter of 2025, a 16% decrease in its overall net revenue as compared to the same period of the previous year.

29.     These persistent pressures on the petrochemical industry have significantly impacted the Braskem Group's cash flows.  The group's consolidated recurring cash outflow increased from R$493 million (approximately US$95.7 million as of June 18, 2026) in 2024 to R$5.9 billion (approximately US$1.13 billion as of June 18, 2026) in 2025—a tenfold increase solely to maintain its operational activities.

30.     During the same time period, interest costs on debt rose substantially from R$3.88 billion in 2024 to R$4.23 in 2025.  The combination of the high cost of the Braskem Group's debt and the downturn in the petrochemical industry led to the Braskem Group recording a consolidated loss of over R$10 billion in the fourth quarter of 2025.

**B.     Geological Event in Alagoas, Brazil**

31.     In 2019, the Geological Survey of Brazil  ("CPRM") released a report indicating that the geological phenomenon identified in neighborhoods of Maceió, Alagoas, was linked to the rock salt well exploration activities carried out by the Company in the region.  The Company immediately ceased rock salt extraction in the region and implemented various measures to protect

18

and take care of those affected by the event in coordination with the National Mining Agency ("ANM").

32.     These measures have resulted in a recurring and significant investment in the region by the Company.  In November 2025, the Company entered into an agreement with the State of Alagoas in which it undertook to pay a total of R$1.2 billion to local authorities.  Although part of this amount had already been provisioned, the agreement involved the recognition of new obligations and the reaffirmation of the Braskem Group's long-term financial commitment to remedying the damage attributed to the event.

33.     Although unrelated to the normal course of the Braskem Group's business, the liabilities arising from the geological event are substantial, and have consumed a significant portion of its cash flow in recent years.  By the end of 2025, the Company had already spent more than R$14 billion (US$2.7 billion as of June 18, 2026) as a result of the geological event, with a balance for future expenses reaching a total of R$3.5 billion (US$678 million as of June 18, 2026).

34.     This is a significant liability, with concrete effects on cash management, the market's perception of risk, and the conduct of the Braskem Group's business.  And, against a backdrop of a downturn in the petrochemical industry, the obligations related to the geological event have increasingly compromised the Debtors' finances.

### C.     International Tensions Driven by Recent Geopolitical Developments

35.     In early 2026, the Debtors began to face new financial and operational challenges due to the escalation of geopolitical tensions in the Middle East, related to the conflict involving Iran and the United States and the impact of the war on operations in the Strait of Hormuz—a strategic maritime passageway crucial for the global transport of oil and its derivatives.  This conflict had an immediate impact on the price of oil and its derivatives as well as on sea freight

19

rates.  The uncertainty surrounding the duration of the conflict has caused the price of naphtha, a petroleum derivative, to increase dramatically.

36.    Naphtha is the main raw material in the petrochemical industry and the feedstock most commonly used by the Braskem Group in the production of thermoplastic resins. Consequently, a change in its price has a direct impact on the Braskem Group's production costs. Given the scale of the Braskem Group's industrial production, even a small increase in the price of naphtha can result in a significant increase in costs for Braskem.

37.    At the same time, many of Braskem's competitors use ethane, rather than naphtha, as a raw material—a feedstock that currently has more favorable economic conditions than naphtha.  Thus, the Braskem Group finds itself bearing an increase in the cost of naphtha and a significant competitive disadvantage arising from its use as well.

38.    Amid a prolonged downtown in the global petrochemical market, the widespread uncertainty generated by the war in the Middle East further exacerbates the already fragile economic and financial situation of the Debtors.  While the long-term repercussions of the downtown in the global petrochemical market and the current geopolitical situation remain unknown, the Braskem Group's liquidity crisis is far from irreversible.  The Company, along with its stakeholders, has entered the Brazilian Proceeding to strengthen its financial condition, which the Company expects will ultimately culminate in a comprehensive restructuring plan, so it can continue to execute on its operational objectives.

**D.    Imminent Maturities and Negotiation Efforts with Financial Creditors**

39.    As of June 2026, various debt obligations totaling more than R$2.6 billion (US$499 million as of June 24, 2026) have come due for Braskem Parent, including: (i) more than R$750 million (US$144 million as of June 24, 20206) in interest payments due to holders of the Notes; (ii) more than R$1.3 billion (US$249 million as of June 24, 2026) in maturing letters of credit; and

20

(iii) more than R$450 million (US$87 million as of June 24, 2026) in maturities due on debts denominated in reis. The repayment of this financial debt would significantly impact the Debtors' cash position, which would be reduced below the minimum operating level.

40. Operating below the minimum operating cash balance would have concrete impacts on the Debtors' activities, transforming a situation of misalignment in the financial debt repayment schedule in a more serious crisis that would affect the liquidity needed to maintain operations and relationships with business partners. Tangibly, this would mean that the Braskem Group would lack sufficient cash to meet its commitment to purchase raw materials, pay suppliers and employees, and invest in maintenance and safety—in short, everything that is necessary to manage the Company. There is also the risk that, in the event of non-payment, all of the Braskem Group's financial debt, totaling R$54 billion (approximately US$10.3 billion as of June 24, 2026) would be accelerated, with cross-acceleration of maturities.

41. The impacts of the Company operating below its minimum operating level would not be limited to the Braskem Group. The entire production chain that the Company utilizes would be affected and customers and consumers would face delays in the delivery of goods.

42. To avoid this outcome, the Debtors have been engaging with all of the Braskem Group's financial creditors (the "Subject Financial Creditors") about the extension of letter of credit lines and the payment of their claims (such claims, the "Subject Financial Claims") over a longer time frame. The Company has been working with the Subject Financial Creditors to sign confidentiality agreements to exchange information, hold meetings, and submit proposals that would promote an organized restructuring of the Subject Financial Claims.

43. Despite these efforts, not all Subject Financial Creditors have agreed to voluntarily suspend collection or enforcement actions, risking the Company's restructuring efforts. More

21

recently, some creditors have begun threatening to seek accelerated payment even before any defaults have occurred. For example, Banco Safra S.A. ("Safra") has attempted to seek accelerated payment of R$348 million (approximately US$66.8 million as of June 24, 2026), including threatening to offset balances held by the Braskem Group with it, as well as to adopt other restrictive measures. Other creditors are likely to attempt similar measures and seek to exercise any available self-help remedies.

44. For those reasons, the Company commenced the Brazilian Proceeding on June 24, 2026, to leverage the structured and controlled environment of the mediation process combined with the preliminary injunction granted by the Brazilian Court. The Debtors intend to use the stay provided by the preliminary injunction to prevent further attempts by individual creditors to destroy value that is essential for the payment of all of the Company's creditors, suppliers, and customers, and continue negotiations to reach a global solution for the Subject Financial Claims.

## JURISDICTION, ELIGIBILITY, AND VENUE

45. This Court has jurisdiction to consider the Verified Petition pursuant to 28 U.S.C. §§ 157 and 1334 as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "Amended Standing Order").

46. These Chapter 15 Cases have been properly commenced with respect to the Petitioner and the Debtors in accordance with §§ 1504 and 1509(a) of the Bankruptcy Code by the filing of the Petition. This is a core proceeding pursuant to section 157(b) and (2)(P) of title 28 of the United States Code.

47. Venue is proper in this Court pursuant to 28 U.S.C. § 1410(1), as the principal U.S. assets of the Debtors are located within New York County and thus within this District.

22

48.     The presence of assets within the United States renders each of the Debtors eligible

to file these Chapter 15 Cases pursuant to section 109(a) of the Bankruptcy Code.  *See In re*

*Suntech Power Holdings Co., Ltd.* 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014); *Drawbridge Special*

*Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247–51 (2d Cir. 2013) (applying

the local property requirement of section 109(a) to chapter 15 cases).[11]

## RELIEF REQUESTED

49.     The Petitioner requests that this Court enter an order substantially in the form of

the Proposed Order attached hereto and pursuant to sections 105(a), 1515, 1517, 1520, and 1521

the Bankruptcy Code:

    (a)     granting the Petition in these Chapter 15 Cases and recognizing the Brazilian Proceeding as the "foreign main proceeding" for each of the Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, recognizing the Brazilian Proceeding as a "foreign nonmain proceeding" for each of the Debtors other than Braskem Parent;

    (b)     finding that the Petitioner is the duly appointed "foreign representative" of each of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each Chapter 15 Debtor; and

    (c)     granting such other and further relief as the Court deems just and proper.

## REQUIRED DISCLOSURES

50.     Appended to the Voluntary Petitions are the following certified disclosures by the

Foreign Representative in accordance with Rule 1007(a)(4) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"):

    (a)     a Corporate Ownership Statement identifying any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class

---

[11]     *See also In re Avanti Commc'ns Grp. PLC,* 582 B.R. 603, 611 (Bankr. S.D.N.Y. 2018) (finding that the "property in the United States" requirement of section 109(a) is satisfied by a New York law-governed indenture); *In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) (same).

of each of the Debtors' equity interests as of the commencement of these Chapter 15 Cases;

(b)    a list of administrators, parties to litigation in the United States to which the Debtors are a party, and entities against whom provisional relief is being sought[12]; and

(c)    a statement pursuant to section 1515(c) of the Bankruptcy Code identifying any other foreign proceedings of the Debtors.

## BASIS FOR RELIEF

51.    The Court should grant the Petition and recognize the Brazilian Proceeding as the foreign main proceeding for each of the Debtors. For the reasons stated below, each of the requirements in section 1517(a) of the Bankruptcy Code are satisfied. As an initial matter, each of the Debtors is eligible to be a debtor under the Bankruptcy Code, and this Court is the proper venue for them to administer their Chapter 15 Cases. Additionally, the Petitioner is the duly appointed "foreign representative" of the Brazilian Proceeding with respect to each of the Debtors, and the Brazilian Proceeding satisfies the standard to be considered a "foreign main proceeding" for the purposes of chapter 15 because the center of main interests for each of the Debtors is in Brazil, which aligns with the expectations of the Debtors' creditors. In the alternative, if this Court declines to recognize the Brazilian Proceeding as the foreign main proceeding for any of the Debtors, those Debtors are eligible for non-main recognition and relief to ensure a comprehensive restructuring of the Braskem Group. Lastly, the Petition meets the requirements of section 1515.

**I.    THE DEBTORS ARE ELIGIBLE TO BE DEBTORS UNDER SECTION 109(A) OF THE BANKRUPTCY CODE, AND THIS COURT IS THE PROPER VENUE FOR THE CASES**

52.    Each of the Debtors has assets in the United States and is thus eligible to be a debtor under chapter 15 of the Bankruptcy Code in accordance with section 109(a) of the Bankruptcy

---

[12]    As of the date hereof, there are no parties that fall within the required disclosures of Bankruptcy Rule 1007(a)(4)(B).

Code. *See In re Barnet*, 737 F.3d at 250–51. Section 109(a) states that a debtor can be "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality." 11 U.S.C. § 109(a). Here, the Debtors have property located in the United States, including cash held in U.S. accounts and U.S.-based contractual rights.

53.     With respect to accounts in the United States, the Debtors hold US$292 million (R$1.5 billion) in cash in U.S. bank accounts as of June 26, 2026. *See In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) (finding that cash held in bank accounts in the United States satisfied the requirements of § 109(a)).

54.     With respect to contractual rights, Braskem Netherlands Finance, as issuer of the Notes other than the 2041 Notes, America Finance, as issuer of the 2041 Notes, and Braskem Parent, as guarantor of all of the Notes, all have rights under the U.S. dollar-denominated Notes that are governed by New York law. The Indentures also contain identical forum selection clauses that provides that parties to the Indenture have consented to the jurisdiction of courts in New York and federal courts in Manhattan, New York, with respect to any action related to the Notes or the Indentures. Braskem Netherlands and BT&S are also issuers under certain debt instruments that are governed by New York law and contain New York forum selection provisions.

55.     This Court has previously held that a chapter 15 debtor is able to meet the debtor eligibility requirement under section 109(a) of the Bankruptcy Code if it has debt instruments that are governed by New York law and contain New York forum selection provisions. *See In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re PT Bakrie Telecom Tbk*, 601 B.R. 707, 715 (Bankr. S.D.N.Y. 2019) ("An indenture subject to New

25

York governing law and containing New York forum selection clauses constitutes property in the United States and thereby satisfies Section 109's eligibility requirement."); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017) (holding that presence of "debt subject to New York governing law and a New York forum selection clause constitutes property in the United States," thereby satisfying the requirement under section 109(a)); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction."). Thus, even if any of the Debtors did not have cash in the United States, the Notes, Indentures, and other U.S. law-governed debt documents are sufficient for each of the Debtors, except BNI, to satisfy section 109(a) of the Bankruptcy Code.

56. Moreover, "[a] case under chapter 15 of title 11 may be commenced in the district court of the United States for the district" (a) "in which the debtor has its principal place of business or principal assets in the United States," (b) "if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court," or (c) "in a case other than those specified in paragraph [(a) or (b)], in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative." 28 U.S.C. § 1410. As discussed above, a majority of the Debtors have their principal assets in the United States in the Southern District of New York, including the primary assets of America Finance, which maintains its only bank account in New York. Additionally, venue in this Court is consistent with the interest of justice and convenience of the parties given the aforementioned connections to New York and that the Debtors' undersigned counsel is in New York and close to this Court. Accordingly, venue in this District is proper. *See* 28 U.S.C. § 1410(3).

26

II.   **THE REQUIREMENTS OF SECTION 1517(A) OF THE BANKRUPTCY CODE ARE SATISFIED**

57.   Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if the following three requirements are met: (a) such foreign proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code; (b) the foreign representative applying for recognition is a person or body; and (c) the petition meets the requirements of section 1515. *See* 11 U.S.C. § 1517(a); *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). These foregoing requirements are satisfied with respect to the Brazilian Proceeding, the Petitioner, and the Verified Petition. Therefore, the Brazilian Proceeding should be recognized as the foreign main proceeding of the Debtors.

A.   **The Brazilian Proceeding is a "Foreign Proceeding"**

58.   The Brazilian Proceeding satisfies the general definition of "foreign proceeding" as set forth in section 101(23) of the Bankruptcy Code. Section 101(23) requires that a "foreign proceeding" be (a) either judicial or administrative in character, (b) collective in nature, (c) pending in a foreign country and authorized or conducted under a law related to insolvency or the adjustment of debts, (d) a proceeding in which the debtor's assets and affairs are subject to the control or supervision of a foreign court, and (e) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23); *In re Barnet*, 737 F.3d at 247; *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013). The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3). As described above, the Brazilian Proceeding is initially the Brazilian Mediation and then may (if no fully consensual agreement among all mediation parties is reached) later convert into either the

27

Brazilian EJ or the Brazilian RJ. *See* Brazilian Counsel Decl. ¶¶ 13–14. Courts in this Circuit have long agreed that proceedings commenced under Brazilian Bankruptcy Law satisfy these standards. *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) ("*Constellation I*").

> ### 1. The Brazilian Proceeding is a Judicial Process Pending in a Foreign Country, Authorized Under a Law Related to Insolvency, for the Purpose of Reorganizing

59. The Brazilian Mediation is a judicial-supervised process provided for under Brazilian Bankruptcy Law that the Debtors initiated when they requested to commence a mediation process with the Wind Chamber of Mediation (the "Brazilian Mediation Chamber") and a motion for injunctive relief in the Brazilian Court. Brazilian Counsel Decl. ¶ 14. The Mediation Petition has been granted, and the Brazilian Court has entered an order imposing a sixty-day stay on certain creditor collection and enforcement actions to allow the Brazilian Debtors time to negotiate a plan (the "Initial Court Order").[13] *Id.*, Exs. E–F. The Brazilian Mediation is administered by the Brazilian Mediation Chamber and is collective in that the Debtors have invited each of their significant financial creditors to participate. *Id.* ¶ 69. Only the creditors that are invited to the mediation are subject to the court-imposed stay. *Id.* One of the goals of the Debtors is to reach an agreement with their creditors on the liabilities owed and the treatment to be provided on account of such liabilities. *Id.* ¶ 16. If the parties reach a fully consensual agreement in the Brazilian Mediation, the Brazilian Court will decide whether to confirm the agreement pursuant to Article 20-C of the Brazilian Bankruptcy Law. *Id.* ¶ 19. If a fully consensual agreement is not reached in the Brazilian Mediation, the Debtors could choose, but are not required, to commence a Brazilian

---

[13]    A machine translation of the Initial Court Order is attached to the Brazilian Counsel Declaration. The Foreign Representative has requested a certified translation and will file it in these Chapter 15 cases as soon as it is finalized.

28

EJ or Brazilian RJ.[14] *Id*. As set forth in the Brazilian Counsel Declaration, the Brazilian Mediation is intended to preserve optionality based on the outcome of the Debtors' discussions with their creditors as well as to protect the Debtors so that they may continue to operate their business and negotiate a value-maximizing resolution for all stakeholders. *Id*. Therefore, the Brazilian Mediation satisfies all elements of a "foreign proceeding."

60.    The fact that the Brazilian Mediation is a preliminary proceeding does not require a different result. On the contrary, section 101(23) of the Bankruptcy Code explicitly provides that "interim proceeding[s]" qualify as foreign proceedings. 11 U.S.C. § 101(23). Indeed, courts have emphasized in cases under chapter 15's predecessor, *i.e.*, section 304 of the Bankruptcy Code, that the definition of "foreign proceeding" should be broadly construed and encompasses cases in their preliminary stages that may not result in full-fledged liquidations or restructurings. Courts in this District have held that interim insolvency proceedings are "foreign proceedings." *See* Order Granting Provisional Relief, *In re InterCement Brasil S.A.*, No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024), ECF No. 22 (preliminarily recognizing as a foreign proceeding a jointly-

---

[14]    Courts in this district have routinely recognized Brazilian EJ and RJ proceedings as "foreign proceedings." *See, e.g.*, Order Granting Recognition of Foreign Proc., *In re Virgolino de Oliveira, S.A. Açúcar e Álcool,* No. 25-10696 (MG) (Bankr. S.D.N.Y. July 18, 2025), ECF No. 25 (recognizing a Brazilian RJ proceeding as foreign main proceedings); Order Granting Recognition & Final Relief in Aid of a Foreign Proc., *In re Odebrecht Engenharia e Construção S.A. – Em Recuperação Judicial*, No. 25-10482 (MG) (Bankr. S.D.N.Y. Apr. 8, 2025), ECF No. 21 (same); *In re InterCement S.A.*, 668 B.R. 802 (Bankr. S.D.N.Y. 2025) (same); Order Granting Recognition of Brazilian RJ Proc. & Certain Related Relief, *In re U.S.J. – Açúcar e Álcool S.A., et al.*, No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022), ECF No. 21 (recognizing as a foreign main proceeding a case filed pursuant to in-court reorganization section of the Brazilian Bankruptcy Law); Order Granting Recognition & Final Relief in Aid of a Foreign Proc., *In re Samarco Mineração S.A. - Em Recuperação Judicial*, No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 13, 2021), ECF No. 22 (same); Order Recognizing Brazilian Proc. as Foreign Main Proc., *In re Usina de Açúcar Santa Terezinha Ltda.*, No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019), ECF No. 30 (same); Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Novonor S.A. – Em Recuperação Judicial*, No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22 (same); Mem. Op. Recognizing Foreign Debtors' Foreign Main & Foreign Nonmain Proc., *In re Serviços de Petróleo Constellation S.A.*, No. 18-13952 (MG) (Bankr. S.D.N.Y. May 9, 2019), ECF No. 86 (same); Order Granting Recognition of Foreign Main Proc., *In re OAS S.A.*, No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015), ECF No. 85 (same); Order Granting Certain Relief Related to Recognition of Foreign Main Proc., *In re Rede Energia S.A.*, No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014), ECF No. 36 (same); *see also* Order Granting Recognition & Final Relief in Aid of a Foreign Proc., *In re Odebrecht Engenharia e Construção S.A.*, No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020), ECF No. 15 (recognizing Brazilian EJ proceeding as a foreign main proceeding).

administered protective injunction proceedings in support of a court-supervised interim mediation process in Brazil); *accord In re Netia Holdings, S.A.*, 277 B.R. 571, 582–83 (Bankr. S.D.N.Y. 2002) (holding that Polish insolvency proceedings that were in their "pre-opening phase" still constituted "foreign proceedings"); *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 269–70 (Bankr. D. Del. 2016) (granting recognition of Spanish conciliation procedure under Spanish Insolvency Law); *cf.* Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Oi S.A.*, No. 23-10193 (JPM) (Bankr. S.D.N.Y. Mar. 29, 2023), ECF No. 30 (recognizing as a foreign proceeding a jointly-administered projective injunction proceeding in preparation for a Brazilian RJ); Mem. Op. Recognizing the BVI Proc. as Foreign Main Proc. & Granting Related Relief, *In re Prince Glob. Holdings Ltd.*, No. 26-10769 (MG) (Bankr. S.D.N.Y. June 11, 2026), ECF No. 82 (recognizing a provisional liquidation proceeding as a "foreign proceeding" since it was a proceeding "under a law relating to insolvency"—the BVI Insolvency Act).

## 2. The Brazilian Proceeding is Collective in Nature

61.     In addition to the Brazilian Mediation being collective, as mentioned above, a Brazilian EJ and a Brazilian RJ are "collective" in that they "consider[] the rights and obligations of creditors"[15] in a single proceeding. *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009); *see also Constellation I*, 600 B.R. at 263 (holding that courts in the Second Circuit have long agreed that a Brazilian RJ process satisfies the standards for a "foreign proceeding," including being a collective proceeding). Each proceeding involves the treatment of multiple creditors and claims together rather than merely the resolution of a two-party dispute. Brazilian Counsel Decl. ¶ 15. Brazilian Bankruptcy Law provides that both a Brazilian RJ and a Brazilian EJ culminate in

---

[15]     In a Brazilian EJ, the Company can choose what claims are subject to the prepackaged plan. *See* Brazilian Counsel Decl. ¶ 18.

30

a court-sanctioned restructuring plan when the requisite number of creditors accept the proposed plan, although a "cram-down" procedure with lessened voting requirements also exists. *See id.* ¶¶ 24, 53–55.

### 3.    The Debtors' Assets and Affairs Are Subject to the Brazilian Court's Supervision

62.    Moreover, the Brazilian Court's oversight of the Debtors' assets and affairs starts when the Brazilian Mediation is commenced (*e.g.*, the Bankruptcy Court has exclusive jurisdiction over matters relating to the Debtor's assets within the scope of the mediation and enforcement attempts or actions by creditors subject to the mediation are stayed, *see id.* ¶ 17), and will continue if the Brazilian Debtors commence a Brazilian EJ or Brazilian RJ.  In a Brazilian EJ, creditors may seek court intervention with respect to the Debtors' assets and affairs in certain circumstances. *See id.* ¶ 26.  But in a Brazilian RJ, the assets and affairs of the Debtors are subject to the control and supervision of the Brazilian Court throughout the Brazilian RJ.  *Id.* ¶ 43.

\*\*\*

63.    For the foregoing reasons, the Court should recognize the Brazilian Proceeding as a "foreign proceeding."  It is a judicial or judicially supervised process—initiated by the Debtors with the Brazilian Mediation Chamber and their motion for injunctive relief before the Brazilian Court—that is collective in nature, pending in a foreign country under a law related to insolvency, and undertaken for the purpose of reorganizing the Debtors' assets and affairs.  To the extent the Brazilian Mediation is in its preliminary stages, this Court should have no difficulty finding it qualifies: Section 101(23) encompasses "interim proceedings," and courts in this District have construed the statutory definition to include early-stage insolvency processes, including Brazilian mediation proceedings substantially similar to the one at issue here. *See, e.g.,* Order Granting Provisional Relief, *In re InterCement Brasil S.A.*, No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18,

31

2024), ECF No. 22; *In re Netia Holdings*, 277 B.R. at 582–83. Moreover, the Brazilian Court's supervisory authority over the Debtors' assets and affairs, including the imposition of a stay on creditor collection and enforcement actions, has been operative since the commencement of the Brazilian Mediation and will continue through any subsequent Brazilian EJ or Brazilian RJ.

**B.     The Brazilian Proceeding Satisfies the Requirements for Recognition as a "Foreign Main Proceeding"**

64.     The Brazilian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code for the Debtors. A "foreign main proceeding" is defined in the Bankruptcy Code as a "foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). Although the Bankruptcy Code does not define center of main interests ("COMI"), section 1516(c) provides that, in the absence of evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *see also In re Olinda Star Ltd.*, 614 B.R. 28, 40–41 (Bankr. S.D.N.Y. 2020) ("Courts have found that a debtor's registered jurisdiction is its COMI where no objection was raised or evidence presented rebutting the section 1516 presumption."). The legislative history indicates that this rebuttable presumption was "designed to make recognition as simple and expedient as possible" in cases where the "COMI" of a debtor is not controversial. H.R. No. 109-31, pt. 1, at 112–13 (2005).

65.     In assessing whether the statutory presumption withstands scrutiny, courts in this Circuit have developed a non-exclusive list of factors for determining COMI. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137–38 (2d Cir. 2013) (referring to the COMI factors developed by the court in *In re SPhinX*, 351 B.R. at 117). Those factors include the following: (a) "the location of the debtor's headquarters;" (b) "the location of those who actually manage the

32

debtor" (which, conceivably could be the headquarters of a holding company); (c) "the location of the debtor's primary assets;" (d) "the location of the majority of the debtor's creditors or [] a majority of the creditors who would be affected by the case;" and (e) "the jurisdiction whose law would apply to most disputes." *See In re SPhinX*, 351 B.R. at 117; *In re Fairfield Sentry*, 714 F.3d at 137.

66.     Courts may also consider a debtor's "principal place of business" as part of their COMI analysis, which looks at the location of a corporation's "nerve center," *i.e.*, "where a corporation's officers direct, control, and coordinate the corporation's activities." *See In re Fairfield Sentry*, 714 F.3d at 138 n.10 (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 78 (2010)). Given Congress's choice to use "COMI" instead of "principal place of business" in chapter 15, the "nerve center" concept does not control, "[b]ut to the extent that the concepts are similar, a court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI." *Id.* In addition, courts have emphasized the need for the debtor's COMI to be readily ascertainable by third parties. *See id.* at 130.

67.     Similarly, some courts also look to the expectations of creditors, which can be "evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Serviços de Petróleo Constellation S.A.*, 613 B.R. 497, 508 (Bankr. S.D.N.Y. 2019) ("*Constellation II*") (citing *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017)); *In re OAS S.A.*, 533 B.R. 83, 101–03 (Bankr. S.D.N.Y. 2015) (reviewing offering memorandum to establish noteholder expectations as part of a COMI analysis); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93–94 (S.D.N.Y. 2012) (same); *In re Suntech Power*, 520 B.R. at

33

418 (considering terms of indenture to establish creditor expectations regarding likely location of a restructuring as part of a COMI analysis).

### 1. The Debtors are Part of the Economically and Operationally Integrated Braskem Group

68. The Braskem Group is an economically and operationally integrated group, whose main assets are located in Brazil and whose activities are managed, directed, and monitored out of the Company's corporate headquarters in Brazil. Specifically, the Braskem Group's São Paulo headquarters is the nerve center of each of the Debtors, where the Braskem Group's strategic control and business generation functions are centralized. Its most important contracts for the financing and development of the activities of the Company have been negotiated, formalized, and authorized in Brazil. The co-controllers of the Braskem Group, who collectively hold more than 97% of Braskem Parent's voting capital, are Brazilian: Shine I Fundo de Investimento em Participações Responsabilidade Limitada (the "Shine Fund"), an investment vehicle linked to Brazilian asset management firm IG4 Capital, and Petrobras, a mixed-capital company controlled by the Brazilian federal government.

69. Strategic decisions regarding the Company are made from Brazil, as Braskem Parent is responsible for providing the Company direction on key matters such as principal business, strategic, legal and financial decisions. So, for example, the Company's most important contracts for the financing and development of the activities of the Company have been negotiated, formalized, and authorized in Brazil. In that same vein, the Company's main negotiations with creditors relating to the Debtors' restructuring process have taken place in Brazil, with support from legal and financial advisors located in Brazil. And, as required under Brazilian law, the Debtors filed the Brazilian Proceeding in the Brazilian Court, which is located in the jurisdiction where the Braskem Group's principal place of business (*principal estabelecimento*) is located. *See*

34

Brazilian Counsel Decl. ¶ 11.  Courts have found that the location where certain policy decisions are made and main operations of the corporation are conducted is indicative of where the corporation's business was centered.  *See Kelly v. U.S. Steel Corp.*, 284 F.2d 850, 854 (3d Cir. 1960); *see also Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F.Supp.2d. 205, 215 (S.D.N.Y. 2006); *cf. In re Fairfield Sentry*, 714 F.3d at 138 n.10 (courts may consider a debtor's principal place of business in determining the debtor's COMI).  While each of the Debtors maintains managing board structures in compliance with local regulatory and tax requirements, each of the Debtors also receives strategic advice, direction and guidance from Braskem Parent on the Company's long-term interests and priorities.  *See infra* ¶ 71.

70.    The Braskem Group's production activities are also concentrated in Brazil. Braskem has 28 industrial plants in Brazil, spread across five states, which employ, directly or indirectly, more than six thousand people.  Brazil is also home to the largest volume of the customer contracts, suppliers, operators and financiers.  Given that, revenue generated in Brazil accounted for approximately 70% of the Braskem Group's consolidated net revenue in 2025.

71.    Moreover, all of the Debtors have the following connections to Brazil:

(a)    investor relations for the Braskem Group is also centralized in Brazil, and the investor relations contact information on the Braskem Group's website is an address in São Paulo;

(b)    the domicile of many of the Debtors' directors is in Brazil;

(c)    the Debtors' operations are centrally managed and directed from Brazil;

(d)    strategic and key operating and policy decisions for each of the Debtors are made by management located in São Paulo;

(e)    the Debtors' corporate accounting, accounts payable, insurance procurement, accounts receivable, financial planning, internal auditing, marketing, treasury, research and development, and tax services are largely provided in São Paulo;

35

(f)     the finance, legal, human resources, payroll, billing, and procurement for the Debtors are carried out mainly in São Paulo;

(g)     key information technology and systems used by the Debtors are provided from Brazil;

(h)     cash management functions are maintained and directed from Brazil;

(i)     management, senior staff, and/or principal decision-makers regularly attend meetings in São Paulo;

(j)     all of the financial statements of the Debtors are consolidated into Braskem Parent; and

(k)     the management of capital expenditure decisions affecting the Debtors is made from São Paulo.

72.     Furthermore, now that the Initial Court Order has been entered, creditors will be engaging in a Brazilian Court-supervised process, further underscoring that the COMI of all of the Debtors is Brazil. *See In re Intercement Brasil S.A.*, 668 B.R. 802, 823 (Bankr. S.D.N.Y.) a(finding that restructuring activities occurring in Brazil as part of a mediation and extrajudicial proceeding "establish[ed] conclusively" that the COMI of a Dutch entity was Brazil); *In re Giftcraft Ltd.*, No. 25-11030 (MG), 2025 WL 1583480, at *10 (Bankr. S.D.N.Y. June 4, 2025) (considering pre-filing restructuring efforts in determining a debtor's COMI was in Canada); *In re Mega Newco Ltd.*, No. 24-12031 (MEW), 2025 WL 601463, at *4 (Bankr. S.D.N.Y. Feb. 24, 2025) (granting foreign main recognition, considering that no creditors had objected to recognition of a Scheme demonstrating that creditors had acquiesced in or supported the proposed COMI); *see also In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 783, 789 (Bankr. S.D.N.Y. 2022) ("Cayman court's supervision of the [scheme proceeding], in light of the other factors present here, is enough for the Court to conclude that the Debtor's COMI for the proceeding involving the single class of [existing noteholders] was in the Cayman Islands."); *In re Suntech Power*, 520 B.R. at 417 (finding COMI shifted to Cayman Islands from China as a result of Cayman scheme restructuring proceeding); *In*

36

*re Culligan Ltd.*, No. 20-12191, 2021 WL 278926, at *11–13 (Bankr. S.D.N.Y. 2021) (finding Bermuda COMI because Bermuda restructuring proceeding made Bermuda law "applicable with respect to any disputes arising with respect to [that proceeding]").

73. Finally, for Braskem Netherlands, BT&S, and America Finance, although their financial statements are prepared and audited in the Netherlands or America, as relevant, they are sent to Brazil for consistency, approval, and consolidation with the Company's financial statements. As a part of the Company's consolidated financial statements, these Debtors' accounts are audited following instructions from the Braskem Group's auditor located in Brazil.[16]

### 2. The COMI for Braskem Parent is Brazil

74. Braskem Parent is incorporated in Brazil and headquartered in Brazil, which makes its COMI presumptively Brazil. 11 U.S.C. § 1516(c); *see also In re Olinda Star Ltd.*, 614 B.R. at 28, 40–41. This presumption cannot be rebutted in light of the deep and material connections that Braskem Parent has with Brazil, as further discussed above, and its lack of material connections to other jurisdictions.

### 3. The COMI for Each of the Other Debtors is Brazil

75. With respect to Braskem Netherlands, BNI, Netherlands Finance, BT&S, and America Finance,[17] though not registered there, each of their COMI is nevertheless squarely in Brazil.

---

[16] The financial statements for BNI and Netherlands Finance are prepared and audited in the Netherlands but as part of instructions received from Braskem Parent, are not sent to Brazil for consolidation given that (i) they are less complex in nature as financing entities and (ii) they primarily reflect intercompany transactions, which are eliminated on a consolidated level.

[17] Courts in this District have held that U.S. debtors may have their COMI in foreign jurisdictions when granting provisional relief. *See In re Iovate Health Scis. Int'l Inc.*, 673 B.R. 516, 533 (Bankr. S.D.N.Y. 2025); *In re Giftcraft Ltd.*, No. 25-11030 (MG), 2025 WL 1583480, at *9–10 (Bankr. S.D.N.Y. June 4, 2025); *In re Ascot Fund Ltd.*, 603 B.R. 271, 278–83 (Bankr. S.D.N.Y. 2019); *see also* Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Raízen S.A.*, No. 26-10528 (LGB) (Bankr. S.D.N.Y. Apr. 8, 2026), ECF No. 36 (finding COMI of U.S. debtor in Brazil).

76.     First, as an initial matter, the fact that these Debtors' registered offices are not in Brazil does not control the analysis; indeed, numerous Courts in this District have previously found in other chapter 15 cases that a chapter 15 debtor's COMI may be different from the location of its registered offices. *See, e.g.*, Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Raízen S.A.*, No. 26-10528 (LGB) (Bankr. S.D.N.Y. Apr. 8, 2026), ECF No. 36 (finding COMI for entities incorporated in the U.S., Luxembourg and Switzerland was Brazil); *In re InterCement*, 668 B.R. at 825–26 (finding COMI for entities incorporated in the Netherlands and Spain was Brazil); *Constellation I*, 600 B.R. at 237 (finding that the COMI for several entities incorporated outside Brazil was Brazil considering different factors and ties between such entities); *In re OAS*, 533 B.R. at 100–103 (finding that Austrian financing entities' limited Austrian activities, effected to maintain its corporate existence under Austrian law, did not detract from finding of COMI in Brazil); *In re Oi Brasil*, 578 B.R. at 234 (finding COMI for Dutch-incorporated SPV was Brazil notwithstanding its registered office in the Netherlands).

77.     Second, wherever their registered offices may be, each of the Debtors exists to support, directly and indirectly, the Brazilian operations of the Braskem Group.  BNI, Netherlands Finance, and America Finance (collectively, the "SPV Debtors") provide access to global markets and investors outside of Brazil and facilitate the flow of intercompany transactions, all for the benefit of the Company's Brazilian operations.  For example, proceeds of the Notes issued by the SPV Debtors were on-lent to Braskem Parent.  Likewise, Braskem Netherlands and BT&S provide services designed to facilitate the global trade of the Company's products to and from Brazil.  *See infra* ¶¶ 88–90.  These Debtors' critical function in the Braskem Group's Brazilian operations supports finding that the COMI of each is Brazil.  *See, e.g.*, *In re Iovate Health Scis. Int'l Inc.*, 673 B.R. 516, 533 (Bankr. S.D.N.Y. 2025) (finding that a U.S. debtor's COMI was likely in Canada

38

given that the debtor's operations were "all highly integrated and shared management, headquarters, and accounting/finance/HR functions," in spite of having eleven employees in the U.S. and its principal assets in the U.S.); *In re OAS S.A.*, 533 B.R. at 101–12 (location of group operations and of parent entity led to finding of COMI in the jurisdiction of the parent, not that of the individual debtor's registered office).

78.    Third, where a subsidiary entity is a holding company or a financing SPV "with no operations other than managing relationships with creditors and paying off obligations on behalf of a larger corporate parent, . . . [its COMI] should be determined by the location of the corporate 'nerve center.'" *See, e.g.*, *In re InterCement*, 668 B.R. at 822 (quoting *In re Oi Brasil*, 578 B.R. at 222–30); *In re OAS*, 533 B.R. at 102 (finding COMI of a foreign SPV to be in the jurisdiction of its corporate group largely because the SPV's "principal purpose [was] the financing of the operations of [the ultimate parent], its affiliates and direct and indirect subsidiaries"); *In re Suntech Power*, 520 B.R. at 416–17 (indicating that, at time of foreign filing, a holding company with no tangible assets or operations had its COMI in the functional nerve center of its corporate group, which was ascertainable to creditors); *see also In re SPhinX*, 351 B.R. at 117 (noting that a subsidiary's nerve center could very well sit with its parent company).

79.    The SPV Debtors are each limited in purpose, do not own any real estate and designed solely to support the corporate group. *See supra* ¶ 19. Additionally, the SPV Debtors are entirely reliant on their Brazilian affiliates' operations to service their debt obligations (which only exist in the first place to fund the operations of Braskem Group). *See id*. Further, the Notes made clear that an adverse change in the financial condition or results of the operations Braskem Parent and its subsidiaries would result in the failure of Netherlands Finance and America Finance to have funds sufficient to repay the Notes. *See id*.

39

80.    Lastly, the conclusion that Brazil is COMI for each of the Debtors is consistent with creditor expectations. *See In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."). As to the holders of the Notes, the Offering Memoranda made clear that Netherlands Finance, the issuer of each of the Dutch Notes, and America Finance, as issuer of the 2041 Notes, have no operations of their own and as such their ability to pay their obligations was dependent "upon the financial condition and results of operations of Braskem [S.A.] and its subsidiaries." *See, e.g.*, 2028 Notes OM at 14; 2041 Notes OM at 18; *supra* ¶ 25. Additionally, the Offering Memoranda made clear that if the Company was unable to pay amounts due under the guarantees, then it "may become subject to bankruptcy proceedings in Brazil." *See* 2028 Notes OM at 17; 2041 Notes OM at 21; *supra* ¶ 25. Given the more than 240 references throughout each of the Offering Memoranda to Brazil, finding that Brazil is the COMI for Netherlands Finance and America Finance is thus consistent with creditor expectation.

81.    For Braskem Netherlands, BT&S and BNI, finding Brazil as COMI for each is consistent with creditor expectation. These entities have limited creditors that are not affiliated Braskem Group entities. Furthermore, the Netherlands section of the Company's website refers entirely to information about Braskem Parent and the Company, rather than any information specific to the Dutch entities. Given that the logistics, shipping and trading activities of Braskem Netherlands and BT&S are so integrally tied to Brazil and the Braskem Group's Brazilian operations, there is nothing inconsistent about finding their COMI is Brazil is COMI.

a.    Netherlands Finance's COMI is in Brazil

82.    Netherlands Finance was established as an SPV to issue all of the Notes, except for the 2041 Notes (such Notes, the "Dutch Notes"), all of which are guaranteed by Braskem Parent. As a financing vehicle, and as disclosed in the offering memoranda for the Dutch Notes,

40

Netherlands Finance is dependent on the Braskem Group's Brazilian operations to repay its financial obligations. *See supra* ¶ 25. It on-lent the proceeds from the Dutch Notes, directly or indirectly, to Braskem Parent to fund, *inter alia*, their Brazilian operations, as well as certain other Debtors, resulting in certain intercompany loans in favor of Netherlands Finance. Netherlands Finance does not own any real estate, any physical assets, and although it has four employees, one of whom is a Brazilian national and all of whom support treasury and tax functions, in the Netherlands, it is reliant on central management and decision-making support from the Braskem Group's São Paulo nerve center. Netherlands Finance does not maintain its own physical office in Rotterdam separate from its direct parent, Braskem Netherlands.

83.   As a matter of compliance with local regulatory and tax authority, Netherlands Finance has two classes of statutory directors, as only Dutch residents can be appointed as managing directors in one of the two classes. Netherlands Finance currently has two managing directors, both of whom are Brazilian citizens (one is a dual citizen of Spain) located in the Netherlands. Pursuant to its Articles of Association, the managing directors of Netherlands Finance owe duties to both Netherlands Finance and the enterprise connected with it (i.e., Braskem Group).

84.   As the Offering Memoranda of the Dutch Notes made clear, Netherlands Finance: (i) is subject to the risks associated with the Company's operations in Brazil, (ii) has no means of repaying its obligations other than from revenue generated by the Braskem Group's operations, and (iii) does not have its own investor relations, and directs all investor inquiries to the "principal executive office" of the Braskem Group in Brazil. Courts have found that creditor expectations— as evidenced by disclosures in the Braskem Group's debt documents, including references to risk factors in the parent company's jurisdiction—and financial dependence on the parent entities, as

41

discussed *supra* ¶¶ 78–79, support a finding that, here, Netherlands Finance's COMI is unquestionably in Brazil. *See In re Oi Brasil*, 578 B.R. at 228–230; *see also In re InterCement*, 668 B.R. at 822–23 (granting foreign main recognition of a Brazilian insolvency proceeding for an SPV domiciled outside of Brazil in part given the disclosures in the governing indentures that (i) the SPV had no operations or business other than issuing notes and other indebtedness and (ii) explained the SPV's dependence on the Brazilian parent to repay its obligations); *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 788 (Bankr. S.D.N.Y. 2022) (discussing relevance of disclosures in offering memorandum to creditor expectations); *In re OAS*, 533 B.R. at 102 (discussing, *inter alia*, disclosures in offering memorandum about consolidated financial statements, business operations of group as a whole, and centralized investor relations through parent company in finding that SPV's COMI was in Brazil where parent company was located).

b.      America Finance's COMI is in Brazil

85.     America Finance was established as an SPV to issue the 2041 Notes. As a financing vehicle, it is dependent on the Braskem Group's Brazilian operations to repay its financial obligations. *See supra* ¶ 25. Like Netherlands Finance, it on-lent the proceeds from the 2041 Notes, directly or indirectly, to other members of the Braskem Group, including Braskem Parent, as well as certain non-Debtor Braskem entities including, without limitation, Braskem America, Inc., resulting in certain intercompany loans in favor of America Finance. Braskem America, Inc. is the direct provider of the cash used to pay interest on the 2041 Notes. The 2041 Notes are also guaranteed by Braskem Parent, a Brazil-based member of the Braskem Group. America Finance does not own any real estate, has no physical assets of its own, and has no employees. It is reliant on central management and decision-making support from the Braskem Group's São Paulo nerve center. America Finance does not maintain a physical office in the U.S.—its registered office address is the Corporation Service Company in Delaware, which is its registered service agent.

42

One of the directors of America Finance is a Brazilian citizen located in Brazil, the other is a dual citizen of Argentina and the U.S. who is located in the U.S.

86.     The risk factors in the 2041 Notes included disclosures similar to the Dutch Notes with respect to America Finance's ties to Brazil, including that it had no operations of its own, that its ability to pay its debts is entirely dependent on the Brazilian operations of Braskem Parent, and that it may become subject to bankruptcy proceedings in Brazil.  *See supra* ¶ 25; *see also In re Oi Brasil*, 578 B.R. at 228–230; *see also In re InterCement*, 668 B.R. at 822–23; *In re Modern Land (China) Co., Ltd.*, 641 B.R. at 788; *In re OAS*, 533 B.R. at 102.

c.     BNI's COMI is in Brazil

87.     As an SPV, BNI is a financial services entity with no operations of its own and its primary purpose is to facilitate financial intercompany transactions between the European and Brazilian entities in the corporate structure.  To do so, it has three main functions: (i) obtaining and providing intercompany loans from Braskem Netherlands and Netherlands Finance to Braskem Parent to ensure allocation of cash among Braskem Group entities, and to perform related treasury activities, (ii) to incorporate, participate, manage or otherwise take a financial interest in other companies and undertakings, and (iii) to provide financial support to other entities in the Braskem Group to meet their financing needs.  As an SPV, BNI owns no real estate and has no operations of its own other than providing financial services.  BNI is highly integral to, and a critical part of, the Company's operations in Brazil, and strategic decisions involving BNI are directed from Brazil.  *See In re Fairfield Sentry Ltd.*, 714 F.3d at 138 n.10 (citing *Hertz Corp. v. Friend*, 559 U.S. 77 (2010)) ("[A] court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI."). As required by local regulatory and tax authority, BNI must have at least fifty percent of its

43

statutory board consisting of Dutch residents.  Its two statutory directors are domiciled in the Netherlands, but both are Brazilian citizens (one is a dual Spanish citizen).

d. Braskem Netherlands's COMI is in Brazil

88. Braskem Netherlands, along with its direct subsidiary BT&S, carries out commercial activities that are purely ancillary to the Company's operations in Brazil.  Its main purpose is to serve as an international holding and trading company of the Braskem Group to support the sales, marketing and distribution of petrochemical products.  *See supra* ¶ 19.  As the holding company for the Braskem Group's foreign companies segment, it facilitates the distribution of petrochemical resins produced in Brazil throughout Europe and Asia.  Braskem Netherlands also plays a significant role in raising funds to finance the Braskem Group's activities in Brazil and its ability to repay its creditors is heavily dependent on the Company's Brazilian operations.  Braskem Netherlands's management comprises both a Supervisory Board and Managing Board.  All three of the directors on the Supervisory Board, which provides oversight and strategic guidance to the Managing Board, are located in Brazil and two are Brazilian citizens. *See In re Serviços de Petróleo Constellation S.A. ("Constellation I"),* 600 B.R. 237, 288 (Bankr. S.D.N.Y. 2019) (location of staff in charge of operations and management relevant factor for COMI analysis); *see also In re OAS*, 533 B.R. at 101-12 (location of group operations and of parent entity led to finding of COMI in the jurisdiction of the group, not that of the individual debtor's registered office).  As a matter of compliance with regulations from local regulatory and tax authorities, and like Netherlands Finance and BNI, Braskem Netherlands has two classes of managing directors.  The Managing Board, which is subordinate to the Supervisory Board, comprises two Brazilian citizens domiciled in the Netherlands and one Dutch citizen domiciled in the Netherlands.  The Supervisory Board provides the Managing Board with oversight, strategic guidance and advice on the Company's affairs and long-term goals.

44

e.    BT&S's COMI is in Brazil

89.    BT&S's main purpose is to support the Braskem Group's international trading and shipping functions in Brazil, as well as Europe and Asia.  It also functions as a holding company of several SPVs for contracted bareboat vessels that frequent Brazilian ports.  As such, BT&S's operations are heavily intertwined with Brazil in particular because it facilitates the purchase and sale of thermoplastic resins produced by Braskem, particularly in Brazil, worldwide.  It also purchases naphtha and other bio-based and circular feedstock products from third-party suppliers in various markets worldwide to supply to Braskem Parent.  BT&S undertakes three primary types of intercompany transactions: (i) the sale of naphtha and other feedstock to Braskem Parent in Brazil and its non-Debtor affiliate, Braskem Idesa S.A.P.I. ("Braskem Idesa"), (ii) the purchase of basic chemicals from Braskem Parent for resale to the external market, and (iii) leasing vessels from its subsidiary SPVs and subsequent subleasing to non-Debtor affiliates.  BT&S has three statutory directors located in the Netherlands, two of whom are Brazilian nationals.

90.    As one of the Company's main conduits to the global markets, at any given time, BT&S's activity may not appear to be focused in any one market around the world, but regardless of the focus of that activity, the strategic direction guiding that activity is always provided by the Company's headquarters in São Paulo.  That centralized strategic direction is critical for BT&S to fulfil its purpose of optimizing the Braskem Group's network and maximizing profitability for the Company as an enterprise.  As such, given BT&S's function as a for the Brazilian operations in the European and Asian markets, whereby the vast majority of purchase and sale operations are directed to or sourced from Brazil, the facts support a determination that BT&S's COMI is in Brazil.

***

45

91.    In sum, the operations and services of the Debtors are highly interdependent and effectively form a single, integrated economic unit where material aspects of the Company's operations, finances, corporate management, employee management, and short-and long-term strategic planning are based in Brazil.  *See In re Serviços de Petróleo Constellation S.A.* ("*Constellation I*")*,* 600 B.R. 237, 288 (Bankr. S.D.N.Y. 2019) (location of staff in charge of operations and management relevant factor for COMI analysis); *see also In re OAS S.A.*, 533 B.R. at 101-12 (location of group operations and of parent entity led to finding of COMI in the jurisdiction of the group, not that of the individual debtor's registered office); *Kelly v. U.S. Steel Corp.*, 284 F.2d 850, 854 (3d Cir. 1960); *see also Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F.Supp.2d. 205, 215 (S.D.N.Y. 2006); *cf. In re Fairfield Sentry*, 714 F.3d at 138 n.10 (courts may consider a debtor's principal place of business in determining the debtor's COMI).  For the reasons set forth above, the COMI for each Debtor is in Brazil, and the Brazilian Proceeding should be recognized as the foreign main proceeding for each Debtor pursuant to section 1517(b)(1) of the Bankruptcy Code.

C.     **The Petitioner is a Proper "Foreign Representative"**

92.    The Petitioner is the proper "foreign representative" of the Brazilian Proceeding, thereby satisfying sections 101(24) and 1517(a)(2) of the Bankruptcy Code.  Section 101(24) of the Bankruptcy Code provides that "[t]he term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).  The Bankruptcy Code does not require that the foreign representative be appointed by the foreign court.  Instead, a debtor may appoint a foreign representative pursuant to corporate authorizations.  *See, e.g., In re Agro Santino, OOD*, 653 B.R. 79, 94 (Bankr. S.D.N.Y. 2023) ("[I]n considering whether a person may serve as

46

a foreign representative, the Court does not look to foreign law governing appointments—it looks to section 101(24)."); *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 183 (Bankr. S.D.N.Y. 2022) (holding that the foreign representative duly authorized by the chapter 15 debtors' board was a foreign representative within 11 U.S.C. §101(24) and citing Collier on Bankruptcy ¶ 13.04 (16th ed. 2022.) ("[w]here the debtor remains in charge of its own affairs, the debtor itself might be able to appoint its own representative for this purpose, without express court sanction"); *Constellation I*, 600 B.R. at 270 (recognizing as proper a foreign representative authorized under resolutions to commence a chapter 15 case on behalf of each of the debtors); *In re Oi Brasil*, 578 B.R. at 183 (recognizing appointment of foreign representative "pursuant to resolutions and powers of attorney signed by authorized representatives of" the foreign debtors); *In re OAS*, 533 B.R. at 95 (holding that the "Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative"); *In re Americanas S.A.*, No. 23-10092 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) (appointing a foreign representative that the chapter 15 debtors' governing body authorized).

93. Here, the Petitioner is the person that has been duly appointed by the Debtors to act as the representative of the Brazilian Proceeding in these Chapter 15 Cases in accordance with section 101(24) of the Bankruptcy Code and has been granted authority to commence these Chapter 15 Cases by appropriate corporate approvals under applicable law. *See* Resolutions attached to Voluntary Petition. As explained in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law authorizes the Debtors' management to continue to administer the reorganization of their assets and affairs throughout the Brazilian Proceeding. Brazilian Counsel Decl. ¶ 18. This Court has recognized that the appointment of foreign representatives in similar manners is acceptable for purposes of commencing chapter 15 cases. *See, e.g.*, Order Granting Recognition

47

of Foreign Main Proc., *In re Mina Tucano Ltda.*, No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022), ECF No. 26 (approving the verified petition where the foreign representative was authorized by chapter 15 debtors' corporate resolution); *Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*, 470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates "self-management" during the proceeding similar to that of a debtor in possession, fit within the scope of the definition of "foreign representative," and recognizing the individual as the foreign representative).

### D.   The Petition was Properly Filed Under Sections 1504 and 1509 and Meets the Requirements of Section 1515 and Bankruptcy Rule 1007(a) (4)

94.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meet the procedural requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(3). Here, all of section 1515's procedural requirements are satisfied.

95.    First, the Petitioner duly and properly commenced these Chapter 15 Cases in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the Petition with all the documents and information required by sections 1515(b) and 1515(c). *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) (*"Bear Stearns I"*) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.").

96.    Second, in accordance with sections 1515(b)(1)–(3) of the Bankruptcy Code, the Petitioner has submitted evidence of the existence of the Brazilian Proceeding and the appointment

48

of the foreign representative.  *See* Brazilian Counsel Decl., Exs. E–F; *see also* Voluntary Petitions. *See, e.g.*, *In re Vitro*, 470 B.R. 408; *see also* OAS, 533 B.R. at 93 (*citing In re Vitro*, 701 F.3d at 1046).

97.    Third, in accordance with section 1515(c) of the Bankruptcy Code, the Petitioner filed together with the Petition a statement identifying all the foreign proceedings with respect to the Debtors.  As set forth in such statement, the Brazilian Proceeding is currently pending with respect to the Debtors.

98.    Fourth, the Foreign Representative has also satisfied the additional requirements set forth in Rule 1007(a)(4) of the Bankruptcy Rules by including the following in the Petition: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1, with respect to each of the Debtors; and (b) a list containing the names and addresses of all persons or bodies authorized to administer the foreign proceedings of the Debtors and all parties to litigation pending in the U.S. in which the Debtors are a party at the time of the filing of the Petition.  *See supra* ¶ 50.

## III.    ALTERNATIVELY, THE COURT SHOULD FIND THAT THE BRAZILIAN PROCEEDING IS A FOREIGN NONMAIN PROCEEDING FOR EACH OF THE DEBTORS OTHER THAN BRASKEM PARENT AND GRANT DISCRETIONARY RELIEF

99.    As demonstrated above, the Brazilian Proceeding should be recognized as the "foreign main proceeding" for each of the Debtors.  Should this Court conclude, however, that the Brazilian Proceeding is not qualified as the foreign main proceeding of any of the Debtors, the Foreign Representative submits that, in the alternative, the Brazilian Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) for any such Debtor pursuant to section 1517(b)(2) of the Bankruptcy Code, and that discretionary relief, including the application of a protective stay to the full extent set forth in section 362, should be

49

granted with respect to such debtors and their U.S.-located property.  11 U.S.C. §§ 1517(b)(2),

1521(a).

> A.   **The Brazilian Proceeding Satisfies the Requirements for Recognition as a "Foreign Nonmain Proceeding"**

100.   A "foreign nonmain proceeding" is defined as a "foreign proceeding, other than a

foreign main proceeding, pending in a country where the debtor has an establishment."  11 U.S.C.

§ 1502(5).  Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of

operations where the debtor carries out a non-transitory economic activity." 11 U.S.C. § 1502(2).

Whether a debtor has an establishment in a particular location is "essentially a factual question,"

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 389 B.R. 325, 338

(S.D.N.Y. 2008) ("*Bear Stearns II*"), and the petitioner bears the burden of proof.  *See In re Brit.*

*Am. Ins. Co.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010).

101.   The Bankruptcy Code does not define "non-transitory economic activity," and, as

this Court has noted, "[t]here is relatively little U.S. authority construing the term 'establishment'

as it is used in chapter 15." *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R.

63, 84 (Bankr. S.D. N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012).  Indeed, "[n]either Chapter

15 nor its legislative history explain what it means for a debtor to have 'any place of operations'

or to have 'been carrying on a non-transitory economic activity' in a location." *Lavie v. Ran (In*

*re Ran)*, 607 F.3d 1017, 1027 (5th Cir. 2010) (citing H.R. No. 109-31, pt. 1, at 107 (2005)).

102.   Accordingly, U.S. courts have interpreted the meaning of "establishment" in the

context of the purpose of chapter 15 and the Model Law and by looking to the meaning ascribed

to such term by foreign courts. *See, e.g.*, *In re Millennium Glob.*, 458 B.R. at 84 n.49; *Bear Stearns*

*I*, 374 B.R. at 131 n.12.  The limited number of U.S. courts to consider the question have

determined a debtor has an "establishment" in a place where it has operations, conducts business,

50

or otherwise carries out a non-transitory economic activity in that jurisdiction. *See, e.g.*, *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 92 n.8 (Bankr. S.D.N.Y. 2012); *Bear Stearns I*, 374 B.R. at 131; *In re Creative Fin., Ltd.*, 543 B.R. 498, 520 (Bankr. S.D. N.Y. 2016); *In re Brit. Am.*, 425 B.R. at 916. Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *In re Millennium Glob.*, 458 B.R. at 85; *see In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 784 (Bankr. S.D.N.Y. 2022). A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *In re Creative Fin.*, 543 B.R. at 520; *In re Brit. Am.*, 425 B.R. at 915, evidenced by, among other things, "fees paid to retain local counsel and commitment of capital to local banks." *In re Millennium Glob.*, 458 B.R. at 85.

103. Courts in this district have emphasized that the threshold for proving an "establishment" is not high. *See In re Mood Media Corp.*, 569 B.R. 556, 563 (Bankr. S.D.N.Y. 2017) (stating that "not much is needed" to demonstrate that an establishment exists); *see also Constellation I*, 600 B.R. at 277 (recognizing an establishment were the debtor maintained at least "a base level of connection").

104. Here, even if the Court were to find that Brazil is not the COMI for any of the Debtors, the Court should still find that they each have an establishment in Brazil for purposes of chapter 15 recognition as each has a "base level of connection" to Brazil. All of the Debtors play a critical role in the lifecycle of Braskem's Brazilian petrochemical operations. Braskem Netherlands and BTS are integral to the sale of feedstock to Braskem Parent, the purchase of basic petrochemicals from Braskem Parent, and the shipping and import/export of both for the benefit

51

of the Braskem Group. The SPV Debtors play an integral but limited role in the financing of the Brazilian operations as discussed above. *See supra* ¶¶ 19, 78–79, 82–87.

105. Braskem Netherlands and BT&S are responsible for facilitating Braskem Parent's transactions with the European and Asian marketplace. To do so, Braskem Netherlands and BT&S buy, sell and/or export in the Brazilian marketplace through Braskem Parent *See supra* ¶¶ 88–90. Furthermore, certain of the vessels that BT&S's subsidiaries lease (the vessels that transport naphtha) routinely stop in Brazilian ports as part of their operations.

106. In light of the foregoing, The Petitioner submits that the foregoing evidence in support of finding that the COMI of each of the Debtors is in Brazil also provides sufficient evidence that each of these Debtors has an impact on the Brazilian marketplace and therefore maintains an establishment in that jurisdiction.

**B. Discretionary Relief Under Section 1521 of the Bankruptcy Code is Warranted**

107. Regardless of whether the Court finds that the Brazilian Proceeding is a main proceeding or nonmain proceeding with respect to the non-Brazilian-incorporated Debtors, the Petitioner requests that the Court grant discretionary relief with respect to each Debtor and their U.S.-located property pursuant to section 1521 of the Bankruptcy Code. Specifically, the Petitioner requests that any protective relief that is the subject of the Provisional Relief Motion be extended pursuant to section 1521(a)(6) of the Bankruptcy Code, [18] including the continued application of the section 362 stay with respect to any such Debtor and its property within the

---

[18] Section 1521(a) provides that, upon recognition of a foreign main proceeding or nonmain proceeding and at the request of the foreign representative, a court may grant (with exceptions not here relevant) "any appropriate relief" necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors, including "extending relief granted under section 1519(a)." 11 U.S.C. § 1521(a)(6). Even if this Court does not recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to any of the Debtors, section 1521 relief is available where "the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding." 11 U.S.C. § 1521(c).

territorial jurisdiction of the United States.[19] *See* 11 U.S.C. § 1521(a)(6); Provisional Relief Mot. ¶¶ 40–43. The Petitioner submits that the foregoing evidence concerning the non-Brazilian Debtors and their integral role within the Braskem Group justifies such discretionary relief, which is critical for the maintenance of the status quo and the preservation of the Debtors' going-concern value.

108. To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law). Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H.R. No. 109-31, pt. 1, at 116 (2005). A determination of sufficient protection requires a balancing of the respective parties' interests. *CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *see In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").[20]

109. Here, the balance of interests weighs in favor of granting the relief requested. First, recognition and the application of the stay will allow for the efficient and orderly administration

---

[19] Notably, the Petitioner is entitled to the continued application of the protective stay even if the Court were to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to any of the Debtors because "chapter [15] gives the bankruptcy court the ability to grant substantially the same types of relief in assistance of foreign nonmain proceedings as main proceedings." *In re SPhinX*, 351 B.R. at 116.

[20] The analysis of whether the relief sought provides sufficient protection requires a balancing of the interests of the debtor and other affected parties to ensure that the relief does not "impinge excessively on any one entity's interests" and that "each entity must receive at least some protection." *See Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14, 27–28 (4th Cir. 2013) ("The analysis required by § 1522(a) is . . . best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test"). Importantly, courts recognize that interests of the various parties are often at odds with one another and "protection to one side might well come at some expense to the other." *Id*. at 27. A balancing test requires the court to consider "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Artimm, S.r.l.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005).

of the Debtors' assets and affairs in a centralized, organized mediation, and potential restructuring process (*i.e.*, the Brazilian Proceeding), thus protecting the interests of all creditors and maximizing the value of assets by preventing certain opportunistic creditors from circumventing the Brazilian Proceeding and commencing self-serving actions in the United States at the expense of the broader process.

110.   As set forth in the Brazilian Counsel Declaration, the Brazilian Proceeding provides creditors and stakeholders with many of the same procedural safeguards present in chapter 11 of the Bankruptcy Code thereby ensuring a fair and equitable process. *See* Brazilian Counsel Decl. ¶¶ 62–65. The stay will not bar or otherwise disenfranchise parties from participating in the Brazilian Proceeding, where each creditor's right to be heard will remain unaffected. Nor will the requested stay preclude a creditor that feels unduly burdened by the Court's grant of the requested relief to seek to lift the stay for "cause." *See, generally*, 11 U.S.C. § 362(d). Instead, the Petitioner merely seeks to prevent creditors from attempting to end-run the Brazilian Proceeding at the expense of all creditors. Accordingly, any prejudice to creditors caused by the discretionary relief requested is extremely limited.

111.   In contrast, failure to grant the discretionary relief requested will cause tremendous harm to the Debtors and their stakeholders. As detailed more fully in the Petitioner's Provisional Relief Motion, absent relief, the Debtors are at risk of adverse creditor action that could threaten their ability to continue as a going concern. Provisional Relief Mot. ¶¶ 28–31. Accordingly, the balance between the minimal harm to those seeking to bring adverse actions against the Debtors,

54

and the significant harm to the Debtors and the orderly administration of the Debtors' assets that would be caused by such actions, weighs in favor of granting the discretionary relief requested.[21]

\* \* \*

112.   For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and that the Debtors are entitled to the relief provided by section 1520 of the Bankruptcy Code. Thus, the Court should enter the Proposed Order attached hereto as **Exhibit A** recognizing the Brazilian Proceeding as the foreign main proceeding.

## NOTICE

113.   Notice of the Verified Petition has been provided to the parties (the "Notice Parties") set forth in **Exhibit B** attached hereto (the "Notice List").   The Petitioner respectfully submits that no other or further notice is required. *See also Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief*, filed contemporaneously herewith.

## NO PRIOR REQUEST

114.   No previous request for the relief requested herein has been made by the Debtors to this or any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that the Court (1) grant the Verified Petition and enter the Proposed Order annexed hereto as **Exhibit A** recognizing the Brazilian Proceeding as the foreign main proceeding for the Debtors and granting

---

[21]   Further, the Petitioner demonstrates in the Provisional Relief Motion that all parties in interest will be sufficiently protected by the Court's grant of the discretionary relief requested. *See* Provisional Relief Motion ¶¶ 59–60.

the related relief in connection therewith and (2) grant such other and further relief as the Court

deems just and proper.

Dated: June 29, 2026
New York, New York

Respectfully submitted,


By: */s/ Thomas S. Kessler*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper
Thomas S. Kessler
David Z. Schwartz
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for Antonio Reinaldo Rabelo Filho, as
Petitioner and Foreign Representative*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, I, Antonio Reinaldo Rabelo Filho declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative of the Debtors with respect to the Brazilian Proceeding for purposes of these Chapter 15 Cases. I declare under penalty of perjury that the factual contents of the foregoing Verified Petition as well as the factual contents of each of the attachments and appendices thereto are true and accurate to the best of my knowledge, information, and belief, and I respectfully represent as follows:

I reside at Rua Barão da Torre, 550, Apt. 201, Ipanema, Rio de Janeiro, Brazil. I hold a law degree from the Federal University of Bahia, a post-graduate degree in business law from IBMEC/RJ, and a Master's degree in tax law from Pontifical Catholic University of São Paulo. I began my career at PWC Brasil, from where I left to work for the Oi Group ("<u>Oi</u>") in 2000. In Oi, I held positions in the financial and legal departments and served on the tax legal board from 2007 to 2017. Since 2017, I started my own law firm practice. I am also a member (vice president) of the National and State Commission of Bankruptcy of the Brazilian Bar Association.

In particular, I served as the foreign representative of Oi's chapter 15 proceeding in front of this Court and the judicial reorganization proceeding in front of the United Kingdom court, where I negotiated with various creditors and implemented Oi's restructuring plan internationally in Brazil, USA, Netherlands, and Portugal. I also acted as the foreign representative of the chapter 15 cases for (i) Americanas S.A. and its affiliates and (ii) InterCement Brasil S.A. and its affiliates before this Court, as well as for Light S.A. – Em Recuperação Judicial before the U.S. Bankruptcy Court for the Southern District of Texas.

On June 24, 2026, each of the other Debtors appointed me as their foreign representative and the foreign representative of the Brazilian Proceeding and authorized me to file the Verified

Petition and to act on their behalf in these Chapter 15 Cases.  Accordingly, I am fully authorized and take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon the following: (a) my review of relevant information, data, and documents (including oral information) furnished to me by the Debtors and its legal advisors; (b) information supplied to me by the Debtors' officers, directors, employees, and professionals; or (c) my analyses of the information I have received on the Debtors' operations and financial condition. I have also been kept abreast of major discussions with stakeholders, including the Debtors' primary financial creditors.  I am an individual over the age of 18.  If I am called to testify, I will do so competently and based on the facts set forth herein.

*[Remainder of Page Left Intentionally Blank]*

Dated: June 29, 2026
Respectfully submitted,

_____
Antonio Reinaldo Rabelo Filho

*As Foreign Representative of the Debtors*

59

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 26-11522 (MEW) |
| Braskem S.A., *et al.*,[1] | ) | |
| | ) | Chapter 15 |
| Debtors in a Foreign Proceeding. | ) | (Jointly Administered) |
| | ) | |

**ORDER GRANTING RECOGNITION OF FOREIGN**
**MAIN PROCEEDING AND CERTAIN RELATED RELIEF**

Upon the *Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief pursuant to 11 U.S.C. §§ 105, 1515, 1517, 1520, and 1521* (the "Verified Petition")[2] dated June 26, 2026, Antonio Reinaldo Rabelo Filho (the "Petitioner" or "Foreign Representative"), in his capacity as the duly-appointed foreign representative of the above-captioned debtors (collectively, the "Debtors") in the jointly-administered protective injunction proceeding in support of a court supervised interim mediation process (the "Brazilian Mediation"[3] and together with the protective injunction proceeding, the "Brazilian Proceeding") that is in furtherance or in preparation of either an extrajudicial proceeding (*recuperação extrajudicial*) (the "Brazilian EJ") or a judicial reorganization (*recuperação judicial*) (the "Brazilian RJ") of the Debtors commenced on June 24, 2026 pursuant to Federal Law No. 11.101 of February 9, 2005 (as modified, the "Brazilian Bankruptcy Law"), of the laws of the Federative

---

[1]     The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Braskem S.A. (01-70–Brazil); Braskem Netherlands B.V. (6B01–Netherlands); Braskem Netherlands Inc., B.V. (9B01–Netherlands); Braskem Netherlands Finance B.V. (5B01–Netherlands); Braskem Trading & Shipping B.V. (7B01–Netherlands); and Braskem America Finance Co. (1581–US).

[2]     Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Verified Petition.

[3]     For ease of reference, the term "Brazilian Mediation" refers to both the protective injunction proceeding and the court supervised mediation process collectively.

Republic of Brazil ("Brazil"), pending before the 2nd Bankruptcy and Reorganization Division of the São Paulo State Court of Justice (the "Brazilian Bankruptcy Court"),[4] requesting this Order (the "Order") (a) granting the Verified Petition and recognizing the Brazilian Proceeding as the foreign main proceeding for the Debtors pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code"), and all relief included therewith as provided in section 1520 of the Bankruptcy Code; (b) finding that the Petitioner is the duly-appointed foreign representative, as defined in section 101(24) of the Bankruptcy Code, of the Brazilian Proceeding for each of the Debtors for purposes of these proceedings; and (c) granting such other and further relief as the Court deems just and proper; and this Court having reviewed (i) the Forms of Voluntary Petition, (ii) the Verified Petition, along with the exhibits annexed thereto, (iii) the *Declaration of Ana Elisa Laquimia Pursuant to 28 U.S.C. § 1746 In Support of the Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* (the "Brazilian Counsel Declaration") filed contemporaneously therewith, and (iv) the statements of counsel with respect to the Verified Petition at a hearing before this Court (the "Hearing"); and appropriate and timely notice of the filing of the Verified Petition and the Hearing having been given in accordance with the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* (the "Notice Order") (ECF No. ●); and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the evidence admitted by the Court at the Hearing including the Verified Petition, the Brazilian Counsel Declaration, and all other

---

[4]    The case number for the Brazilian Proceeding before the Brazilian Bankruptcy Court is 4113246-86.2026.8.26.0100.

2

pleadings and papers in these chapter 15 cases (the "Chapter 15 Cases") establish just cause to grant the relief ordered herein; and after due deliberation thereon;

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.).

C.      This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

D.      Venue for this proceeding is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

E.      The Petitioner has been (i) duly appointed to act as the "foreign representative," within the meaning of section 101(24) of the Bankruptcy Code, of the Brazilian Proceeding with respect to the Debtors and (ii) authorized to commence and prosecute these Chapter 15 Cases.

F.      These Chapter 15 Cases were properly commenced on June 26, 2026 by the Foreign Representative pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

3

G.      The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code, Bankruptcy Rules 1007(a)(4), 2002(q) and 7007.1, and Rules 2002-4 and 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

H.      The Brazilian Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

I.      The Brazilian Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

J.      The COMI of each of the Debtors is in Brazil.  Accordingly, the Brazilian Proceeding is the "foreign main proceeding" of each of the Debtors, as that term is defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as such pursuant to section 1517(b)(1) of the Bankruptcy Code.

K.      The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Debtors, their creditors and other parties in interest.

L.      Appropriate notice of the filing of and the Hearing on the Verified Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

For all of the foregoing reasons, and for the reasons stated by the Court at the Hearing and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Verified Petition is GRANTED as set forth herein.

4

2.      The Petitioner is the duly appointed foreign representative of the Brazilian Proceeding with respect to the Debtors, within the meaning of section 101(24) of the Bankruptcy Code, and is authorized to act on behalf of each of the Debtors in these Chapter 15 Cases.

3.      The Brazilian Proceeding is granted recognition as the foreign main proceeding of each of the Debtors pursuant to section 1517 of the Bankruptcy Code.

4.      All relief and protection afforded to foreign main proceedings under section 1520 of the Bankruptcy Code are hereby granted to the Brazilian Proceeding, the Petitioner, the Debtors and the property of the Debtors that is within the territorial jurisdiction of the United States, as applicable, including application of section 362 of the Bankruptcy Code with respect to each of the Debtors and the property of the Debtors that is within the territorial jurisdiction of the United States, subject to the exceptions to section 362 that are set forth in the Bankruptcy Code.

5.      Notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered and may in its discretion and without further delay take any action and perform any act necessary to implement and effectuate the terms of this Order.

6.      A copy of this Order shall be served by the Petitioner within seven business days of entry of this Order by email, first class mail, or overnight courier on the Notice Parties (as defined in the Notice Order), and such service shall be good and sufficient service and adequate notice for all purposes.

7.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, enforcement, amendment or modification of this Order.

5

Dated: New York, New York
     _____, 2026

_____
UNITED STATES BANKRUPTCY JUDGE

6

**EXHIBIT B**

**Notice Parties List**

**Via E-mail**

| Notice Party Name | Notice Party Address |
| --- | --- |
| Judge's Chambers, Bankruptcy Court, SDNY | Hon. Michael E. Wiles |
| **The United States Trustee** | |
| Office of the United States Trustee | William K. Harrington, USTP.Region02@usdoj.gov<br><br>Annie Wells, Annie.Wells@usdoj.gov<br><br>Linda Riffkin, Linda.Riffkin@usdoj.gov |
| **Counsel to the Chapter 15 Debtors** | |
| Cleary Gottlieb Steen & Hamilton LLP (Counsel to the Braskem Group) | Attn:<br><br>Richard J. Cooper, rcooper@cgsh.com<br>Thomas S. Kessler, tkessler@cgsh.com<br>David Z. Schwartz, dschwartz@cgsh.com<br>John Veraja, jveraja@cgsh.com<br>Timothy Wolfe, twolfe@cgsh.com<br><br>One Liberty Plaza, New York, NY 10006 |
| **Counsel to the Ad Hoc Group of Noteholders and Debenture Holders** | |
| Davis Polk & Wardwell LLP (Counsel to Ad Hoc Group of Noteholders and Debenture Holders) | Attn:<br><br>Timothy Graulich, timothy.graulich@davispolk.com<br>David Schiff, david.schiff@davispolk.com<br><br>450 Lexington Avenue, New York, NY 10017 |
| **Counsel to the Steering Group of Lenders** | |
| Freshfields LLP (Counsel to the Steering Group of Lenders) | Attn:<br><br>Scott Talmadge, scott.talmadge@freshfields.com<br>Mark Liscio, mark.liscio@freshfields.com<br><br>3 World Trade Center, 175 Greenwich St. 51st Floor, New York, NY 10007 |
| **Others** | |
| Depository Trust Company | conversionsandwarrantsannouncements@dtcc.com |
| **Chapter 15 Creditors** | |

| Braskem S.A. | Notice Party Address |
|---|---|
| Banco Latinoamericano de Comercio Exterior S.A. | g_backofficeprestamos@bladex.com |
| Banco Safra S.A. | tatiana.guimaraes@safra.com.br |
| Citibank | rai.curtolo@citi.com; Loans.AgencyUS@sc.com |
| Citibank, N.A. | francine.lima@citi.com |
| Crédit Agricole Corporate and Investment Bank | felix.vasquez@ca-cib.com |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main | credit.service@dzbank.de |
| Eco Securitizadora de Direitos Creditórios do Agronegócio S.A. | controleoperacional@ecoagro.agr.br |
| Itau Unibanco S.A. | atendimentolarge@itaubba.com |
| Kfw IPEX-Bank GmbH | nicole.keller@kfw.de |
| Pentágono S.A. Distribuidora de Títulos e Valores Mobiliários | assembleias@pentagonotrustee.com.br |
| Sumitomo Mitsui Banking Corporation | bcdadagencyspecialproducts@smbcgroup.com |
| Terminal Química Puerto Mexico S.A.P.I. de C.V | cts.spag@citi.com |
| **Braskem America Finance Company** | **Notice Party Address** |
| The Bank of New York Mellon | joanne.adamis@bny.com |
| **Braskem Trading & Shipping B.V.** | **Notice Party Address** |
| Banco Latinoamericano de Comercio Exterior S.A. | mbertolucci@bladex.com |
| Banco Santander S.A. | globalmotrade@gruposantander.com; gtfdmiddleoffice@smbcgroup.com; Loans.AgencyUS@sc.com |
| BNP Paribas Securities Corp | nyk_gtbmo_gts@us.bnpparibas.com |
| Citibank | rai.curtolo@citi.com; Loans.AgencyUS@sc.com |
| Crédit Agricole Corporate and Investment Bank | Thibault.berger@ca-cib.com |
| Deutsche Bank Aktiengesellschaft | gui.leporace@db.com; Loans.AgencyUS@sc.com |

| | |
|---|---|
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main | credit.service@dzbank.de; gtfdmiddleoffice@smbcgroup.com; Loans.AgencyUS@sc.com |
| Kfw | nicole.keller@kfw.de; gtfdmiddleoffice@smbcgroup.com |
| Mizuho Bank, Ltd | sandy.sung@mizuhogroup.com; gtfdmiddleoffice@smbcgroup.com |
| Natixis | cib-communications@natixis.com; gtfdmiddleoffice@smbcgroup.com |
| Standard Chartered Bank | daniel.Guiotti@sc.com; gtfdmiddleoffice@smbcgroup.com; Loans.AgencyUS@sc.com |
| Sumitomo Mitsui Banking Corporation | gtfdmiddleoffice@smbcgroup.com; Loans.AgencyUS@sc.com |
| **Braskem Netherlands B.V.** | **Notice Party Address** |
| Banco Santander S.A. | sindicadossan@gruposantander.com |
| Bank of America, N.A. | felipe.speranzini@bofa.com |
| Barclays Bank PLC | eliza.askarova@barclays.com |
| Citibank, N.A. | francine.lima@citi.com |
| Crédit Agricole Corporate and Investment Bank | francisco.casas@ca-cib.com |
| Deutsche Bank AG, New York Branch | gui.leporace@db.com |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main | credit.service@dzbank.de |
| ING Capital LLC | Alejandro.jimeno@ing.com |
| Standard Chartered Bank | Daniel.Guiotti@sc.com |
| **Braskem Netherlands Finance B.V.** | **Notice Party Address** |
| Banco Santander S.A. | sindicadossan@gruposantander.com |
| BNP Paribas | thierry.anezo@bnpparibas.com |
| BNP Paribas Fortis SA/NV | thierry.anezo@bnpparibas.com |
| ING Bank N.V. | Agency.Services.Asia@Asia.ING.com |
| The Bank of New York Mellon | joanne.adamis@bny.com |

**Via First Class Mail**

| Notice Party Name | Notice Party Address |
|---|---|
| **The United States Trustee** | |
| Office of the United States Trustee for the Southern District of New York | Attn: Linda Riffkin, Linda.Riffkin@usdoj.gov 201 Varick Street, Suite 1006, New York, NY 10014 |
| **Chapter 15 Creditors** | |
| **Braskem S.A.** | **Notice Party Address** |
| Banco Latinoamericano de Comercio Exterior S.A. | Torre V, Business Park - Ave. La Rotonda, Costa del Este, Panama City, Panama 0819-08730 |
| Banco Safra S.A. | Av. Paulista 2100, São Paulo, SP 01310-930 |
| Crédit Agricole Corporate and Investment Bank | 1301 Avenue of the Americas, New York, New York 10019 |
| Citibank | 388 Greenwich Street, New York, NY 10013 |
| Citibank, N.A. | Av. Paulista 1111, São Paulo, Brazil 011311-920 |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main | Platz der Republik, Frankfurt am Main, Germany 60325 |
| Eco Securitizadora de Direitos Creditórios do Agronegócio S.A. | Avenida Pedroso de Morais, nº 1.553, 3º andar, conjunto 32, Pinheiros, São Paulo, SP 05419-001 |
| Itau Unibanco S.A. | Av. Brigadeiro Faria Lima, 3500, 1 2 3 Parte; 4 E 5 And., São Paulo, SP 04538-132 |
| Kfw IPEX-Bank GmbH | Palmengartenstrasse 5 - 9, 60325 Frankfurt am Main, Germany |
| Pentágono S.A. Distribuidora de Títulos e Valores Mobiliários | Avenida das Américas, nº 4200, Bloco 8, Ala B, salas 302, 303 e 304, Rio de Janeiro, RJ 22640-102 |
| Sumitomo Mitsui Banking Corporation | 277 Park Avenue, New York, New York 10172 |
| Terminal Química Puerto Mexico S.A.P.I. de C.V | Blvd. Manuel Ávila Camacho 36, Piso 10, Oficina 108, Ciudad de México, Mexico 11000 |
| **Braskem America Finance Company** | **Notice Party Address** |
| The Bank of New York Mellon | 101 Barclay Street, 7E New York, NY 10286 |
| **Braskem Trading & Shipping B.V.** | **Notice Party Address** |
| Banco Latinoamericano de Comercio Exterior S.A. | Torre V, Business Park - Ave. La Rotonda, Costa del Este, Panama City, Panama 0819-08730 |
| Banco Santander S.A. | Edificio Monteprincipe, planta 2a, Madrid, Spain 28925 |

| | |
|---|---|
| BNP Paribas Securities Corp | 787 Seventh Avenue, New York, New York 10019 |
| Citibank | 388 Greenwich Street, New York, NY 10013 |
| Crédit Agricole Corporate and Investment Bank | 1301 Avenue of the Americas, New York, New York 10019 |
| Deutsche Bank Aktiengesellschaft | Taunusanlage 12, Frankfurt, Germany 60325 |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main | Platz der Republik, Frankfurt am Main, Germany 60325 |
| Kfw | Palmengartenstrasse 5 - 9, 60325 Frankfurt am Main, Germany |
| Mizuho Bank, Ltd | 1271 Avenue of the Americas, New York, New York 10020 |
| Natixis | 7, promenade Germaine Sablon, Paris, France 75013 |
| Standard Chartered Bank | 1095 Avenue of the Americas, New York, New York 10036 |
| Sumitomo Mitsui Banking Corporation | 277 Park Avenue, New York, New York 10172 |
| **Braskem Netherlands B.V.** | **Notice Party Address** |
| Banco Santander S.A. | Edificio Monteprincipe, planta 2a Madrid, Spain 28925 |
| Bank of America, N.A. | Faria Lima 3400 São Paulo, Brazil 04538-132 |
| Barclays Bank PLC | 125 S. West Street Wilmington, Delaware 19801 |
| Citibank, N.A. | Av. Paulista 1111, São Paulo, Brazil 011311-920 |
| Crédit Agricole Corporate and Investment Bank | 1301 Avenue of the Americas New York, New York 10019 |
| Deutsche Bank AG, New York Branch | One Columbus Circle, New York, New York 10019 |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt Am Main | Platz der Republik, Frankfurt am Main, Germany 60325 |
| ING Capital LLC | 1133 Avenue of the Americas New York, New York 10136 |
| Standard Chartered Bank | 1095 Avenue of the Americas New York, New York 10036 |
| **Braskem Netherlands Finance B.V.** | **Notice Party Address** |
| Banco Santander S.A. | Edificio Monteprincipe, planta 2a Madrid, Spain 28925 |
| BNP Paribas Fortis SA/NV | 35 rue de la Gare, Paris, France 75019 |
| ING Bank N.V. | 1 Wallich Street #12-01 Guoco Tower Singapore, Singapore 78881 |
| The Bank of New York Mellon | 240 Greenwich Street, Floor 7 East New York, New York 10286 |

| Indenture Trustees | |
|---|---|
| The Bank of New York Mellon | Attn:<br><br>Corporate Trust Administration<br><br>240 Greenwich Street – 7E<br>New York, NY 10286 |
| **Counsel** | |
| Cleary Gottlieb Steen & Hamilton LLP (Counsel to the Braskem Group) | Attn:<br><br>Richard J. Cooper, rcooper@cgsh.com<br>Thomas S. Kessler, tkessler@cgsh.com<br>David Z. Schwartz, dschwartz@cgsh.com<br>John Veraja, jveraja@cgsh.com<br>Timothy Wolfe, twolfe@cgsh.com<br><br>One Liberty Plaza,<br>New York, NY 10006 |
| Davis Polk & Wardwell LLP (Counsel to Ad Hoc Group of Noteholders and Debenture Holders)<br><br>450 Lexington Avenue,<br>New York, NY 10017 | Attn:<br><br>Timothy Graulich, timothy.graulich@davispolk.com<br>David Schiff, david.schiff@davispolk.com |
| Freshfields LLP (Counsel to the Steering Group of Lenders)<br><br>3 World Trade Center, 51st Floor,<br>New York, NY 10007 | Attn:<br><br>Scott Talmadge, Scott.talmadge@freshfields.com<br>Mark Liscio, Mark.liscio@freshfields.com |
| Special Counsel,<br><br>Office of International Corporate Finance Division of Corporation Finance (Counsel to U.S. Securities and Exchange Commission) | Attn: Corey A. Jennings, jenningsc@sec.gov<br><br>100 F Street, NE<br>Washington, D.C. 20549 |

## EXHIBIT C

**Organizational Chart**

# Braskem

**05 DE JUNHO DE 2026**

**79 ENTITIES**

37 CONTROLLED COMPANIES
4 JOINT CONTROLLED COMPANIES
2 INVESTMENT
3 INVESTMENT FUNDS
31 AFFILIATED COMPANIES
2 COMPANIES IN DISSOLUTION

**BRAZIL**
100,00 / 100,00 — VOQEN ENERGIA LTDA.

**BRAZIL**
84,90 / 42,45 — SF 401 PARTICIPAÇÕES SOCIETÁRIAS S.A.*
JAÍBA V HOLDING   15,10   57,55

**BRAZIL**
33,33 / 33,20 — REFINARIA DE PETRÓLEO RIOGRANDENSE S.A.*
ULTRAPAR   33,33   33,20
PETROBRÁS   33,33   33,20
OUTROS   0,40   0,40

**BRAZIL**
37,57 / 37,57 — COMPANHIA DE DESENVOLVIMENTO RIO VERDE – CODEVERDE – EM LIQUIDAÇÃO
CNO S.A.   30,88   30,88
ECON. AGRO   20,32   20,32
OUTROS   11,23   11,23

**BERMUDAS**
100,00 / 100,00 — BM INSURANCE COMPANY LIMITED

**BERMUDAS**
EVEREN LIMITED
BM INSURANCE COMPANY   1 AÇÃO "A"   1 AÇÃO "A"

**BRAZIL**
49,90 / 49,90 — PLAIND INVESTIMENTOS S.A.*
SOLVÍ ESSENCIS   50,10   50,10

**BRAZIL**
63,70 / 63,70 — CETREL S.A
ESTADO DA BAHIA   18,60   18,60
OUTROS   17,70   17,70

**MEXICO**
99,97 / 99,97 — BRASKEM MEXICO, S.R.L. DE C.V.
BRASKEM NETHERLANDS INC BV   0,03   0,03

**MEXICO**
99,97 / 99,97 — BRASKEM MEXICO SERVICIOS, S.R.L. DE C.V. – EN LIQUIDACIÓN
ROBERTO BISCHOFF   0,03   0,03

**BRAZIL**
10,45 / 10,45 — NITROCLOR PRODUTOS QUÍMICOS LTDA.
NOVONOR S.A. - RJ   50,75   50,75
PETROBRAS   38,80   38,80

**BRAZIL**
100,00 / 100,00 — OXYGEA VENTURES LTDA.

**BRAZIL**
20,00 / 20,00 — BOREALIS BRASIL S.A.*
BOREALIS  A/G   80,00   80,00

**BRAZIL**
49,00 / 24,50 — SERRA DAS ALMAS F1 HOLDING S.A.*
SDA F1.2 HOLDING   51,00   75,50

**BRAZIL**
49,89 / 24,95 — FOLHA LARGA 1 HOLING S.A.*
EDF LTDA.   50.09   75,05

**CHILE**
99,79 / 99,79 — BRASKEM PETROQUÍMICA CHILE LTDA.
BRASKEM NETHERLANDS B.V.   0,21   0,21

**ARGENTINA**
99,99 / 99,99 — BRASKEM ARGENTINA S.A.
BRASKEM NETHERLANDS BV.   1 AÇÃO   1 AÇÃO

**CAYMAN ISLANDS**
100,00 / 100,00 — BRASKEM FINANCE LIMITED

**BRAZIL**
61,10 / 61,10 — WISE PLÁSTICOS S.A.*
BRUNO IGEL   33,96   33,96
WISE CAPITAL   4,94   4,94

**NETHERLANDS**
100,00 / 100,00 — BRASKEM NETHERLANDS B.V.

**BRAZIL**
100,00 / 100,00 — VENTOS DE SANTO ABELARDO, VENTOS DE SANTO ARTUR, VENTOS DE SÃO GUILHERME, VENTOS DE SÃO GALDINO & VENTOS DE SANTA AMÉLIA ENERGIAS RENOVÁVEIS S.A. (EÓLICAS EM PARCERIA COM A CASA DOS VENTOS S.A. - 5 SPEs)

---

**BRAZIL**
JAÍBA V ENERGIAS RENOVÁVEIS S.A.
58,98 / 00,00 — JAÍBA V HOLDING   41,02

**BRAZIL**
100,00 / 59,95 — JAÍBA CN ENERGIAS RENOVÁVEIS S.A.
JAÍBA V HOLDING   00,00   40,05

**BRAZIL**
100,00 / 61,20 — JAÍBA CO ENERGIAS RENOVÁVEIS S.A.
JAÍBA V HOLDING   00,00   38,80

**BRAZIL**
100,00 / 57,91 — JAÍBA LN ENERGIAS RENOVÁVEIS S.A.
JAÍBA V HOLDING   00,00   42,09

**BRAZIL**
100,00 / 100,00 — GRI – GERENCIAMENTO DE RESÍDUOS INDUSTRIAIS S.A.*

**BRAZIL**
100,00 / 100,00 — DISTRIBUIDORA DE ÁGUA CAMAÇARI S.A.

**BRAZIL**
50,00 / 50,00 — CETECH SERVIÇOS S.A.*
Tetra Tech Eng. e Consultoria LTDA.   50,00   50,00

**USA**
100,00 / 100,00 — STARCLE GENERAL PARTNER LLC

**CANADA**
OXYGEA FUND LP
99,999
STARCLE GENERAL PARTNER LLC   0,001

**BRAZIL**
100,00 / 100,00 — BUILDER BRASIL LTDA.

**BRAZIL**
100,00 / 100,00 — PARQUE EÓLICO SERRA DAS ALMAS I, III, IV, V & VI S.A. (5 SPEs)

**BRAZIL**
100,00 / 100,00 — PARQUE EÓLICO VENTOS DE SÃO JANUÁRIO 01, 04, 13 & 14 S.A. (4 SPEs)

**NETHERLANDS**
100,00 / 100,00 — BRASKEM TRADING AND SHIPPING B.V. (BT&S)

**NETHERLANDS**
100,00 / 100,00 — BEAUTIFUL, BLOOMING, BLISSFUL, BOLD, BRAVE, BRIGHT, BRILLIANT, BAITA, BRAVO, FORTUNATE & MARES DO FUTURO SHIPPING B.V.(11 SPVs)

**NETHERLANDS**
100,00 / 100,00 — BRASKEM NETHERLANDS GREEN B.V.

**BRAZIL**
99,99 / 99,99 — BRASKEM GREEN S.A.
BRASKEM NETHERLANDS B.V.   1 AÇÃO   1 AÇÃO

**NETHERLANDS**
100,00 / 100,00 — BRASKEM NETHERLANDS INC. B.V.

**THAILAND**
50,98 / 50,98 — BRASKEM SIAM COMPANY LIMITED*
THAI POLYETHYLENE CO., LTD.   48,99   48,99
SENFI VENTURES CO., LTD.   0,002   0,002
BRASKEM EUROPE GMBH   0,019   0,019

**NETHERLANDS**
100,00 / 100,00 — BRASKEM NETHERLANDS FINANCE B.V.

**MEXICO**
TERMINAL QUÍMICA PUERTO MEXICO, S.A.P.I. DE C.V.
ADVARIO B.V.   50,00   50,00

**VENEZUELA**
50,00 / 50,00 — POLIPROPILENO DEL SUR, S.A.*
PEQUIVEN   50,00   50,00

**MEXICO**
74,99 / 74,99 — BRASKEM IDESA, S.A.P.I.*
ETILENO XXI,S.A DE CV   25,00   25,00
BRASKEM S.A.   0,01   0,01

**MEXICO**
99,99 / 99,99 — BRASKEM IDESA SERVICIOS, S.A. DE C.V.
ETILENO XXI,S.A DE CV   0,01   0,01

**USA**
100,00 / 100,00 — BRASKEM AMERICA LAPORTE LLC.

**USA**
1,46 / 1,36 — NEXUS CIRCULAR, LLC
COX CORPORATE SERVICES INC   65,00   60,00
FUNDADORES   17,00   16,00
OUTROS   16,54   22,64

**GERMANY**
100,00 / 100,00 — BRASKEM EUROPE GMBH

**USA**
100,00 / 100,00 — BRASKEM AMERICA, INC.

**USA**
100,00 / 100,00 — BRASKEM AMERICA FINANCE COMPANY

**BRAZIL**
99,99 / 99,99 — BRASKEM MEXICO PROYECTOS, S.A. DE C.V SOFOM
BRASKEM NETHERLANDS INC. B.V.   0,01   0,01

**INDIA**
99,99 / 99,99 — BRASKEM INDIA PRIVATE LIMITED
BRASKEM EUROPE GmbH   0,01   0,01

**USA**
51,00 / 51,00 — SUSTEINEA BIOGLYCOLS LLC* (Controle Compartilhado)
Sojitz Bioglycols, Inc.   49,00   49,00

**BRAZIL**
100,00 — BIOGLYCOLS AND SERVICES LTDA

**BRAZIL**
100,00 / 100,00 — CTA ENGENHARIA E TREINAMENO LTDA.

**BRAZIL**
100,00 / 100,00 — CTA GROUP LTDA.

**BRAZIL**
100,00 / 100,00 — EMERGENCIALL EMERGÊNCIAS AMBIENTAIS LTDA.

---



**BRAZIL**
PETRÓLEO BRASILEIRO S.A. - PETROBRAS

**BRAZIL**
SHINE I FUNDO DE INVESTIMENTOS EM PARTICIPAÇÕES E RESPONSABILIDADE LIMITADA

47,03   35,29      50,11   33,50

BRASKEM S.A.*

OUTROS   2,86   31,21

---

## Legend



| 1 | 2 |
| 3 | |
| 4 | |

1  Interest in Voting Capital
2  Interest in Total Capital Stock
3  Companies
4  Other Shareholders

**Controlling Shareholder (Joint Control)**

**Controlled Company**

**Affiliated Company**

**Joint Control Company**

**Company in Dissolution**

**Investment**

**\* – Companies with Shareholders Agreement**

**Investment Funds \*\*\***

\*\*\* Fundo de Investimentos Caixa Jupiter Multimercado Crédito Privado Longo Prazo; e
Netuno Renda Fixa Referenciado di Fundo de Investimento

## EXHIBIT D

**Excerpts of 2028 Notes Offering Memorandum**

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT, AS AMENDED (THE "SECURITIES ACT"); OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE U.S.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum and its annexes (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OF THE U.S. OR OTHER JURISDICTION AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE U.S. OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS. THE OFFERING MEMORANDUM AND THE OFFER OF THE SECURITIES ARE ONLY ADDRESSED TO AND DIRECTED AT PERSONS IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA WHO ARE "QUALIFIED INVESTORS" WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE (DIRECTIVE 2003/71/EC, AS AMENDED) AND RELATED IMPLEMENTATION MEASURES IN MEMBER STATES ("QUALIFIED INVESTORS"). IN ADDITION, IN THE UNITED KINGDOM THE OFFERING MEMORANDUM IS ONLY BEING DISTRIBUTED TO QUALIFIED INVESTORS WHO HAVE PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLES 19(5) AND 19(2)(A) TO (D) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005, AND OTHER PERSONS TO WHOM IT MAY OTHERWISE LAWFULLY BE COMMUNICATED (ALL SUCH PERSONS TOGETHER REFERRED TO AS "RELEVANT PERSONS"). ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH THIS OFFERING MEMORANDUM RELATES IS AVAILABLE ONLY TO (i) IN THE UNITED KINGDOM, RELEVANT PERSONS; AND (ii) IN ANY MEMBER STATE OF THE EUROPEAN ECONOMIC AREA OTHER THAN THE UNITED KINGDOM, QUALIFIED INVESTORS, AND WILL BE ENGAGED IN ONLY WITH SUCH PERSONS. IN ADDITION, NO PERSON MAY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY, WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (THE "FSMA"), RECEIVED BY IT IN CONNECTION WITH THE ISSUE OR SALE OF THE SECURITIES OTHER THAN IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO US.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of your Representation:** In order to be eligible to view this Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs; or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the U.S. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing this

Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act) and that the electronic mail address that you gave us and to which this Offering Memorandum has been delivered is not located in the U.S.; and (ii) that you consent to delivery of such Offering Memorandum by electronic transmission.

You are reminded that this Offering Memorandum has been delivered to you on the basis that you are a person into whose possession this Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver this Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the Initial Purchasers or any affiliate of the Initial Purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the Initial Purchasers or such affiliate on behalf of the issuer in such jurisdiction.

This Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and consequently neither the Initial Purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between this Offering Memorandum distributed to you in electronic format and the hard copy version available to you on request from the Initial Purchasers.

**OFFERING MEMORANDUM**                                                                                       **CONFIDENTIAL**



# Braskem Netherlands Finance B.V.

*(a private company with limited liability* (besloten vennootschap met beperkte aansprakelijkheid) *incorporated under the law of The Netherlands)*

**US$500,000,000 3.500% Notes due 2023**
**US$1,250,000,000 4.500% Notes due 2028**

**Unconditionally and Irrevocably Guaranteed by**

# Braskem S.A.

*(Incorporated in the Federative Republic of Brazil)*

Braskem Netherlands Finance B.V., or Braskem Netherlands Finance, is offering US$500.0 million in aggregate principal amount of its 3.500% notes due 2023, or the five year notes, and US$1,250.0 million in aggregate principal amount of its 4.500% notes due 2028, or the ten year notes, and, together with the five year notes, the notes. Braskem Netherlands Finance is a private company with limited liability incorporated under the laws of The Netherlands. The notes will be fully, unconditionally and irrevocably guaranteed by Braskem S.A., or Braskem, a corporation (*sociedade anônima*) incorporated under the laws of the Federative Republic of Brazil. The five year notes will bear interest at the rate of 3.500% per year and will mature on January 10, 2023. The ten year notes will bear interest at the rate of 4.500% per year and will mature on January 10, 2028. Interest on the notes is payable on January 10 and July 10 of each year, beginning on January 10, 2018.

At any time, prior to December 10, 2022 (which is the date that is one month prior to the maturity of the five year notes), Braskem Netherlands Finance or Braskem may, at its option, redeem the five year notes, in whole or in part, by paying 100% of the principal amount of the five year notes plus the applicable "make-whole" amount and accrued interest and additional amounts, if any, to but excluding the redemption date. If the redemption date of the five year notes is on or after December 10, 2022, the redemption price will equal 100% of the principal amount of the notes, plus accrued and unpaid interest and additional amounts, if any, to, but excluding the redemption date.

At any time, prior to October 10, 2027 (which is the date that is three months prior to the maturity of the ten year notes), Braskem Netherlands Finance or Braskem may, at its option, redeem the ten year notes, in whole or in part, by paying 100% of the principal amount of the ten year notes plus the applicable "make-whole" amount and accrued interest and additional amounts, if any, to but excluding the redemption date. If the redemption date of the ten year notes is on or after October 10, 2027, the redemption price will equal 100% of the principal amount of the notes, plus accrued and unpaid interest and additional amounts, if any, to, but excluding the redemption date.

The notes may also be redeemed by Braskem Netherlands Finance or Braskem, in whole but not in part, at 100% of their principal amount plus accrued interest and additional amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption."

If a specified Change of Control event as described herein occurs, unless Braskem Netherlands Finance has exercised its option to redeem the notes, Braskem will be required to offer to purchase the notes at the price described in this offering memorandum.

**Neither the U.S. Securities and Exchange Commission, or the SEC, nor any state securities commission has approved or disapproved of these notes or the guarantees or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

The notes will be senior unsecured obligations of Braskem Netherlands Finance, ranking equal in right of payment with all of its other existing and future senior unsecured debt. The guarantees will be senior unsecured obligations of Braskem, ranking equal in right of payment with all of its other existing and future senior unsecured debt.

We will apply to the Singapore Exchange Securities Trading Limited, or the SGX-ST, for permission to list the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this offering memorandum. Admission to the Official List of the SGX-ST is not to be taken as an indication of the merits of the notes or our company.

**Investing in the notes involves risks. See "Risk Factors" beginning on page 4 of the Braskem Annual Report (as defined below), which is incorporated by reference in this offering memorandum, and "Risk Factors" beginning on page 14 of this offering memorandum.**

The notes and the guarantees have not been registered under the U.S. Securities Act of 1933, as amended, or the Securities Act, or any state securities laws and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S under the Securities Act, or Regulation S), except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act, or Rule 144A, and outside the United States in accordance with Regulation S. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For a description of certain restrictions on transfer of the notes, see "Notice to Investors."

The notes are being offered pursuant to an exemption from prospectus requirements under the Directive 2003/71/EC (as amended), or the Prospectus Directive, of the European Union, and this offering memorandum has not been approved by a competent authority within the meaning of that Directive.

**Issue Price: 99.058% plus accrued interest from October 10, 2017.**
**Issue Price: 98.995% plus accrued interest from October 10, 2017.**

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company, or DTC, and its direct and indirect participants, including Clearstream Banking, *société anonyme*, or Clearstream, and Euroclear Bank S.A./N.V., as operator of the Euroclear System, or Euroclear, is expected on or about October 10, 2017.

*Global Coordinators and Joint Book-Running Managers*

**Itaú BBA**                              **Morgan Stanley**                              **Santander**

*Joint Book-Running Managers*

**BNP PARIBAS**          **Credit Agricole CIB**          **SMBC Nikko**          **UBS Investment Bank**

**The date of this offering memorandum is October 4, 2017.**

**TABLE OF CONTENTS**

                                                                                                             **Page**

INCORPORATION BY REFERENCE ................................................................................................... iii
PRESENTATION OF FINANCIAL AND OTHER INFORMATION ............................................ iv
FORWARD-LOOKING STATEMENTS ..................................................................................... vi
SUMMARY ................................................................................................................................. 1
SUMMARY HISTORICAL FINANCIAL AND OTHER INFORMATION ................................ 11
RISK FACTORS ........................................................................................................................ 14
USE OF PROCEEDS ................................................................................................................. 19
EXCHANGE RATES ................................................................................................................. 20
CAPITALIZATION ................................................................................................................... 21
RECENT DEVELOPMENTS .................................................................................................... 24
DESCRIPTION OF THE NOTES .............................................................................................. 25
FORM OF THE NOTES ............................................................................................................ 47
TAXATION ............................................................................................................................... 51
NOTICE TO INVESTORS ........................................................................................................ 62
ENFORCEABILITY OF CIVIL LIABILITIES ......................................................................... 64
PLAN OF DISTRIBUTION ...................................................................................................... 66
LEGAL MATTERS ................................................................................................................... 71
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ............................................ 72
AVAILABLE INFORMATION ................................................................................................. 73

_____

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. None of Braskem, Braskem Netherlands Finance or the initial purchasers is making an offer of the notes (or the related guarantees) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the front of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to "our company," "we," "our," "ours," "us" or similar terms are to Braskem and its consolidated subsidiaries and jointly controlled companies, including Braskem Idesa S.A.P.I., which we refer to together with its consolidated subsidiary as Braskem Idesa.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantees) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantees). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future. We have furnished the information contained in this offering memorandum.

None of the SEC, any state securities commission or any other regulatory authority has approved or disapproved the notes (or the related guarantees) nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this offering memorandum. Any representation to the contrary is a criminal offense. Each person receiving this offering memorandum acknowledges that this offering

i

memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

The notes (and the related guarantees) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Notice to Investors."

In making an investment decision, prospective investors must rely on their own examination of our company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to herein will be made available to prospective investors upon request to us or the initial purchasers.

### NOTICE TO PROSPECTIVE INVESTORS IN THE NETHERLANDS

The notes (including rights representing an interest in each global note that represents the notes) may not be offered or sold to individuals or legal entities in The Netherlands other than to qualified investors (*gekwalificeerde beleggers*) within the meaning of The Netherlands Financial Supervision Act (*Wet op het financieel toezicht*). No approved prospectus within the meaning of the Prospectus Directive is required.

### NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL

**THE NOTES (AND RELATED GUARANTEES) HAVE NOT BEEN, AND WILL NOT BE, REGISTERED WITH THE BRAZILIAN SECURITIES COMMISSION (*COMISSÃO DE VALORES MOBILIÁRIOS*), OR THE CVM. THE NOTES MAY NOT BE OFFERED OR SOLD IN BRAZIL, EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE A PUBLIC OFFERING OR UNAUTHORIZED DISTRIBUTION UNDER BRAZILIAN LAWS AND REGULATIONS. THE NOTES (AND RELATED GUARANTEES) ARE NOT BEING OFFERED INTO BRAZIL. DOCUMENTS RELATING TO THE OFFERING OF THE NOTES, AS WELL AS INFORMATION CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN BRAZIL, NOR BE USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION OR SALE OF THE NOTES TO THE PUBLIC IN BRAZIL.**

## INCORPORATION BY REFERENCE

We are incorporating by reference into this offering memorandum the following information contained in documents that we have filed with or furnished to the SEC:

- our annual report on Form 20-F for the year ended December 31, 2016, filed with the SEC on September 22, 2017, containing our audited consolidated financial statements as of December 31, 2016 and 2015 and for the three years ended December 31, 2016, 2015 and 2014, which we refer to herein as the Braskem Annual Report.

- our unaudited consolidated financial information as of June 30, 2017 and for the six-month periods ended June 30, 2017 and 2016, including the independent registered public accounting firm's limited review report on the consolidated financial information as of June 30, 2017 and for the six-month period then ended included therein, contained in a Form 6-K which we furnished to the SEC on September 28, 2017, which we refer to as the Second Quarter Financial Statement Report; and

- our Management's Discussion and Analysis of Financial Condition and Results of Operations for the six-month periods ended June 30, 2017 and 2016 contained in a Form 6-K which we furnished to the SEC on September 28, 2017, which we refer to as the Second Quarter MD&A Report.

Incorporation by reference of information contained in the Braskem Annual Report, the Second Quarter Financial Statement Report and the Second Quarter MD&A Report means that (1) this information is considered part of this offering memorandum, and (2) we can disclose important information to you by referring to the portions of the Braskem Annual Report that we incorporate by reference, the Second Quarter Financial Statement Report and the Second Quarter MD&A Report.

The portions of the Braskem Annual Report that we incorporate by reference, the Second Quarter Financial Statement Report and the Second Quarter MD&A Report contain important information about our company and our results of operations and financial condition and are an important part of this offering memorandum.

Any statement contained in the portions of the Braskem Annual Report that we incorporate by reference, the Second Quarter Financial Statement Report and the Second Quarter MD&A Report will be deemed to be modified or superseded for purposes of this offering memorandum to the extent that a statement contained herein modifies or supersedes that statement.

You should read "Available Information" for information on how to obtain the Braskem Annual Report, the Second Quarter Financial Statement Report and the Second Quarter MD&A Report or other information relating to our company.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references herein to the "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars," "dollars" or "US$" are to U.S. dollars.

On September 26, 2017, the exchange rate for *reais* into U.S. dollars was R$3.1674 to US$1.00, based on the selling rate as reported by the Central Bank of Brazil (*Banco Central do Brasil*), or the Central Bank. The selling rate was R$3.3082 to US$1.00 as of June 30, 2017, R$3.2098 to US$1.00 as of June 30, 2016, R$3.2591 to US$1.00 as of December 31, 2016, R$3.9048 to US$1.00 as of December 31, 2015 and R$2.6562 to US$1.00 as of December 31, 2014, in each case, as reported by the Central Bank. The *real*/U.S. dollar exchange rates fluctuate widely, and the selling rate on September 26, 2017 may not be indicative of future exchange rates. See "Exchange Rates" for information regarding exchange rates for the Brazilian currency since January 1, 2012.

Solely for the convenience of the reader, we have translated certain amounts included in "Summary—Summary Historical Financial and Other Information," "Capitalization" and elsewhere in this offering memorandum from *reais* into U.S. dollars using the selling rate as reported by the Central Bank as of June 30, 2017 of R$3.3082 to US$1.00. These translations should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate. Such translations should not be construed as representations that the *real* amounts represent or have been or could be converted into U.S. dollars as of that or any other date.

### Financial Statements

#### *Braskem Financial Statements*

We maintain our books and records in *reais*. The financial information of Braskem contained in this offering memorandum has been derived from the records and financial statements of Braskem, and includes our unaudited consolidated financial information as of June 30, 2017 and for the six-month periods ended June 30, 2017 and 2016, which are incorporated into this offering memorandum by reference to the Second Quarter Financial Statement Report, and our audited consolidated financial statements as of December 31, 2016 and 2015 and for each of the three years ended December 31, 2016, 2015 and 2014, which are incorporated into this offering memorandum by reference to the Braskem Annual Report.

We have prepared our audited consolidated financial statements as of December 31, 2016 and 2015 and for the three years ended December 31, 2016, 2015 and 2014, which are incorporated by reference into this offering memorandum, in accordance with International Financial Reporting Standards, or IFRS, as issued by the International Accounting Standards Board, or IASB. We have prepared our unaudited consolidated financial information as of June 30, 2017 and for the six-month periods ended June 30, 2017 and 2016, which are incorporated by reference into this offering memorandum, in accordance with IAS 34 – Interim Financial Reporting as issued by the IASB.

#### *Braskem Netherlands Finance Financial Statements*

We have not included any financial statements for Braskem Netherlands Finance in this offering memorandum. Braskem Netherlands Finance does not, and will not, publish financial statements, except for such financial statements which Braskem Netherlands Finance may be required to publish under the laws of The Netherlands. In addition, Braskem Netherlands Finance will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, Braskem Netherlands Finance. Braskem Netherlands Finance does not have any operations independent from Braskem. Braskem Netherlands Finance's obligations under the notes will be fully and unconditionally guaranteed by Braskem. The financial statements of Braskem Netherlands Finance have been fully consolidated in the consolidated financial statements of Braskem for dates and periods ending after November 17, 2014 (the date of incorporation of Braskem Netherlands Finance).

**Market Share and Other Information**

We make statements in this offering memorandum, the Braskem Annual Report and the Second Quarter MD&A Report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market share with respect to specific products by dividing our domestic net sales volumes of these products by the total Brazilian domestic consumption of these products as estimated by the Brazilian Chemical Industry Association (*Associação Brasileira da Indústria Química*), or ABIQUIM. We derive information regarding the production capacity of other companies in the Brazilian petrochemical industry and the estimated total Brazilian domestic consumption of petrochemical products principally from reports published by ABIQUIM. We derive information regarding the production capacity of other companies in the global petrochemical industry, the United States petrochemical industry and the Latin American petrochemical industry, international market prices for petrochemicals products and per capita consumption in certain geographic regions, principally from reports published by IHS, Inc., or IHS. We derive information relating to Brazilian imports and exports from the System for Analyzing International Trade (*Sistema de Análise das Informações de Comércio Exterior*), or ALICE-Web, produced by the Brazilian Secretary of International Trade (*Secretaria de Comércio Exterior*), and the Brazilian Secretary of Development, Industry and Trade (*Ministério do Desenvolvimento, Indústria e Comércio Exterior*). We also include information and statistics regarding economic growth in emerging economies obtained from the International Monetary Fund and statistics regarding gross domestic product, or GDP, growth in Brazil, the United States, Europe and Mexico obtained from independent public sources such as the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*), or the IBGE; the U.S. Department of Commerce, Eurostat, the statistical office of the European Union; and the Mexican Institute of Statistics and Geography (*Instituto Nacional de Estadística y Geografía*).

We have no reason to believe that any of this information is inaccurate in any material respect. However, neither we nor the initial purchasers have independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

We provide information regarding domestic apparent consumption of some of our products, based on information available from the Brazilian government, Institute of Applied Economic Research (*Instituto de Pesquisa Econômica Aplicada*), or IPEA, ABIQUIM and our internal estimates. Domestic apparent consumption is equal to domestic production plus imports minus exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

**Production Capacity and Sales Volume**

As used in this offering memorandum:

- "production capacity" means the annual projected capacity for a particular facility, calculated based upon operations for 24 hours each day of a year and deducting scheduled downtime for regular maintenance; and

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

## FORWARD-LOOKING STATEMENTS

This offering memorandum contains forward-looking statements. Some of the matters discussed concerning our business operations and financial performance include forward-looking statements within the meaning of the Securities Act or the Exchange Act.

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including the following:

- general economic, political and business conditions in the markets in which we operate, including demand and prices for petrochemical products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar and other currencies;

- the cyclical nature of the global petrochemical industry;

- competition in the global petrochemical industry;

- prices of naphtha, ethane, propane, propylene and other raw materials;

- international prices of petrochemical products;

- actions taken by our major shareholders;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- the implementation of our principal operating strategies, including our potential participation in acquisition, divestiture or joint venture transactions or other investment opportunities;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, laws and regulations affecting tax and environmental matters and import tariffs in other markets in which we operate or to which we export our products;

- future changes in Brazilian, Mexican, American and European policies and related actions undertaken by those governments;

- a deterioration in the world economy that could negatively impact demand for petrochemicals;

- decisions rendered in major pending or future tax, labor and other legal proceedings; and

- other factors identified under "Risk Factors" herein and in the reports filed with the SEC that are incorporated by reference in this offering memorandum.

Our forward-looking statements are not guarantees of future performance, and our actual results or other developments may differ materially from the expectations expressed in the forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

vi

Forward-looking statements speak only as of the date they are made, and neither we nor the initial purchasers undertake any obligation to update them in light of new information or future developments or to release publicly any revisions to these statements in order to reflect later events or circumstances or to reflect the occurrence of unanticipated events.

|  |  |
|---|---|
|  | notes taking place within 90 days of the earlier of the date of a public notice of a Change of Control and the date on which Braskem publicly declares its intention to effect a Change of Control, and (2) the applicable Ratings Agencies expressly stating that the downgrade was the result of the Change of Control. See "Description of the Notes—Purchase of Notes Upon Change of Control Event." |
| **Additional amounts** ................................. | Payments of interest on the notes or payments on the guarantees will be made after withholding and deduction for any Brazilian or Netherlands taxes as set forth under "Taxation." Braskem Netherlands Finance or Braskem will pay such additional amounts as will result in receipt by the holders of notes of such amounts as would have been received by them had no such withholding or deduction for Brazilian or Netherlands taxes been required, subject to certain exceptions described under "Description of the Notes—Additional Amounts." |
| **Covenants of Braskem Netherlands Finance**................................................... | The indenture will prohibit the incurrence of debt (other than the notes and other indebtedness ranking equally with or subordinated to the notes) by Braskem Netherlands Finance and impose certain other limitations and restrictions on Braskem Netherlands Finance as described under "Description of the Notes—Additional Limitations on Braskem Netherlands Finance and Braskem." |
| **Covenants of Braskem**............................ | The indenture will limit the creation of liens by Braskem and its significant subsidiaries and will permit Braskem to consolidate or merge with, or transfer all or substantially all of its assets to, another person only if it complies with certain requirements. However, these covenants are subject to a number of important exceptions. See "Description of the Notes—Covenants." |
| **Events of default** ...................................... | The indenture will set forth the events of default applicable to the notes, including an event of default triggered by cross-acceleration of other debt of Braskem and its significant subsidiaries in a total amount of US$100.0 million or more. See "Description of the Notes—Events of Default." |
| **Further issuances**.................................... | We may, from time to time, without the consent of the holders of the notes, issue an unlimited principal amount of additional notes of the same series as the notes initially issued in this offering. |
| **Substitution of issuer**............................... | Braskem Netherlands Finance may, without the consent of the holders of the notes and subject to certain conditions, be replaced and substituted by Braskem or any wholly-owned subsidiary of Braskem as principal debtor in respect of the notes. See "Description of the Notes—Substitution of the Issuer." |
| **Form and denomination**........................... | The notes will be issued in the form of global notes in fully registered form without interest coupons. The global notes will be exchangeable or transferable, as the case may be, for definitive certificated notes in fully registered form without interest coupons only in limited circumstances. The notes will be issued in registered form in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. See "Description of the Notes—Form, |

## RISK FACTORS

*The Braskem Annual Report, which is incorporated by reference in this offering memorandum, includes extensive risk factors relating to our company, the petrochemical industry, Brazil, Mexico and the United States. Prospective purchasers of notes should carefully consider the risks discussed below and in the Braskem Annual Report, as well as the other information included in or incorporated by reference into this offering memorandum, before deciding to purchase any notes. We make special reference to the risk factors "We could be materially adversely affected by the impacts of the Global Settlement" and the risk factors under "Risk Factors—Compliance and Control Risks" in the Braskem Annual Report. Our business, results of operations, financial condition or prospects could be negatively affected if any of these risks occurs, and as a result, the trading price of the notes could decline and you could lose all or part of your investment.*

*The risk factors discussed below and in the Braskem Annual Report are not the only risks that we face, but are the risks that we currently consider to be material. There may be additional risks that we currently consider immaterial or of which we are currently unaware, and any of these risks could have similar effects to those set forth below and in the Braskem Annual Report.*

**Risks Relating to the Notes and the Guarantees**

***Because Braskem Netherlands Finance has no operations of its own, holders of the notes must depend on Braskem to provide Braskem Netherlands Finance with sufficient funds to make payments on the notes when due.***

Braskem Netherlands Finance, a wholly-owned indirect subsidiary of Braskem, has no operations other than the issuing and making payments on the notes and other indebtedness ranking equally with the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem Netherlands Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of Braskem Netherlands Finance to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance. In the event of an adverse change in the financial condition or results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance, these entities may be unable to service their indebtedness to Braskem Netherlands Finance, which would result in the failure of Braskem Netherlands Finance to have sufficient funds to repay all amounts due on or with respect to the notes.

***Payments on Braskem's guarantees will be junior to Braskem's secured debt obligations and effectively junior to debt obligations of Braskem's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by Braskem on an unsecured basis. The Braskem guarantees will constitute senior unsecured obligations of Braskem. The guarantees will rank equal in right of payment with all of Braskem's other existing and future senior unsecured indebtedness. Although the guarantees will provide the holders of the notes with a direct, but unsecured claim on Braskem's assets and property, payment on the guarantees will be subordinated to secured debt of Braskem to the extent of the assets and property securing such debt. Payment on the guarantees will also be structurally subordinated to the payment of secured and unsecured debt and other creditors of Braskem's subsidiaries and jointly controlled companies other than Braskem Netherlands Finance or any other finance subsidiary with a Braskem guarantee.

Upon any liquidation or reorganization of Braskem, any right of the holders of the notes, through enforcement of the guarantees, to participate in the assets of Braskem, including the capital stock of its subsidiaries and jointly controlled entities, will be subject to the prior claims of Braskem's secured creditors, and to participate in the assets of Braskem's subsidiaries and jointly controlled entities will be subject to the prior claims of the creditors of its subsidiaries and jointly controlled entities. The indenture relating to the notes includes a covenant limiting the ability of Braskem and its subsidiaries to create or suffer to exist liens, although this limitation is subject to significant exceptions. See "Description of the Notes—Covenants—Limitation on Liens."

14

As of June 30, 2017, Braskem had (1) consolidated corporate debt, net of transaction costs, of R$23,602.3 million (US$7,134.5 million), and (2) consolidated project debt of R$10,195.8 million (US$3,082.0 million). Of the consolidated corporate debt, R$5,296.6 million (US$1,601.1 million) was unsecured debt of Braskem, R$2,415.3 million (US$730.1 million) was secured debt of Braskem, R$15,890.3 million (US$4,803.3 million) was debt of Braskem's subsidiaries and special purpose entities (other than Braskem Netherlands Finance). All of the consolidated project debt was secured debt of Braskem Idesa, with limited recourse against Braskem. Braskem conducts a portion of its business operations through subsidiaries, including Braskem Petroquímica, Braskem America, Braskem Europe and Braskem Netherlands. In servicing payments to be made on its guarantees of the notes, Braskem will rely, in part, on cash flows from these subsidiaries and jointly controlled companies, mainly in the form of dividend payments and interest on shareholders' equity. The ability of these subsidiaries and jointly controlled entities to make dividend payments to Braskem will be affected by, among other factors, the obligations of these entities to their creditors, requirements of Brazilian corporate and other law, and restrictions contained in agreements entered into by or relating to these entities.

***Braskem's obligations under the guarantees are subordinated to certain statutory preferences.***

Under Brazilian law, Braskem's obligations under the guarantees are subordinated to certain statutory preferences. In the event of a liquidation, bankruptcy or judicial reorganization of Braskem, such statutory preferences, including post-petition claims, claims for salaries, wages, social security, taxes and court fees and expenses and claims secured by collateral, among others, will have preference over any other claims, including claims by any investor in respect of the guarantees. In such event, enforcement of any of the guarantees may be unsuccessful, and noteholders may be unable to collect amounts that they are due under the notes.

***Braskem may not be able to purchase the notes upon a specified Change of Control event.***

Upon the occurrence of a specified Change of Control event, Braskem will be required to offer to purchase each holder's notes at a price equal to 101% of their principal amount plus accrued and unpaid interest. At the time of any specified Change of Control event, Braskem may not have sufficient financial resources to purchase all of the notes that holders may tender in connection with any such change of control offer.

***We may incur additional indebtedness ranking equal to the notes and the guarantees, and secured indebtedness which would give such secured creditors a prior claim on our assets covered by their liens.***

The indenture will permit Braskem and its subsidiaries, including Braskem Netherlands Finance, to incur additional debt, including debt that ranks on an equal and ratable basis with the notes and the guarantees. If Braskem or any of its subsidiaries incurs additional debt or provides any guarantee that ranks on an equal and ratable basis with the notes or the guarantees, as the case may be, the holders of that debt (and beneficiaries of the guarantee) would be entitled to share ratably with the holders of the notes in any proceeds that may be distributed upon Braskem's insolvency, liquidation, reorganization, dissolution or other winding up. This would likely reduce the amount of any liquidation proceeds that would be available to be paid to you.

In addition, Braskem may, in the future, grant additional liens to secure indebtedness without equally and ratably securing the notes or the guarantees, in the circumstances provided for in the indenture. See "Description of the Notes" for more information. If we become insolvent, liquidated, reorganized, dissolved, wound-up or default in the payment of these obligations, these secured creditors will be entitled to exercise the remedies available to them under applicable law.

***Developments in the international capital markets may adversely affect the market value of the notes.***

The market price of the notes may be adversely affected by declines in the international financial markets and world economic and political conditions, including terrorism and war. Although economic and political conditions are different in each country, investors' reaction to developments in one country can affect the securities markets and the securities of issuers in other countries, including Brazil, the United States and European countries. Securities markets in emerging market countries are, to varying degrees, influenced by economic, political and market conditions in other countries. Any adverse economic, political or other developments in other markets may

adversely affect investor confidence in securities issued by Brazilian companies, causing their market price and liquidity to suffer. We cannot assure you that the market for Brazilian securities will not continue to be affected negatively by events elsewhere, or that such developments will not have a negative impact on the market value of the notes.

***Restrictions on the movement of currency out of Brazil may impair the ability of holders of the notes to receive interest and other payments on the notes.***

The Brazilian government may impose temporary restrictions on the conversion of Brazilian currency into foreign currencies and on the remittance to foreign investors of proceeds of their investments in Brazil. Brazilian law permits the government to impose these restrictions whenever there is a serious imbalance in Brazil's balance of payments or there are reasons to foresee a serious imbalance.

The Brazilian government imposed remittance restrictions for approximately six months in 1990. Similar restrictions, if imposed in the future, would impair or prevent the conversion of interest payments on the notes from *reais* into U.S. dollars and the remittance of U.S. dollars abroad to holders of the notes. The Brazilian government may take similar measures in the future.

***The foreign exchange policy of Brazil may affect the ability of Braskem to make money remittances outside Brazil in respect of the guarantees.***

Under current Brazilian regulations, Brazilian companies are not required to obtain authorization from the Central Bank in order to make payments under a guarantee in favor of foreign persons, such as the holders of the notes. We cannot assure you that these regulations will continue to be in force at the time Braskem is required to perform its payment obligations under the guarantees. If these regulations or their interpretation are modified and an authorization from the Central Bank is required, Braskem would need to seek an authorization from the Central Bank to transfer the amounts under the guarantee out of Brazil or, alternatively, make such payments with funds held by Braskem outside Brazil. We cannot assure you that such an authorization will be obtained or that such funds will be available. If such authorization is not obtained, we may be unable to make payments to noteholders in U.S. dollars. If we are unable to obtain the required approvals, if needed for the payment of amounts owed by Braskem through remittances from Brazil, we may have to seek other lawful mechanisms to effect payment of amounts due under the notes. However, we cannot assure you that other remittance mechanisms will be available in the future, and even if they are available in the future, we cannot assure you that payment on the notes would be possible through such mechanism.

***Judgments of Brazilian courts enforcing Braskem's obligations under the guarantees would be payable only in reais.***

If proceedings are brought in the courts of Brazil seeking to enforce Braskem's obligations under the guarantees, Braskem would not be required to discharge its obligations in a currency other than *reais*. Any judgment obtained against Braskem in Brazilian courts in respect of any payment obligations under the guarantees would be expressed in *reais*. We cannot assure you that this amount in *reais* will afford you full compensation of the amount sought in any such litigation.

***We cannot assure you that a judgment of a U.S. court for liabilities under U.S. securities laws would be enforceable in Brazil or The Netherlands, or that an original action can be brought in Brazil or The Netherlands against Braskem or its officers and directors for liabilities under U.S. securities laws.***

Braskem Netherlands Finance is an indirect wholly-owned subsidiary of Braskem in The Netherlands. All or substantially all of Braskem Netherlands Finance's managing directors and certain advisors named herein reside in Brazil or The Netherlands.

Braskem is a corporation organized under the laws of Brazil. All of the directors and officers of Braskem and some of the advisors named herein reside in Brazil or elsewhere outside the United States, and all or a significant portion of the assets of such persons may be located outside the United States. As a result, it may not be possible for

16

investors to effect service of process within the United States or other jurisdictions outside Brazil upon such persons, or to enforce against such persons judgments predicated upon the civil liability provisions of the U.S. federal securities laws or the laws of such other jurisdictions. In addition, it may not be possible to bring an original action in Brazil against Braskem for liabilities under applicable securities laws. Furthermore, as a material portion of our assets are located in Brazil, any action for enforceability of the guarantees would likely need to be validated by the courts of Brazil. We cannot assure you that such judicial validation would be obtained in a timely manner or at all. See "Enforceability of Civil Liabilities."

***We cannot assure you that an active trading market for the notes will develop.***

The notes constitute a new issue of securities, for which there is no existing market. Although we will apply to list the notes on the SGX-ST, we cannot provide you with any assurances that the application will be accepted. We cannot provide you with any assurances regarding the future development of a market for the notes, the ability of holders of the notes to sell their notes, or the price at which such holders may be able to sell their notes. If such a market were to develop, the notes could trade at prices that may be higher or lower than the initial offering price depending on many factors, including prevailing interest rates, our results of operations and financial condition, political and economic developments in and affecting Brazil, Mexico and the market for similar securities. The initial purchasers of this offering have advised our company that they currently intend to make a market in the notes. However, the initial purchasers are not obligated to do so, and any market-making with respect to the notes may be discontinued at any time without notice.

***The notes are subject to transfer restrictions.***

The notes (and the related guarantees) have not been, and will not be, registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. Such exemptions include offers and sales that occur outside the United States in compliance with Regulation S and in accordance with any applicable securities laws of any other jurisdiction and sales to qualified institutional buyers as defined under Rule 144A. For a discussion of certain restrictions on resale and transfer, see "Notice to Investors."

In addition, we are relying upon an exemption from the Prospectus Directive to offer the notes (and the related guarantees) to investors in member states of the EEA which have implemented the Prospectus Directive. Any future offer or sale of notes in any member state of the EEA which has implemented the Prospectus Directive must be for a minimum purchase price or a minimum consideration of at least €100,000 or the equivalent in other currency.

***Brazilian bankruptcy laws may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness, including our obligations under the guarantees, then we may become subject to bankruptcy proceedings in Brazil. The bankruptcy laws of Brazil currently in effect are significantly different from, and may be less favorable to creditors than, those of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a court reorganization proceeding. In addition, any judgment obtained against us in Brazilian courts in respect of any payment obligations under a guarantee would normally be expressed in the *real* equivalent of the U.S. dollar amount of such sum at the exchange rate in effect (1) on the date of actual payment, (2) on the date on which such judgment is rendered, or (3) on the date on which collection or enforcement proceedings are started against us. Consequently, in the event of our bankruptcy, all of our debt obligations that are denominated in foreign currency, including the guarantees, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. We cannot assure you that such rate of exchange will afford full compensation of the amount invested in the notes plus accrued interest.

17

## EXHIBIT E

**Excerpts of 2031 Notes Offering Memorandum**

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE UNITED STATES.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION, AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED, THE "INSURANCE DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN REGULATION (EU) 2017/1129, AS AMENDED (THE "PROSPECTUS REGULATION"). CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION.

**PROHIBITION OF SALES TO U.K. RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE UNITED KINGDOM ("U.K."). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2 OF REGULATION (EU) NO 2017/565 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (THE "EUWA"); (II) A CUSTOMER WITHIN THE MEANING OF THE PROVISIONS OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (AS AMENDED, THE "FSMA") AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA TO IMPLEMENT THE INSURANCE DISTRIBUTION DIRECTIVE, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) NO 600/2014 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN ARTICLE 2 OF THE PROSPECTUS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA. CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY THE PRIIPS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA (THE "U.K. PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE U.K. HAS

BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE U.K. MAY BE UNLAWFUL UNDER THE U.K. PRIIPS REGULATION.

IN ADDITION, IN THE U.K., THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III) PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS"). THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE U.K. ANY PERSON IN THE U.K. THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of Your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the United States. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the United States; and (ii) you consent to delivery of the Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and, consequently, neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic form and the hard copy version available to you on request from the initial purchasers.

**OFFERING MEMORANDUM** <span style="float:right">**CONFIDENTIAL**</span>



# Braskem Netherlands Finance B.V.

(*a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*)
incorporated under the laws of the Netherlands*)

## US$850,000,000 8.500% Senior Notes due 2031

Unconditionally and Irrevocably Guaranteed by

# Braskem S.A.

(*incorporated under the laws of the Federative Republic of Brazil*)

---

Braskem Netherlands Finance B.V. ("Braskem Netherlands Finance") is offering US$850,000,000 in aggregate principal amount of its 8.500% senior notes due 2031 (the "notes"). Braskem Netherlands Finance is a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands. The notes will be fully, unconditionally and irrevocably guaranteed by Braskem S.A. ("Braskem"), a corporation (*sociedade anônima*) incorporated under the laws of the Federative Republic of Brazil. The notes will bear interest at the rate of 8.500% per year and will mature on January 12, 2031. Interest on the notes is payable on January 12 and July 12 of each year, beginning on January 12, 2024.

At any time, prior to November 12, 2030 (which is the date that is two months prior to the maturity of the notes), Braskem Netherlands Finance or Braskem may, at its option, redeem the notes, in whole or in part, by paying 100% of the principal amount of the notes *plus* a "make-whole" amount and accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date. If the redemption date of the notes is on or after November 12, 2030, the redemption price will equal 100% of the principal amount of the notes, *plus* accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date. See "Description of the Notes—Redemption—Optional Redemption." The notes may also be redeemed by Braskem Netherlands Finance or Braskem, at its option, in whole but not in part, at 100% of their principal amount *plus* accrued and unpaid interest and additional amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption—Tax Redemption."

If a Change of Control Triggering Event (as defined herein) occurs, unless Braskem Netherlands Finance or Braskem has exercised its option to redeem the notes, Braskem will be required to offer to purchase the notes at the price described in this offering memorandum. See "Description of the Notes—Purchase of Notes Upon Change of Control Triggering Event."

**Neither the U.S. Securities and Exchange Commission (the "SEC"), nor any state securities commission has approved or disapproved of the notes or the guarantee or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

The notes will be senior unsecured obligations of Braskem Netherlands Finance, ranking equal in right of payment with all of its other existing and future senior unsecured debt. The guarantee will be senior unsecured obligations of Braskem, ranking equal in right of payment with all of its other existing and future senior unsecured debt.

We will apply to the Singapore Exchange Securities Trading Limited (the "SGX-ST") for permission to list the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this offering memorandum. Admission to the Official List of the SGX-ST is not to be taken as an indication of the merits of the notes, Braskem Netherlands Finance or Braskem.

---

**Investing in the notes involves risks. See "Item 3. Key Information—Risk Factors" of our Annual Report (as defined herein), which is incorporated by reference in this offering memorandum, and "Risk Factors" beginning on page 25 of this offering memorandum.**

This offering memorandum has been prepared on the basis that any offer of the notes in any Member State of the European Economic Area (the "EEA") will be made pursuant to an exemption under Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC, as amended (the "Prospectus Regulation") from the requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for purposes of the Prospectus Regulation and has not been approved by a competent authority within the meaning of the Prospectus Regulation. This offering memorandum has been prepared on the basis that any offer of the notes in the United Kingdom (the "UK") will be made pursuant to an exemption from the obligation to publish a prospectus under Section 86 of the Financial Services and Markets Act 2000 (the "FSMA") in the UK. This offering memorandum is not a prospectus for purposes of the UK Prospectus Regulation (meaning Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, or the "EUWA") and has not been approved by the UK Financial Conduct Authority (the "FCA").

The notes and the guarantee have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S under the Securities Act ("Regulation S")), except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act ("Rule 144A"), and outside the United States in accordance with Regulation S. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For a description of certain restrictions on transfer of the notes, see "Transfer Restrictions."

**Issue price of the notes: 98.687% *plus* accrued interest, if any, from September 12, 2023.**

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company ("DTC") and its direct and indirect participants, including Clearstream Banking S.A. ("Clearstream") and Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), is expected on or about September 12, 2023.

*Global Coordinators*

**Citigroup**    **Credit Agricole CIB**    **Itaú BBA**    **Morgan Stanley**    **Santander**    **SMBC Nikko**

*Joint Book Runners*

**ING**                    **Mizuho**

The date of this offering memorandum is September 7, 2023.

**TABLE OF CONTENTS**

<u>Page</u>

INCORPORATION BY REFERENCE ...................................................................................................iv
PRESENTATION OF FINANCIAL AND OTHER INFORMATION ...............................................v
FORWARD-LOOKING STATEMENTS ........................................................................................ix
SUMMARY....................................................................................................................................11
RISK FACTORS ...........................................................................................................................25
USE OF PROCEEDS ....................................................................................................................31
CAPITALIZATION.......................................................................................................................32
DESCRIPTION OF THE NOTES .................................................................................................33
FORM OF THE NOTES................................................................................................................55
TAXATION...................................................................................................................................59
TRANSFER RESTRICTIONS.......................................................................................................71
ENFORCEABILITY OF CIVIL LIABILITIES ............................................................................74
PLAN OF DISTRIBUTION ..........................................................................................................76
CERTAIN ERISA CONSIDERATIONS .......................................................................................83
LEGAL MATTERS ......................................................................................................................85
INDEPENDENT AUDITORS .......................................................................................................86
AVAILABLE INFORMATION.....................................................................................................87

_____

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantee) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to "Braskem," the "Company," "our Company," "we," "our," "ours," "us" or similar terms are to Braskem and its consolidated subsidiaries, which include Braskem Netherlands Finance.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantee) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantee). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantee) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

In making an investment decision, prospective investors must rely on their own examination of our Company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

## PROHIBITION OF SALES TO EEA RETAIL INVESTORS

The notes (and the related guarantee) described in this offering memorandum are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No. 1286/2014, as amended (the "PRIIPs Regulation"), for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any member state of the EEA will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for offers of notes.

## PROHIBITION OF SALES TO UK RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No. 2017/565 as it forms part of domestic law by virtue of the EUWA; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No. 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a qualified investor as defined in Article 2 of the UK Prospectus Regulation as it forms part of domestic law by virtue of the EUWA. Consequently, no key information document required by Regulation (EU) No. 1286/2014 as it forms part of domestic law by virtue of the EUWA, or the UK PRIIPs Regulation, for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

The above selling restriction is in addition to any other selling restrictions set forth in this offering memorandum.

## MiFID PRODUCT GOVERNANCE/
## PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET

Solely for the purposes of the product approval process of the issuer and the guarantors (each a "Manufacturer"), the target market assessment in respect of the notes described in this offering memorandum has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each

as defined in MiFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes, or a distributor should take into consideration the Manufacturers' target market assessment; however, and without prejudice to the issuer's obligations in accordance with MiFID II, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

**SECTION 309B(1) NOTIFICATION** – In connection with Section 309B of the Securities and Futures Act 2001 of Singapore, as modified or amended from time to time (the "SFA") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "CMP Regulations 2018"), the issuer has determined, and hereby notifies all persons (including relevant persons (as defined in Section 309A(1) of the SFA)) that the notes are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

**NOTICE TO PROSPECTIVE INVESTORS IN THE NETHERLANDS**

The notes (including rights representing an interest in each global note that represents the notes) may not be offered or sold to individuals or legal entities in the Netherlands other than to qualified investors within the meaning of the Prospectus Regulation. No approved prospectus within the meaning of the Prospectus Regulation is required.

**NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL**

**THE NOTES (AND RELATED GUARANTEE) HAVE NOT BEEN, AND WILL NOT BE, REGISTERED WITH THE BRAZILIAN SECURITIES COMMISSION (*COMISSÃO DE VALORES MOBILIÁRIOS*, THE "CVM"). THE NOTES MAY NOT BE OFFERED OR SOLD IN BRAZIL, EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE A PUBLIC OFFERING OR UNAUTHORIZED DISTRIBUTION UNDER BRAZILIAN LAWS AND REGULATIONS. THE NOTES (AND RELATED GUARANTEE) ARE NOT BEING OFFERED INTO BRAZIL. DOCUMENTS RELATING TO THE OFFERING OF THE NOTES, AS WELL AS INFORMATION CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN BRAZIL, NOR BE USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION FOR OR SALE OF THE NOTES TO THE PUBLIC IN BRAZIL.**

## INCORPORATION BY REFERENCE

We are incorporating by reference into this offering memorandum the following information contained in documents that we have filed with, or furnished to, the SEC:

- our annual report on Form 20-F for the year ended December 31, 2022, filed with the SEC on April 25, 2023 (SEC File No. 001-14862), containing the audited consolidated financial statements of Braskem S.A. and its subsidiaries as of December 31, 2022 and 2021 and for the years ended December 31, 2022, 2021 and 2020, including the report of the independent registered public accounting firm, which we refer to in this offering memorandum as our "Annual Report";

- our unaudited condensed consolidated interim financial statements as of June 30, 2023 and for the six-month periods ended June 30, 2023 and 2022, contained in a report on Form 6-K furnished to the SEC on September 6, 2023 (SEC File No. 001-14862), which we refer to in this offering memorandum as our "Unaudited Condensed Consolidated Financial Statements"; and

- our report on Form 6-K including certain information regarding Braskem and, without limitation, Braskem's Management's Discussion and Analysis of Financial Condition and Results of Operations for the six-month periods ended June 30, 2023 and 2022, furnished to the SEC on September 6, 2023 (SEC File No. 001-14862), which we refer to herein as our "June 2023 Report."

Incorporation by reference of information contained in our Annual Report, our Unaudited Condensed Consolidated Financial Statements and our June 2023 Report means that (1) this information is considered part of this offering memorandum and (2) we can disclose important information to you, in such case, by referring to our Annual Report, our Unaudited Condensed Consolidated Financial Statements and our June 2023 Report that we incorporate by reference.

Any statement contained in a document incorporated by reference or deemed to be incorporated by reference in this offering memorandum will be deemed to be modified or superseded for purposes of this offering memorandum to the extent that a statement contained in this offering memorandum or any other subsequently filed document that also is, or is deemed to be, incorporated by reference in this offering memorandum modifies or supersedes that statement.

You should read "Available Information" for information on how to obtain a copy of our Annual Report, our Unaudited Condensed Consolidated Financial Statements and our June 2023 Report or other information relating to our Company.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

On September 6, 2023, the *real*/U.S. dollar exchange rate was R$4.9762 to US$1.00, based on the selling rate as reported by the Central Bank of Brazil (*Banco Central do Brasil*, the "Central Bank"). The selling rate was R$4.8192 to US$1.00 as of June 30, 2023, R$5.2177 to US$1.00 as of December 31, 2022, R$5.5805 to US$1.00 as of December 31, 2021 and R$5.1967 to US$1.00 as of December 31, 2020, in each case, as reported by the Central Bank. The *real*/U.S. dollar exchange rate fluctuates widely, and these selling rates may not be indicative of future selling rates.

Solely for the convenience of the reader, we have translated certain *real* amounts in this offering memorandum into U.S. dollars at the selling rate as reported by the Central Bank as of June 30, 2023 of R$4.8192 to US$1.00. These translations (i) should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate and (ii) do not necessarily represent amounts in accordance with accounting practices adopted in Brazil or International Financial Reporting Standards as issued by the International Accounting Standards Board (the "IASB").

**Financial Statements**

*Braskem Financial Statements*

We maintain our books and records in *reais*. Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our unaudited condensed consolidated interim financial statements as of June 30, 2023 and for the six-month periods ended June 30, 2023 and 2022, which are incorporated into this offering memorandum by reference to our Unaudited Condensed Consolidated Financial Statements (our "unaudited condensed consolidated interim financial statements") and our audited consolidated financial statements as of December 31, 2022 and 2021 and for the years ended December 31, 2022, 2021 and 2020 (our "audited consolidated financial statements"), which are incorporated into this offering memorandum by reference to our Annual Report.

We have prepared our audited consolidated financial statements in accordance with International Financial Reporting Standards ("IFRS"), as issued by the IASB. We have prepared our unaudited condensed consolidated interim financial statements in accordance with International Accounting Standard ("IAS") 34—Interim Financial Reporting, as issued by the IASB.

*Braskem Netherlands Finance Financial Statements*

We have not included any financial statements for Braskem Netherlands Finance in this offering memorandum. Braskem Netherlands Finance does not, and will not, publish financial statements, except for financial statements that it is required to publish under the laws of the Netherlands. In addition, Braskem Netherlands Finance will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, Braskem Netherlands Finance. Braskem Netherlands Finance's obligations under the notes will be fully and unconditionally guaranteed by us. The financial condition and results of operations of Braskem Netherlands Finance have been fully consolidated in our consolidated financial statements for all dates and periods ending after November 17, 2014 (the date of incorporation of Braskem Netherlands Finance).

**Special Note Regarding Non-GAAP Financial Measures**

The body of generally accepted accounting principles is commonly referred to as "GAAP." We have included in this offering memorandum certain non-GAAP financial measures, which are not defined by IFRS, as issued by the IASB, as part of our financial disclosure. This offering memorandum includes the following non-GAAP financial measures: (i) EBITDA, (ii) LTM EBITDA, (iii) Adjusted EBITDA, (iv) LTM Adjusted EBITDA, (v) Gross Debt, (vi) Net Debt, (vii) Financial Leverage Ratio, (viii) Adjusted EBITDA Margin and (ix) LTM Adjusted EBITDA Margin. We believe that the presentation of these non-GAAP measures provides useful information for investors regarding our performance and trends related to our results of operations and financial condition.

Non-GAAP financial measures have important limitations as analytical tools, and you should not consider them in isolation or as representative of cash flows, alternatives to profit (loss), an indicator of operating performance or liquidity, a basis for dividend distribution or a substitute for analysis of our financial performance, liquidity or indebtedness. Non-GAAP financial measures and similar measures do not have a standard definition, are used by various companies for different purposes and are often calculated in ways that reflect the circumstances of those companies. You should exercise caution in comparing these measures or data as reported by us to similar measures reported by other companies. Non-GAAP financial measures are not measures of financial performance or liquidity under IFRS. Because this financial information is not prepared in accordance with IFRS, as issued by the IASB, investors are cautioned not to place undue reliance on this information.

For a reconciliation of these non-GAAP financial measures to the most directly comparable GAAP financial measures, see "Selected Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

***EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin***

EBITDA (earnings before interest, taxes, depreciation and amortization) is a non-GAAP financial measure prepared by us in accordance with CVM Resolution No. 156, of June 23, 2022 ("CVM Resolution No. 156").

We calculate EBITDA pursuant to CVM Resolution No. 156, reconciled with our consolidated financial statements, as (i) net profit (loss) for the period, *plus* (ii) income taxes, *plus* (iii) net financial results, *plus* (iv) depreciation and amortization.

We calculate LTM EBITDA as EBITDA for the last twelve months. For the twelve-month period ended June 30, 2023, it is calculated as EBITDA for the six-month period ended June 30, 2023, *plus* EBITDA for the year ended December 31, 2022, *minus* EBITDA for the six-month period ended June 30, 2022.

We calculate Adjusted EBITDA as EBITDA *plus* (i) expense for (reversal of) impairment provisions on long-lived assets, *plus* (ii) results from equity accounted investees, *plus* (iii) (reversal) provision – geological event in Alagoas, *plus* (iv) PIS and COFINS credits – exclusion of ICMS from calculation basis, *plus* (v) provision for remediation of environmental impacts, *plus* (vi) tax credit recovery (INSS), *plus* (vii) reversal of provision for fine on feedstock supply agreement, *plus* (viii) tax credit recovery (IPTU), *plus* (ix) PIS/COFINS credits – gasoline, *plus* (x) insurance Alagoas."

We calculate LTM Adjusted EBITDA as Adjusted EBITDA for the last twelve months. For the twelve-month period ended June 30, 2023, it is calculated as Adjusted EBITDA for the six-month period ended June 30, 2023, *plus* Adjusted EBITDA for the year ended December 31, 2022, *minus* Adjusted EBITDA for the six-month period ended June 30, 2022.

We calculate Adjusted EBITDA Margin as Adjusted EBITDA *divided by* net revenue.

We calculate LTM Adjusted EBITDA Margin as LTM Adjusted EBITDA for the last twelve months *divided by* net revenue for the last twelve months.

We use EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin as measures of our operating performance, without any influence from our capital structure, tax or financial effects. EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin are not measures of profitability, financial performance or liquidity defined by IFRS, as issued by the IASB, and you should not consider them in isolation or as alternatives or substitutes for profit (loss), as measures of operating performance, cash flows, as indicators of liquidity, debt payment capacity or as a basis for dividend distribution. Other companies may calculate EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin in a different way than we do.

### Gross Debt and Net Debt

We calculate Gross Debt as (i) current and non-current borrowings and debentures, *plus* (ii) current and non-current Braskem Idesa borrowings, *plus* (iii) derivatives, which refer to (1) a swap related to a Brazilian real-denominated debt (*Certificado de Recebíveis do Agronegócio – CRA*), bearing interest at the Consumer Price Index (*Índice de Preços do Consumidor – IPCA*) *plus* spread, to a U.S. dollar-denominated debt, bearing interest at a fixed rate ("CRA Swap"); and/or (2) an interest rate swap of the project finance of Braskem Idesa, bearing interest at LIBOR, to a fixed interest rate ("NCE Swap"); and/or (3) a swap related to a Brazilian real-denominated debt, bearing interest at the Interbank Deposit Certificate interest rate (*Certificado de Depósito Interbancário – CDI*), to a U.S. dollar-denominated debt, bearing interest at a fixed rate ("Interest Rate Swap").

We calculate Net Debt as (i) Gross Debt, *minus* (ii) cash and cash equivalents, *minus* (iii) current and non-current financial investments.

We use Gross Debt and Net Debt as supplemental measures of our financial condition and financial leverage in relation to our operating cash flows.

Gross Debt and Net Debt are not measures of financial performance, liquidity or indebtedness under IFRS, as issued by the IASB, and have no standard definition. Other companies may calculate Gross Debt and Net Debt in a different way than we do.

### Financial Leverage Ratio

We calculate Financial Leverage Ratio as Net Debt *divided by* LTM Adjusted EBITDA.

We use Financial Leverage Ratio as a supplemental measure for investors and financial analysts to assess our financial condition and operating performance, and our management uses it to make certain managerial decisions.

Financial Leverage Ratio is not a measure of financial performance, liquidity or indebtedness under IFRS, as issued by the IASB, and has no standard definition. Other companies may calculate Financial Leverage Ratio in a different way than we do.

**Market Share and Other Information**

We make statements in this offering memorandum, our Annual Report and our June 2023 Report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, other countries in Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market share with respect to specific products by dividing our domestic net sales volumes of these products by the total Brazilian domestic consumption of these products. We derive information regarding the production capacity of other companies in the global petrochemical industry, international market prices for petrochemicals products and per capita consumption in certain geographic regions principally from reports published by Chemical Market Analytics by OPIS, a Dow Jones Company ("CMA"). We derive information relating to Brazilian imports and exports from ComexStat, published by the Brazilian Ministry of Development, Industry, Trade and Services (*Ministério do Desenvolvimento, Indústria, Comércio e Serviços*, the "MDIC"). We also derive information from reports published by the Brazilian Association of the Alkali, Chlorine and Derivatives Industry (*Associação Brasileira da Indústria de Álcalis, Cloro e Derivados*, the "Abiclor"). We also include information and statistics regarding economic growth in emerging economies obtained from the International Monetary Fund, and statistics regarding gross domestic product, growth in Brazil, the United States, Europe and Mexico obtained from independent public sources, such as the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*); the U.S. Bureau of Economic Analysis of the U.S. Department of Commerce; the statistical office of the European Union (Eurostat); and the Mexican Institute of Statistics and Geography (*Instituto Nacional de Estadística y Geografía*).

We provide information regarding domestic apparent consumption of some of our products based on information available from ComexStat, produced by the MDIC, and reports published by Abiclor. Domestic apparent consumption is equal to domestic production *plus* imports *minus* exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

We have no reason to believe that any of this information is inaccurate in any material respect. However, neither we nor the initial purchasers have independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

**Production Capacity and Sales Volume**

As used in this offering memorandum:

- "production capacity" means the annual projected capacity for a particular facility, calculated based upon operations for 24 hours each day of a year and deducting scheduled downtime for regular maintenance; and

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

## FORWARD-LOOKING STATEMENTS

This offering memorandum and the documents incorporated by reference in this offering memorandum include forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including, without limitation, the following:

- the cyclical and volatile nature of the global petrochemical industry and its adverse effects, which may have negative impacts on us and in the petrochemical sector;

- global macroeconomic conditions (including a United States recession) and their adverse effects on the margins of our products;

- the adverse effect of war and other armed conflicts, such as the conflict involving Russia and Ukraine, on our sales and operations in Brazil and internationally, and on the Brazilian and international petrochemical industry;

- a deterioration in the world economy and its potential adverse effect on demand for petrochemicals and thermoplastic products;

- any adverse effect of China's economy deceleration on global demand and on our Brazilian and international business;

- the adverse effect of global health crises on our Brazilian and international sales and operations, and on the Brazilian and international petrochemical industry;

- the adverse effect of inflation globally on our Brazilian and international business;

- the adverse effect of a more contractionary monetary policy globally on our Brazilian and international business;

- demand for our petrochemical products, our manufacturing facilities, price of raw materials and other inputs of our production, global logistics for our products, raw materials and other inputs of our production, and supply chains;

- general economic, political and business conditions in the markets or jurisdictions in which we operate or sell to, including governmental and electoral changes, and demand and supply for, and prices of, petrochemical and thermoplastic products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar and other currencies;

- our ability to successfully carry out our sustainable development strategy, and to successfully develop initiatives to adapt to and mitigate climate change;

- competition in the global petrochemical and biopolymer industry;

- our ability to successfully develop our innovation projects, in particular in renewable and recycling initiatives;

- prices of naphtha, ethane, ethanol, propane, propylene and other raw materials and the terms and conditions of the supply agreements related thereto;

- international prices of petrochemical and biopolymer products;

- actions taken by our controlling shareholder;

- inherent risks related to any change of our corporate control;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, laws and regulations affecting tax and environmental matters and import tariffs in other markets or jurisdictions in which we operate or to which we export our products;

- political conditions in the countries where we operate, particularly in Brazil and Mexico;

- future changes in governmental policies, including the adoption of new environmental policies and related actions undertaken by the governments of the locations in which we operate;

- unfavorable decisions rendered in major pending or future tax, labor, environmental and other legal proceedings; and

- other factors identified under "Risk Factors" in this offering memorandum, in our Annual Report and in any other reports filed with or furnished to the SEC that are incorporated by reference in this offering memorandum.

Our forward-looking statements are not a guarantee of future performance, and our actual results of operations or other developments may differ materially from the expectations expressed in our forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

All forward-looking statements attributed to us or a person acting on our behalf are qualified in their entirety by this cautionary statement, and you should not place undue reliance on any forward-looking statement included in this offering memorandum. Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update them as a result of new information or future developments.

For additional information on factors that could cause our actual results of operations to differ from expectations reflected in forward-looking statements, please see the "Risk Factors" sections in this offering memorandum and "Item 3. Key Information—Risk Factors" in our Annual Report, which is incorporated by reference herein.

|  |  |
|---|---|
|  | to the notes) by Braskem Netherlands Finance and impose certain other limitations and restrictions on Braskem Netherlands Finance as described under "Description of the Notes—Additional Limitations on Braskem Netherlands Finance." |
| Covenants of Braskem.............................. | The indenture will limit the creation of liens by Braskem and its significant subsidiaries and will permit Braskem to consolidate or merge with, or transfer all or substantially all of its assets to, another person only if it complies with certain requirements. However, these covenants are subject to a number of important exceptions. See "Description of the Notes—Covenants." |
| Events of default...................................... | The indenture will set forth the events of default applicable to the notes, including an event of default triggered by cross-acceleration of other debt of Braskem and its Significant Subsidiaries (as hereinafter defined) in a total amount of US$100.0 million or more. See "Description of the Notes—Events of Default." |
| Further issuances ..................................... | Braskem Netherlands Finance may, from time to time, without the consent of the holders of the notes, issue an unlimited principal amount of additional notes of the same series as the notes initially issued in this offering. |
| Substitution of the issuer .......................... | Braskem Netherlands Finance may, without the consent of the holders of the notes and subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary (as hereinafter defined) of Braskem as principal debtor in respect of the notes. See "Description of the Notes—Substitution of the Issuer." |
| Form and denomination............................. | The notes will be issued in the form of global notes in fully registered form without interest coupons. The global notes will be exchangeable or transferable, as the case may be, for definitive certificated notes in fully registered form without interest coupons only in limited circumstances. The notes will be issued in registered form in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. See "Description of the Notes—Form, Denomination and Title" and "Form of the Notes." |
| Use of proceeds ........................................ | We expect the net proceeds from the sale of the notes to be approximately US$833.3 million after deducting commissions, fees and estimated expenses of the offering.<br><br>We intend to use the net proceeds of this offering for general corporate purposes, which may include, but is not limited to, the prepayment of certain outstanding debt. |
| Settlement................................................. | The notes will be delivered in book-entry form only through the facilities of DTC for the accounts of its direct and indirect participants, including Euroclear and Clearstream. |
| Notice to investors.................................... | The notes have not been, and will not be, registered under the Securities Act and are subject to limitations on transfers, as described under "Notice to Investors." |

18

**RISK FACTORS**

*Our Annual Report includes extensive risk factors relating to our Company, the petrochemical industry and the countries in which we operate. Prospective purchasers of notes should carefully consider the risks discussed under "Item 3. Key Information—Risk Factors" in our Annual Report and below, as well as the other information included in or incorporated by reference into this offering memorandum, before deciding to purchase any notes. Our business, results of operations, financial condition or prospects could be materially and adversely affected if any of these risks occurs, and as a result, the trading price of the notes could decline and you could lose all or part of your investment.*

*The risk factors discussed in our Annual Report and below are not the only risks that we face, but are the risks that we currently consider to be material. There may be additional risks that we currently consider immaterial or of which we are currently unaware, and any of these risks could have similar effects to those set forth in our Annual Report and below.*

**Risks Relating to the Notes and the Guarantee**

***Because Braskem Netherlands Finance has no operations of its own, holders of the notes must depend on Braskem and its subsidiaries to provide Braskem Netherlands Finance with sufficient funds to make payments on the notes when due.***

Braskem Netherlands Finance, a wholly-owned indirect subsidiary of Braskem, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or subordinated to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem Netherlands Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of Braskem Netherlands Finance to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance. In the event of an adverse change in the financial condition or results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance, these entities may be unable to service their indebtedness to Braskem Netherlands Finance, which would result in the failure of Braskem Netherlands Finance to have sufficient funds to repay all amounts due on or with respect to the notes.

***Payments on Braskem's guarantee will be junior to Braskem's secured debt obligations and effectively junior to debt obligations of Braskem's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by Braskem on an unsecured basis. The Braskem guarantee will constitute an unsecured obligation of Braskem. The guarantee will rank equal in right of payment with all of Braskem's other existing and future senior unsecured indebtedness. Although the guarantee will provide the holders of the notes with a direct, but unsecured claim on Braskem's assets and property, payment on the guarantee will be subordinated to secured debt of Braskem to the extent of the assets and property securing such debt. Payment on the notes and the guarantee will also be structurally subordinated to the payment of all existing and future liabilities of Braskem's subsidiaries and jointly controlled companies (other than Braskem Netherlands Finance).

Upon any liquidation or reorganization of Braskem, any right of the holders of the notes, through enforcement of the guarantee, to participate in the assets of Braskem, including the capital stock of its subsidiaries and jointly controlled entities, will be subject to the prior claims of Braskem's secured creditors, and to participate in the assets of Braskem's subsidiaries and jointly controlled entities will be subject to the prior claims of the creditors of its subsidiaries and jointly controlled entities.

In October 2021, Braskem Idesa issued sustainability-linked debt securities in the aggregate amount of US$1.2 billion, maturing in 10 years. The coupon of 6.99% can be increased by up to 37.5 basis points in case of non-compliance with the sustainability target. The proceeds obtained from the sale of the bonds, *plus* a credit line of US$150 million, were used to pay off the project finance facility entered into by Braskem Idesa in 2012 (the "Project Finance"). Such indebtedness is non-recourse to Braskem S.A.

25

***The notes are subject to transfer restrictions.***

The notes (and the related guarantee) have not been, and will not be, registered under the Securities Act or any U.S. state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable U.S. state securities laws. These exemptions include offers and sales to qualified institutional buyers as defined under Rule 144A and offers and sales that occur outside the United States in compliance with Regulation S and in accordance with any applicable securities laws of any other jurisdiction. The notes are subject to certain transfer restrictions and can be transferred only to certain transferees. These transfer restrictions may further limit the liquidity of the notes. For a discussion of certain restrictions on resale and transfer of the notes, see "Transfer Restrictions."

***Brazilian bankruptcy law may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness, including our obligations under the guarantee, then we may become subject to insolvency proceedings in Brazil. The bankruptcy law of Brazil currently in effect is significantly different from, and may be less favorable to creditors than, that of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a judicial reorganization proceeding. Under Brazilian bankruptcy law, in the event of our bankruptcy or liquidation, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. The obligations under the guarantee would be considered unsecured in case of a judicial reorganization, extrajudicial reorganization or bankruptcy liquidation, and would be subject to the reorganization plan or, in case of a bankruptcy liquidation, would be paid according to a statutory order pursuant to Brazilian bankruptcy law.

Courts in Brazil have taken different approaches regarding the representation of noteholders in insolvency proceedings. Some courts have admitted the representation of noteholders by a trustee or agent, while others have required the direct participation of the beneficial owner of the notes, and sometimes considered the relevant note as an independent credit.

Brazilian bankruptcy laws have recently been amended to include provisions regarding cross-border reorganization or insolvency proceedings. In general terms, these rules follow the United Nations Commission on International Trade Law (UNCITRAL) Model Law and set forth the principles for cross-border insolvency proceedings, mechanisms for cooperation between jurisdictions, and legally define a foreign main proceeding and a foreign secondary proceeding. This means that Brazil would recognize a foreign proceeding and cooperate with the foreign authority in any event.

***The imposition of IOF/Exchange taxes or other similar taxes may indirectly influence the price and volatility of the notes.***

Brazilian law imposes the Tax on Foreign Exchange Transactions (*Imposto sobre Operações de Crédito, Câmbio e Seguro, ou relativas a Títulos e Valores Mobiliários*, "IOF/Exchange taxes"), on the conversion of *reais* into foreign currency and on the conversion of foreign currency into *reais*. Among others, the objective of these taxes is to slow the pace of speculative inflows of foreign capital into the Brazilian market and the appreciation of the *real* against the U.S. dollar. The imposition of this tax or other similar taxes may discourage foreign investment in the debt securities of Brazilian companies, including our Company, due to higher transaction costs, and may negatively impact the price and volatility of the notes. See "Taxation—Brazilian Taxation—Other Brazilian Tax Considerations."

***Substitution of the issuer may have adverse tax consequences.***

Braskem Netherlands Finance may, subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary of Braskem as principal debtor in respect of the notes (see "Description of the Notes—Substitution of the Issuer"), which may result in certain adverse tax consequences to holders. The Substituted Issuer

29

## EXHIBIT F

**Excerpts of 2033 Notes Offering Memorandum**

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE UNITED STATES.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION, AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED, THE "INSURANCE DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN REGULATION (EU) 2017/1129, AS AMENDED (THE "PROSPECTUS REGULATION"). CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION.

**PROHIBITION OF SALES TO U.K. RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE UNITED KINGDOM ("U.K."). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2 OF REGULATION (EU) NO 2017/565 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (THE "EUWA"); (II) A CUSTOMER WITHIN THE MEANING OF THE PROVISIONS OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (AS AMENDED, THE "FSMA") AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA TO IMPLEMENT THE INSURANCE DISTRIBUTION DIRECTIVE, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) NO 600/2014 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN ARTICLE 2 OF THE PROSPECTUS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA. CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY THE PRIIPS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA (THE "U.K. PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE U.K. HAS

BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE U.K. MAY BE UNLAWFUL UNDER THE U.K. PRIIPS REGULATION.

IN ADDITION, IN THE U.K., THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III) PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS"). THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE U.K. ANY PERSON IN THE U.K. THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of Your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the United States. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the United States; and (ii) you consent to delivery of the Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and, consequently, neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic form and the hard copy version available to you on request from the initial purchasers.

**OFFERING MEMORANDUM**                                          **CONFIDENTIAL**



# Braskem Netherlands Finance B.V.

(*a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands*)

## US$1,000,000,000 7.250% Senior Notes due 2033

Unconditionally and Irrevocably Guaranteed by

# Braskem S.A.

(*incorporated under the laws of the Federative Republic of Brazil*)

Braskem Netherlands Finance B.V. ("Braskem Netherlands Finance") is offering US$1,000,000,000 in aggregate principal amount of its 7.250% senior notes due 2033 (the "notes"). Braskem Netherlands Finance is a private company with limited liability incorporated under the laws of the Netherlands. The notes will be fully, unconditionally and irrevocably guaranteed by Braskem S.A. ("Braskem"), a corporation (*sociedade anônima*) incorporated under the laws of the Federative Republic of Brazil. The notes will bear interest at the rate of 7.250% per year and will mature on February 13, 2033. Interest on the notes is payable on February 13 and August 13 of each year, beginning on August 13, 2023.

At any time, prior to November 13, 2032 (which is the date that is three months prior to the maturity of the notes), Braskem Netherlands Finance or Braskem may, at its option, redeem the notes, in whole or in part, by paying 100% of the principal amount of the notes plus a "make-whole" amount and accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date. If the redemption date of the notes is on or after November 13, 2032, the redemption price will equal 100% of the principal amount of the notes, plus accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date. See "Description of the Notes—Redemption—Optional Redemption." The notes may also be redeemed by Braskem Netherlands Finance or Braskem, at its option, in whole but not in part, at 100% of their principal amount plus accrued and unpaid interest and additional amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption—Tax Redemption."

If a Change of Control Triggering Event (as defined herein) occurs, unless Braskem Netherlands Finance or Braskem has exercised its option to redeem the notes, Braskem will be required to offer to purchase the notes at the price described in this offering memorandum. See "Description of the Notes—Purchase of Notes Upon Change of Control Triggering Event."

**Neither the U.S. Securities and Exchange Commission (the "SEC"), nor any state securities commission has approved or disapproved of the notes or the guarantees or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

The notes will be senior unsecured obligations of Braskem Netherlands Finance, ranking equal in right of payment with all of its other existing and future senior unsecured debt. The guarantees will be senior unsecured obligations of Braskem, ranking equal in right of payment with all of its other existing and future senior unsecured debt.

We will apply to the Singapore Exchange Securities Trading Limited (the "SGX-ST") for permission to list the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this offering memorandum. Admission to the Official List of the SGX-ST is not to be taken as an indication of the merits of the notes, Braskem Netherlands Finance or Braskem.

**Investing in the notes involves risks. See "Item 3. Key Information—Summary of Risk Factors" beginning on page 1 of our Annual Report (as defined herein), which is incorporated by reference in this offering memorandum, and "Risk Factors" beginning on page 26 of this offering memorandum.**

This offering memorandum has been prepared on the basis that any offer of the notes in any Member State of the European Economic Area (the "EEA") will be made pursuant to an exemption under Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC, as amended (the "Prospectus Regulation") from the requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for purposes of the Prospectus Regulation and has not been approved by a competent authority within the meaning of the Prospectus Regulation. This offering memorandum has been prepared on the basis that any offer of the notes in the United Kingdom (the "UK") will be made pursuant to an exemption from the obligation to publish a prospectus under s.86 of the Financial Services and Markets Act 2000 (the "FSMA") in the UK. This offering memorandum is not a prospectus for purposes of the UK Prospectus Regulation (meaning Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, or the "EUWA") and has not been approved by the UK Financial Conduct Authority (the "FCA").

The notes and the guarantees have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S under the Securities Act ("Regulation S")), except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act ("Rule 144A"), and outside the United States in accordance with Regulation S. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For a description of certain restrictions on transfer of the notes, see "Transfer Restrictions."

---

**Issue price of the notes:100.000%** *plus* **accrued interest, if any, from February 13, 2023.**

---

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company ("DTC") and its direct and indirect participants, including Clearstream Banking, S.A. ("Clearstream") and Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear") is expected on or about February 13, 2023.

---

*Global Coordinators*

**BNP PARIBAS**      **Citigroup**      **Itaú BBA**      **Morgan Stanley**      **Santander**      **SMBC Nikko**

*Joint Book-Running Managers*

**Credit Agricole CIB**      **Mizuho**      **Standard Chartered Bank AG**      **ING**      **Natixis**

The date of this offering memorandum is February 8, 2023.

**TABLE OF CONTENTS**

**Page**

INCORPORATION BY REFERENCE ..................................................................................................iv
PRESENTATION OF FINANCIAL AND OTHER INFORMATION ...............................................v
FORWARD-LOOKING STATEMENTS ..........................................................................................ix
SUMMARY .........................................................................................................................................11
RISK FACTORS ................................................................................................................................26
USE OF PROCEEDS .........................................................................................................................32
CAPITALIZATION ...........................................................................................................................33
DESCRIPTION OF THE NOTES .....................................................................................................35
FORM OF THE NOTES.....................................................................................................................57
TAXATION.........................................................................................................................................61
TRANSFER RESTRICTIONS...........................................................................................................73
ENFORCEABILITY OF CIVIL LIABILITIES ...............................................................................76
PLAN OF DISTRIBUTION ..............................................................................................................78
CERTAIN ERISA CONSIDERATIONS ..........................................................................................85
LEGAL MATTERS ...........................................................................................................................87
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM AND INDEPENDENT AUDITOR.........88
AVAILABLE INFORMATION.........................................................................................................89

————————————

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantees) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to "Braskem," the "Company," "our company," "we," "our," "ours," "us" or similar terms are to Braskem and its consolidated subsidiaries, which include Braskem Netherlands Finance.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantees) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantees). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantees) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

i

In making an investment decision, prospective investors must rely on their own examination of our company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

### PROHIBITION OF SALES TO EEA RETAIL INVESTORS

The notes (and the related gurantee) described in this offering memorandum are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No 1286/2014, as amended (the "PRIIPs Regulation"), for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any member state of the EEA will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for offers of notes.

### PROHIBITION OF SALES TO UK RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the EUWA; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a qualified investor as defined in Article 2 of the UK Prospectus Regulation as it forms part of domestic law by virtue of the EUWA. Consequently, no key information document required by Regulation (EU) No 1286/2014 as it forms part of domestic law by virtue of the EUWA, or the UK PRIIPs Regulation, for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

The above selling restriction is in addition to any other selling restrictions set forth in this offering memorandum.

### MiFID PRODUCT GOVERNANCE/PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET

Solely for the purposes of the product approval process of the issuer and the guarantors (each a "Manufacturer"), the target market assessment in respect of the notes described in this offering memorandum has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each

ii

as defined in MiFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes, or a distributor should take into consideration the Manufacturers' target market assessment; however, and without prejudice to the issuer's obligations in accordance with MiFID II, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

**SECTION 309B(1) NOTIFICATION** – In connection with Section 309B of the Securities and Futures Act 2001 of Singapore, as modified or amended from time to time (the "SFA") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "CMP Regulations 2018"), the issuer has determined, and hereby notifies all persons (including relevant persons (as defined in Section 309A(1) of the SFA)) that the notes are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

### NOTICE TO PROSPECTIVE INVESTORS IN THE NETHERLANDS

The notes (including rights representing an interest in each global note that represents the notes) may not be offered or sold to individuals or legal entities in the Netherlands other than to qualified investors within the meaning of the Prospectus Regulation. No approved prospectus within the meaning of the Prospectus Regulation is required.

### NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL

**THE NOTES (AND RELATED GUARANTEES) HAVE NOT BEEN, AND WILL NOT BE, REGISTERED WITH THE BRAZILIAN SECURITIES COMMISSION (*COMISSÃO DE VALORES MOBILIÁRIOS*, THE "CVM"). THE NOTES MAY NOT BE OFFERED OR SOLD IN BRAZIL, EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE A PUBLIC OFFERING OR UNAUTHORIZED DISTRIBUTION UNDER BRAZILIAN LAWS AND REGULATIONS. THE NOTES (AND RELATED GUARANTEES) ARE NOT BEING OFFERED INTO BRAZIL. DOCUMENTS RELATING TO THE OFFERING OF THE NOTES, AS WELL AS INFORMATION CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN BRAZIL, NOR BE USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION FOR OR SALE OF THE NOTES TO THE PUBLIC IN BRAZIL.**

## INCORPORATION BY REFERENCE

We are incorporating by reference into this offering memorandum the following information contained in documents that we have filed with or furnished to the SEC:

- our annual report on Form 20-F for the year ended December 31, 2021, filed with the SEC on April 28, 2022 (SEC File No. 001-14862), containing the audited consolidated financial statements of Braskem S.A. and its subsidiaries as of December 31, 2021 and 2020 and for the years ended December 31, 2021, 2020 and 2019, including the reports of the independent registered public accounting firm, which we refer to in this offering memorandum as our "Annual Report";

- our unaudited condensed consolidated interim financial statements as of September 30, 2022 and for the nine-month periods ended September 30, 2022 and 2021, contained in a report on Form 6-K furnished to the SEC on November 9, 2022 (SEC File No. 001-14862), which we refer to in this offering memorandum as our "Third Quarter Financial Statements Report"; and

- our report on Form 6-K including certain information regarding Braskem and, without limitation, Braskem's Management's Discussion and Analysis of Financial Condition and Results of Operations for the nine-month periods ended September 30, 2022 and 2021, furnished to the SEC on February 6, 2023 (SEC File No. 001-14862), which we refer to herein as our "September 2022 Report."

Incorporation by reference of information contained in our Annual Report, our Third Quarter Financial Statements Report and our September 2022 Report means that (1) this information is considered part of this offering memorandum and (2) we can disclose important information to you, in such case, by referring to our Annual Report, our Third Quarter Financial Statements Report and our September 2022 Report that we incorporate by reference.

Any statement contained in a document incorporated by reference or deemed to be incorporated by reference in this offering memorandum will be deemed to be modified or superseded for purposes of this offering memorandum to the extent that a statement contained in this offering memorandum or any other subsequently filed document that also is, or is deemed to be, incorporated by reference in this offering memorandum modifies or supersedes that statement.

You should read "Available Information" for information on how to obtain a copy of our Annual Report, our Third Quarter Financial Statements Report and our September 2022 Report or other information relating to our company.

### PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

On February 7, 2023, the *real*/U.S. dollar exchange rate was R$5.1695 to US$1.00, based on the selling rate as reported by the Central Bank of Brazil (*Banco Central do Brasil*, the "Central Bank"). The selling rate was R$5.4066 to US$1.00 as of September 30, 2022, R$5.5805 to US$1.00 as of December 31, 2021, R$5.1967 to US$1.00 as of December 31, 2020 and R$4.0307 to US$1.00 as of December 31, 2019, in each case, as reported by the Central Bank. The *real*/U.S. dollar exchange rate fluctuates widely, and these selling rates may not be indicative of future selling rates.

Solely for the convenience of the reader, we have translated certain *real* amounts in this offering memorandum into U.S. dollars at the selling rate as reported by the Central Bank as of September 30, 2022 of R$5.4066 to US$1.00. These translations (i) should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate and (ii) do not necessarily represent amounts in accordance with accounting practices adopted in Brazil or International Financial Reporting Standards as issued by the International Accounting Standards Board (the "IASB").

### Financial Statements

#### *Braskem Financial Statements*

We maintain our books and records in *reais*. Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our unaudited condensed consolidated interim financial statements as of September 30, 2022 and for the nine-month periods ended September 30, 2022 and 2021, which are incorporated into this offering memorandum by reference to our Third Quarter Financial Statements Report (our "unaudited condensed consolidated interim financial statements") and our audited consolidated financial statements as of December 31, 2021 and 2020 and for the years ended December 31, 2021, 2020 and 2019 (our "audited consolidated financial statements"), which are incorporated into this offering memorandum by reference to our Annual Report.

We have prepared our audited consolidated financial statements in accordance with International Financial Reporting Standards ("IFRS"), as issued by the IASB. We have prepared our unaudited condensed consolidated interim financial statements in accordance with CPC 21 (R1) and International Accounting Standard ("IAS") 34—Interim Financial Reporting, as issued by the IASB.

Our audited consolidated statement of profit or loss, consolidated statements of changes in equity and consolidated statement of cash flow for the year ended December 31, 2019 are not equivalent to our statutory financial statements as issued under the requirements applicable in Brazil. The date of issue of the 2019 audited consolidated financial statements was different from the date of issue of our consolidated financial statements in Brazil, and there were differences due to adjusting and non-adjusting events after the reporting period, under IAS 10—Events after the Reporting Period.

#### *Braskem Netherlands Finance Financial Statements*

We have not included any financial statements for Braskem Netherlands Finance in this offering memorandum. Braskem Netherlands Finance does not, and will not, publish financial statements, except for financial statements that it expects to publish under the laws of the Netherlands. In addition, Braskem Netherlands Finance will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, Braskem Netherlands Finance. Braskem Netherlands Finance's obligations under the notes will be fully and unconditionally guaranteed by us. The financial condition and results of operations of Braskem Netherlands Finance have been fully consolidated in our consolidated financial statements for dates and periods ending after November 17, 2014 (the date of incorporation of Braskem Netherlands Finance).

**Special Note Regarding Non-GAAP Financial Measures**

The body of generally accepted accounting principles is commonly referred to as "GAAP." We have included in this offering memorandum certain non-GAAP financial measures, which are not defined by Brazilian GAAP or IFRS, as part of our financial disclosure. This offering memorandum includes the following non-GAAP financial measures: (i) Consolidated EBITDA, (ii) Adjusted Consolidated EBITDA, (iii) LTM Adjusted Consolidated EBITDA, (iv) Consolidated Gross Debt, (v) Consolidated Net Debt, (vi) Financial Leverage Ratio, and (vii) Adjusted Consolidated EBITDA Margin. We believe that the presentation of these non-GAAP measures provides useful information for investors regarding our performance and trends related to our results of operations and financial condition.

Non-GAAP financial measures have important limitations as analytical tools, and you should not consider them in isolation or as representative of cash flows, alternatives to profit (loss), an indicator of operating performance or liquidity, a basis for dividend distribution or a substitute for analysis of our financial performance, liquidity or indebtedness. Non-GAAP financial measures and similar measures do not have a standard definition, are used by various companies for different purposes and are often calculated in ways that reflect the circumstances of those companies. You should exercise caution in comparing these measures or data as reported by us to similar measures reported by other companies. Non-GAAP financial measures are not measures of financial performance or liquidity under IFRS or Brazilian GAAP. Because this financial information is not prepared in accordance with Brazilian GAAP or IFRS, investors are cautioned not to place undue reliance on this information.

For a reconciliation of these non-GAAP financial measures to the most directly comparable GAAP financial measures, see "Selected Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

***Consolidated EBITDA, Adjusted Consolidated EBITDA, LTM Adjusted Consolidated EBITDA and Adjusted Consolidated EBITDA Margin***

EBITDA (earnings before interest, taxes, depreciation and amortization) is a non-GAAP financial measure prepared by us in accordance with CVM Instruction No. 527, of October 4, 2012 ("CVM Instruction No. 527").

We calculate Consolidated EBITDA pursuant to CVM Instruction No. 527, reconciled with our consolidated financial statements, as (i) net profit (loss) for the period, *plus* (ii) current and deferred income tax and social contribution, *plus* (iii) net financial results, *plus* (iv) depreciation and amortization.

We calculate Adjusted Consolidated EBITDA as Consolidated EBITDA *plus* (i) accrual (reversal) of provisions for losses from long-lived assets, *plus* (ii) results from equity investments, *plus* (iii) (reversal) provision – geological event in Alagoas, *plus* (iv) PIS and COFINS credits – exclusion of ICMS from calculation basis, *plus* (v) amounts related to the settlement agreement entered into by us, the Brazilian Ministry of Transparency and Controllership (*Ministério da Transparência, Fiscalização e Controle*) and the Brazilian Office of the Attorney General (*Advocacia-Geral da União*) in 2019 (the "Leniency Agreement"), *plus* (vi) provision for remediation of environmental impacts, *plus* (vii) tax credit recovery (INSS), plus (viii) reversal of provision for fine on feedstock supply agreement, plus (ix) tax credit recovery (IPTU), *plus* (x) the recovery of federal tax credit on PIS/COFINS related to the gasoline sales in fiscal year 2015, arising from the favorable final and unappealable ruling that impacts the result in "Other income (expenses), net".

We calculate LTM Adjusted Consolidated EBITDA as Adjusted Consolidated EBITDA for the last twelve months. For the twelve-month period ended September 30, 2022, it is calculated as Adjusted Consolidated EBITDA for the nine-month period ended September 30, 2022, *plus* Adjusted Consolidated EBITDA for the twelve-month period ended December 31, 2021, *minus* Adjusted Consolidated EBITDA for the nine-month period ended September 30, 2021.

We calculate Adjusted Consolidated EBITDA Margin as Adjusted Consolidated EBITDA *divided by* net revenue.

vi

We use Consolidated EBITDA, Adjusted Consolidated EBITDA, LTM Adjusted Consolidated EBITDA and Adjusted Consolidated EBITDA Margin as measures of our operating performance, without any influence from our capital structure, tax or financial effects. Consolidated EBITDA, Adjusted Consolidated EBITDA, LTM Adjusted Consolidated EBITDA and Adjusted Consolidated EBITDA Margin are not measures of profitability, financial performance or liquidity defined by accounting practices adopted in Brazil or by IFRS, as issued by the IASB, and you should not consider them in isolation or as alternatives or substitutes for profit (loss), as measures of operating performance, cash flows, as indicators of liquidity, debt payment capacity or as a basis for dividend distribution. Other companies may calculate Consolidated EBITDA, Adjusted Consolidated EBITDA, LTM Adjusted Consolidated EBITDA and Adjusted Consolidated EBITDA Margin in a different way than we do.

### *Consolidated Gross Debt and Consolidated Net Debt*

We calculate Consolidated Gross Debt as (i) current and non-current borrowings and debentures *plus* (ii) borrowings and debentures derivatives.

We calculate Consolidated Net Debt as (i) Consolidated Gross Debt *minus* (ii) cash and cash equivalents *minus* (iii) current and non-current financial investments.

We use Consolidated Gross Debt and Consolidated Net Debt as supplemental measures of our financial condition and financial leverage in relation to our operating cash flows.

Consolidated Gross Debt and Consolidated Net Debt are not measures of financial performance, liquidity or indebtedness under the accounting practices adopted in Brazil or by IFRS, as issued by the IASB, and have no standard definition. Other companies may calculate Consolidated Gross Debt and Consolidated Net Debt in a different way than we do.

### *Financial Leverage Ratio*

We calculate Financial Leverage Ratio as Consolidated Net Debt *divided by* LTM Adjusted Consolidated EBITDA.

We use Financial Leverage Ratio as a supplemental measure for investors and financial analysts to assess our financial condition and operating performance, and our management uses it to make certain managerial decisions.

Financial Leverage Ratio is not a measure of financial performance, liquidity or indebtedness under the accounting practices adopted in Brazil or by IFRS, as issued by the IASB, and has no standard definition. Other companies may calculate Financial Leverage Ratio in a different way than we do.

**Market Share and Other Information**

We make statements in this offering memorandum, our Annual Report and our September 2022 Report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, other countries in Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market share with respect to specific products by dividing our domestic net sales volumes of these products by the total Brazilian domestic consumption of these products. We derive information regarding the production capacity of other companies in the global petrochemical industry, international market prices for petrochemicals products and per capita consumption in certain geographic regions principally from reports published by IHS, Inc. ("IHS"). We derive information relating to Brazilian imports and exports from ComexStat, produced by the Brazilian Ministry of Development, Industry, Commerce and Services (*Ministério do Desenvolvimento, Indústria, Comércio e Serviços*, the "MDIC"). We also derive information from reports published by Brazilian Association of the Alkali, Chlorine and Derivatives Industry (*Associação Brasileira da Indústria de Álcalis, Cloro e Derivados*, the "Abiclor"). We also include information and statistics regarding economic growth in emerging economies obtained from the International Monetary Fund, and statistics regarding gross domestic product, growth in Brazil, the United States, Europe and Mexico obtained from independent public sources, such as the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*); the U.S. Bureau of Economic Analysis of the U.S. Department of Commerce; the statistical office of the European Union (Eurostat); and the Mexican Institute of Statistics and Geography (*Instituto Nacional de Estadística y Geografía*).

We provide information regarding domestic apparent consumption of some of our products based on information available from ComexStat, produced by the MDIC, and reports published by Abiclor. Domestic apparent consumption is equal to domestic production *plus* imports *minus* exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

We have no reason to believe that any of this information is inaccurate in any material respect. However, neither we nor the initial purchasers have independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

**Production Capacity and Sales Volume**

As used in this offering memorandum:

- "production capacity" means the annual projected capacity for a particular facility, calculated based upon operations for 24 hours each day of a year and deducting scheduled downtime for regular maintenance; and

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

## FORWARD-LOOKING STATEMENTS

This offering memorandum and the documents incorporated by reference in this offering memorandum include forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including, without limitation, the following:

- the cyclical nature of the global petrochemical industry and its adverse effects in the industry in general and our company specifically from time to time;

- global macroeconomic conditions (including a United States recession) and their adverse effects on the margins of our products;

- the adverse effect of war and other armed conflicts, such as the conflict involving Russia and Ukraine, on our sales and operations in Brazil and internationally, and on the Brazilian and international petrochemical industry;

- a deterioration in the world economy and its potential adverse effect on demand for petrochemicals and thermoplastic products;

- any adverse effect of China's economy deceleration on global demand and on our Brazilian and international business;

- the adverse effect of global health crises, such as the coronavirus pandemic (the "COVID-19 pandemic") and consequently the Chinese "Zero Covid" policy, on our Brazilian and international sales and operations, and on the Brazilian and international petrochemical industry;

- the adverse effect of inflation globally on our Brazilian and international business;

- the adverse effect of a more contractionary monetary policy globally on our Brazilian and international business;

- demand for our petrochemical products, our manufacturing facilities, price of raw materials and other inputs of our production, global logistics for our products, raw materials and other inputs of our production, and supply chains;

- general economic, political and business conditions in the markets or jurisdictions in which we operate or sell to, including governmental and electoral changes, and demand and supply for, and prices of, petrochemical and thermoplastic products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar and other currencies;

- our ability to successfully carry out our sustainable development strategy, and to successfully develop initiatives to adapt to and mitigate climate change;

ix

- competition in the global petrochemical and biopolymer industry;

- our ability to successfully develop our innovation projects, in particular in renewable and recycling initiatives;

- prices of naphtha, ethane, ethanol, propane, propylene and other raw materials and the terms and conditions of the supply agreements related thereto;

- international prices of petrochemical and biopolymer products;

- actions taken by our controlling shareholder;

- inherent risks related to any change of our corporate control;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, laws and regulations affecting tax and environmental matters and import tariffs in other markets or jurisdictions in which we operate or to which we export our products;

- political conditions in the countries where we operate, particularly in Brazil and Mexico;

- future changes in governmental policies, including the adoption of new environmental policies and related actions undertaken by the governments of the locations in which we operate;

- unfavorable decisions rendered in major pending or future tax, labor, environmental and other legal proceedings; and

- other factors identified under "Risk Factors" in this offering memorandum, in our Annual Report and in any other reports filed with or furnished to the SEC that are incorporated by reference in this offering memorandum.

Our forward-looking statements are not a guarantee of future performance, and our actual results of operations or other developments may differ materially from the expectations expressed in our forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

All forward-looking statements attributed to us or a person acting on our behalf are qualified in their entirety by this cautionary statement, and you should not place undue reliance on any forward-looking statement included in this offering memorandum. Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update them as a result of new information or future developments.

For additional information on factors that could cause our actual results of operations to differ from expectations reflected in forward-looking statements, please see the "Risk Factors" sections in this offering memorandum and "Item 3. Key Information—Summary of Risk Factors" in our Annual Report, which is incorporated by reference herein.

x

other limitations and restrictions on Braskem Netherlands Finance as described under "Description of the Notes—Additional Limitations on Braskem Netherlands Finance."

Covenants of Braskem ................................ The indenture will limit the creation of liens by Braskem and its significant subsidiaries and will permit Braskem to consolidate or merge with, or transfer all or substantially all of its assets to, another person only if it complies with certain requirements. However, these covenants are subject to a number of important exceptions. See "Description of the Notes—Covenants."

Events of default ....................................... The indenture will set forth the events of default applicable to the notes, including an event of default triggered by cross-acceleration of other debt of Braskem and its Significant Subsidiaries (as hereinafter defined) in a total amount of US$100.0 million or more. See "Description of the Notes—Events of Default."

Further issuances ...................................... Braskem Netherlands Finance may, from time to time, without the consent of the holders of the notes, issue an unlimited principal amount of additional notes of the same series as the notes initially issued in this offering.

Substitution of the issuer ........................... Braskem Netherlands Finance may, without the consent of the holders of the notes and subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary (as hereinafter defined) of Braskem as principal debtor in respect of the notes. See "Description of the Notes—Substitution of the Issuer."

Form and denomination ............................. The notes will be issued in the form of global notes in fully registered form without interest coupons. The global notes will be exchangeable or transferable, as the case may be, for definitive certificated notes in fully registered form without interest coupons only in limited circumstances. The notes will be issued in registered form in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. See "Description of the Notes—Form, Denomination and Title" and "Form of the Notes."

Use of proceeds ........................................ We expect the net proceeds from the sale of the notes to be approximately US$993.0 million after deducting commissions, fees and estimated expenses of the offering.

We intend to use the net proceeds of this offering for general corporate purposes, which may include the repayment of certain of our outstanding debt, including without limitation outstanding bonds.

Settlement ................................................ The notes will be delivered in book-entry form only through the facilities of DTC for the accounts of its direct and indirect participants, including Euroclear and Clearstream.

Notice to investors .................................... The notes have not been, and will not be, registered under the Securities Act and are subject to limitations on transfers, as described under "Notice to Investors."

19

## RISK FACTORS

*Our Annual Report includes extensive risk factors relating to our company, the petrochemical industry and the countries in which we operate. Prospective purchasers of notes should carefully consider the risks discussed under "Item 3. Key Information—Risk Factors" in our Annual Report and below, as well as the other information included in or incorporated by reference into this offering memorandum, before deciding to purchase any notes. Our business, results of operations, financial condition or prospects could be materially and adversely affected if any of these risks occurs, and as a result, the trading price of the notes could decline and you could lose all or part of your investment.*

*The risk factors discussed in our Annual Report and below are not the only risks that we face, but are the risks that we currently consider to be material. There may be additional risks that we currently consider immaterial or of which we are currently unaware, and any of these risks could have similar effects to those set forth in our Annual Report and below.*

### Risks Relating to the Notes and the Guarantees

***Because Braskem Netherlands Finance has no operations of its own, holders of the notes must depend on Braskem and its subsidiaries to provide Braskem Netherlands Finance with sufficient funds to make payments on the notes when due.***

Braskem Netherlands Finance, a wholly-owned indirect subsidiary of Braskem, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or subordinated to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem Netherlands Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of Braskem Netherlands Finance to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance. In the event of an adverse change in the financial condition or results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance, these entities may be unable to service their indebtedness to Braskem Netherlands Finance, which would result in the failure of Braskem Netherlands Finance to have sufficient funds to repay all amounts due on or with respect to the notes.

***Payments on Braskem's guarantee will be junior to Braskem's secured debt obligations and effectively junior to debt obligations of Braskem's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by Braskem on an unsecured basis. The Braskem guarantee will constitute an unsecured obligation of Braskem. The guarantee will rank equal in right of payment with all of Braskem's other existing and future senior unsecured indebtedness. Although the guarantee will provide the holders of the notes with a direct, but unsecured claim on Braskem's assets and property, payment on the guarantee will be subordinated to secured debt of Braskem to the extent of the assets and property securing such debt. Payment on the notes and the guarantees will also be structurally subordinated to the payment of all existing and future liabilities of Braskem's subsidiaries and jointly controlled companies (other than Braskem Netherlands Finance).

Upon any liquidation or reorganization of Braskem, any right of the holders of the notes, through enforcement of the guarantees, to participate in the assets of Braskem, including the capital stock of its subsidiaries and jointly controlled entities, will be subject to the prior claims of Braskem's secured creditors, and to participate in the assets of Braskem's subsidiaries and jointly controlled entities will be subject to the prior claims of the creditors of its subsidiaries and jointly controlled entities.

In October 2021, Braskem Idesa issued sustainability-linked debt securities in the aggregate amount of US$1.2 billion, maturing in 10 years. The coupon of 6.99% can be increased by up to 37.5 basis points in case of non-compliance with the sustainability target. The proceeds obtained from the sale of the bonds, plus a credit line of US$150 million, were used to pay off the project finance facility entered into by Braskem Idesa in 2012 (the "Project Finance"). Such indebtedness is non-recourse to Braskem S.A.

26

of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable U.S. state securities laws. These exemptions include offers and sales to qualified institutional buyers as defined under Rule 144A and offers and sales that occur outside the United States in compliance with Regulation S and in accordance with any applicable securities laws of any other jurisdiction. The notes are subject to certain transfer restrictions and can be transferred only to certain transferees. These transfer restrictions may further limit the liquidity of the notes. For a discussion of certain restrictions on resale and transfer of the notes, see "Transfer Restrictions."

***Brazilian bankruptcy law may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness, including our obligations under the guarantee, then we may become subject to insolvency proceedings in Brazil. The bankruptcy law of Brazil currently in effect is significantly different from, and may be less favorable to creditors than, that of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a judicial reorganization proceeding. Under Brazilian bankrupty law, in the event of our bankruptcy or liquidation, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. The obligations under the guarantee would be considered unsecured in case of a judicial reorganization, extrajudicial reorganization or bankruptcy liquidation, and would be subject to the reorganization plan or, in case of a bankruptcy liquidation, would be paid according to a statutory order pursuant to Brazilian bankruptcy law.

Courts in Brazil have taken different approaches regarding the representation of noteholders in insolvency proceedings. Some courts have admitted the representation of noteholders by a trustee or agent, while others have required the direct participation of the beneficial owner of the notes, and sometimes considered the relevant note as an independent credit.

Brazilian bankruptcy laws have recently been amended to include provisions regarding cross-border reorganization or insolvency proceedings. In general terms, these rules follow the United Nations Commission on International Trade Law (UNCITRAL) Model Law and set forth the principles for cross-border insolvency proceedings, mechanisms for cooperation between jurisdictions, and legally define a foreign main proceeding and a foreign secondary proceeding. This means that Brazil would recognize a foreign proceeding and cooperate with the foreign authority in any event.

***The imposition of IOF/Exchange taxes or other similar taxes may indirectly influence the price and volatility of the notes.***

Brazilian law imposes the Tax on Foreign Exchange Transactions (*Imposto sobre Operações de Crédito, Câmbio e Seguro, ou relativas a Títulos e Valores Mobiliários*, "IOF/Exchange taxes"), on the conversion of *reais* into foreign currency and on the conversion of foreign currency into *reais*. Among others, the objective of these taxes is to slow the pace of speculative inflows of foreign capital into the Brazilian market and the appreciation of the *real* against the U.S. dollar. The imposition of this tax or other similar taxes may discourage foreign investment in the debt securities of Brazilian companies, including our company, due to higher transaction costs, and may negatively impact the price and volatility of the notes. See "Taxation—Brazilian Taxation—Other Brazilian Tax Considerations."

***Substitution of the issuer may have adverse tax consequences.***

Braskem Netherlands Finance may, subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary of Braskem as principal debtor in respect of the notes (see "Description of the Notes—Substitution of the Issuer"), which may result in certain adverse tax consequences to holders. The Substituted Issuer (as hereinafter defined) and Braskem will have an obligation to indemnify and hold harmless each holder and beneficial owner of the notes (1) against all taxes or duties which arise by reason of a law or regulation having legal effect or contemplated on the date such substitution becomes effective, which may be incurred or levied against such holder or beneficial owner as a result of any substitution described under "Description of the Notes—Substitution of

**EXHIBIT G**

**Excerpts of 2034 Offering Memorandum**

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE UNITED STATES.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION, AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED, THE "INSURANCE DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN REGULATION (EU) 2017/1129, AS AMENDED (THE "PROSPECTUS REGULATION"). CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION.

**PROHIBITION OF SALES TO U.K. RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE UNITED KINGDOM ("U.K."). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2 OF REGULATION (EU) NO 2017/565 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (THE "EUWA"); (II) A CUSTOMER WITHIN THE MEANING OF THE PROVISIONS OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (AS AMENDED, THE "FSMA") AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA TO IMPLEMENT THE INSURANCE DISTRIBUTION DIRECTIVE, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) NO 600/2014 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN ARTICLE 2 OF THE PROSPECTUS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA. CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY THE PRIIPS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA (THE "U.K. PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE U.K. HAS

BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE U.K. MAY BE UNLAWFUL UNDER THE U.K. PRIIPS REGULATION.

IN ADDITION, IN THE U.K., THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III) PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS"). THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE U.K. ANY PERSON IN THE U.K. THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of Your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the United States. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act); and (ii) you consent to delivery of the Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and, consequently, neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic form and the hard copy version available to you on request from the initial purchasers.



# Braskem Netherlands Finance B.V.

(*a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*)
incorporated under the laws of the Netherlands*)

## US$850,000,000 8.000% Senior Notes due 2034

Unconditionally and Irrevocably Guaranteed by

# Braskem S.A.

(*incorporated under the laws of the Federative Republic of Brazil*)

Braskem Netherlands Finance B.V. ("Braskem Netherlands Finance") is offering US$850,000,000 in aggregate principal amount of its 8.000% senior notes due 2034 (the "notes"). Braskem Netherlands Finance is a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands. The notes will be fully, unconditionally and irrevocably guaranteed by Braskem S.A. ("Braskem"), a corporation (*sociedade anônima*) incorporated under the laws of the Federative Republic of Brazil. The notes will bear interest at the rate of 8.000% per year and will mature on October 15, 2034. Interest on the notes is payable on April 15 and October 15 of each year, beginning on April 15, 2025.

At any time, prior to July 15, 2034 (which is the date that is three months prior to the maturity of the notes), Braskem Netherlands Finance or Braskem may, at its option, redeem the notes, in whole or in part, by paying 100% of the principal amount of the notes *plus* a "make-whole" amount and accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date. If the redemption date of the notes is on or after July 15, 2034, the redemption price will equal 100% of the principal amount of the notes, *plus* accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date. See "Description of the Notes—Redemption—Optional Redemption." The notes may also be redeemed by Braskem Netherlands Finance or Braskem, at its option, in whole but not in part, at 100% of their principal amount *plus* accrued and unpaid interest and additional amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption—Tax Redemption."

In certain circumstances, if a Change of Control Triggering Event (as defined herein) occurs, unless Braskem Netherlands Finance or Braskem has exercised its option to redeem the notes, Braskem will be required to offer to purchase the notes at the price described in this offering memorandum. See "Description of the Notes—Purchase of Notes Upon Change of Control Triggering Event."

**Neither the U.S. Securities and Exchange Commission (the "SEC"), nor any state securities commission has approved or disapproved of the notes or the guarantee or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

The notes will be senior unsecured obligations of Braskem Netherlands Finance, ranking equal in right of payment with all of its other existing and future senior unsecured debt. The guarantee will be senior unsecured obligations of Braskem, ranking equal in right of payment with all of its other existing and future senior unsecured debt.

We will apply to the Singapore Exchange Limited (the "SGX-ST") for permission to list the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this offering memorandum. Admission to the Official List of the SGX-ST is not to be taken as an indication of the merits of the notes, Braskem Netherlands Finance or Braskem.

---

**Investing in the notes involves risks. See "Item 3. Key Information—Risk Factors" in our Annual Report (as defined herein) and "Risk Factors" in our June 2024 Form 6-K Report (as defined herein), which are**

**incorporated by reference in this offering memorandum, and "Risk Factors" beginning on page 16 of this offering memorandum.**

This offering memorandum has been prepared on the basis that any offer of the notes in any Member State of the European Economic Area (the "EEA") will be made pursuant to an exemption under Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC, as amended (the "Prospectus Regulation") from the requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for purposes of the Prospectus Regulation and has not been approved by a competent authority within the meaning of the Prospectus Regulation. This offering memorandum has been prepared on the basis that any offer of the notes in the United Kingdom (the "UK") will be made pursuant to an exemption from the obligation to publish a prospectus under Section 86 of the Financial Services and Markets Act 2000 (the "FSMA") in the UK. This offering memorandum is not a prospectus for purposes of the UK Prospectus Regulation (meaning Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, or the "EUWA") and has not been approved by the UK Financial Conduct Authority (the "FCA").

The notes and the guarantee have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S under the Securities Act ("Regulation S")), except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act ("Rule 144A"), and outside the United States in accordance with Regulation S. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For a description of certain restrictions on transfer of the notes, see "Transfer Restrictions."

---

**Issue price of the notes: 100.000% *plus* accrued interest, if any, from October 15, 2024.**

---

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company ("DTC") and its direct and indirect participants, including Clearstream Banking S.A. ("Clearstream") and Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), is expected on or about October 15, 2024.

---

*Global Coordinators*

| **Citigroup** | **Itaú BBA** | **Morgan Stanley** | **Santander** | **SMBC Nikko** |

*Joint Book Runners*

| **BNP PARIBAS** | **BofA Securities** | **Crédit Agricole CIB** | **Deutsche Bank Securities** | **Mizuho** | **Standard Chartered Bank AG** |

The date of this offering memorandum is October 9, 2024.

**TABLE OF CONTENTS**

<u>Page</u>

INCORPORATION BY REFERENCE ...................................................................................................iv

PRESENTATION OF FINANCIAL AND OTHER INFORMATION ...............................................v

FORWARD-LOOKING STATEMENTS ..........................................................................................ix

SUMMARY ...........................................................................................................................................1

RISK FACTORS ...............................................................................................................................16

USE OF PROCEEDS .......................................................................................................................22

CAPITALIZATION ..........................................................................................................................23

DESCRIPTION OF THE NOTES ...................................................................................................25

FORM OF THE NOTES...................................................................................................................47

TAXATION.........................................................................................................................................51

TRANSFER RESTRICTIONS.........................................................................................................63

ENFORCEABILITY OF CIVIL LIABILITIES ...........................................................................66

PLAN OF DISTRIBUTION ............................................................................................................68

CERTAIN ERISA CONSIDERATIONS ........................................................................................75

LEGAL MATTERS ...........................................................................................................................77

INDEPENDENT AUDITORS .........................................................................................................78

AVAILABLE INFORMATION........................................................................................................79

––––––––––––––

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantee) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to "Braskem," the "Company," "our Company," "we," "our," "ours," "us" or similar terms are to Braskem and its consolidated subsidiaries, which include Braskem Netherlands Finance.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantee) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantee). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantee) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

In making an investment decision, prospective investors must rely on their own examination of our Company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum

are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

## PROHIBITION OF SALES TO EEA RETAIL INVESTORS

The notes (and the related guarantee) described in this offering memorandum are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No. 1286/2014, as amended (the "PRIIPs Regulation"), for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any member state of the EEA will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for offers of notes.

## PROHIBITION OF SALES TO UK RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No. 2017/565 as it forms part of domestic law by virtue of the EUWA; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No. 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a qualified investor as defined in Article 2 of the UK Prospectus Regulation as it forms part of domestic law by virtue of the EUWA. Consequently, no key information document required by Regulation (EU) No. 1286/2014 as it forms part of domestic law by virtue of the EUWA, or the UK PRIIPs Regulation, for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

The above selling restriction is in addition to any other selling restrictions set forth in this offering memorandum.

## MiFID PRODUCT GOVERNANCE/
## PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET

Solely for the purposes of the product approval process of the issuer and the guarantors (each a "Manufacturer"), the target market assessment in respect of the notes described in this offering memorandum has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each as defined in MiFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes, or a distributor should take into consideration the Manufacturers' target market assessment; however, and without prejudice to the issuer's obligations in accordance with MiFID II, a distributor subject to MiFID II is responsible for undertaking its own

target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

**SECTION 309B(1) NOTIFICATION** – In connection with Section 309B of the Securities and Futures Act 2001 of Singapore, as modified or amended from time to time (the "SFA") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "CMP Regulations 2018"), the issuer has determined, and hereby notifies all persons (including relevant persons (as defined in Section 309A(1) of the SFA)) that the notes are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

**NOTICE TO PROSPECTIVE INVESTORS IN THE NETHERLANDS**

The notes (including rights representing an interest in each global note that represents the notes) may not be offered or sold to individuals or legal entities in the Netherlands other than to qualified investors within the meaning of the Prospectus Regulation. No approved prospectus within the meaning of the Prospectus Regulation is required.

**NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL**

**THE NOTES (AND RELATED GUARANTEE) HAVE NOT BEEN, AND WILL NOT BE, REGISTERED WITH THE BRAZILIAN SECURITIES COMMISSION (*COMISSÃO DE VALORES MOBILIÁRIOS*, THE "CVM"). THE NOTES MAY NOT BE OFFERED OR SOLD IN BRAZIL, EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE A PUBLIC OFFERING OR UNAUTHORIZED DISTRIBUTION UNDER BRAZILIAN LAWS AND REGULATIONS. THE NOTES (AND RELATED GUARANTEE) ARE NOT BEING OFFERED INTO BRAZIL. DOCUMENTS RELATING TO THE OFFERING OF THE NOTES, AS WELL AS INFORMATION CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN BRAZIL, NOR BE USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION FOR OR SALE OF THE NOTES TO THE PUBLIC IN BRAZIL.**

## INCORPORATION BY REFERENCE

We are incorporating by reference into this offering memorandum the following information contained in documents that we have filed with, or furnished to, the SEC:

- our annual report on Form 20-F for the year ended December 31, 2023, filed with the SEC on April 12, 2024 (SEC File No. 001-14862), containing the audited consolidated financial statements of Braskem S.A. and its subsidiaries as of December 31, 2023 and 2022 and for the years ended December 31, 2023, 2022 and 2021, including the report of the independent registered public accounting firm, which we refer to in this offering memorandum as our "Annual Report";

- our unaudited condensed consolidated interim financial statements as of June 30, 2024 and for the six-month periods ended June 30, 2024 and 2023, contained in a report on Form 6-K furnished to the SEC on October 7, 2024 (SEC File No. 001-14862), which we refer to in this offering memorandum as our "Unaudited Condensed Consolidated Financial Statements"; and

- our report on Form 6-K including certain information regarding Braskem and, without limitation, Braskem's Management's Discussion and Analysis of Financial Condition and Results of Operations for the six-month periods ended June 30, 2024 and 2023, furnished to the SEC on October 7, 2024 (SEC File No. 001-14862), which we refer to herein as our "June 2024 Form 6-K Report."

Incorporation by reference of information contained in our Annual Report, our Unaudited Condensed Consolidated Financial Statements and our June 2024 Form 6-K Report means that (1) this information is considered part of this offering memorandum and (2) we can disclose important information to you, in such case, by referring to our Annual Report, our Unaudited Condensed Consolidated Financial Statements and our June 2024 Form 6-K Report that we incorporate by reference.

Any statement contained in a document incorporated by reference or deemed to be incorporated by reference in this offering memorandum will be deemed to be modified or superseded for purposes of this offering memorandum to the extent that a statement contained in this offering memorandum or any other subsequently filed document that also is, or is deemed to be, incorporated by reference in this offering memorandum modifies or supersedes that statement.

You should read "Available Information" for information on how to obtain a copy of our Annual Report, our Unaudited Condensed Consolidated Financial Statements and our June 2024 Form 6-K Report or other information relating to our Company.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

On October 9, 2024, the *real*/U.S. dollar exchange rate was R$5.5737 to US$1.00, based on the selling rate as reported by the Central Bank of Brazil (*Banco Central do Brasil*, the "Central Bank"). The selling rate was R$5.5589 to US$1.00 as of June 30, 2024, R$4.8413 to US$1.00 as of December 31, 2023, R$5.2177 to US$1.00 as of December 31, 2022, and R$5.5805 to US$1.00 as of December 31, 2021, in each case, as reported by the Central Bank. The *real*/U.S. dollar exchange rate fluctuates widely, and these selling rates may not be indicative of future selling rates.

Solely for the convenience of the reader, we have translated certain *real* amounts in this offering memorandum into U.S. dollars at the selling rate as reported by the Central Bank as of June 30, 2024 of R$5.5589  to US$1.00. These translations (i) should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate and (ii) do not necessarily represent amounts in accordance with accounting practices adopted in Brazil or International Financial Reporting Standards as issued by the International Accounting Standards Board (the "IASB").

**Financial Statements**

***Braskem Financial Statements***

We maintain our books and records in *reais.* Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our unaudited condensed consolidated interim financial statements as of June 30, 2024 and for the six-month periods ended June 30, 2024 and 2023, which are incorporated into this offering memorandum by reference to our Unaudited Condensed Consolidated Financial Statements and our audited consolidated financial statements as of December 31, 2023 and 2022 and for the years ended December 31, 2023, 2022 and 2021, which are incorporated into this offering memorandum by reference to our Annual Report.

We have prepared our audited consolidated financial statements in accordance with International Financial Reporting Standards ("IFRS"), as issued by the IASB. We have prepared our unaudited condensed consolidated interim financial statements in accordance with International Accounting Standard ("IAS") 34—Interim Financial Reporting, as issued by the IASB.

***Braskem Netherlands Finance Financial Statements***

We have not included any financial statements for Braskem Netherlands Finance in this offering memorandum. Braskem Netherlands Finance does not, and will not, publish financial statements, except for financial statements that it is required to publish under the laws of the Netherlands. In addition, Braskem Netherlands Finance will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, Braskem Netherlands Finance. Braskem Netherlands Finance's obligations under the notes will be fully and unconditionally guaranteed by us. The financial condition and results of operations of Braskem Netherlands Finance have been fully consolidated in our consolidated financial statements for all dates and periods ending after November 17, 2014 (the date of incorporation of Braskem Netherlands Finance).

v

**Special Note Regarding Non-GAAP Financial Measures**

The body of generally accepted accounting principles is commonly referred to as "GAAP." We have included in this offering memorandum certain non-GAAP financial measures, which are not defined by IFRS, as issued by the IASB, as part of our financial disclosure. This offering memorandum includes the following non-GAAP financial measures: (i) EBITDA, (ii) LTM EBITDA, (iii) Adjusted EBITDA, (iv) LTM Adjusted EBITDA, (v) Gross Debt, (vi) Net Debt, (vii) Financial Leverage Ratio, (viii) Adjusted EBITDA Margin and (ix) LTM Adjusted EBITDA Margin. We believe that the presentation of these non-GAAP measures provides useful information for investors regarding our performance and trends related to our results of operations and financial condition, as it may help understand our operational data on a recurring basis.

Non-GAAP financial measures have important limitations as analytical tools, and you should not consider them in isolation or as representative of cash flows, alternatives to profit (loss), an indicator of operating performance or liquidity, a basis for dividend distribution or a substitute for analysis of our financial performance, liquidity or indebtedness. Non-GAAP financial measures and similar measures do not have a standard definition, are used by various companies for different purposes and are often calculated in ways that reflect the circumstances of those companies. You should exercise caution in comparing these measures or data as reported by us to similar measures reported by other companies. Non-GAAP financial measures are not measures of financial performance or liquidity under IFRS. Because this financial information is not prepared in accordance with IFRS, as issued by the IASB, investors are cautioned not to place undue reliance on this information.

For a reconciliation of these non-GAAP financial measures to the most directly comparable GAAP financial measures, see "Selected Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

***EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin***

EBITDA (earnings before interest, taxes, depreciation and amortization) is a non-GAAP financial measure prepared by us in accordance with CVM Resolution No. 156, of June 23, 2022 ("CVM Resolution No. 156").

We calculate EBITDA pursuant to CVM Resolution No. 156, reconciled with our consolidated financial statements, as (i) net profit (loss) for the period, *plus* (ii) income taxes, *plus* (iii) net financial results, *plus* (iv) depreciation and amortization.

We calculate LTM EBITDA as EBITDA for the last twelve months. For the twelve-month period ended June 30, 2024, it is calculated as EBITDA for the six-month period ended June 30, 2024, *plus* EBITDA for the year ended December 31, 2023, *minus* EBITDA for the six-month period ended June 30, 2023.

We calculate Adjusted EBITDA as EBITDA *plus* (i) expense for (reversal of) impairment provisions on long-lived assets, *plus* (ii) results from equity accounted investees, *plus* (iii) (reversal) provision – geological event in Alagoas, *plus* (iv) PIS/COFINS credits – exclusion of ICMS from calculation basis, *plus* (v) provision for remediation of environmental impacts, *plus* (vi) tax credit recovery (INSS), *plus* (vii) tax credit recovery (IPTU), *plus* (viii) PIS/COFINS credits – gasoline, *plus* (ix) insurance Alagoas, *plus* (x) Acordo Paulista, a program enacted by the State of São Paulo to allow the settlement of ICMS debts at a discount on interest, fines and legal fees ("Acordo Paulista").

We calculate LTM Adjusted EBITDA as Adjusted EBITDA for the last twelve months. For the twelve-month period ended June 30, 2024, it is calculated as Adjusted EBITDA for the six-month period ended June 30, 2024, *plus* Adjusted EBITDA for the year ended December 31, 2023, *minus* Adjusted EBITDA for the six-month period ended June 30, 2023.

We calculate Adjusted EBITDA Margin as Adjusted EBITDA *divided by* net revenue.

We calculate LTM Adjusted EBITDA Margin as LTM Adjusted EBITDA for the last twelve months *divided by* net revenue for the last twelve months.

We use EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin as measures of our operating performance, without any influence from our capital structure, tax or financial effects. EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin are not measures of profitability, financial performance or liquidity defined by IFRS, as issued by the IASB, and you should not consider them in isolation or as alternatives or substitutes for profit (loss), as measures of operating performance, cash flows, as indicators of liquidity, debt payment capacity or as a basis for dividend distribution. Other companies may calculate EBITDA, LTM EBITDA, Adjusted EBITDA, LTM Adjusted EBITDA, Adjusted EBITDA Margin and LTM Adjusted EBITDA Margin in a different way than we do.

### Gross Debt and Net Debt

We calculate Gross Debt as (i) current and non-current borrowings and debentures, *plus* (ii) current and non-current Braskem Idesa borrowings, *plus* (iii) Braskem derivatives, which refer to a swap related to a Brazilian real-denominated debt (*Certificado de Recebíveis do Agronegócio – CRA*), bearing interest at the Consumer Price Index (*Índice de Preços do Consumidor – IPCA*) *plus* spread, to a U.S. dollar-denominated debt, bearing interest at a fixed rate ("Braskem – CRA Swap"), *plus* (iv) Braskem Idesa derivatives, which refer to an interest rate swap related to the Terminal Química Puerto México project finance facility ("Terminal Química – Swap"), bearing interest at the Secured Overnight Financing Rate ("SOFR"), to a fixed interest rate.

We calculate Net Debt as (i) Gross Debt, *minus* (ii) cash and cash equivalents, *minus* (iii) current and non-current financial investments.

We use Gross Debt and Net Debt as supplemental measures of our financial condition and financial leverage in relation to our operating cash flows.

Gross Debt and Net Debt are not measures of financial performance, liquidity or indebtedness under IFRS, as issued by the IASB, and have no standard definition. Other companies may calculate Gross Debt and Net Debt in a different way than we do.

### Financial Leverage Ratio

We calculate Financial Leverage Ratio as Net Debt *divided by* Adjusted EBITDA.

We use Financial Leverage Ratio as a supplemental measure for investors and financial analysts to assess our financial condition and operating performance, and our management uses it to make certain managerial decisions.

Financial Leverage Ratio is not a measure of financial performance, liquidity or indebtedness under IFRS, as issued by the IASB, and has no standard definition. Other companies may calculate Financial Leverage Ratio in a different way than we do.

**Market Share and Other Information**

We make statements in this offering memorandum, our Annual Report and our June 2024 Form 6-K Report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, other countries in Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market share with respect to specific products by dividing our domestic net sales volumes of these products by the total Brazilian domestic consumption of these products. We derive information regarding the production capacity of other companies in the global petrochemical industry, international market prices for petrochemical products and per capita consumption in certain geographic regions principally from reports published by Chemical Market Analytics by OPIS, a Dow Jones Company ("CMA"). We derive information relating to Brazilian imports and exports from ComexStat, published by the Brazilian Ministry of Development, Industry, Trade and Services (*Ministério do Desenvolvimento, Indústria, Comércio e Serviços*, the "MDIC"). We also derive information from reports published by the Brazilian Association of the Alkali, Chlorine and Derivatives Industry (*Associação Brasileira da Indústria de Álcalis, Cloro e Derivados*, the "Abiclor"). We also include information and statistics regarding economic growth in emerging economies obtained from the International Monetary Fund ("IMF"), and statistics regarding gross domestic product, growth in Brazil, the United States, Europe and Mexico obtained from independent public sources, such as the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*); the U.S. Bureau of Economic Analysis of the U.S. Department of Commerce; the statistical office of the European Union (Eurostat); and the Mexican Institute of Statistics and Geography (*Instituto Nacional de Estadística y Geografía*).

We provide information regarding domestic apparent consumption of some of our products based on information available from ComexStat, published by the MDIC, and reports published by Abiclor. Domestic apparent consumption is equal to domestic production *plus* imports *minus* exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

We have no reason to believe that any of this information is inaccurate in any material respect. However, neither we nor the initial purchasers have independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

**Production Capacity and Sales Volume**

As used in this offering memorandum:

- "production capacity" means the annual projected capacity for a particular facility, calculated based upon operations for 24 hours each day of a year and deducting scheduled downtime for regular maintenance; and

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

**FORWARD-LOOKING STATEMENTS**

This offering memorandum and the documents incorporated by reference in this offering memorandum include forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including, without limitation, the following:

- the cyclical and volatile nature of the global petrochemical industry and its adverse effects, which has had and may continue to have a material adverse effect on us and in the petrochemical sector;

- prices of naphtha, ethane, ethanol, propane, propylene and other raw materials and the terms and conditions of the supply agreements related thereto;

- international prices of petrochemical and biopolymer products;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- the adverse effects of the geological event in Alagoas, including unfavorable decisions in judicial or other proceedings related to it;

- global macroeconomic conditions (including a United States recession) and their adverse effects on the margins of our products;

- the adverse effect of war and other armed conflicts, such as the conflict involving Russia and Ukraine, Israel and Hamas, and related conflicts in the Middle East on our sales and operations in Brazil and internationally, and on the Brazilian and international petrochemical industry;

- a deterioration in the world economy and its potential adverse effect on demand for petrochemicals and thermoplastic products;

- any adverse effect of China's economy deceleration on global demand and on our Brazilian and international business;

- the adverse effect of global health crises on our Brazilian and international sales and operations, and on the Brazilian and international petrochemical industry;

- the adverse effect of inflation globally on our Brazilian and international business;

- the adverse effect of a more contractionary monetary policy globally on our Brazilian and international business;

- demand for our petrochemical products, our manufacturing facilities, price of raw materials and other inputs of our production, global logistics for our products, raw materials and other inputs of our production, and supply chains;

- general economic, political and business conditions in the markets or jurisdictions in which we operate or sell to, including governmental and electoral changes, and demand and supply for, and prices of, petrochemical and thermoplastic products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar and other currencies;

- our ability to successfully carry out our sustainable development strategy, and to successfully develop initiatives to adapt to and mitigate climate change;

- competition in the global petrochemical and biopolymer industry;

- our ability to successfully develop our innovation projects, in particular in renewable and recycling initiatives;

- actions taken by our controlling shareholder;

- inherent risks related to any change of our corporate control;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, laws and regulations affecting tax and environmental matters and import tariffs in other markets or jurisdictions in which we operate or to which we export our products;

- political conditions in the countries where we operate, particularly in Brazil and Mexico;

- future changes in governmental policies, including the adoption of new environmental policies and related actions undertaken by the governments of the locations in which we operate;

- unfavorable decisions rendered in major pending or future tax, labor, environmental and other legal proceedings; and

- other factors identified under "Risk Factors" in this offering memorandum, our June 2024 Form 6-K Report, our Annual Report and in any other reports filed with or furnished to the SEC that are incorporated by reference in this offering memorandum.

Our forward-looking statements are not a guarantee of future performance, and our actual results of operations or other developments may differ materially from the expectations expressed in our forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

All forward-looking statements attributed to us or a person acting on our behalf are qualified in their entirety by this cautionary statement, and you should not place undue reliance on any forward-looking statement included in this offering memorandum. Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update them as a result of new information or future developments.

For additional information on factors that could cause our actual results of operations to differ from expectations reflected in forward-looking statements, please see the "Risk Factors" sections in this offering memorandum, "Item 3. Key Information—Risk Factors" in our Annual Report and "Risk Factors" in our June 2024 Form 6-K Report, which are incorporated by reference herein.

x

Braskem may not be obligated or may not be able to purchase the notes upon a Change of Control Triggering Event."

Redemption Following Tender Offer ........ In connection with any tender offer for the notes, in the event that the holders of not less than 85% of the aggregate principal amount of the outstanding notes validly tender and do not validly withdraw their notes in such tender offer or a third party purchases the notes held by such holders, then Braskem Netherlands Finance will have the right to redeem all of the notes that remain outstanding at a price equal to the price paid to each other holder in such tender offer *plus*, to the extent not included in the purchase price, accrued and unpaid interest and additional amounts, if any, on the notes that remain outstanding, to the date of redemption. See "Description of the Notes—Redemption Following Tender Offer."

Additional amounts ................................... Payments of interest on the notes or payments on the guarantee will be made after withholding and deduction for any Brazilian or Dutch taxes as set forth under "Taxation." In the event of any such withholding or deduction, Braskem Netherlands Finance or Braskem will pay such additional amounts as will result in receipt by the holders of notes of such amounts as would have been received by them had no such withholding or deduction for Brazilian or Dutch taxes been required, subject to certain exceptions described under "Description of the Notes—Additional Amounts."

Covenants of Braskem Netherlands Finance ...................................................... The indenture will prohibit the incurrence of debt (other than the notes and other indebtedness ranking equally with or subordinated to the notes) by Braskem Netherlands Finance and impose certain other limitations and restrictions on Braskem Netherlands Finance as described under "Description of the Notes—Additional Limitations on Braskem Netherlands Finance."

Covenants of Braskem............................. The indenture will limit the creation of liens by Braskem and its significant subsidiaries and will permit Braskem to consolidate or merge with, or transfer all or substantially all of its assets to, another person only if it complies with certain requirements. However, these covenants are subject to a number of important exceptions. See "Description of the Notes—Covenants."

Events of default...................................... The indenture will set forth the events of default applicable to the notes, including an event of default triggered by cross-acceleration of other debt of Braskem and its Significant Subsidiaries (as hereinafter defined) in a total amount of US$100 million or more. See "Description of the Notes—Events of Default."

Further issuances ..................................... Braskem Netherlands Finance may, from time to time, without the consent of the holders of the notes, issue an unlimited principal amount of additional notes of the same series as the notes initially issued in this offering.

Substitution of the issuer .......................... Braskem Netherlands Finance may, without the consent of the holders of the notes and subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary (as hereinafter defined) of Braskem as principal debtor in respect of the notes. See "Description of the Notes—Substitution of the Issuer"

8

**RISK FACTORS**

*Our Annual Report includes extensive risk factors relating to our Company, the petrochemical industry and the countries in which we operate. Prospective purchasers of notes should carefully consider the risks discussed under "Item 3. Key Information—Risk Factors" in our Annual Report, "Risk Factors" in our June 2024 Form 6-K Report and below, as well as the other information included in or incorporated by reference into this offering memorandum, before deciding to purchase any notes. Our business, results of operations, financial condition or prospects could be materially and adversely affected if any of these risks occurs, and as a result, the trading price of the notes could decline and you could lose all or part of your investment.*

*The risk factors discussed in our Annual Report, in our June 2024 Form 6-K Report and below are not the only risks that we face, but are the risks that we currently consider to be material. There may be additional risks that we currently consider immaterial or of which we are currently unaware, and any of these risks could have similar effects to those set forth in our Annual Report and below.*

**Risks Relating to the Notes and the Guarantee**

***Because Braskem Netherlands Finance has no operations of its own, holders of the notes must depend on Braskem and its subsidiaries to provide Braskem Netherlands Finance with sufficient funds to make payments on the notes when due.***

Braskem Netherlands Finance, a wholly-owned indirect subsidiary of Braskem, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or subordinated to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem Netherlands Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of Braskem Netherlands Finance to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Braskem and its subsidiaries that are debtors of Braskem Netherlands Finance. In the event of an adverse change in the financial condition or results of operations of Braskem and its subsidiaries that are debtors of Braskem Netherlands Finance, these entities may be unable to service their indebtedness to Braskem Netherlands Finance, which would result in the failure of Braskem Netherlands Finance to have sufficient funds to repay all amounts due on or with respect to the notes.

***Payments on Braskem's guarantee will be junior to Braskem's secured debt obligations and effectively junior to debt obligations of Braskem's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by Braskem on an unsecured basis. The Braskem guarantee will constitute an unsecured obligation of Braskem. The guarantee will rank equal in right of payment with all of Braskem's other existing and future senior unsecured indebtedness. Although the guarantee will provide the holders of the notes with a direct, but unsecured claim on Braskem's assets and property, payment on the guarantee will be subordinated to secured debt of Braskem to the extent of the assets and property securing such debt. Payment on the notes and the guarantee will also be structurally subordinated to the payment of all existing and future liabilities of Braskem's subsidiaries and jointly controlled companies (other than Braskem Netherlands Finance).

Upon any liquidation or reorganization of Braskem, any right of the holders of the notes, through enforcement of the guarantee, to participate in the assets of Braskem, including the capital stock of its subsidiaries and jointly controlled entities, will be subject to the prior claims of Braskem's secured creditors, and to participate in the assets of Braskem's subsidiaries and jointly controlled entities will be subject to the prior claims of the creditors of its subsidiaries and jointly controlled entities.

As of June 30, 2024, Braskem had (i) current and non-current corporate debt (borrowings and debentures) of R\$46,426 million (US\$8,352 million), and (ii) current and non-current corporate debt (borrowings) of Braskem Idesa and its subsidiaries of R\$13,513 million (US\$2,431 million). Of the current and non-current corporate debt (borrowings and debentures), R\$9,278 million (US\$1,669 million) was debt of Braskem S.A., R\$37,148 million

16

***We cannot assure you that an active trading market for the notes will develop.***

The notes constitute a new issue of securities, for which there is no existing market. Although we will apply to list the notes on the SGX-ST, we cannot provide you with any assurances that the application will be accepted, that a market for the notes will develop or continue or that holders of the notes will be able to sell their notes or the price at which such holders may be able to sell their notes. If a market for the notes does develop, the notes could trade at prices that may be higher or lower than the initial offering price depending on many factors, including prevailing interest rates, our results of operations and financial condition, political and economic developments in and affecting Brazil and other countries. The initial purchasers of this offering have advised us that they currently intend to make a market in the notes. However, the initial purchasers are not obligated to do so, and any market-making with respect to the notes may be discontinued at any time without notice.

***The notes are subject to transfer restrictions.***

The notes (and the related guarantee) have not been, and will not be, registered under the Securities Act or any U.S. state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable U.S. state securities laws. These exemptions include offers and sales to qualified institutional buyers as defined under Rule 144A and offers and sales that occur outside the United States in compliance with Regulation S and in accordance with any applicable securities laws of any other jurisdiction. The notes are subject to certain transfer restrictions and can be transferred only to certain transferees. These transfer restrictions may further limit the liquidity of the notes. For a discussion of certain restrictions on resale and transfer of the notes, see "Transfer Restrictions."

***Brazilian bankruptcy law may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness, including our obligations under the guarantee, then we may become subject to insolvency proceedings in Brazil.

The Brazilian insolvency laws currently in effect allow Brazilian companies in a situation of insolvency to be the target of bankruptcy requests by creditors and to initiate legal measures aiming to renegotiate their debts while maintaining their operations, preserving value and promoting their social purpose. In the case of a bankruptcy, payments of the debts must be made in accordance with a legal order pursuant to applicable law. In the case of a judicial reorganization or a request for ratification of an extrajudicial recovery plan, payments of debts subject to such procedures would be made in accordance with the provisions of the judicial or extrajudicial recovery plan.

The insolvency laws of Brazil are significantly different from, and may be less favorable to creditors than, that of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a judicial reorganization proceeding. Under Brazilian bankruptcy law, in the event of our bankruptcy or liquidation, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. The obligations under the guarantee would be considered unsecured in case of a judicial reorganization, extrajudicial reorganization or bankruptcy liquidation, and would be subject to the reorganization plan or, in case of a bankruptcy liquidation, would be paid according to a statutory order pursuant to Brazilian bankruptcy law.

Courts in Brazil have taken different approaches regarding the representation of noteholders in insolvency proceedings. Some courts have admitted the representation of noteholders by a trustee or agent, while others have required the direct participation of the beneficial owner of the notes, and sometimes considered the relevant note as an independent credit.

Brazilian bankruptcy laws have been amended to include provisions regarding cross-border reorganization or insolvency proceedings. In general terms, these rules follow the United Nations Commission on International Trade Law (UNCITRAL) Model Law and set forth the principles for cross-border insolvency proceedings, mechanisms for

<u>**EXHIBIT H**</u>

**Excerpts of 2030/2050 Offering Memorandum**

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT, AS AMENDED (THE "SECURITIES ACT"); OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE U.S.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum and its annexes (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS** - THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); OR (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE 2002/92/EC (AS AMENDED OR SUPERSEDED, THE "INSURANCE MEDIATION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II. CONSEQUENTLY NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (AS AMENDED, THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION.

IN ADDITION, IN THE UNITED KINGDOM, THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING TO THE NOTES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III) PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM, ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS." THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE UNITED KINGDOM. ANY PERSON IN

THE UNITED KINGDOM THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the U.S. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act) and that the electronic mail address that you gave us and to which the Offering Memorandum has been delivered is not located in the U.S.; and (ii) that you consent to delivery of such Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and consequently neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic format and the hard copy version available to you on request from the initial purchasers.

**OFFERING MEMORANDUM**                                                                           **CONFIDENTIAL**



# Braskem Netherlands Finance B.V.

(*a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the law of the Netherlands*)

## US$1,500,000,000 4.500% Notes due 2030
## US$750,000,000 5.875% Notes due 2050

Unconditionally and Irrevocably Guaranteed by

# Braskem S.A.

(*Incorporated in the Federative Republic of Brazil*)

Braskem Netherlands Finance B.V., or Braskem Netherlands Finance, is offering US$1,500,000,000 in aggregate principal amount of its 4.500% notes due 2030, or the ten-year notes, and US$750,000,000 in aggregate principal amount of its 5.875% notes due 2050, or the thirty-year notes, and, together with the ten-year notes, the notes. Braskem Netherlands Finance is a private company with limited liability incorporated under the laws of the Netherlands. The notes will be fully, unconditionally and irrevocably guaranteed by Braskem S.A., or Braskem, a corporation (*sociedade anônima*) incorporated under the laws of the Federative Republic of Brazil. The ten-year notes will bear interest at the rate of 4.500% per year and will mature on January 31, 2030. The thirty-year notes will bear interest at the rate of 5.875% per year and will mature on January 31, 2050. Interest on the notes is payable on January 31 and July 31 of each year, beginning on July 31, 2020.

At any time, prior to October 31, 2029 (which is the date that is three months prior to the maturity of the ten-year notes), Braskem Netherlands Finance or Braskem may, at its option, redeem the ten-year notes, in whole or in part, by paying 100% of the principal amount of the ten-year notes plus the applicable "make-whole" amount and accrued interest and additional amounts, if any, to but excluding the redemption date. If the redemption date of the ten-year notes is on or after October 31, 2029, the redemption price will equal 100% of the principal amount of the notes, plus accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date.

At any time, prior to July 31, 2049 (which is the date that is six months prior to the maturity of the thirty-year notes), Braskem Netherlands Finance or Braskem may, at its option, redeem the thirty-year notes, in whole or in part, by paying 100% of the principal amount of the thirty-year notes plus the applicable "make-whole" amount and accrued interest and additional amounts, if any, to but excluding the redemption date. If the redemption date of the thirty-year notes is on or after July 31, 2049, the redemption price will equal 100% of the principal amount of the notes, plus accrued and unpaid interest and additional amounts, if any, to, but excluding, the redemption date.

The notes of a series may also be redeemed by Braskem Netherlands Finance or Braskem, at its option, in whole but not in part, at 100% of their principal amount *plus* accrued and unpaid interest and additional amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption."

If a specified Change of Control Triggering Event as defined herein occurs, unless Braskem Netherlands Finance or Braskem has exercised its option to redeem the notes, Braskem will be required to offer to purchase the notes at the price described in this offering memorandum.

**Neither the U.S. Securities and Exchange Commission, or the SEC, nor any state securities commission has approved or disapproved of the notes or the guarantees or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

This offering memorandum does not constitute a prospectus for the purposes of Article 6 of Regulation (EU) 2017/1129 (as such regulation may be amended or superseded from time to time, the Prospectus Regulation). Braskem Netherlands Finance is not offering the notes in any jurisdiction in circumstances that would require a prospectus to be prepared pursuant to the Prospectus Regulation.

The notes will be senior unsecured obligations of Braskem Netherlands Finance, ranking equal in right of payment with all of its other existing and future senior unsecured debt. The guarantees will be senior unsecured obligations of Braskem, ranking equal in right of payment with all of its other existing and future senior unsecured debt.

We will apply to the Singapore Exchange Securities Trading Limited, or the SGX-ST, for permission to list the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this offering memorandum. Admission to the Official List of the SGX-ST is not to be taken as an indication of the merits of the notes, their issuer or their guarantor.

**Investing in the notes involves risks. See "Risk Factors" beginning on page 4 of our annual report (as defined below), which is incorporated by reference in this offering memorandum, and "Risk Factors" beginning on page 15 of this offering memorandum.**

The notes and the guarantees have not been registered under the U.S. Securities Act of 1933, as amended, or the Securities Act, or any state securities laws and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S under the Securities Act, or Regulation S), except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act, or Rule 144A, and outside the United States in accordance with Regulation S. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For a description of certain restrictions on transfer of the notes, see "Transfer Restrictions."

**Issue price of the ten-year notes: 99.268% plus accrued interest from November 1, 2019.**
**Issue price of the thirty-year notes: 98.853% plus accrued interest from November 1, 2019.**

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company, or DTC, and its direct and indirect participants, including Clearstream Banking, *société anonyme*, or Clearstream, and Euroclear Bank S.A./N.V., as operator of the Euroclear System, or Euroclear, is expected on or about November 1, 2019.

*Global Coordinators and Joint Book-Running Managers*

| **Citigroup** | **Itaú BBA** | **Morgan Stanley** | **Santander** |
|---|---|---|---|

*Joint Book-Running Managers*

| **ABN AMRO** | **BNP PARIBAS** | **Credit Agricole CIB** | **Deutsche Bank Securities** | **ING** | **Nomura** | **SMBC Nikko** | **Standard Chartered Bank** |
|---|---|---|---|---|---|---|---|

The date of this offering memorandum is October 29, 2019.

**TABLE OF CONTENTS**

**Page**

INCORPORATION BY REFERENCE .................................................................................................iv

PRESENTATION OF FINANCIAL AND OTHER INFORMATION ...............................................v

FORWARD-LOOKING STATEMENTS ........................................................................................vii

SUMMARY.....................................................................................................................................1

RISK FACTORS ...........................................................................................................................15

USE OF PROCEEDS ....................................................................................................................20

CAPITALIZATION.......................................................................................................................21

DESCRIPTION OF THE NOTES .................................................................................................23

FORM OF THE NOTES................................................................................................................46

TAXATION...................................................................................................................................50

TRANSFER RESTRICTIONS......................................................................................................60

ENFORCEABILITY OF CIVIL LIABILITIES ...........................................................................63

PLAN OF DISTRIBUTION .........................................................................................................65

CERTAIN ERISA CONSIDERATIONS .....................................................................................71

LEGAL MATTERS ......................................................................................................................73

INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM .............................................74

AVAILABLE INFORMATION....................................................................................................75

_____

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantees) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to "our company," "we," "our," "ours," "us" or similar terms are to Braskem and its consolidated subsidiaries, which include Braskem Netherlands Finance, and jointly controlled companies, including Braskem Idesa S.A.P.I., which we refer to together with its consolidated subsidiary as Braskem Idesa.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantees) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantees). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantees) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

i

In making an investment decision, prospective investors must rely on their own examination of our company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

### PROHIBITION OF SALES TO EEA RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area, or the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended, or MiFID II; (ii) a customer within the meaning of Directive 2016/97/EC, as amended, or the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a "qualified investor" as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No 1286/2014, as amended, or the PRIIPs Regulation, for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any member state of the EEA will be made pursuant to an exemption under the European Regulation 2017/1129 of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, as amended or superseded, or the Prospectus Regulation, from the requirement to publish a prospectus for offers of notes.

### MiFID II PRODUCT GOVERNANCE

Solely for the purposes of each manufacturer's, or the Manufacturers, product approval process, the target market assessment in respect of the notes has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each as defined in MIFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes (each a distributor) should take into consideration the Manufacturers' target market assessment; however, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the Manufacturers' target market assessment) and determining appropriate distribution channels.

### NOTICE TO PROSPECTIVE INVESTORS IN THE NETHERLANDS

The notes (including rights representing an interest in each global note that represents the notes) may not be offered or sold to individuals or legal entities in the Netherlands other than to qualified investors within the meaning of the Prospectus Regulation. No approved prospectus within the meaning of the Prospectus Regulation is required.

### NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL

THE NOTES (AND RELATED GUARANTEES) HAVE NOT BEEN, AND WILL NOT BE, REGISTERED WITH THE BRAZILIAN SECURITIES COMMISSION (*COMISSÃO DE VALORES MOBILIÁRIOS*), OR THE CVM. THE NOTES MAY NOT BE OFFERED OR SOLD IN BRAZIL, EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE A PUBLIC OFFERING OR UNAUTHORIZED DISTRIBUTION UNDER BRAZILIAN LAWS AND REGULATIONS. THE NOTES (AND RELATED

**GUARANTEES) ARE NOT BEING OFFERED INTO BRAZIL. DOCUMENTS RELATING TO THE OFFERING OF THE NOTES, AS WELL AS INFORMATION CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN BRAZIL, NOR BE USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION FOR OR SALE OF THE NOTES TO THE PUBLIC IN BRAZIL.**

## INCORPORATION BY REFERENCE

We are incorporating by reference into this offering memorandum the following information contained in documents that we have filed with or furnished to the SEC:

- our annual report on Form 20-F for the year ended December 31, 2018, filed with the SEC on October 17, 2019, except for information relating to the years ended December 31, 2015 and 2014, containing our audited consolidated financial statements as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016, which we refer to in this offering memorandum as our annual report;

- our unaudited condensed quarterly financial information as of June 30, 2019 and for the six-month periods ended June 30, 2019 and 2018, contained in a Report on Form 6-K furnished to the SEC on October 22, 2019, which we refer to in this offering memorandum as our second quarter financial statement report; and

- our Management's Discussion and Analysis of Financial Condition and Results of Operations for the six-month periods ended June 30, 2019 and 2018 contained in a Report on Form 6-K furnished to the SEC on October 22, 2019, which we refer to in this offering memorandum as our second quarter MD&A report.

Incorporation by reference of information contained in our annual report, our second quarter financial statement report and our second quarter MD&A report means that (1) this information is considered part of this offering memorandum and (2) we can disclose important information to you, in such case, by referring to our annual report, our second quarter financial statement report and our second quarter MD&A report that we incorporate by reference.

Any statement contained in a document incorporated by reference or deemed to be incorporated by reference in this offering memorandum will be deemed to be modified or superseded for purposes of this offering memorandum to the extent that a statement contained in this offering memorandum or any other subsequently filed document that also is, or is deemed to be, incorporated by reference in this offering memorandum modifies or supersedes that statement.

You should read "Available Information" for information on how to obtain a copy of our annual report, our second quarter financial statement report and our second quarter MD&A report or other information relating to our company.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

On October 29, 2019, the *real*/U.S. dollar exchange rate was R$3.9946 to US$1.00, based on the selling rate as reported by the Central Bank of Brazil (*Banco Central do Brasil*), or the Central Bank. The selling rate was R$3.8322 to US$1.00 as of June 30, 2019, R$3.8558 to US$1.00 as of June 30, 2018, R$3.8748 to US$1.00 as of December 31, 2018, R$3.3080 to US$1.00 as of December 31, 2017 and R$3.2591 to US$1.00 as of December 31, 2016, in each case, as reported by the Central Bank. The *real*/U.S. dollar exchange rate fluctuates widely, and these selling rates may not be indicative of future selling rates.

Solely for the convenience of the reader, we have translated certain *real* amounts in this offering memorandum into U.S. dollars at the selling rate as reported by the Central Bank as of June 30, 2019 of R$3.8322 to US$1.00. These translations should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate.

### Financial Statements

### *Braskem Financial Statements*

We maintain our books and records in *reais.* Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our unaudited condensed quarterly financial information as of June 30, 2019 and for the six-month periods ended June 30, 2019 and 2018, which are incorporated into this offering memorandum by reference to our second quarter financial statement report, or our unaudited condensed quarterly financial information, and our audited consolidated financial statements as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016, or our audited consolidated financial statements, which are incorporated into this offering memorandum by reference to our annual report.

We have prepared our audited consolidated financial statements in accordance with International Financial Reporting Standards, or IFRS, as issued by the International Accounting Standards Board, or IASB. We have prepared our unaudited condensed quarterly financial information in accordance with CPC 21 (R1) and International Accounting Standard ("IAS") 34—Interim Financial Reporting, as issued by the IASB.

Our audited consolidated financial statements are not equivalent to our statutory financial statements as issued under the requirements applicable in Brazil. The date of issue of these audited consolidated financial statements is different from the date of issue of our consolidated financial statements in Brazil, and there are differences due to adjusting and non-adjusting events after the reporting period, under IAS 10—Events after the Reporting Period.

### *Braskem Netherlands Finance Financial Statements*

We have not included any financial statements for Braskem Netherlands Finance in this offering memorandum. Braskem Netherlands Finance does not, and will not, publish financial statements, except for financial statements that it expects to publish under the laws of the Netherlands. In addition, Braskem Netherlands Finance will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, Braskem Netherlands Finance. Braskem Netherlands Finance's obligations under the notes will be fully and unconditionally guaranteed by us. The financial condition and results of operations of Braskem Netherlands Finance have been fully consolidated in our consolidated financial statements for dates and periods ending after November 17, 2014 (the date of incorporation of Braskem Netherlands Finance).

**Market Share and Other Information**

We make statements in this offering memorandum, our annual report and our second quarter MD&A report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, other countries in Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market share with respect to specific products by dividing our domestic net sales volumes of these products by the total Brazilian domestic consumption of these products. We derive information regarding the production capacity of other companies in the Brazilian petrochemical industry and the estimated total Brazilian domestic consumption of petrochemical products principally from reports published by the Brazilian Chemical Industry Association (*Associação Brasileira da Indústria Química*), or ABIQUIM. We derive information regarding the production capacity of other companies in the global petrochemical industry, international market prices for petrochemicals products and per capita consumption in certain geographic regions principally from reports published by IHS, Inc., or IHS. We derive information relating to Brazilian imports and exports from the ComexStat (*http://comexstat.mdic.gov.br*), produced by the Brazilian Ministry of Economy (*Ministério da Economia)*. We also include information and statistics regarding economic growth in emerging economies obtained from the International Monetary Fund, or IMF, and statistics regarding gross domestic product, or GDP, growth in Brazil, the United States, Europe and Mexico obtained from independent public sources, such as the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*), or the IBGE; the U.S. Department of Commerce; the statistical office of the European Union, or Eurostat; and the Mexican Institute of Statistics and Geography (*Instituto Nacional de Estadística y Geografía*).

We have no reason to believe that any of this information is inaccurate in any material respect. However, neither we nor the initial purchasers have independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

We provide information regarding domestic apparent consumption of some of our products based on information available from the Brazilian government, Institute of Applied Economic Research (*Instituto de Pesquisa Econômica Aplicada*) and ABIQUIM. Domestic apparent consumption is equal to domestic production *plus* imports *minus* exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

**Production Capacity and Sales Volume**

As used in this offering memorandum:

- "production capacity" means the annual projected capacity for a particular facility, calculated based upon operations for 24 hours each day of a year and deducting scheduled downtime for regular maintenance; and

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

## FORWARD-LOOKING STATEMENTS

This offering memorandum and some of the matters discussed concerning our business operations and financial performance include forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended, or the Exchange Act.

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including the following:

- general economic, political and business conditions in the markets in which we operate and to which we export our products, including demand, supply and market prices of petrochemical products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar and other currencies;

- the cyclical nature of the global petrochemical industry;

- competition in the global petrochemical industry;

- market prices of naphtha, ethane, propane, propylene and other raw materials and the terms and conditions of the supply agreements we enter into for these and other raw materials;

- international market prices of petrochemical products;

- actions taken by our major shareholders;

- inherent risks related to any change of our corporate control;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, laws and regulations affecting tax and environmental matters and import tariffs in other markets or jurisdictions in which we operate or to which we export our products;

- future changes in Brazilian, Mexican, American and European policies and related actions undertaken by those governments;

- decisions rendered in major pending or future tax, labor, environmental and other legal proceedings;

- the potential effects of any cyber attacks;

- the potential effects of any natural disasters; and

- other factors identified under "Risk Factors" in this offering memorandum and in the reports filed with or furnished to the SEC that are incorporated by reference in this offering memorandum.

Our forward-looking statements are not guarantees of future performance, and our actual results or other developments may differ materially from the expectations expressed in our forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different

due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

Forward-looking statements speak only as of the date they are made, and neither we nor the initial purchasers undertake any obligation to update them in light of new information or future developments or to release publicly any revisions to these statements in order to reflect later events or circumstances or to reflect the occurrence of unanticipated events.

exercised its option to redeem the notes, Braskem will be required to offer to purchase the notes at a price equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and additional amounts, if any, to, but excluding, the purchase date.

This requirement to offer to purchase the notes is contingent upon certain conditions. See "Description of the Notes—Purchase of Notes Upon Change of Control Triggering Event."

**Additional amounts** ................................... Payments of interest on the notes or payments on the guarantees will be made after withholding and deduction for any Brazilian or Dutch taxes as set forth under "Taxation." Braskem Netherlands Finance or Braskem will pay such additional amounts as will result in receipt by the holders of notes of such amounts as would have been received by them had no such withholding or deduction for Brazilian or Dutch taxes been required, subject to certain exceptions described under "Description of the Notes—Additional Amounts."

**Covenants of Braskem Netherlands Finance** ................................... The indenture will prohibit the incurrence of debt (other than the notes and other indebtedness ranking equally with or subordinated to the notes) by Braskem Netherlands Finance and impose certain other limitations and restrictions on Braskem Netherlands Finance as described under "Description of the Notes—Additional Limitations on Braskem Netherlands Finance."

**Covenants of Braskem** ............................. The indenture will limit the creation of liens by Braskem and its significant subsidiaries and will permit Braskem to consolidate or merge with, or transfer all or substantially all of its assets to, another person only if it complies with certain requirements. However, these covenants are subject to a number of important exceptions. See "Description of the Notes—Covenants."

**Events of default** ........................................ The indenture will set forth the events of default applicable to the notes, including an event of default triggered by cross-acceleration of other debt of Braskem and its Significant Subsidiaries (as hereinafter defined) in a total amount of US$100.0 million or more. See "Description of the Notes—Events of Default."

**Further issuances** ....................................... Braskem Netherlands Finance may, from time to time, without the consent of the holders of the notes of a series, issue an unlimited principal amount of additional notes of the same series as the notes initially issued in this offering.

**Substitution of the issuer** .......................... Braskem Netherlands Finance may, without the consent of the holders of the notes and subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary (as hereinafter defined) of Braskem as principal debtor in respect of the notes. See "Description of the Notes—Substitution of the Issuer."

**Form and denomination** ........................... The notes will be issued in the form of global notes in fully registered form without interest coupons. The global notes will be exchangeable or transferable, as the case may be, for definitive certificated notes in fully registered form without interest coupons only in limited circumstances. The notes will be issued in

10

## RISK FACTORS

*Our annual report includes extensive risk factors relating to our company, the petrochemical industry and the countries in which we operate. Prospective purchasers of notes should carefully consider the risks discussed in our annual report and below, as well as the other information included in or incorporated by reference into this offering memorandum, before deciding to purchase any notes. We make reference to the risk factors under "Risk Factors—Risks Relating to Us and the Petrochemical Industry—We are exposed to behaviors of our employees and non-employees that may be incompatible with our ethics and compliance standards, and failure to timely prevent, detect or remedy any such behavior and/or process vulnerabilities may have a material adverse effect on our results of operations and financial condition" in our annual report. Our business, results of operations, financial condition or prospects could be materially and adversely affected if any of these risks occurs, and as a result, the trading price of the notes could decline and you could lose all or part of your investment.*

*The risk factors discussed in our annual report and below are not the only risks that we face, but are the risks that we currently consider to be material. There may be additional risks that we currently consider immaterial or of which we are currently unaware, and any of these risks could have similar effects to those set forth in our annual report and below.*

### Risks Relating to the Notes and the Guarantees

**Because Braskem Netherlands Finance has no operations of its own, holders of the notes must depend on Braskem to provide Braskem Netherlands Finance with sufficient funds to make payments on the notes when due.**

Braskem Netherlands Finance, a wholly-owned indirect subsidiary of Braskem, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem Netherlands Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of Braskem Netherlands Finance to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance. In the event of an adverse change in the financial condition or results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance, these entities may be unable to service their indebtedness to Braskem Netherlands Finance, which would result in the failure of Braskem Netherlands Finance to have sufficient funds to repay all amounts due on or with respect to the notes.

**Payments on Braskem's guarantees will be junior to Braskem's secured debt obligations and effectively junior to debt obligations of Braskem's subsidiaries and jointly controlled companies.**

The notes will be fully guaranteed by Braskem on an unsecured basis. The Braskem guarantees will constitute senior unsecured obligations of Braskem. The guarantees will rank equal in right of payment with all of Braskem's other existing and future senior unsecured indebtedness. Although the guarantees will provide the holders of the notes with a direct, but unsecured claim on Braskem's assets and property, payment on the guarantees will be subordinated to secured debt of Braskem to the extent of the assets and property securing such debt. While the indenture relating to the notes includes a covenant limiting the ability of Braskem and its subsidiaries to create or assume liens, that limitation is subject to significant exceptions. See "Description of the Notes—Covenants—Limitation on Liens." Payment on the guarantees will also be structurally subordinated to the payment of secured and unsecured debt and other creditors of Braskem's subsidiaries and jointly controlled companies other than Braskem Netherlands Finance.

Upon any liquidation or reorganization of Braskem, any right of the holders of the notes, through enforcement of the guarantees, to participate in the assets of Braskem, including the capital stock of its subsidiaries and jointly controlled entities, will be subject to the prior claims of Braskem's secured creditors, and to participate in the assets of Braskem's subsidiaries and jointly controlled entities will be subject to the prior claims of the creditors of its subsidiaries and jointly controlled entities.

15

***Brazilian bankruptcy laws may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness, including our obligations under the guarantees, then we may become subject to bankruptcy proceedings in Brazil. The bankruptcy laws of Brazil currently in effect are significantly different from, and may be less favorable to creditors than those of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a court reorganization proceeding. In addition, any judgment obtained against us in Brazilian courts in respect of any payment obligations under a guarantee would normally be expressed in the *real* equivalent of the U.S. dollar amount of such sum at the exchange rate in effect (1) on the date of actual payment, (2) on the date on which a judgment is rendered or (3) on the date on which collection or enforcement proceedings are started against us. Consequently, in the event of our bankruptcy, all of our debt obligations that are denominated in foreign currency, including the guarantees, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. We cannot assure you that this exchange rate will afford full compensation of the amount invested in the notes *plus* accrued interest.

***The imposition of IOF/Exchange taxes or other similar taxes may indirectly influence the price and volatility of the notes.***

Brazilian law imposes the Tax on Foreign Exchange Transactions (*Imposto sobre Operações de Crédito, Câmbio e Seguro, ou relativas a Títulos e Valores Mobiliários*), or IOF/Exchange taxes, on the conversion of *reais* into foreign currency and on the conversion of foreign currency into *reais*. The objective of these taxes is to slow the pace of speculative inflows of foreign capital into the Brazilian market and the appreciation of the *real* against the U.S. dollar. The imposition of this tax or other similar taxes may discourage foreign investment in the debt securities of Brazilian companies, including our company, due to higher transaction costs, and may negatively impact the price and volatility of the notes. See "Taxation—Brazilian Taxation—Other Brazilian Tax Considerations."

***Substitution of the issuer may have adverse tax consequences.***

Braskem Netherlands Finance may, subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary of Braskem as principal debtor in respect of the notes (see "Description of the Notes—Substitution of the Issuer"), which may result in certain adverse tax consequences to holders. The Substituted Issuer (as hereinafter defined) and Braskem will have an obligation to indemnify and hold harmless each holder and beneficial owner of the notes (1) against all taxes or duties which arise by reason of a law or regulation having legal effect or contemplated on the date such substitution becomes effective, which may be incurred or levied against such holder or beneficial owner as a result of any substitution described under "Description of the Notes—Substitution of the Issuer" and which would not have been so incurred or levied had such substitution not been made, and (2) against all taxes or duties which are imposed on such holder or beneficial owner of the notes by any political subdivision or taxing authority of any country in which such holder or beneficial owner of the notes resides or is subject to any such tax or duty and which would not have been so imposed had the substitution not been made, in each case subject to certain exceptions.

Holders are urged to consult their tax advisors regarding any potential adverse tax consequences that may result from a substitution of Braskem Netherlands Finance.

19

# EXHIBIT I

**Excerpts of 2081 Offering Memorandum**

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT, AS AMENDED (THE "SECURITIES ACT"); OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE U.S.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum and its annexes (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO UK AND EEA RETAIL INVESTORS** - THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE UNITED KINGDOM ("UK") OR THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); OR (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE 2002/92/EC (AS AMENDED OR SUPERSEDED, THE "INSURANCE MEDIATION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II. CONSEQUENTLY NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (AS AMENDED, THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE UK AND THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE UK OR THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION. THE OFFERING MEMORANDUM HAS BEEN PREPARED ON THE BASIS THAT ANY OFFER OF SECURITIES IN THE UK OR ANY MEMBER STATE OF THE EEA WILL BE MADE PURSUANT TO AN EXEMPTION UNDER THE EUROPEAN REGULATION 2017/1129 OF JUNE 14, 2017 ON THE PROSPECTUS TO BE PUBLISHED WHEN SECURITIES ARE OFFERED TO THE PUBLIC OR ADMITTED TO TRADING ON A REGULATED MARKET, AS AMENDED OR SUPERSEDED, FROM THE REQUIREMENT TO PUBLISH A PROSPECTUS FOR OFFERS OF SECURITIES.

IN ADDITION, IN THE UK, THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005

(THE "ORDER"), OR (II) PERSONS WHO FALL WITHIN ARTICLE 43(2)(B) OF THE ORDER, OR (III) HIGH NET WORTH ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (IV) PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM, ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS." THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE UK. ANY PERSON IN THE UK THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) outside the U.S. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act) and that the electronic mail address that you gave us and to which the Offering Memorandum has been delivered is not located in the U.S.; and (ii) that you consent to delivery of such Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and consequently neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic format and the hard copy version available to you on request from the initial purchasers.

**OFFERING MEMORANDUM**                                                                 **CONFIDENTIAL**



# Braskem Netherlands Finance B.V.

(*a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the law of the Netherlands*)

## US$600,000,000 Subordinated Resettable Fixed Rate Notes due 2081

Unconditionally and Irrevocably Guaranteed by

# Braskem S.A.

(*Incorporated in the Federative Republic of Brazil*)

Braskem Netherlands Finance B.V., or Braskem Netherlands Finance, is offering US$600,000,000 in aggregate principal amount of its subordinated resettable fixed rate notes due 2081, or the notes. Braskem Netherlands Finance is a private company with limited liability incorporated under the laws of the Netherlands. The notes will be fully, unconditionally and irrevocably guaranteed by Braskem S.A., or Braskem, a corporation (*sociedade anônima*) incorporated under the laws of the Federative Republic of Brazil.

The notes will mature on January 23, 2081. Subject to Braskem Netherlands Finance's right to defer payment, interest on the notes will be payable semi-annually in arrears on January 23 and July 23 of each year, beginning on January 23, 2021. As more fully described in this offering memorandum, Braskem Netherlands Finance may defer interest payments on the notes for any period of time; *provided* that any such deferred interest payments will bear interest at the same rate as the principal amount of the notes and will become due and payable on the Mandatory Settlement Date (as defined herein), if any.

The notes will bear interest on their principal amount from, and including, the issue date to, but excluding, January 23, 2026 (5.5 years after the issue date), or the First Reset Date, at a rate of 8.500% *per annum*. From, and including, the First Reset Date to, but excluding, January 23, 2031 (10.5 years after the issue date), or the First Step-up Date, the notes will bear interest on their principal amount at a rate *per annum* equal to the relevant five-year U.S. treasury rate *plus* 8.220%, which is the initial spread. From, and including, the First Step-up Date to, but excluding, January 23, 2041 (20.5 years after the issue date) (or, if on the 30th calendar day preceding the First Reset Date, Braskem is assigned an issuer credit rating by Standard & Poor's Ratings Group, a division of McGraw Hill, Inc. of BBB- or higher, January 23, 2046 (25.5 years after the issue date)), or the Second Step-up Date, the notes will bear interest for each Reset Period (as defined herein) on their principal amount at a rate *per annum* equal to the relevant five-year U.S. treasury rate *plus* the initial spread *plus* 0.250%. From, and including, the Second Step-up Date to, but excluding, the maturity date of the notes, the notes will bear interest for each Reset Period on their principal amount at a rate *per annum* equal to the relevant five-year U.S. treasury rate *plus* the initial spread *plus* 1.000%.

Braskem Netherlands Finance or Braskem may, at its option, redeem the notes, in whole or in part, at any time or from time to time on (i) any day during the period commencing on, and including, October 24, 2025 and ending on, and including, the First Reset Date, and (ii) any day during the period commencing on, and including, the 90th calendar day prior to each subsequent Reset Date thereafter and ending on, and including, such Reset Date, at their aggregate principal amount, together with any accrued and unpaid interest to, but excluding, the redemption date and any Arrears of Interest (as defined herein). Braskem Netherlands Finance or Braskem may also, at its option, redeem the notes, in whole but not in part, upon the occurrence of a Rating Methodology Event, a Substantial Repurchase Event, a Change of Control Triggering Event, a Withholding Tax Event or a Tax Deductibility Event (each as defined herein) at the applicable redemption price as set forth in this offering memorandum, together with any accrued and unpaid interest to, but excluding, the redemption date and any Arrears of Interest. As an alternative to a redemption of the notes as described in the preceding sentences, and subject to certain conditions, Braskem Netherlands Finance or Braskem may, at its option, substitute all (but not less than all), or vary the terms of the notes.

**Neither the U.S. Securities and Exchange Commission, or the SEC, nor any state securities commission has approved or disapproved of the notes or the guarantee or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

This offering memorandum does not constitute a prospectus for the purposes of Article 6 of Regulation (EU) 2017/1129 (as such regulation may be amended or superseded from time to time), or the Prospectus Regulation. Braskem Netherlands Finance is not offering the notes in any jurisdiction in circumstances that would require a prospectus to be prepared pursuant to the Prospectus Regulation.

The notes will be unsecured deeply subordinated obligations of Braskem Netherlands Finance and will rank senior only to all existing and future classes of equity capital of Braskem Netherlands Finance. Braskem's guarantee of the notes will be an unsecured deeply subordinated obligation of Braskem and will rank senior only to all existing and future classes of equity capital of Braskem.

We will apply to the Singapore Exchange Securities Trading Limited, or the SGX-ST, for permission to list the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this offering memorandum. Admission to the Official List of the SGX-ST is not to be taken as an indication of the merits of the notes, their issuer or their guarantor.

---

**Investing in the notes involves risks. See "Item 3. Key Information—Risk Factors" beginning on page 4 of our Annual Report (as defined below), which is incorporated by reference in this offering memorandum, and "Risk Factors" beginning on page 15 of this offering memorandum.**

The notes and the guarantee have not been registered under the U.S. Securities Act of 1933, as amended, or the Securities Act, or any state securities laws and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S under the Securities Act, or Regulation S), except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act, or Rule 144A, and outside the United States in accordance with Regulation S. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For a description of certain restrictions on transfer of the notes, see "Transfer Restrictions."

---

**Issue price of the notes: 100.000%** *plus* **accrued interest, if any, from July 23, 2020.**

---

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company, or DTC, and its direct and indirect participants, including Clearstream Banking, *société anonyme*, or Clearstream, and Euroclear Bank S.A./N.V., as operator of the Euroclear System, or Euroclear, is expected on or about July 23, 2020.

---

*Global Coordinators and Joint Book-Running Managers*

| **BNP PARIBAS** | **Morgan Stanley** | **Santander** |
|---|---|---|

*Joint Book-Running Managers*

| **Itaú BBA** | **SMBC Nikko** | **Standard Chartered Bank** |
|---|---|---|

The date of this offering memorandum is July 20, 2020.

## TABLE OF CONTENTS

**Page**

INCORPORATION BY REFERENCE ..............................................................................................iv
PRESENTATION OF FINANCIAL AND OTHER INFORMATION ...............................................vi
FORWARD-LOOKING STATEMENTS ............................................................................................ix
SUMMARY...........................................................................................................................................1
RISK FACTORS .................................................................................................................................15
USE OF PROCEEDS ..........................................................................................................................25
CAPITALIZATION .............................................................................................................................26
DESCRIPTION OF THE NOTES .......................................................................................................28
FORM OF THE NOTES......................................................................................................................53
TAXATION..........................................................................................................................................57
TRANSFER RESTRICTIONS.............................................................................................................70
ENFORCEABILITY OF CIVIL LIABILITIES ..................................................................................73
PLAN OF DISTRIBUTION ................................................................................................................75
CERTAIN ERISA CONSIDERATIONS .............................................................................................81
LEGAL MATTERS .............................................................................................................................83
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ....................................................84
AVAILABLE INFORMATION...........................................................................................................85

———————————

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantee) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to "Braskem," "the Company," "our company," "we," "our," "ours," "us" or similar terms are to Braskem and its consolidated subsidiaries, which include Braskem Netherlands Finance and Braskem Idesa S.A.P.I., which we refer to together with its consolidated subsidiary as Braskem Idesa.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantee) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantee). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantee) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

i

In making an investment decision, prospective investors must rely on their own examination of our company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

## PROHIBITION OF SALES TO UK AND EEA RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom, or the UK, or the European Economic Area, or the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended, or MiFID II; or (ii) a customer within the meaning of Directive 2016/97/EC, as amended, or the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II. Consequently, no key information document required by Regulation (EU) No 1286/2014, as amended, or the PRIIPs Regulation, for offering or selling the notes or otherwise making them available to retail investors in the UK and the EEA has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the UK or the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in the UK or any member state of the EEA will be made pursuant to an exemption under the European Regulation 2017/1129 of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, as amended or superseded, or the Prospectus Regulation, from the requirement to publish a prospectus for offers of notes.

## MiFID II PRODUCT GOVERNANCE

Solely for the purposes of each manufacturer's product approval process, the target market assessment in respect of the notes has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each as defined in MIFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes (each a distributor) should take into consideration the manufacturers' target market assessment; however, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

## NOTICE TO PROSPECTIVE INVESTORS IN THE NETHERLANDS

The notes (including rights representing an interest in each global note that represents the notes) may not be offered or sold to individuals or legal entities in the Netherlands other than to qualified investors within the meaning of the Prospectus Regulation. No approved prospectus within the meaning of the Prospectus Regulation is required.

## NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL

THE NOTES (AND RELATED GUARANTEE) HAVE NOT BEEN, AND WILL NOT BE, REGISTERED WITH THE BRAZILIAN SECURITIES COMMISSION (*COMISSÃO DE VALORES MOBILIÁRIOS*), OR THE CVM. THE NOTES MAY NOT BE OFFERED OR SOLD IN BRAZIL, EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE A PUBLIC OFFERING OR UNAUTHORIZED DISTRIBUTION UNDER BRAZILIAN LAWS AND REGULATIONS. THE NOTES (AND RELATED

**GUARANTEE) ARE NOT BEING OFFERED INTO BRAZIL. DOCUMENTS RELATING TO THE OFFERING OF THE NOTES, AS WELL AS INFORMATION CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN BRAZIL, NOR BE USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION FOR OR SALE OF THE NOTES TO THE PUBLIC IN BRAZIL.**

## INCORPORATION BY REFERENCE

We are incorporating by reference into this offering memorandum the following information contained in documents that we have filed with or furnished to the SEC:

- the following sections of our annual report on Form 20-F for the year ended December 31, 2019, filed with the SEC on June 15, 2020, which we collectively refer to in this offering memorandum as our "Annual Report":

  o the information under the caption "Presentation of Financial and Other Information";

  o the information contained in "Item 3. Key Information" in our Annual Report, with the exception of financial data as of and for the years ended December 31, 2017, 2016 and 2015;

  o the information contained in "Item 4. Information on the Company" in our Annual Report, with the exception of financial data as of and for the year ended December 31, 2017;

  o the information contained in "Item 5. Operating and Financial Review and Prospects" in our Annual Report, with the exception of financial data as of and for the year ended December 31, 2017;

  o the information contained in "Item 6. Directors, Senior Management and Employees";

  o the information contained in "Item 7. Major Shareholders and Related Party Transactions";

  o the information contained in "Item 8. Financial Information" in our Annual Report, with the exception of financial data as of and for the year ended December 31, 2017;

  o the information contained in "Item 11. Quantitative and Qualitative Disclosures About Market Risk";

  o the information contained in "Item 15. Controls and Procedures"; and

  o the audited consolidated financial statements of Braskem S.A. and its subsidiaries, including the reports of the independent registered public accounting firm, contained in our Annual Report, with the exception of such financial statements, including the reports of the independent registered public accounting firm, as of and for the year ended December 31, 2017;

- our unaudited condensed quarterly financial information as of March 31, 2020 and for the three-month periods ended March 31, 2020 and 2019, contained in a report on Form 6-K furnished to the SEC on July 14, 2020, which we refer to in this offering memorandum as our "First Quarter Financial Statement Report"; and

- our Management's Discussion and Analysis of Financial Condition and Results of Operations for the three-month periods ended March 31, 2020 and 2019 contained in a report on Form 6-K furnished to the SEC on July 14, 2020, which we refer to in this offering memorandum as our "First Quarter MD&A Report."

Incorporation by reference of information contained in our Annual Report, our First Quarter Financial Statement Report and our First Quarter MD&A Report means that (1) this information is considered part of this offering memorandum and (2) we can disclose important information to you, in such case, by referring to our Annual Report, our First Quarter Financial Statement Report and our First Quarter MD&A Report that we incorporate by reference.

Any statement contained in a document incorporated by reference or deemed to be incorporated by reference in this offering memorandum will be deemed to be modified or superseded for purposes of this offering memorandum to the extent that a statement contained in this offering memorandum or any other subsequently filed document that

iv

also is, or is deemed to be, incorporated by reference in this offering memorandum modifies or supersedes that statement.

You should read "Available Information" for information on how to obtain a copy of our Annual Report, our First Quarter Financial Statement Report and our First Quarter MD&A Report or other information relating to our company.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

On July 20, 2020, the *real*/U.S. dollar exchange rate was R$5.3635 to US$1.00, based on the selling rate as reported by the Central Bank of Brazil (*Banco Central do Brasil*), or the Central Bank. The selling rate was R$5.1987 to US$1.00 as of March 31, 2020, R$4.0307 to US$1.00 as of December 31, 2019, R$3.8748 to US$1.00 as of December 31, 2018 and R$3.3080 to US$1.00 as of December 31, 2017, in each case, as reported by the Central Bank. The *real*/U.S. dollar exchange rate fluctuates widely, and these selling rates may not be indicative of future selling rates.

Solely for the convenience of the reader, we have translated certain *real* amounts in this offering memorandum into U.S. dollars at the selling rate as reported by the Central Bank as of March 31, 2020 of R$5.1987 to US$1.00. These translations should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate.

**Financial Statements**

***Braskem Financial Statements***

We maintain our books and records in *reais*. Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our unaudited condensed quarterly financial information as of March 31, 2020 and for the three-month periods ended March 31, 2020 and 2019, which are incorporated into this offering memorandum by reference to our First Quarter Financial Statement Report, or our unaudited condensed quarterly financial information, and our audited consolidated financial statements as of December 31, 2019 and 2018 and for the years ended December 31, 2019 and 2018, or our audited consolidated financial statements, which are incorporated into this offering memorandum by reference to our Annual Report.

We have prepared our audited consolidated financial statements in accordance with International Financial Reporting Standards, or IFRS, as issued by the International Accounting Standards Board, or IASB. We have prepared our unaudited condensed quarterly financial information in accordance with CPC 21 (R1) and International Accounting Standard ("IAS") 34—Interim Financial Reporting, as issued by the IASB.

Our audited consolidated financial statements are not equivalent to our statutory financial statements as issued under the requirements applicable in Brazil. The date of issue of these audited consolidated financial statements is different from the date of issue of our consolidated financial statements in Brazil, and there are differences due to adjusting and non-adjusting events after the reporting period, under IAS 10—Events after the Reporting Period.

***Braskem Netherlands Finance Financial Statements***

We have not included any financial statements for Braskem Netherlands Finance in this offering memorandum. Braskem Netherlands Finance does not, and will not, publish financial statements, except for financial statements that it expects to publish under the laws of the Netherlands. In addition, Braskem Netherlands Finance will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, Braskem Netherlands Finance. Braskem Netherlands Finance's obligations under the notes will be fully and unconditionally guaranteed by us. The financial condition and results of operations of Braskem Netherlands Finance have been fully consolidated in our consolidated financial statements for dates and periods ending after November 17, 2014 (the date of incorporation of Braskem Netherlands Finance).

**Restatement and Reclassification of the Comparable Interim Quarterly Financial Information for the Three-Month Period Ended March 31, 2019**

***Change to the Presentation of Profit Sharing Expenses by Function***

In the three-month period ended March 31, 2020, we changed the classification of profit sharing expenses to report the effects of such expenses by function. We reclassified the amounts related to the three-month period ended March 31, 2019 for comparison purposes. In the three-month period ended March 31, 2019, the amounts related to this item were reclassified from "other expenses" (R$121.9 million) to "cost of goods sold" (R$47.3 million), "selling and distribution expenses" (R$16.6 million), "general and administrative expenses" (R$52.1 million) and "research and development" (R$5.8 million).

***Reversal of Income Tax and Social Contribution – Current and Deferred***

We restated the balances of income tax and social contribution – current and deferred (reduction in the amount of R$434.5 million in net profit previously reported) for the three-month period ended March 31, 2019 due to the reversal of the tax deductibility of the portion related to the leniency agreement entered into with the Ministry of Transparency and Controllership (*CGU*) and the Office of the Attorney-General (*AGU*) in Brazil, in the amount of R$1.4 billion.

**Market Share and Other Information**

We make statements in this offering memorandum, our Annual Report and our First Quarter MD&A Report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, other countries in Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market share with respect to specific products by dividing our domestic net sales volumes of these products by the total Brazilian domestic consumption of these products. We derive information regarding the production capacity of other companies in the Brazilian petrochemical industry and the estimated total Brazilian domestic consumption of petrochemical products principally from reports published by the Brazilian Chemical Industry Association (*Associação Brasileira da Indústria Química*), or ABIQUIM. We derive information regarding the production capacity of other companies in the global petrochemical industry, international market prices for petrochemicals products and per capita consumption in certain geographic regions principally from reports published by IHS, Inc., or IHS. We derive information relating to Brazilian imports and exports from the ComexStat (*http://comexstat.mdic.gov.br*), produced by the Brazilian Ministry of Economy (*Ministério da Economia)*. We also include information and statistics regarding economic growth in emerging economies obtained from the International Monetary Fund, or IMF, and statistics regarding gross domestic product, or GDP, growth in Brazil, the United States, Europe and Mexico obtained from independent public sources, such as the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*), or the IBGE; the U.S. Department of Commerce; the statistical office of the European Union, or Eurostat; and the Mexican Institute of Statistics and Geography (*Instituto Nacional de Estadística y Geografía*).

We have no reason to believe that any of this information is inaccurate in any material respect. However, neither we nor the initial purchasers have independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

We provide information regarding domestic apparent consumption of some of our products based on information available from the Brazilian government, Institute of Applied Economic Research (*Instituto de Pesquisa Econômica Aplicada*) and ABIQUIM. Domestic apparent consumption is equal to domestic production *plus* imports *minus* exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

**Production Capacity and Sales Volume**

As used in this offering memorandum:

- "production capacity" means the annual projected capacity for a particular facility, calculated based upon operations for 24 hours each day of a year and deducting scheduled downtime for regular maintenance; and

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

## FORWARD-LOOKING STATEMENTS

This offering memorandum and the documents incorporated by reference in this offering memorandum include forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended, or the Exchange Act.

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including the following:

- the adverse effect of global health crises, such as the novel coronavirus (COVID-19) pandemic, or the COVID-19 pandemic, and others, on our Brazilian and international sales and operations, demand for our petrochemical products, our manufacturing facilities, price of raw materials, logistics for our products and raw materials, and supply chains;

- general economic, political and business conditions in the markets in which we operate and to which we export our products, including demand, supply and market prices of petrochemical products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar and other currencies;

- the cyclical nature of the global petrochemical industry;

- competition in the global petrochemical industry;

- prices of naphtha, ethane, propane, propylene and other raw materials and the terms and conditions of the supply agreements related thereto;

- international prices of petrochemical products;

- actions taken by our major shareholders;

- inherent risks related to any change of our corporate control;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, laws and regulations affecting tax and environmental matters and import tariffs in other markets or jurisdictions in which we operate or to which we export our products;

- future changes in Brazilian, Mexican, American and European policies and related actions undertaken by those governments;

- a deterioration in the world economy that could negatively impact demand for petrochemicals;

- decisions rendered in major pending or future tax, labor, environmental and other legal proceedings;

- the potential effects of any cyber attacks;

- the potential effects of any natural disasters; and

- other factors identified under "Risk Factors" in this offering memorandum and in the reports filed with or furnished to the SEC that are incorporated by reference in this offering memorandum.

Our forward-looking statements are not a guarantee of future performance, and our actual results or other developments may differ materially from the expectations expressed in our forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

Forward-looking statements speak only as of the date they are made, and neither we nor the initial purchasers undertake any obligation to update them in light of new information or future developments or to release publicly any revisions to these statements in order to reflect later events or circumstances or to reflect the occurrence of unanticipated events.

the notes or vary the terms of the notes, as described under "Description of the Notes—Substitution or Variation."

**Additional amounts**...................................... Payments of interest on the notes or payments on the guarantee will be made after withholding and deduction for any Brazilian or Dutch taxes as set forth under "Taxation." In such case, Braskem Netherlands Finance or Braskem will pay such additional amounts as will result in receipt by the holders of the notes of such amounts as would have been received by them had no such withholding or deduction for Brazilian or Dutch taxes been required, subject to certain exceptions described under "Description of the Notes—Additional Amounts."

**Covenants of Braskem Netherlands Finance** .................................................. The indenture will impose certain limitations and restrictions on Braskem Netherlands Finance as described under "Description of the Notes—Additional Limitations on Braskem Netherlands Finance."

**Covenants of Braskem** ................................. The indenture will permit Braskem to consolidate or merge with, or transfer all or substantially all of its assets to, another person only if it complies with certain requirements. See "Description of the Notes—Covenants."

**Events of default**........................................... The indenture will set forth the events of default applicable to the notes, which comprise defaults in any payment of interest on the notes, which continue for a period of 30 days, subject to Braskem Netherlands Finance's right to defer interest, defaults in the payment of the principal of the notes and certain events of bankruptcy or insolvency. See "Description of the Notes—Events of Default."

**Further issuances** ........................................ Braskem Netherlands Finance may from time to time, without notice to or consent of the holders of the notes, create and issue an unlimited principal amount of additional notes having the same terms and conditions as the notes initially issued in this offering in all respects, except that the issue date, the issue price and the first payment of interest on additional notes may differ.

**Substitution of the issuer** ............................ Braskem Netherlands Finance may, without the consent of any holder of the notes and subject to certain conditions, be substituted by Braskem or any Wholly-owned Subsidiary (as defined herein) of Braskem as principal debtor in respect of the notes. See "Description of the Notes—Substitution of the Issuer."

**Form and denomination** .............................. The notes will be issued in the form of global notes in fully registered form without interest coupons. The global notes will be exchangeable or transferable, as the case may be, for definitive certificated notes in fully registered form without interest coupons only in limited circumstances. The notes will be issued in registered form in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. See "Description of the Notes—Form, Denomination and Title" and "Form of the Notes."

11

**RISK FACTORS**

*Our Annual Report includes extensive risk factors relating to our company, the petrochemical industry and the countries in which we operate. Prospective purchasers of notes should carefully consider the risks discussed under the heading "Item 3. Key Information—Risk Factors" in our Annual Report and below, as well as the other information included in or incorporated by reference into this offering memorandum, before deciding to purchase any notes. Our business, results of operations, financial condition or prospects could be materially and adversely affected if any of these risks occurs, and as a result, the trading price of the notes could decline and you could lose all or part of your investment.*

*The risk factors discussed in our Annual Report and below are not the only risks that we face, but are the risks that we currently consider to be material. There may be additional risks that we currently consider immaterial or of which we are currently unaware, and any of these risks could have similar effects to those set forth in our Annual Report and below.*

**Risks Relating to the Notes and the Guarantee**

***Because Braskem Netherlands Finance has no operations of its own, holders of the notes must depend on Braskem to provide Braskem Netherlands Finance with sufficient funds to make payments on the notes when due.***

Braskem Netherlands Finance, a wholly-owned indirect subsidiary of Braskem, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or senior to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem Netherlands Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of Braskem Netherlands Finance to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance. In the event of an adverse change in the financial condition or results of operations of Braskem and its subsidiaries that are creditors of Braskem Netherlands Finance, these entities may be unable to service their indebtedness to Braskem Netherlands Finance, which would result in the failure of Braskem Netherlands Finance to have sufficient funds to repay all amounts due on or with respect to the notes.

***The obligations of Braskem Netherlands Finance under the notes and Braskem under the guarantee will be subordinated to other claims and obligations and the indenture will provide that holders of the notes waive certain rights.***

The obligations of Braskem Netherlands Finance under the notes and of Braskem under its guarantee of the notes will be unsecured and subordinated. In the event of the acceleration of the maturity of the notes due to the insolvency or liquidation of Braskem Netherlands Finance or Braskem and upon any distribution of assets to creditors upon any liquidation, dissolution, winding up, assignment for the benefit of creditors, marshaling of assets or any bankruptcy, insolvency or similar proceedings in connection with the insolvency or bankruptcy of Braskem Netherlands Finance or Braskem, (i) all principal, premium, if any, and interest due or to become due on all Senior Indebtedness (as defined under "Description of the Notes") must be paid in full before the holders of Parity Securities (as defined under "Description of the Notes" and including the notes and the guarantee) are entitled to receive or retain any payment in respect thereof, and (ii) the holders of Parity Securities (including the notes and the guarantee) will be entitled to receive pari passu among themselves any payment in respect thereof only after the holders of Senior Indebtedness have been paid in full.

In addition, the indenture will provide that holders waive certain rights and limit certain claims against Braskem Netherlands Finance and Braskem and their respective creditors. The notes will be subordinated to the Senior Indebtedness of Braskem Netherlands Finance and Braskem. As of March 31, 2020, we had R$38,898.7 million (US$7,482.4 million) of outstanding debt, including R$38,898.7 million (US$7,482.4 million) of Senior Indebtedness. For additional information and a description of the rights of holders and of the Senior Indebtedness, see "Description of the Notes—General," "Description of the Notes—Braskem Guarantee" and "Description of the Notes—Holders' Acknowledgement of Subordination of Notes."

15

***Brazilian bankruptcy laws may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness, including our obligations under the guarantee, then we may become subject to bankruptcy proceedings in Brazil. The bankruptcy laws of Brazil currently in effect are significantly different from, and may be less favorable to creditors than those of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a court reorganization proceeding. In addition, any judgment obtained against us in Brazilian courts in respect of any payment obligations under a guarantee would normally be expressed in the *real* equivalent of the U.S. dollar amount of such sum at the exchange rate in effect (1) on the date of actual payment, (2) on the date on which a judgment is rendered or (3) on the date on which collection or enforcement proceedings are started against us. Consequently, in the event of our bankruptcy, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. We cannot assure you that this exchange rate will afford full compensation of the amount invested in the notes *plus* accrued interest.

***The imposition of IOF/Exchange taxes or other similar taxes may indirectly influence the price and volatility of the notes.***

Brazilian law imposes the Tax on Foreign Exchange Transactions (*Imposto sobre Operações de Crédito, Câmbio e Seguro, ou relativas a Títulos e Valores Mobiliários*), or IOF/Exchange taxes, on the conversion of *reais* into foreign currency and on the conversion of foreign currency into *reais*. The objective of these taxes is to slow the pace of speculative inflows of foreign capital into the Brazilian market and the appreciation of the *real* against the U.S. dollar. The imposition of this tax or other similar taxes may discourage foreign investment in the debt securities of Brazilian companies, including our company, due to higher transaction costs, and may negatively impact the price and volatility of the notes. See "Taxation—Brazilian Taxation—Other Brazilian Tax Considerations."

***Substitution of the issuer may have adverse tax consequences.***

Braskem Netherlands Finance may, subject to certain conditions, be replaced and substituted by Braskem or any Wholly-owned Subsidiary of Braskem as principal debtor in respect of the notes (see "Description of the Notes—Substitution of the Issuer"), which may result in certain adverse tax consequences to holders. The Substituted Issuer (as hereinafter defined) and Braskem will have an obligation to indemnify and hold harmless each holder and beneficial owner of the notes (1) against all taxes or duties which arise by reason of a law or regulation having legal effect or contemplated on the date such substitution becomes effective, which may be incurred or levied against such holder or beneficial owner as a result of any substitution described under "Description of the Notes—Substitution of the Issuer" and which would not have been so incurred or levied had such substitution not been made, and (2) against all taxes or duties which are imposed on such holder or beneficial owner of the notes by any political subdivision or taxing authority of any country in which such holder or beneficial owner of the notes resides or is subject to any such tax or duty and which would not have been so imposed had the substitution not been made, in each case subject to certain exceptions.

Holders are urged to consult their tax advisors regarding any potential adverse tax consequences that may result from a substitution of Braskem Netherlands Finance.

***The United States federal income tax consequences of your investment in the notes are not entirely certain.***

The United States federal income tax treatment of a financial instrument with terms similar to the features of the notes is not entirely certain. The notes are in form indebtedness and provide for a repayment of their principal amount at maturity. Notwithstanding the attributes described in the preceding sentence, other factors, such as (i) the term of the notes, (ii) the provisions relating to the potential deferral of interest payments on the notes and (iii) certain of the provisions relating to the creditor rights of holders, suggest that the notes may be characterized as equity of Braskem Netherlands Finance for United States federal income tax purposes. Although the matter is not free from doubt, we believe that the notes are more properly characterized as equity of Braskem Netherlands Finance for United States federal income tax purposes. There can be no assurance, however, that the Internal

23

## EXHIBIT J

**Excerpts of 2041 Offering Memorandum**

**OFFERING MEMORANDUM**                                                              **CONFIDENTIAL**

**Braskem**

**US$500,000,000**

# Braskem America Finance Company

*(Incorporated in the State of Delaware)*

### 7.125% Notes due 2041

**Unconditionally Guaranteed by**

# Braskem S.A.

*(Incorporated in the Federative Republic of Brazil)*

The notes will bear interest at the rate of 7.125% per year. Interest on the notes is payable on January 22 and July 22 of each year, beginning on January 22, 2012. The notes will mature on July 22, 2041.

Braskem America Finance Company, which we refer to as Braskem America Finance, or Braskem S.A., which we refer to as Braskem, may, at its option, redeem the notes, in whole or in part, at any time prior to January 22, 2041, by paying 100% of the principal amount of the notes plus the applicable "make-whole" amount and accrued interest and additional amounts, if any. Braskem America Finance or Braskem may, at its option, redeem the notes, in whole or in part, on January 22, 2041 or at any time thereafter, by paying 100% of the principal amount of the notes plus accrued interest and additional amounts, if any. The notes may also be redeemed, in whole but not in part, at 100% of their principal amount plus accrued interest and additional amounts, if any, at any time upon the occurrence of specified events relating to Brazilian or U.S. tax law, as set forth in this offering memorandum. See "Description of the Notes—Redemption."

If a specified Change of Control event as described herein occurs, unless Braskem America Finance has exercised its option to redeem the notes, Braskem will be required to offer to purchase the notes at the price described in this offering memorandum.

The notes will be senior unsecured obligations of Braskem America Finance, ranking equal in right of payment with all of its other existing and future senior unsecured debt. The guarantees will be senior unsecured obligations of Braskem, ranking equal in right of payment with all of its other existing and future senior unsecured debt.

We will apply to the Singapore Exchange Securities Trading Limited, or the SGX-ST, for permission to list the notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this offering memorandum. Admission to the Official List of the SGX-ST is not to be taken as an indication of the merits of the notes or our company.

**Investing in the notes involves risks. See "Risk Factors" beginning on page 4 of our annual report on Form 20-F for the year ended December 31, 2010, which is incorporated by reference in this offering memorandum, and "Risk Factors" beginning on page 18 of this offering memorandum.**

The notes and the guarantees have not been registered under the U.S. Securities Act of 1933, as amended, or the Securities Act, or any state securities laws and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S under the Securities Act, or Regulation S), except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act, or Rule 144A, and outside the United States in accordance with Regulation S. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For a description of certain restrictions on transfer of the notes, see "Notice to Investors."

The notes are being offered pursuant to an exemption from prospectus requirements under the Directive 2003/71/EC (as amended), or the Prospectus Directive, of the European Union, and this offering memorandum has not been approved by a competent authority within the meaning of that Directive.

**Price: 98.479% plus accrued interest, if any, from July 22, 2011.**

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company, or DTC, and its direct and indirect participants, including Clearstream Banking, *société anonyme,* or Clearstream, and Euroclear Bank S.A./N.V., as operator of the Euroclear System, or Euroclear, is expected on or about July 22, 2011.

*Joint Bookrunners*

**BofA Merrill Lynch**              **HSBC**              **Morgan Stanley**

The date of this offering memorandum is July 19, 2011.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Incorporation by Reference | iii |
| Presentation of Financial and Other Information | iv |
| Forward-Looking Statements | vii |
| Summary | 1 |
| Risk Factors | 18 |
| Use of Proceeds | 22 |
| Exchange Rates | 23 |
| Capitalization | 24 |
| Recent Developments | 26 |
| Description of the Notes | 28 |
| Form of the Notes | 49 |
| Taxation | 53 |
| Notice to Investors | 59 |
| Enforcement of Civil Liabilities | 61 |
| Plan of Distribution | 63 |
| Legal Matters | 67 |
| Independent Accountants | 67 |
| Available Information | 67 |

**You should rely only on the information contained in this offering memorandum. We have not authorized anyone to provide you with different information. None of Braskem, Braskem America Finance or the initial purchasers is making an offer of the notes in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the front of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to "our company," "we," "our," "ours," "us" or similar terms are to Braskem and its consolidated subsidiaries and jointly controlled companies.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes. Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure or any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future. We have furnished the information contained in this offering memorandum.

Neither the U.S. Securities and Exchange Commission, or the SEC, any state securities commission nor any other regulatory authority, has approved or disapproved the notes nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this offering memorandum. Any representation to the contrary is a criminal offense.

i

The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Notice to Investors."

In making an investment decision, prospective investors must rely on their own examination of our company and the terms of the offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as legal, business or tax advice. Each prospective investor should consult its own legal, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to herein will be made available to prospective investors upon request to us or the initial purchasers.

## NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL

**THE NOTES (AND RELATED GUARANTEES) HAVE NOT BEEN, AND WILL NOT BE, REGISTERED WITH THE BRAZILIAN SECURITIES COMMISSION (*COMISSÃO DE VALORES MOBILIÁRIOS*), OR THE CVM. THE NOTES MAY NOT BE OFFERED OR SOLD IN BRAZIL, EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE A PUBLIC OFFERING OR UNAUTHORIZED DISTRIBUTION UNDER BRAZILIAN LAWS AND REGULATIONS. THE NOTES (AND RELATED GUARANTEES) ARE NOT BEING OFFERED INTO BRAZIL. DOCUMENTS RELATING TO THE OFFERING OF THE NOTES, AS WELL AS INFORMATION CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN BRAZIL, NOR BE USED IN CONNECTION WITH ANY PUBLIC OFFER FOR SUBSCRIPTION OR SALE OF THE NOTES TO THE PUBLIC IN BRAZIL.**

## NOTICE TO NEW HAMPSHIRE RESIDENTS

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER RSA 421-B WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATION OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE OR CAUSE TO BE MADE TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

### INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

**PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET OUT HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE. SUCH DESCRIPTION WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE NOTES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**INCORPORATION BY REFERENCE**

We are incorporating by reference into this offering memorandum the following information contained in documents that we have filed with the SEC:

- the following information in our annual report on Form 20-F for the year ended December 31, 2010, which we refer to as the Braskem Annual Report, and which we filed with the SEC on June 10, 2011:

  - the information under the caption "Presentation of Financial and Other Information" on pages ii and iii of the Braskem Annual Report;

  - the information contained in Part I on pages 1 through 180 of the Braskem Annual Report; and

  - the consolidated financial statements of our company, including the reports thereon, contained on pages F-1 through F-123 of the Braskem Annual Report;

- our Supplement Segment Information for the year ended December 31, 2010 contained in a Form 6-K which we filed with the SEC on June 15, 2011, which we refer to as the Supplemental Segment Information Report;

- our unaudited consolidated interim financial statements at March 31, 2011 and for the three-month periods ended March 31, 2011 and 2010 contained in a Form 6-K which we filed with the SEC on May 25, 2011, which we refer to as the First Quarter Financial Statement Report;

- our Management's Discussion and Analysis of Financial Condition and Results of Operations for the first quarter of 2011 contained in a Form 6-K which we filed with the SEC on June 15, 2011, which we refer to as the First Quarter MD&A Report; and

- the information contained in our Form 6-K relating to our pro forma financial information for the year ended December 31, 2010, which we refer to as the Pro Forma Report, and which we filed with the SEC on June 15, 2011.

Incorporation by reference of information contained in the Braskem Annual Report, the Supplemental Segment Information Report, the First Quarter Financial Statement Report, the First Quarter MD&A Report and the Pro Forma Report means that (1) this information is considered part of this offering memorandum, and (2) we can disclose important information to you by referring to the portions of the Braskem Annual Report that we incorporate by reference, the Supplemental Segment Information Report, the First Quarter Financial Statement Report, the First Quarter MD&A Report and the Pro Forma Report.

The information in the portions of the Braskem Annual Report that we incorporate by reference, the Supplemental Segment Information Report, the First Quarter Financial Statement Report, the First Quarter MD&A Report and the Pro Forma Report is an important part of this offering memorandum. The portions of the Braskem Annual Report that we incorporate by reference, the Supplemental Segment Information Report, the First Quarter Financial Statement Report, the First Quarter MD&A Report and the Pro Forma Report contain important information about our company and our results of operations and financial condition.

The statements contained in the portions of the Braskem Annual Report that we incorporate by reference that have been updated in the Supplemental Segment Information Report are deemed to be modified or superseded for purposes of this offering memorandum to the extent that statements contained in the Supplemental Segment Information Report modifies or supersedes those statements.

Any statement contained in the portions of the Braskem Annual Report that we incorporate by reference, the Supplemental Segment Information Report, the First Quarter Financial Statement Report, the First Quarter MD&A Report and the Pro Forma Report will be deemed to be modified or superseded for purposes of this offering memorandum to the extent that a statement contained herein modifies or supersedes that statement.

You should read "Available Information" for information on how to obtain the Braskem Annual Report, the Supplemental Segment Information Report, the First Quarter Financial Statement Report, the First Quarter MD&A Report and the Pro Forma Report or other information relating to our company.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references herein to the "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars," "dollars" or "US$" are to U.S. dollars.

On July 14, 2011, the exchange rate for *reais* into U.S. dollars was R$1.5729 to US$1.00, based on the selling rate as reported by the Central Bank of Brazil (*Banco Central do Brasil*), the Central Bank. The selling rate was R$1.6287 to US$1.00 at March 31, 2011, R$1.7810 to US$1.00 at March 31, 2010, R$1.6662 to US$1.00 at December 31, 2010, R$1.7412 to US$1.00 at December 31, 2009 and R$2.3370 to US$1.00 at December 31, 2008, in each case, as reported by the Central Bank. The *real*/U.S. dollar exchange rate fluctuate widely, and the selling rates at July 14, 2011 may not be indicative of future exchange rates. See "Exchange Rates" for information regarding exchange rates for the Brazilian currency since January 1, 2006.

Solely for the convenience of the reader, we have translated some amounts included in "Summary— Summary Historical and Pro Forma Financial and Other Information," "Capitalization" and elsewhere in this offering memorandum from *reais* into U.S. dollars using the selling rate as reported by the Central Bank at March 31, 2011 of R$1.6287 to US$1.00. These translations should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate. Such translations should not be construed as representations that the *real* amounts represent or have been or could be converted into U.S. dollars as of that or any other date.

### Financial Statements

#### *Braskem Financial Statements*

We maintain our books and records in *reais.* The financial information of Braskem contained in this offering memorandum has been derived from the records and financial statements of Braskem, and includes our unaudited consolidated interim financial statements at March 31, 2011 and for the three-month periods ended March 31, 2011 and 2010, which are incorporated into this offering memorandum by reference to the First Quarter Financial Statement Report, and our audited consolidated financial statements at December 31, 2010 and 2009 and for each of the years ended December 31, 2010 and 2009, which are incorporated into this offering memorandum by reference to the Braskem Annual Report.

We have prepared our consolidated financial statements at December 31, 2010 and 2009 and for each of the years ended December 31, 2010 and 2009, which are incorporated by reference into this offering memorandum, in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, or IFRS. Our consolidated annual financial statements at December 31, 2010 and 2009 and for each of the years ended December 31, 2010 and 2009 are our first annual consolidated financial statements to be prepared in accordance with IFRS. IFRS 1, or the "First-time Adoption of International Reporting Standards," has been applied in preparing these financial statements.

We have prepared our unaudited consolidated interim financial statements at March 31, 2011 and for the three-month periods ended March 31, 2011 and 2010, which are incorporated into this offering memorandum, in accordance with (1) accounting practices adopted in Brazil, or Brazilian GAAP, which include the pronouncements issued by the Brazilian Accounting Standards Committee (*Comitê de Pronunciamentos Contábeis*), or the CPC, and (2) IFRS.

Until December 31, 2009, we prepared our consolidated financial statements in accordance with accounting practices adopted in Brazil in effect on and prior to December 31, 2009, or Prior Brazilian GAAP, which are based on:

- Brazilian Law No. 6,404, dated December 15, 1976, as amended, or the Brazilian Corporation Law;
- the rules and regulations of the CVM; and
- the accounting standards issued by the CPC.

iv

When preparing our 2010 consolidated financial statements under IFRS, management amended certain accounting, valuation and consolidation methods in the Prior Brazilian GAAP financial statements to comply with IFRS. The comparative figures in respect of 2009 have been restated to reflect these adjustments. Reconciliations and descriptions of the effect of the transition from Prior Brazilian GAAP to IFRS are included in note 4 to our consolidated financial statements.

### *Quattor Financial Statements*

We acquired 60% of the outstanding share capital of Quattor Participações S.A., or Quattor, in late April 2010 and acquired the remainder of the outstanding share capital of Quattor in June 2010. As a result of these transactions, we have fully consolidated the results of Quattor and its subsidiaries into our financial statements as from May 1, 2010.

We have incorporated into this offering memorandum by reference to the Pro Forma Report the unaudited consolidated interim financial statements of Quattor at March 31, 2010 and for the three-month periods ended March 31, 2010 and 2009, prepared in accordance with Prior Brazilian GAAP. Quattor maintains its books and records in *reais*.

Prior Brazilian GAAP differs in certain respects from IFRS. We have not identified or quantified those differences. No reconciliation to IFRS of Quattor's unaudited consolidated interim financial statements has been prepared for the purpose of this offering memorandum or for any other purpose. There can be no assurance that reconciliation would identify material quantitative differences as well as disclosure and presentation differences between Quattor's financial statements prepared in accordance with Prior Brazilian GAAP and financial statements prepared under IFRS.

Consistent with Prior Brazilian GAAP, Quattor's unaudited consolidated interim financial statements at March 31, 2010 and for the three-month periods ended March 31, 2010 and 2009 have been prepared in accordance with CVM Instruction No. 247, dated March 27, 1996, as amended, or Instruction 247. Instruction 247 required Quattor to proportionally consolidate the financial statements of Polibutenos S.A. Indústrias Químicas, or Polibutenos, a company that was jointly controlled by Quattor with Unipar—União de Indústrias Petroquímicas S.A., or Unipar, and Chevron Oronite do Brasil Ltda., or Chevron Brasil, at those dates and for those periods. Polibutenos was not deemed a subsidiary of Quattor for accounting purposes.

### *Braskem America Finance Financial Statements*

We have not included any financial statements for Braskem America Finance in this offering memorandum. Braskem America Finance does not, and will not, publish financial statements, except for such financial statements which Braskem America Finance may be required under the laws of the United States or the State of Delaware to publish. In addition, Braskem America Finance will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, Braskem America Finance. Braskem America Finance does not have any operations independent from Braskem. Braskem America Finance's obligations under the notes will be fully and unconditionally guaranteed by Braskem. The financial statements of Braskem America Finance have been fully consolidated in the consolidated financial statements of Braskem for dates and periods ending after July 7, 2011 (the date of incorporation of Braskem America Finance).

### Market Share and Other Information

We make statements in this offering memorandum and in the Braskem Annual Report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market shares with respect to specific products by dividing our domestic net sales volumes of these products by

v

the total Brazilian domestic consumption of these products as estimated by the Brazilian Chemical Industry Association (*Associação Brasileira da Indústria Química*), or ABIQUIM. We derive information regarding the production capacity of other companies in the Brazilian petrochemical industry and the estimated total Brazilian domestic consumption of petrochemical products principally from reports published by ABIQUIM. We derive information regarding the production capacity of other companies in the global petrochemical industry, the United States petrochemical industry and the Latin American petrochemical industry, international market prices for petrochemicals products and per capita consumption in certain geographic regions, principally from reports published by Chemical Markets Associates, Inc., or CMAI. We derive information regarding the size of the chemical distribution industry and our market share in this industry principally from reports published by the Brazilian Chemical and Petrochemical Distributors Association (*Associação Brasileira dos Distribuidores de Produtos Químicos e Petroquímicos*). We derive information relating to Brazilian imports and exports from the System for Analyzing International Trade (*Sistema de Análise das Informações de Comércio Exterior*), or ALICE-Web, produced by the Brazilian Secretary of International Trade (*Secretaria de Comércio Exterior*), and the Brazilian Secretary of Development, Industry and Trade (*Ministério do Desenvolvimento, Indústria e Comércio Exterior*).

We have no reason to believe that any of this information is inaccurate in any material respect. However, neither we nor the initial purchasers have independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

We provide information regarding domestic apparent consumption of some of our products, based on information available from ABIQUIM and our internal estimates. Domestic apparent consumption is equal to domestic production plus imports minus exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

**Production Capacity and Sales Volume**

As used in this offering memorandum:

- "production capacity" means the annual projected capacity for a particular facility, calculated based upon operations for 24 hours each day of a year and deducting scheduled downtime for regular maintenance; and

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

## FORWARD-LOOKING STATEMENTS

This offering memorandum contains forward-looking statements. Some of the matters discussed concerning our business operations and financial performance include forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended, or the Exchange Act.

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including the following:

- general economic, political and business conditions in our company's markets, both in Brazil and abroad, including demand and prices for petrochemical products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar;

- the cyclical nature of the Brazilian and global petrochemical industries;

- competition in the Brazilian and global petrochemical industries;

- prices of naphtha and other raw materials;

- actions taken by our major shareholders;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, Brazilian laws and regulations affecting tax and environmental matters and import tariffs in other markets in which we operate or to which we export our products;

- a continuation of the current worldwide economic downturn or deterioration in the Brazilian and world economies;

- decisions rendered in major pending or future tax, labor and other legal proceedings; and

- other factors identified or discussed under "Item 3. Key Information—Risk Factors" in the Braskem Annual Report and under "Risk Factors" in this offering memorandum.

Our forward-looking statements are not guarantees of future performance, and our actual results or other developments may differ materially from the expectations expressed in the forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

Forward-looking statements speak only as of the date they are made, and neither we nor the initial purchasers undertake any obligation to update them in light of new information or future developments or to release publicly any revisions to these statements in order to reflect later events or circumstances or to reflect the occurrence of unanticipated events.

**Further issuances** . . . . . . . . . . . . . . . . . We may from time to time, without the consent of the holders of the notes, issue an unlimited principal amount of additional notes of the same series as the notes initially issued in this offering.

**Substitution of issuer** . . . . . . . . . . . . . . Braskem America Finance may, without the consent of the holders of the notes and subject to certain conditions, be replaced and substituted by Braskem or any wholly-owned subsidiary of Braskem as principal debtor in respect of the notes. See "Description of the Notes— Substitution of the Issuer."

**Form and denomination** . . . . . . . . . . . . The notes will be issued in the form of global notes in fully registered form without interest coupons. The global notes will be exchangeable or transferable, as the case may be, for definitive certificated notes in fully registered form without interest coupons only in limited circumstances. The notes will be issued in registered form in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. See "Description of the Notes—Form, Denomination and Title" and "Form of the Notes."

**Use of proceeds** . . . . . . . . . . . . . . . . . . We expect the net proceeds to Braskem America Finance from the sale of the notes to be approximately US$489.9 million, after deducting the fees and estimated expenses of the offering. We intend to use the net proceeds of this offering (1) to prepay all amounts outstanding under the syndicated unsecured credit agreement that we entered into to finance the Sunoco Chemicals Acquisition, (2) to prepay a portion of our other short-term and long-term indebtedness, and (3) for general corporate purposes.

**Settlement** . . . . . . . . . . . . . . . . . . . . . . . The notes will be delivered in book-entry form only through the facilities of the DTC for the accounts of its direct and indirect participants, including Euroclear and Clearstream.

**Notice to investors** . . . . . . . . . . . . . . . . The notes have not been, and will not be, registered under the Securities Act and are subject to limitations on transfers, as described under "Notice to Investors."

**Listing** . . . . . . . . . . . . . . . . . . . . . . . . . We will apply to the SGX-ST for permission to list the notes on the SGX-ST. We cannot assure you that this listing will be accepted, or if accepted, that the notes will remain so listed. The notes will be traded on the SGX-ST in minimum board lot size of US$200,000 for so long as the notes are listed on the SGX-ST.

If the listing of the notes on the SGX-ST would, in the future, require us to publish financial information either more regularly than we otherwise would be required to, or according to accounting principles which are materially different from the accounting principles which we would otherwise use to prepare our published financial information, we may seek an alternative admission to listing, trading and/or quotation for the notes by another listing authority, stock exchange and/or quotation system.

**RISK FACTORS**

*The Braskem Annual Report, which is incorporated by reference in this offering memorandum, includes extensive risk factors relating to our company, the petrochemical industry and Brazil. Prospective purchasers of notes should carefully consider the risks discussed below and in the Braskem Annual Report, as well as the other information included in or incorporated by reference into this offering memorandum, before deciding to purchase any notes. Our business, results of operations, financial condition or prospects could be negatively affected if any of these risks occurs, and as a result, the trading price of the notes could decline and you could lose all or part of your investment.*

*The risk factors discussed below and in the Braskem Annual Report are not the only risks that we face, but are the risks that we currently consider to be material. There may be additional risks that we currently consider immaterial or of which we are currently unaware, and any of these risks could have similar effects to those set forth below and in the Braskem Annual Report.*

**Risks Relating to the Notes and the Guarantees**

***Developments in other emerging markets may adversely affect the market value of the notes.***

The market price of the notes may be adversely affected by declines in the international financial markets and world economic conditions. Brazilian securities markets are influenced, to varying degrees, by economic and market conditions in other emerging market countries, especially those in Latin America. Although economic conditions are different in each country, investors' reaction to developments in one country may affect the securities markets and the securities of issuers in other countries, including Brazil. We cannot assure you that the market for Brazilian securities will not continue to be affected negatively by events elsewhere, particularly in emerging markets, or that such developments will not have a negative impact on the market value of the notes.

***Because Braskem America Finance has no operations of its own, holders of the notes must depend on Braskem to provide Braskem America Finance with sufficient funds to make payments on the notes when due.***

Braskem America Finance, a wholly-owned indirect subsidiary of Braskem, has no operations other than the issuing and making payments on the notes and other indebtedness ranking equally with the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem America Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of Braskem America Finance to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Braskem and its subsidiaries that are creditors of Braskem America Finance. In the event of an adverse change in the financial condition or results of operations of Braskem and its subsidiaries that are creditors of Braskem America Finance, these entities may be unable to service their indebtedness to Braskem America Finance, which would result in the failure of Braskem America Finance to have sufficient funds to repay all amounts due on or with respect to the notes.

***Payments on Braskem's guarantees will be junior to Braskem's secured debt obligations and effectively junior to debt obligations of Braskem's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by Braskem on an unsecured basis. The Braskem guarantees will constitute senior unsecured obligations of Braskem. The guarantees will rank equal in right of payment with all of Braskem's other existing and future senior unsecured indebtedness. Although the guarantees will provide the holders of the notes with a direct, but unsecured claim on Braskem's assets and property, payment on the guarantees will be subordinated to secured debt of Braskem to the extent of the assets and property securing such debt. Payment on the guarantees will also be structurally subordinated to the payment of secured and unsecured debt and other creditors of Braskem's subsidiaries and jointly controlled companies.

18

***Restrictions on the movement of currency out of Brazil may impair the ability of holders of the notes to receive interest and other payments on the notes.***

The Brazilian government may impose temporary restrictions on the conversion of Brazilian currency into foreign currencies and on the remittance to foreign investors of proceeds of their investments in Brazil. Brazilian law permits the government to impose these restrictions whenever there is a serious imbalance in Brazil's balance of payments or there are reasons to foresee a serious imbalance.

The Brazilian government imposed remittance restrictions for approximately six months in 1990. Similar restrictions, if imposed in the future, would impair or prevent the conversion of interest payments on the notes from *reais* into U.S. dollars and the remittance of U.S. dollars abroad to holders of the notes. The Brazilian government may take similar measures in the future.

***The foreign exchange policy of Brazil may affect the ability of Braskem to make money remittances outside Brazil in respect of the guarantees.***

Under current Brazilian regulations, Brazilian companies are not required to obtain authorization from the Central Bank in order to make payments under guarantees in favor of foreign persons, such as the holders of the notes. We cannot assure you that these regulations will continue to be in force at the time Braskem is required to perform its payment obligations under the guarantees. If these regulations or their interpretation are modified and an authorization from the Central Bank is required, Braskem would need to seek an authorization from the Central Bank to transfer the amounts under the guarantees out of Brazil or, alternatively, make such payments with funds held by Braskem outside Brazil. We cannot assure you that such an authorization will be obtained or that such funds will be available. If such authorization is not obtained, we may be unable to make payments to noteholders in U.S. dollars. If we are unable to obtain the required approvals, if needed for the payment of amounts owed by Braskem through remittances from Brazil, we may have to seek other lawful mechanisms to effect payment of amounts due under the notes. However, we cannot assure you that other remittance mechanisms will be available in the future, and even if they are available in the future, we cannot assure you that payment on the notes would be possible through such mechanism.

***Judgments of Brazilian courts enforcing Braskem's obligations under the guarantees would be payable only in reais.***

If proceedings are brought in the courts of Brazil seeking to enforce Braskem's obligations under the guarantees, Braskem would not be required to discharge its obligations in a currency other than *reais*. Any judgment obtained against Braskem in Brazilian courts in respect of any payment obligations under the guarantees would be expressed in *reais*. We cannot assure you that this amount in *reais* will afford you full compensation of the amount sought in any such litigation.

***We cannot assure you that a judgment of a U.S. court for liabilities under U.S. securities laws would be enforceable in Brazil, or that an original action can be brought in Brazil against Braskem or its officers and directors for liabilities under U.S. securities laws.***

Braskem is a corporation organized under the laws of Brazil. All of the directors of and officers of Braskem and some of the advisors named herein reside in Brazil or elsewhere outside the United States, and all or a significant portion of the assets of such persons may be located outside the United States. As a result, it may not be possible for investors to effect service of process within the United States or other jurisdictions outside Brazil upon such persons, or to enforce against such persons judgments predicated upon the civil liability provisions of the U.S. federal securities laws or the laws of such other jurisdictions. In addition, it may not be possible to bring an original action in Brazil against Braskem for liabilities under applicable securities laws. Furthermore, as most of our assets are located in Brazil, any action for enforceability of the guarantees would likely need to be validated by the courts of Brazil. We cannot assure you that such judicial validation would be obtained in a timely manner or at all. See "Enforcement of Civil Liabilities."

20

*We cannot assure you that an active trading market for the notes will develop.*

The notes constitute a new issue of securities, for which there is no existing market. Although we will apply to list the notes on the SGX-XT, we cannot provide you with any assurances that the application will be accepted. We cannot provide you with any assurances regarding the future development of a market for the notes, the ability of holders of the notes to sell their notes, or the price at which such holders may be able to sell their notes. If such a market were to develop, the notes could trade at prices that may be higher or lower than the initial offering price depending on many factors, including prevailing interest rates, our results of operations and financial condition, political and economic developments in and affecting Brazil and the market for similar securities. The initial purchasers of this offering have advised our company that they currently intend to make a market in the notes. However, the initial purchasers are not obligated to do so, and any market-making with respect to the notes may be discontinued at any time without notice.

*The notes are subject to transfer restrictions.*

The notes have not been, and will not be, registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. Such exemptions include offers and sales that occur outside the United States in compliance with Regulation S and in accordance with any applicable securities laws of any other jurisdiction and sales to qualified institutional buyers as defined under Rule 144A. For a discussion of certain restrictions on resale and transfer, see "Notice to Investors."

In addition, we are relying upon an exemption from the Prospectus Directive to offer the notes to investors in member states of the EEA which have implemented the Prospectus Directive. Any future offer or sale of notes in any member state of the EEA which has implemented the Prospectus Directive must be for a minimum purchase price or a minimum consideration of at least €100,000 or the equivalent in other currency.

*Brazilian bankruptcy laws may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions.*

If we are unable to pay our indebtedness, including our obligations under the guarantees, then we may become subject to bankruptcy proceedings in Brazil. The bankruptcy laws of Brazil currently in effect are significantly different from, and may be less favorable to creditors than, those of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a court reorganization proceeding. In addition, any judgment obtained against us in Brazilian courts in respect of any payment obligations under the guarantees normally would be expressed in the *real* equivalent of the U.S. dollar amount of such sum at the exchange rate in effect (1) on the date of actual payment, (2) on the date on which such judgment is rendered, or (3) on the date on which collection or enforcement proceedings are started against us. Consequently, in the event of our bankruptcy, all of our debt obligations that are denominated in foreign currency, including the guarantees, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. We cannot assure you that such rate of exchange will afford full compensation of the amount invested in the notes plus accrued interest.

**Exhibit 2**

**Blackline of Amended Verified Petition**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper
Thomas S. Kessler
David Z. Schwartz
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 26-11522 (MEW) |
| Braskem S.A.,[1] | Chapter 15 |
| Debtor in a Foreign Proceeding. | |

---

[1]   The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Braskem S.A. (01-70–Brazil); Braskem Netherlands B.V. (6B01–Netherlands); Braskem Netherlands Inc., B.V. (9B01–Netherlands); Braskem Netherlands Finance B.V. (5B01–Netherlands); Braskem Trading & Shipping B.V. (7B01–Netherlands); and Braskem America Finance Co. (1581–US).

1

|  |  |
|---|---|
| In re:<br><br>Braskem Netherlands B.V.,<br><br>    Debtor in a Foreign<br>    Proceeding. | Case No. 26-11523 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem Netherlands Inc., B.V.,<br><br>    Debtor in a Foreign<br>    Proceeding. | Case No. 26-11524 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem Netherlands Finance B.V.,<br><br>    Debtor in a Foreign<br>    Proceeding. | Case No. 26-11526 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem Trading & Shipping B.V.,<br><br>    Debtor in a Foreign<br>    Proceeding. | Case No. 26-11527 (MEW)<br><br>Chapter 15 |
| In re:<br><br>Braskem America Finance Co.,<br><br>    Debtor in a Foreign Proceeding. | Case No. 26-11528 (MEW)<br><br>Chapter 15 |

**AMENDED VERIFIED PETITION FOR RECOGNITION OF THE
BRAZILIAN PROCEEDING AND MOTION FOR ORDER GRANTING
RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 105(A), 1515, 1517, 1520, AND 1521**

2

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES............................................................................................iii

PRELIMINARY STATEMENT ........................................................................................2

BACKGROUND................................................................................................................6

    I.     GENERAL BACKGROUND AND HISTORY ...................................................6

         A.    An Overview of the Company's Business ....................................................6

         B.    Connections to the United States..............................................................12

         C.    The Company's Financial Situation ..........................................................13

    II.    EVENTS PRECIPITATING COMMENCEMENT OF THE BRAZILIAN
PROCEEDING ...................................................................................................17

         A.    Global Pressures on the Petrochemical Industry.......................................17

         B.    Geological Event in Alagoas, Brazil.........................................................18

         C.    International Tensions Driven by Recent Geopolitical Developments..........19

         D.    Imminent Maturities and Negotiation Efforts with Financial Creditors........20

JURISDICTION, ELIGIBILITY, AND VENUE.............................................................22

RELIEF REQUESTED.....................................................................................................23

REQUIRED DISCLOSURES ..........................................................................................23

BASIS FOR RELIEF .......................................................................................................23

    I.     THE DEBTORS ARE ELIGIBLE TO BE DEBTORS UNDER SECTION 109(a)
OF THE BANKRUPTCY CODE, AND THIS COURT IS THE PROPER VENUE
FOR THE CASES ...............................................................................................24

    II.    THE REQUIREMENTS OF SECTION 1517(a) OF THE BANKRUPTCY CODE
ARE SATISFIED ...............................................................................................26

         A.    The Brazilian Proceeding is a "Foreign Proceeding".................................27

             1.    The Brazilian Proceeding is a Judicial Process Pending in a
Foreign Country, Authorized Under a Law Related to
Insolvency, for the Purpose of Reorganizing..................................27

             2.    The Brazilian Proceeding is Collective in Nature............................30

             3.    The Debtors' Assets and Affairs Are Subject to the Brazilian
Court's Supervision.......................................................................30

         B.    The Brazilian Proceeding Satisfies the Requirements for Recognition as
a "Foreign Main Proceeding"...................................................................31

             1.    The Debtors are Part of the Economically and Operationally
Integrated Braskem Group..............................................................33

             2.    The COMI for Braskem Parent is Brazil .........................................37

3.  The COMI for Each of the Other Debtors is Brazil ........................ 37

    a.  Netherlands Finance's COMI is in Brazil ................................. 40

    b.  America Finance's COMI is in Brazil ....................................... 42

    c.  BNI's COMI is in Brazil ............................................................ 43

    d.  Braskem Netherlands's COMI is in Brazil .............................. 43

    e.  BT&S's COMI is in Brazil ......................................................... 44

C.  The Petitioner is a Proper "Foreign Representative" ................................... 46

D.  The Petition was Properly Filed Under Sections 1504 and 1509 and
Meets the Requirements of Section 1515 and Bankruptcy Rule 1007(a)
(4) ......................................................................................................................... 48

III.  ALTERNATIVELY, THE COURT SHOULD FIND THAT THE BRAZILIAN
PROCEEDING IS A FOREIGN NONMAIN PROCEEDING FOR EACH OF
THE DEBTORS OTHER THAN BRASKEM PARENT AND GRANT
DISCRETIONARY RELIEF ................................................................................. 49

A.  The Brazilian Proceeding Satisfies the Requirements for Recognition as
a "Foreign Nonmain Proceeding" ................................................................... 49

B.  Discretionary Relief Under Section 1521 of the Bankruptcy Code is
Warranted ............................................................................................................ 52

NOTICE ...................................................................................................................... 54

NO PRIOR REQUEST .............................................................................................. 55

CONCLUSION ........................................................................................................... 55

VERIFICATION OF CHAPTER 15 PETITION ..................................................... 57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*,
470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012)................ 47, 48

*CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*,
482 B.R. 96 (Bankr. S.D.N.Y. 2012) ....................................................................... 53

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
737 F.3d 238 (2d Cir. 2013)............................................................................ 23, 25, 27

*In re ABC Learning Ctrs. Ltd.*,
728 F.3d 301 (3d Cir. 2013) ................................................................................. 27

*In re Abeinsa Holding, Inc.*,
562 B.R. 265 (Bankr. D. Del. 2016)........................................................................ 30

*In re Agro Santino, OOD*,
653 B.R. 79 (Bankr. S.D.N.Y. 2023) ...................................................................... 46

*In re Americanas S.A.*,
No. 23-10092 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023)............................................. 47

*In re Andrade Gutierrez Engenharia S.A.*,
645 B.R. 175 (Bankr. S.D.N.Y. 2022)..................................................................... 46

*In re Artimm, S.r.l.*,
335 B.R. 149 (Bankr. C.D. Cal. 2005) .................................................................... 53

*In re Ascot Fund Ltd.*,
603 B.R. 271 (Bankr. S.D.N.Y. 2019)..................................................................... 37

*In re Ashapura Minechem Ltd.*,
480 B.R. 129 (S.D.N.Y. 2012)............................................................................... 27

*In re Avanti Commc'ns Grp. PLC*,
582 B.R. 603 (Bankr. S.D.N.Y. 2018)..................................................................... 23

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*,
389 B.R. 325 (S.D.N.Y. 2008)............................................................................... 50

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007)...................................................................... 48, 50

*In re Berau Cap. Res. Pte Ltd.*,
540 B.R. 80 (Bankr. S.D.N.Y. 2015) ..................................................................... 23, 25

*In re Betcorp Ltd.*,
400 B.R. 266 (Bankr. D. Nev. 2009)............................................................................ 30

*In re Brit. Am. Ins. Co. Ltd.*,
425 B.R. 884 (Bankr. S.D. Fla. 2010) ........................................................... 40, 50, 51

*In re Cell C Proprietary Ltd.*,
571 B.R. 542 (Bankr. S.D.N.Y. 2017)......................................................................... 26

*In re Creative Fin., Ltd.*,
543 B.R. 498 (Bankr. S.D. N.Y. 2016)..................................................................... 50, 51

*In re Culligan Ltd.*,
No. 20-12191, 2021 WL 278926 (Bankr. S.D.N.Y. 2021) ....................................... 36, 37

*In re Gerova Fin. Grp., Ltd.*,
482 B.R. 86 (Bankr. S.D.N.Y. 2012) .......................................................................... 50

*In re Giftcraft Ltd.*,
No. 25-11030, 2025 WL 1583480 (Bankr. S.D.N.Y. June 4, 2025)........................... 36, 37

*In re InterCement S.A.*,
668 B.R. 802 (Bankr. S.D.N.Y. 2025)................................................................... *passim*

*In re Inversora Eléctrica de Buenos Aires S.A.*,
560 B.R. 650 (Bankr. S.D.N.Y. 2016)......................................................................... 26

*In re Iovate Health Scis. Int'l Inc.*,
673 B.R. 516 (Bankr. S.D.N.Y. 2025)...................................................................... 37, 38

*In re Mega Newco Ltd.*,
No. 24-12031, 2025 WL 601463 (Bankr. S.D.N.Y. Feb. 24, 2025)................................ 36

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
458 B.R. 63 (Bankr. S.D. N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012)................... 50, 51

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
474 B.R. 88 (S.D.N.Y. 2012)................................................................................. 33, 50

iv

*In re Mina Tucano Ltda.*,
No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022)............................................. 47

*In re Modern Land (China) Co., Ltd.*,
641 B.R. 768 (Bankr. S.D.N.Y. 2022)...............................................36, 42, 43, 51

*In re Mood Media Corp.*,
569 B.R. 556 (Bankr. S.D.N.Y. 2017)............................................. 51

*In re Netia Holdings, S.A.*,
277 B.R. 571 (Bankr. S.D.N.Y. 2002)............................................. 30, 32

*In re OAS S.A.*,
533 B.R. 83 (Bankr. S.D.N.Y. 2015) ............................................. *passim*

*In re OAS S.A.*,
No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015)............................................. 29

*In re Odebrecht Engenharia e Construção S.A.*,
No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020)............................................. 29

*In re Oi Brasil Holdings Coöperatief U.A.*,
578 B.R. 169 (Bankr. S.D.N.Y. 2017).................................................38, 42, 43, 47

*In re Oi Brasil Holdings Coöperatief U.A.*,
No. 23-10193 (JPM) (Bankr. S.D.N.Y. Mar. 29, 2023)............................................. 30

*In re Olinda Star Ltd.*,
614 B.R. 28 (Bankr. S.D.N.Y. 2020) ............................................. 32, 37

*In re Oversight & Control Comm'n of Avánzit, S.A.*,
385 B.R. 525 (Bankr. S.D.N.Y. 2008)............................................. 27

*In re Prince Glob. Holdings Ltd.*,
No. 26-10769 (MG) (Bankr. S.D.N.Y. June 11, 2026)............................................. 30

*In re PT Bakrie Telecom Tbk*,
601 B.R. 707 (Bankr. S.D.N.Y. 2019)............................................. 25

*In re Raízen S.A.*,
No. 26-10528 (LGB) (Bankr. S.D.N.Y. Apr. 8, 2026) ............................................. 37, 38

*In re Rede Energia S.A.*,
No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014)............................................. 29

*In re Samarco Mineracão S.A. - Em Recuperação Judicial*,
  No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 13, 2021) ................................................. 29, 31

*In re Serviços de Petróleo Constellation S.A.*,
  600 B.R. 237 (Bankr. S.D.N.Y. 2019) .......................................................................... *passim*

*In re Serviços de Petróleo Constellation S.A.*,
  613 B.R. 497 (Bankr. S.D.N.Y. 2019) .......................................................................... 33

*In re Serviços de Petróleo Constellation S.A.*,
  No. 18-13952 (MG) (Bankr. S.D.N.Y. May 9, 2019) ................................................... 29

*In re SPhinX, Ltd.*,
  351 B.R. 103 (Bankr. S.D.N.Y. 2006) ................................................................32, 33, 39, 52

*In re Standing Order of Reference Re: Title 11*,
  12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) ..................................................................... 22

*In re Suntech Power Holdings Co., Ltd.*
  520 B.R. 399 (Bankr. S.D.N.Y. 2014) ................................................................23, 33, 36, 39

*In re Toft*,
  453 B.R. 186 (Bankr. S.D.N.Y. 2011) .......................................................................... 53

*In re U.S.J. – Açúcar e Álcool S.A., et al.*,
  No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022) ................................................ 29

*In re U.S. Steel Can. Inc.*,
  571 B.R. 600 (Bankr. S.D.N.Y. 2017) .......................................................................... 25

*In re Usina de Açúcar Santa Terezinha Ltda.*,
  No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019) .............................................. 29

*Jaffe v. Samsung Elecs. Co.*,
  737 F.3d 14 (4th Cir. 2013) .......................................................................................... 53

*Kelly v. U.S. Steel Corp.*,
  284 F.2d 850 (3d Cir. 1960) .......................................................................................... 35, 46

*Lavie v. Ran (In re Ran)*,
  607 F.3d 1017 (5th Cir. 2010) ...................................................................................... 50

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
  714 F.3d 127 (2d Cir. 2013) .......................................................................................... *passim*

vi

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
  446 F.Supp.2d. 205 (S.D.N.Y. 2006).................................................. 35, 46

**Rules and Statutes**

11 U.S.C. § 101.............................................................................. *passim*

11 U.S.C. § 105.............................................................................. 1, 2, 23

11 U.S.C. § 109.............................................................................. *passim*

11 U.S.C. § 304.............................................................................. 29

11 U.S.C. § 362.............................................................................5, 49, 52, 54

11 U.S.C. § 1502.............................................................................27, 32, 49, 50

11 U.S.C. § 1504.............................................................................. 22, 48

11 U.S.C. § 1509.............................................................................2, 22, 48

11 U.S.C. § 1515.............................................................................. *passim*

11 U.S.C. § 1516.............................................................................. 32, 37

11 U.S.C. § 1517.............................................................................. *passim*

11 U.S.C. § 1520.............................................................................1, 2, 23, 54

11 U.S.C. § 1521............................................................................. *passim*

11 U.S.C. § 1522.............................................................................. 53

28 U.S.C. § 157.............................................................................. 22

28 U.S.C. § 1334.............................................................................. 22

28 U.S.C. § 1410.............................................................................. 22, 26

Fed. R. Bankr. P. 1007.............................................................................23, 24, 48, 49

Fed. R. Bankr. P. 7007.............................................................................. 49

**Other Authorities**

H.R. No. 109-31, pt. 1 (2005).............................................................. 32, 53

I, Antonio Reinaldo Rabelo Filho (the "Petitioner" or "Foreign Representative"), the duly-authorized foreign representative of Braskem S.A. ("Braskem"); Braskem Netherlands B.V.; Braskem Netherlands Inc., B.V.; Braskem Netherlands Finance B.V.; Braskem Trading & Shipping B.V.; and Braskem America Finance Company (collectively, the "Debtors") in the jointly-administered protective injunction proceeding in support of a court-supervised interim mediation process (the "Brazilian Mediation", and together with the protective injunction proceeding, the "Brazilian Proceeding") that is in furtherance or in preparation of either an extrajudicial proceeding (*recuperação extrajudicial*) (the "Brazilian EJ") or a judicial reorganization (*recuperação judicial*) (the "Brazilian RJ") of the Debtors, which commenced on June 24, 2026, pursuant to Federal Law No. 11.101 of February 9, 2005 (as modified, the "Brazilian Bankruptcy Law"), of the laws of the Federative Republic of Brazil ("Brazil"), pending before the 2nd Bankruptcy and Reorganization Division of the São Paulo State Court of Justice (the "Brazilian Court").[2]   By and through its undersigned counsel, the Foreign Representative respectfully submits this *Amended Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* (the "Verified Petition").  This Verified Petition is filed in furtherance of each voluntary petition [ECF No. 1] (collectively, the "Voluntary Petition" and, together with this Verified Petition, the "Petitions") filed on June 26, 2026, by each of the Debtors.  The Petitioner hereby requests that the Court enter an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") pursuant to sections 105(a), 1515, 1517, 1520, and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"):[3]

(a)      granting the Petitions in these chapter 15 cases (the "Chapter 15 Cases") and

---

[2]      The case number for the Brazilian Proceeding before the Brazilian Court is 4113246-86.2026.8.26.0100.

[3]      Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

1

recognizing the Brazilian Proceeding as the "foreign main proceeding" for each of the Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, as a "foreign nonmain proceeding" for each of the Debtors other than Braskem S.A.;

(b)     finding that the Petitioner is the duly-appointed "foreign representative" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each of the Debtors for purposes of these proceedings; and

(c)     granting such other and further relief as the Court deems just and proper.

In support of this Verified Petition, the Petitioner relies upon and incorporates by reference the *Declaration of Ana Elisa Laquimia Pursuant to 28 U.S.C. § 1746 in Support of the Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(A), 1509, 1515, 1517, 1520, and 1521* (the "Brazilian Counsel Declaration") filed contemporaneously herewith. In further support of the relief requested herein, the Petitioner respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     The Debtors and certain of their non-debtor affiliates (the "Braskem Group" or the "Company") are Brazil's largest producers of thermoplastic resins and petrochemical products. The Company serves over seventy countries, employs nearly 8,000 employees, and generated nearly R$80[34] billion in annual revenue in 2024. Brazil is the Company's most critical market, and it accounts for nearly 70% of the Company's net revenue.

2.     The Braskem Group comprises a network of operating and financing companies, each of which performs complementary and interdependent functions to support the Company's overall business. With respect to the operating companies, these functions include the production and sale of various petrochemical products as well as domestic and international product distribution. The financing companies provide separate financing ventures for those operations. To support these

2

functions, the Company has operational facilities in four countries (Brazil, the United States, Mexico, and Germany), with significant concentration in five Brazilian states (Alagoas, Bahia, Rio de Janeiro, São Paulo, and Rio Grande do Sul).

3. Recently, the Braskem Group has implemented a series of strategic initiatives aimed at strengthening its competitive position, preserving revenue generation, and preparing the Company for the future of the petrochemical market. In order to facilitate the success of these initiatives, the Company and certain stakeholders have engaged in various measures to mitigate factors negatively affecting its financial situation and have engaged in discussions with certain creditors with the goal of developing a comprehensive out-of-court realignment of the Company's capital structure. Although productive, these measures have not yet achieved the results necessary in the timeframe required to address the Company's liquidity needs. Accordingly, on June 24, 2026, the Company commenced the Brazilian Mediation under the Brazilian Bankruptcy Law and asked (i) for a preliminary judicial stay to prevent the accelerated maturity of certain obligations and creditor enforcement actions, and (ii) to formally mediate with key financial creditors.

4. As explained further herein, despite the Company's best efforts, several recent events accelerated the Company's ongoing restructuring efforts and led to the commencement of the Brazilian Proceeding.

5. First, since 2022, there has been a downturn in the global petrochemical industry, exacerbated by macroeconomic uncertainty and rising levels of idle capacity. This downturn worsened in 2025, which saw the lowest consumption of thermoplastic resins in recent history and the worst operating rate in decades. The spread on thermoplastic resins—the difference between a product's price and the cost of raw materials used to make it—has decreased significantly in recent

---

3̶4̶ "R$" denotes the Brazilian *real* or BRL.

3

years, affecting revenue in the Brazilian, European and U.S. markets. Because of this reduced spread, the Braskem Group adjusted its production levels, leading to a drop in the utilization rate of its petrochemical plants from 72% in 2024 to 59% by the end of 2025. This has negatively impacted the Company's recurring EBITDA and consolidated revenues. *See infra* ¶¶ 27-30.

6. Second, in 2019, the Geological Survey of Brazil released a report linking geological issues in Maceió, Alagoas to Braskem's prior rock salt extraction activities in the area. Since then, the Company ceased rock salt mining in the region and implemented measures to mitigate and remediate the damage. These measures have required significant ongoing investment and the associated liabilities, which are unrelated to Braskem's normal course of business, have consumed significant cash flow, and against the backdrop of the petrochemical industry downturn, have increasingly compromised the Company's finances. *See infra* ¶¶ 31-34.

7. Third, in early 2026, the Debtors began to face new financial and operational challenges due to the escalation of geopolitical tensions in the Middle East related to the conflict involving Iran and the United States. This conflict has driven up the price of oil and its derivatives, including naphtha—the main raw material in the petrochemical industry—directly impacting the Braskem Group's production costs. Given the scale of the Group's operations, even small increases in naphtha costs can result in billions in additional operating expenses. International freight rates have also risen substantially, affecting both raw material imports and international distribution costs, while trade route restrictions caused by the closure and blockade of the Strait of Hormuz have further disrupted operations and strained the Company's financial condition. *See infra* ¶¶ 35-38.

8. As a result, the Company commenced the Brazilian Proceeding to benefit from a preliminary stay of collection and enforcement actions while it engages in discussions with its key

4

financial stakeholders and with the goal of developing a restructuring solution for the Company's capital structure. To aid and support these restructuring efforts in Brazil, the Petitioner seeks recognition of the Brazilian Proceeding under Chapter 15 of the Bankruptcy Code to protect the Debtors from potential creditor actions in the United States. This relief is imperative to the Company's restructuring objectives. The Braskem Group's value is derived in large part from its significant competitive advantages in the thermoplastic resin industry in Brazil and abroad. These advantages are based in large part on its national platform that allows it to benefit from its substantial domestic operations across Brazil. Those advantages must be preserved if the Braskem Group is to maximize its go-forward value in any restructuring.

9. Given the Debtors' meaningful assets in the United States, and the current lack of agreement among creditors on a path forward, pending the recognition of the Brazilian Proceeding, the Petitioner is also seeking provisional relief to stay the commencement or continuation of any actions or proceedings concerning the Debtors or their assets, rights, obligations, or liabilities in the United States, as provided under the *Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 105(a), and 362* (the "Provisional Relief Motion") filed contemporaneously herewith, again in an attempt to procure an immediate stay of collection and enforcement actions for the benefit of all creditors consistent with the stay provided for in the Brazilian Proceeding.

10. In spite of its recent financial difficulties, the Braskem Group's operations are sustainable and viable. The Company is therefore well positioned for a path to recovery if it can preserve its operations and eventually implement a holistic restructuring solution through the Brazilian Proceeding. Accordingly, the Petitioner respectfully requests that the Court enter the Order granting the Petition in these Chapter 15 Cases, recognizing the Brazilian Proceeding, and

5

authorizing such other relief that the Court deems appropriate.

## BACKGROUND

I.    **GENERAL BACKGROUND AND HISTORY**

A.    **An Overview of the Company's Business**

11.    The Braskem Group was created in 2002 when six major Brazilian petrochemical companies—Copene, OPP, Trikem, Proppet, Polialden, and Nitrocarbono—merged to create a single company. Once formed, Braskem became the largest petrochemical company in Latin America. The Company is registered with the Brazilian Securities and Exchange Commission and its stock trades on Brazil's stock exchange market (Brasil, Bolsa, Balcão, or "B3"). The Company's Class A preferred shares are listed on the New York Stock Exchange ("NYSE"). In 2003, the Company also began listing its stock on the Stock Exchange of Madrid ("LATIBEX").

12.    The Company continued to consolidate Brazil's petrochemical industry since forming. Between 2007 and 2009, through partnerships with other petrochemical producers and subsequent acquisitions, the Company consolidated production operations across its southern complex and acquired Quattor, a joint venture of Unipar and Petróleo Brasileiro S.A. ("Petrobras") and a regional petrochemical producer with significant assets in São Paulo and Rio de Janeiro. From 2009 on, the Braskem Group continued to expand and consolidate its Brazilian operations, quickly becoming the leader of the Brazilian petrochemical market.

13.    As a result, the Braskem Group is the largest producer in the petrochemical plastic resins industry in the Americas. Its primary business segments are the production of various plastic resins, as well as certain sustainable "green" products such as "green polyethylene"—a sustainable plastic resin made from sugarcane using innovative technologies. The Company serves hundreds of customers worldwide and is one of the largest plastics producers in the North and South American markets. It has a diverse portfolio of petrochemical and thermoplastic

products, including polyethylene ("PE"), polypropylene ("PP") and polyvinyl chloride ("PVC"). The Company has the capacity to produce nearly 20,325 kilotons ("ktons") of basic chemicals and polymers per year. Its chemical products are used primarily in the manufacturing of intermediate second-generation petrochemical products, while its plastic resin products are used in a variety of industrial and commercial settings, including food packaging, household furniture, industrial and automotive components, and paints and coatings. In 2025 alone, the Company had an approximately 37% share of the Brazilian PVC market and 11% share of the Brazilian caustic soda market[45] by sales volume.

14.     The Braskem Group's most recent efforts have focused on long-term sustainability. After consolidating its operations in Brazil for several years and expanding into the North American and European markets, the Braskem Group has continued to position itself to adapt to the changing needs of the thermoplastics market. The Braskem Group has set ambitious long-term sustainable development objectives, aiming to achieve an absolute 15% reduction in greenhouse gas emissions by 2030. In pursuit of these efforts, the Braskem Group has (i) expanded the production of its green ethylene production; (ii) entered into a partnership with Lummus Technology LLC, a company that develops and licenses process technologies for the refining, petrochemical, gas processing, and renewable energy industries, for further development and licensing of its green ethylene technology; (iii) created the Sustainea joint venture, which is focused on the production of two plant-based chemicals, bioMEG and bioMPG; (iv) established a Thai joint venture, Braskem Siam Company Limited, dedicated entirely to the production of green ethylene; and (v) invested to increase its ethylene and polyethylene production capacity in Rio de Janeiro. These efforts continue to consolidate the Braskem Group's position as a leading

---

[45]     This figure excludes consumption of alumina by companies located in the North and Northeast regions of Brazil.

7

thermoplastics producer, both domestically and internationally.

15. The Braskem Group has also implemented a series of strategic initiatives aimed at strengthening its competitive position, preserving revenue generation, and preparing the Company for the future of the petrochemical market. These initiatives are organized into two major programs: the "Resilience Program" and the "Transformation Program" (the "Programs"). The Resilience Program encompasses a comprehensive set of seventy action plans effectuated through more than 700 initiatives, which include strategic investments, cost optimization, commercial strategy, operational efficiency, and supplier negotiations. This Resilience Program is designed to increase earnings and improve short-term cash flow generation in the near term, and to help the Company maintain its long-term competitiveness in the Brazilian chemical industry. The Transformation Program is focused on: (i) optimizing the naphtha feedstock base,[56] (ii) increasing and expanding the flexibility of the Company's gas feedstock base, and (iii) transitioning to products derived from renewable sources. These measures complement the Company's other long-term initiatives and investments in renewable energy, recycling, combating climate change, and promoting the circular economy.

16. For administrative ease, the Braskem Group's operations are largely split into geographic segments, focusing on domestic operations in Brazil (the "Brazil Segment") and operations abroad, including the United States, Europe, and Mexico. The Brazil Segment, which covers Debtor Braskem S.A., mainly focuses on (i) the production and sale of various chemicals, (ii) the supply of electricity and other inputs produced in the Company's petrochemical complexes, and (iii) the production and sale of PVC and caustic soda. For 2025, the Brazil Segment's operations generated net revenue of R$51.77 billion, representing about 72% of the net

---

[56]     Naphtha is an intermediate hydrocarbon liquid stream derived mainly from the refining of crude oil and is used by the Company to manufacture a wide variety of petrochemicals in Brazil.

revenue of all of the Company's reportable segments.  Most of the Brazil Segment's production operations take place across four different production plants sites across Brazil.

17.    The Braskem Group's European and U.S. operations are recorded together (the "U.S. and Europe Segment").  The U.S. and Europe Segment includes the remaining Debtors, including Debtor Braskem Netherlands B.V., which facilitates the production, distribution, and sale of PP between Brazil and the rest of the world.   The Netherlands arm of the segment largely handles the logistics of product distribution from Brazil to Europe and Asia.  The U.S. portion of the segment is largely dedicated to the production of PP and ultra-high molecular polyethylene.  In 2025, the total sales volume of the U.S and Europe Segment was approximately 1,938 kton, serving 370 customers.  The resulting combined operations of the U.S. and Europe Segment generated R$ 16.4 billion (or US$3.1 billion as of June 18, 2026) during 2025.  This segment comprises nearly 23% of the Company's net revenue across its reportable segments.

9

18.     A simplified organizational chart is set forth below.



19. Each Chapter 15 Debtor plays an indispensable role in the Company:

(a)     Braskem S.A. ("Braskem Parent"), which is incorporated in Brazil and has its registered office and headquarters in Bahia and São Paulo, Brazil, respectively, is the ultimate parent company for the Braskem Group. It engages in capitalization and financing activities for the Braskem Group, acts as the Company's face to the market, and is responsible for concentrating the operations and investments across the Company's segments. It serves as a guarantor on the majority of the Braskem Group's financial debt, including all of the Notes (as defined below). Braskem Parent's principal assets are located in Brazil. It is responsible for providing centralized business management and support for the entire Braskem Group, including providing strategic direction on key financial matters across the globe. Moreover, investor relations and creditor communications for the Braskem Group are prepared by Braskem Parent in São Paulo, including earning calls and the recent restructuring efforts.

(b)     Braskem Netherlands B.V. ("Braskem Netherlands") is a wholly-owned, private limited liability Dutch-incorporated subsidiary of Braskem S.A. It is an international holding and trading company of the Braskem Group.

10

Braskem Netherlands performs sales, marketing, and distribution of petrochemical products to European and Asian markets on behalf of Braskem Parent  It has a Managing Board of three directors, two of whom are Brazilian citizens located in the Netherlands and the third is a Dutch citizen located in the Netherlands.  It also has a Supervisory Board of three directors—two Brazilian citizens and one Israeli citizen—all located in Brazil.  The Supervisory Board supervises the Managing Board and advises it on the Company's affairs and long-term interests and strategy.  The Managing Board manages the business of Braskem Netherlands, including the setting and executing the business plan.  Although the Managing Board meets at least three times per year in the Netherlands, the two boards hold meetings together, usually as hybrid meetings in both the Netherlands and Brazil offices of Braskem and by simultaneous video conference or conference call.  Its debt is primarily governed by Dutch law.  Braskem Netherlands is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

(c)     Braskem Netherlands Finance B.V. ("Netherlands Finance") is an indirect, wholly-owned subsidiary of Braskem S.A.  It is a special purpose vehicle ("SPV") formed by the Braskem Group for the sole purpose of raising and managing funds on international markets to fund the activities of the operational components of the Braskem Group.  Netherlands Finance has no operations of its own, owns no physical assets and has only four employees.  It has two managing directors—one a Brazilian citizen and the other a dual Brazilian and Spanish citizen—both located in the Netherlands.  Its debt is primarily governed by New York law.  Netherlands Finance is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

(d)     Braskem Netherlands Inc. B.V. ("BNI") is an SPV formed by the Braskem Group for the sole purpose of providing intercompany loans and financial support to other group entities and has no operations of its own.  BNI has two directors—one is a Brazilian citizen and the other is a dual Brazilian and Spanish citizen—both located in the Netherlands.  Its debt is primarily governed by New York law.  It is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

(e)     Braskem Netherlands Trading & Shipping ("BT&S") is an indirect subsidiary of Braskem Parent and holding company of several SPVs dedicated to the management of vessels used for supply and distribution of raw materials and chemical products.  BT&S supports the logistics and procurement of raw materials on international markets to meet the Company's Brazilian demand.  BT&S has three directors—two Brazilian citizens and one Dutch citizen—all located in the Netherlands.  Its debt is primarily governed by English and New York law.  It is incorporated in the Netherlands and has its registered office in Rotterdam, the Netherlands.

11

(f)     Braskem America Finance Company ("America Finance") is a wholly owned subsidiary of non-debtor, Braskem America, Inc., and an SPV incorporated under the laws of the United States. It was formed for the sole purpose of raising and managing funds on international markets to fund the activities of the operational components of the Braskem Group. America Finance has no operations of its own, has no employees, and owns no physical assets of its own. It has two directors—one is Brazilian and located in Brazil and the other is a dual citizen of Argentina and the U.S., located in the U.S. America Finance's debt is primarily governed by New York law. It is incorporated in Delaware and has its registered office in Wilmington, Delaware.

A detailed organizational chart of the Braskem Group and other affiliated entities is attached hereto as **Exhibit C**.

### B.     Connections to the United States

20. Although a significant portion of the Debtors' assets and interests are located in Brazil and abroad, some of their assets and obligations are also located in or connected to the United States. All of the Debtors have debt obligations governed by New York law and/or cash accounts in the United States. New York law governs the majority of the debt held by BNI, Netherlands Finance, BT&S, and America Finance. Braskem Parent also holds debt governed by New York law.

21. The Indentures (as defined below) are governed by New York law and contain a forum selection clause that provides that the parties have consented to the jurisdiction of the courts in any state or federal court located in the Borough of Manhattan, New York, with respect to any action that may be brought in connection with the Indentures or the Notes (as defined below).

22. In addition, all of the Debtors have bank accounts in the United States totaling more than USD$342292 million as of June 2226, 2026.

23. One of the Debtors, Braskem America Finance Co. is incorporated in Delaware and has its registered office in Wilmington, Delaware.

C.      **The Company's Financial Situation**

24. As of June 19, 2026, the Debtors have approximately R$55 billion in consolidated gross debt (approximately US$11 billion as of June 19, 2026), with R$55 billion and US$11 billion in principal amounts outstanding on account of their funded debt obligations, which is comprised of the following instruments:

(a)      ***4.50% Notes due 2028.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$1.25 billion at 4.5% (the "2028 Notes") pursuant to that certain indenture dated October 4, 2017 (the "2028 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2028 Notes Indenture is governed by New York law.  As of the date hereof, US$1.2 billion remains outstanding, and the 2028 Notes are set to mature on January 10, 2028.

(b)      ***4.5% Notes due 2030.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$1.5 billion at 4.5% (the "2030 Notes") pursuant to that certain indenture dated October 29, 2019 (the "2030 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2030 Notes Indenture is governed by New York law.  As of the date hereof, US$1.5 billion remains outstanding, and the 2030 Notes are set to mature on January 31, 2030.

(c)      ***8.5% Senior Notes due 2031.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$850 million at 8.5% (the "2031 Notes") pursuant to that certain indenture dated September 7, 2023 (the "2031 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2031 Notes Indenture is governed by New York law.  As of the date hereof, US$882 million remains outstanding, and the 2031 Notes are set to mature on January 12, 2031.

(d)      ***7.25% Senior Notes due 2033.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$1 billion at 7.25% (the "2033 Notes") pursuant to that certain indenture dated February 8, 2023 (the "2033 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2033 Notes Indenture is governed by New York law.  As of the date hereof, US$1.0 billion remains outstanding, and the 2033 Notes are set to mature on February 13, 2033.

(e)      ***8% Senior Notes due 2034.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$850 million at 8% (the "2034 Notes") pursuant to that certain indenture dated October 9, 2024 (the "2034 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2034 Notes Indenture is

13

governed by New York law.  As of the date hereof, US$862 million remains outstanding, and the 2034 Notes are set to mature on October 15, 2034.

(f)      ***7.125% Notes due 2041.***  Braskem America Finance Company issued unsecured notes in the aggregate principal amount of US$500 million at 7.125% (the "2041 Notes") pursuant to that certain indenture dated July 19, 2011 (the "2041 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2041 Notes Indenture is governed by New York law.  As of the date hereof, US$582 million remains outstanding, and the 2041 Notes are set to mature on July 22, 2041.

(g)      ***5.875% Notes due 2050.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$750 million at 5.875% (the "2050 Notes") pursuant to that certain indenture dated October 29, 2019 (the "2050 Notes Indenture"), with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2050 Notes Indenture is governed by New York law.  As of the date hereof, US$767 million remains outstanding, and the 2050 Notes are set to mature on January 31, 2050.

(h)      ***8.5% Subordinated Resettable Fixed Rate Notes due 2081.***  Braskem Netherlands Finance B.V. issued unsecured notes in the aggregate principal amount of US$600 million at a fixed rate of 8.5% (the "2081 Notes", and together with the 2028 Notes, 2030 Notes, 2031 Notes, 2033 Notes, 2034 Notes, 2041 Notes, and the 2050 Notes, the "Notes") beginning January 23, 2026, pursuant to that certain indenture dated July 20, 2020 (the "2081 Notes Indenture", and together with the 2028 Notes Indenture, 2030 Notes Indenture, 2031 Notes Indenture, 2033 Notes Indenture, 2034 Notes Indenture, 2041 Notes Indenture, and the 2050 Notes Indenture, the "Indentures"),[67] with Braskem Parent as guarantor, and The Bank of New York Mellon, as trustee.  The 2081 Notes Indenture is governed by New York law.  As of the date hereof, US$251 million remains outstanding, and the 2081 Notes are set to mature on January 23, 2081.

(i)      ***Debentures.***  Braskem Parent issued unsecured debentures in the aggregate principal amount of approximately US$428 million.  The debentures were all issued in 2025, are governed by Brazilian law, and mature between May 2029 and November 2032.  As of the date hereof, US$433 million (denominated in Brazilian Real) remains outstanding under the debentures.

(j)      ***2018 SACE Loan.***  Braskem Netherlands, as borrower, entered into a unsecured SACE-covered[78] term loan agreements with Braskem Parent as

---

[67]      Copies of the indentures governing the Notes can be made available upon request.

[78]      A "SACE-covered" facility is a debt facility that is guaranteed by SACE S.p.A., Italy's Export Credit Agency.

guarantor (the "2018 SACE Loan") pursuant to an agreement dated November 18, 2018, with an aggregate principal amount of US$295 million. The 2018 SACE Loan is governed by New York law and as of the date hereof, US$74 million remains outstanding under the facility.

(k)     ***2019 SACE Loan.***   Netherlands Finance, as borrower, entered into a unsecured SACE-covered term loan agreements with Braskem Parent as guarantor (the "2019 SACE Loan") pursuant to an agreement dated December 10, 2019, with an aggregate principal amount of US$150 million. The 2019 SACE Loan is governed by New York law and as of the date hereof, US$53 million remains outstanding under the facility.

(l)     ***2020 Nexi Loan.***   Braskem Netherlands, as borrower, entered into a NEXI loan agreement with Braskem Parent as guarantor dated August 4, 2020 (the "2020 Nexi Loan") in the amount of US$225 million to finance the construction of a polypropylene production facility in the U.S. The 2020 Nexi Loan is governed by New York law, and as of the date hereof, US$115 million remains outstanding under the facility.

(m)     ***Revolving Credit Facility.***   Non-Debtor Braskem America Inc. and Debtor Braskem Netherlands as borrowers, entered in an unsecured revolving credit facility (the "RCF") in the amount of US$1 billion on December 13, 2021, with a five-year maturity. Under the RCF, Braskem America Inc. has an outstanding balance of approximately US$50 million, and Braskem Netherlands has an outstanding balance of approximately US$961 million. The RCF is governed by New York law and is guaranteed by Braskem Parent.

(n)     ***Brazilian Agricultural & Export Debt.***   Braskem Parent has approximately US$100 million in aggregate principal outstanding in *Cédula de Produto Rural* ("CPRs"), US$175 million in aggregate principal outstanding in *Certificados de Recebíveis do Agronegócio* ("Agribusiness Receivables Certificates" or "CRAs"), and US$67 million in aggregate principal outstanding in *Nota de Crédito à Exportação* ("NCEs"). Maturities on this debt range from June 2026 through December 2031.

(o)     ***Letters of Credit.***   BT&S as borrower has letters of credit totaling US$1.3 billion as of the date hereof. Committed letters of credit comprise approximately US$973 million of the total, with the remaining US$338 million in uncommitted facilities. The letters of credit are all guaranteed by Braskem S.A. and are governed by New York law.

(p)     ***Export Prepayment Facilities.***   Braskem S.A. holds US$241 million in unsecured third-party debt under Export Prepayment Facility Agreements with maturities ranging from October 2026 to July 2027.

25. The Offering Memoranda for the Notes that were provided to investors prior to their

15

issuance contained information about the Company's operations.    See Exs. D-J, Offering Memoranda.[82]    The Offering Memoranda focus heavily on the risks associated with the Company's location in Brazil.  *See, e.g.*, 2028 Notes OM at 16 (discussing risk of foreign exchange policy of Brazil); 2041 Notes OM at 20 (same); 2028 Notes OM at 16 (judgments in Brazil); 2041 Notes OM at 20 (same); 2028 Notes OM at 15 (Brazilian securities market); 2041 Notes OM at 18 (same).  The Offering Memoranda state that the issuer, America Finance for the 2041 Notes and Netherlands Finance for all other Notes, is a "wholly-owned indirect subsidiary of Braskem [S.A.], has no operations other than the issuing and making payments on the notes and other indebtedness." 2041 Notes OM at 18; *see also* 2028 Notes OM at 14; 2030/2050 Notes OM at 15; 2031 Notes OM at 25; 2033 Notes OM at 26; 2034 Notes OM at 16; 2081 Notes OM at 15. Furthermore, the Offering Memoranda all state in similar fashion that "the ability of the [Issuer] to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and result of operations of Braskem [S.A.] and its subsidiaries that are creditors of the [Issuer]."  *See* 2030/2050 Notes OM at 15; *see also* 2028 Notes OM at 14; 2031 Notes OM at 25; 2033 Notes OM at 26; 2034 Notes OM at 16; 2041 Notes OM at 18; 2081 Notes OM at 15.  Additionally, the Offering Memoranda state that if the Company is unable to pay amounts due under the guarantees, then "[the issuer] may become subject to bankruptcy proceedings in Brazil." 2028 Notes OM at 17; 2030/2050 Notes OM at 19; 2041 Notes OM at 21; 2081 Notes OM at 23; *accord* 2031 Notes OM at 29 (issuer may become "subject to insolvency proceedings in Brazil"); 2033 Notes OM at 30 (same); 2034 Notes OM at 20 (same).  Furthermore,

---

[82]    Excerpts of the offering memoranda for the Notes are attached hereto as **Exhibit D**, Offering Memorandum, 3.50% Notes due 2023 and 4.5% Notes due 2028 ("2028 Notes OM"); **Exhibit E**, Offering Memorandum, 8.5% Senior Notes due 2031 ("2031 Notes OM"); **Exhibit F**, Offering Memorandum, 7.25% Senior Notes due 2033 ("2033 Notes OM"); **Exhibit G**, Offering Memorandum, 8% Senior Notes due 2034 ("2034 Notes OM"); **Exhibit H**, Offering Memorandum, 4.5% Notes due 2030 and 5.875% Notes due 2050 ("2030/2050 Notes OM"); **Exhibit I**, Offering Memorandum, 8.5% Subordinated Resettable Fixed Rate Notes due 2081 ("2081 Notes OM"); **Exhibit J**,

the Offering Memoranda all provide that the issuer may be replaced and substituted by Braskem Parent "without the consent of the holders of the notes…" *See* 2028 Notes OM at 9; 2030/2050 Notes OM at 10; 2031 Notes OM at 18; 2033 Notes OM at 19; 2034 Notes OM at 8; 2041 Notes OM at 9; 2081 Notes OM at 11. On average, Brazil is referenced more than 240 times in each of the Offering Memoranda.

26. The indentures (*Escritura de Emissão*) governing the Debentures were all made available in Portuguese, and as noted, the Debentures are governed by Brazilian law.[9][10]

## II.    EVENTS PRECIPITATING COMMENCEMENT OF THE BRAZILIAN PROCEEDING

### A.    Global Pressures on the Petrochemical Industry

27. Since 2022, there has been a prolonged downturn in the demand for plastic resins, exacerbated, on the one hand, by a substantial increase in supply of thermoplastic resins on the global market, and, on the other hand, a slowdown in global demand impacting market growth for these products. On the production side, these pressures are the result of a confluence of several factors. The spread on thermoplastic resins has drastically expanded. Despite the Braskem Group's global focus and its continued efforts to adapt to the changing global landscape, the increased cost and diminishing returns on goods using thermoplastic resins has significantly affected the Brazilian market—which constitutes almost 70% of the Braskem Group's revenues—as well as the United States, European, and Asian markets.

28. As a result of rising costs and decreased demand, the Braskem Group has experienced a decline in revenue. The recurring EBITDA of the Brazil/South America segment of the Braskem Group for the fourth quarter of 2025 was US$143 million, a 30% reduction from the previous

---

Offering Memorandum, 7.125% Notes due 2041 ("2041 Notes OM") (collectively, the "Offering Memoranda").

[9][10]    Copies of the indentures governing the Debentures can be made available upon request.

quarter. The United States and Europe segment recorded a negative recurring EBITDA of US$32 million for the same period. The Braskem Group's consolidated net revenue saw a similar decline to R$16.1 billion (or US$3.1 billion as of June 18, 2026) in the fourth quarter of 2025, a 16% decrease in its overall net revenue as compared to the same period of the previous year.

29. These persistent pressures on the petrochemical industry have significantly impacted the Braskem Group's cash flows. The group's consolidated recurring cash outflow increased from R$493 million (approximately US$95.7 million as of June 18, 2026) in 2024 to R$5.9 billion (approximately US$1.13 billion as of June 18, 2026) in 2025—a tenfold increase solely to maintain its operational activities.

30. During the same time period, interest costs on debt rose substantially from R$3.88 billion in 2024 to R$4.23 in 2025. The combination of the high cost of the Braskem Group's debt and the downturn in the petrochemical industry led to the Braskem Group recording a consolidated loss of over R$10 billion in the fourth quarter of 2025.

**B.     Geological Event in Alagoas, Brazil**

31. In 2019, the Geological Survey of Brazil ("CPRM") released a report indicating that the geological phenomenon identified in neighborhoods of Maceió, Alagoas, was linked to the rock salt well exploration activities carried out by the Company in the region. The Company immediately ceased rock salt extraction in the region and implemented various measures to protect and take care of those affected by the event in coordination with the National Mining Agency ("ANM").

32. These measures have resulted in a recurring and significant investment in the region by the Company. In November 2025, the Company entered into an agreement with the State of Alagoas in which it undertook to pay a total of R$1.2 billion to local authorities. Although part of this amount had already been provisioned, the agreement involved the recognition of new

18

obligations and the reaffirmation of the Braskem Group's long-term financial commitment to remedying the damage attributed to the event.

33. Although unrelated to the normal course of the Braskem Group's business, the liabilities arising from the geological event are substantial, and have consumed a significant portion of its cash flow in recent years. By the end of 2025, the Company had already spent more than R$14 billion (US$2.7 billion as of June 18, 2026) as a result of the geological event, with a balance for future expenses reaching a total of R$3.5 billion (US$678 million as of June 18, 2026).

34. This is a significant liability, with concrete effects on cash management, the market's perception of risk, and the conduct of the Braskem Group's business. And, against a backdrop of a downturn in the petrochemical industry, the obligations related to the geological event have increasingly compromised the Debtors' finances.

**C.      International Tensions Driven by Recent Geopolitical Developments**

35. In early 2026, the Debtors began to face new financial and operational challenges due to the escalation of geopolitical tensions in the Middle East, related to the conflict involving Iran and the United States and the impact of the war on operations in the Strait of Hormuz—a strategic maritime passageway crucial for the global transport of oil and its derivatives. This conflict had an immediate impact on the price of oil and its derivatives as well as on sea freight rates. The uncertainty surrounding the duration of the conflict has caused the price of naphtha, a petroleum derivative, to increase dramatically.

36. Naphtha is the main raw material in the petrochemical industry and the feedstock most commonly used by the Braskem Group in the production of thermoplastic resins. Consequently, a change in its price has a direct impact on the Braskem Group's production costs. Given the scale of the Braskem Group's industrial production, even a small increase in the price of naphtha can result in a significant increase in costs for Braskem.

19

37. At the same time, many of Braskem's competitors use ethane, rather than naphtha, as a raw material—a feedstock that currently has more favorable economic conditions than naphtha. Thus, the Braskem Group finds itself bearing an increase in the cost of naphtha and a significant competitive disadvantage arising from its use as well.

38. Amid a prolonged downtown in the global petrochemical market, the widespread uncertainty generated by the war in the Middle East further exacerbates the already fragile economic and financial situation of the Debtors.   While the long-term repercussions of the downtown in the global petrochemical market and the current geopolitical situation remain unknown, the Braskem Group's liquidity crisis is far from irreversible.   The Company, along with its stakeholders, has entered the Brazilian Proceeding to strengthen its financial condition, which the Company expects will ultimately culminate in a comprehensive restructuring plan, so it can continue to execute on its operational objectives.

### D.      Imminent Maturities and Negotiation Efforts with Financial Creditors

39. As of June 2026, various debt obligations totaling more than R$2.6 billion (US$499 million as of June 24, 2026) have come due for Braskem Parent, including: (i) more than R$750 million (US$144 million as of June 24, 20206) in interest payments due to holders of the Notes; (ii) more than R$1.3 billion (US$249 million as of June 24, 2026) in maturing letters of credit; and (iii) more than R$450 million (US$87 million as of June 24, 2026) in maturities due on debts denominated in reis.  The repayment of this financial debt would significantly impact the Debtors' cash position, which would be reduced below the minimum operating level.

40. Operating below the minimum operating cash balance would have concrete impacts on the Debtors' activities, transforming a situation of misalignment in the financial debt repayment schedule in a more serious crisis that would affect the liquidity needed to maintain operations and relationships with business partners.  Tangibly, this would mean that the Braskem Group would

lack sufficient cash to meet its commitment to purchase raw materials, pay suppliers and employees, and invest in maintenance and safety—in short, everything that is necessary to manage the Company. There is also the risk that, in the event of non-payment, all of the Braskem Group's financial debt, totaling R$54 billion (approximately US$10.3 billion as of June 24, 2026) would be accelerated, with cross-acceleration of maturities.

41. The impacts of the Company operating below its minimum operating level would not be limited to the Braskem Group. The entire production chain that the Company utilizes would be affected and customers and consumers would face delays in the delivery of goods.

42. To avoid this outcome, the Debtors have been engaging with all of the Braskem Group's financial creditors (the "Subject Financial Creditors") about the extension of letter of credit lines and the payment of their claims (such claims, the "Subject Financial Claims") over a longer time frame. The Company has been working with the Subject Financial Creditors to sign confidentiality agreements to exchange information, hold meetings, and submit proposals that would promote an organized restructuring of the Subject Financial Claims.

43. Despite these efforts, not all Subject Financial Creditors have agreed to voluntarily suspend collection or enforcement actions, risking the Company's restructuring efforts. More recently, some creditors have begun threatening to seek accelerated payment even before any defaults have occurred. For example, Banco Safra S.A. ("Safra") has attempted to seek accelerated payment of R$348 million (approximately US$66.8 million as of June 24, 2026), including threatening to offset balances held by the Braskem Group with it, as well as to adopt other restrictive measures. Other creditors are likely to attempt similar measures and seek to exercise any available self-help remedies.

44. For those reasons, the Company commenced the Brazilian Proceeding on June 24,

21

2026, to leverage the structured and controlled environment of the mediation process combined with the preliminary injunction granted by the Brazilian Court. The Debtors intend to use the stay provided by the preliminary injunction to prevent further attempts by individual creditors to destroy value that is essential for the payment of all of the Company's creditors, suppliers, and customers, and continue negotiations to reach a global solution for the Subject Financial Claims.

**JURISDICTION, ELIGIBILITY, AND VENUE**

45. This Court has jurisdiction to consider the Verified Petition pursuant to 28 U.S.C. §§ 157 and 1334 as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431*, In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "Amended Standing Order").

46. These Chapter 15 Cases have been properly commenced with respect to the Petitioner and the Debtors in accordance with §§ 1504 and 1509(a) of the Bankruptcy Code by the filing of the Petition. This is a core proceeding pursuant to section 157(b) and (2)(P) of title 28 of the United States Code.

47. Venue is proper in this Court pursuant to 28 U.S.C. § 1410(1), as the principal U.S. assets of the Debtors are located within New York County and thus within this District.

48. The presence of assets within the United States renders each of the Debtors eligible to file these Chapter 15 Cases pursuant to section 109(a) of the Bankruptcy Code. *See In re Suntech Power Holdings Co., Ltd.* 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014); *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247–51 (2d Cir. 2013) (applying the local property requirement of section 109(a) to chapter 15 cases).[10][11]

---

[10][11]   *See also In re Avanti Commc'ns Grp. PLC,* 582 B.R. 603, 611 (Bankr. S.D.N.Y. 2018) (finding that the "property in the United States" requirement of section 109(a) is satisfied by a New York law-governed indenture); *In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) (same).

**RELIEF REQUESTED**

49. The Petitioner requests that this Court enter an order substantially in the form of the Proposed Order attached hereto and pursuant to sections 105(a), 1515, 1517, 1520, and 1521 the Bankruptcy Code:

(a)  granting the Petition in these Chapter 15 Cases and recognizing the Brazilian Proceeding as the "foreign main proceeding" for each of the Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, recognizing the Brazilian Proceeding as a "foreign nonmain proceeding" for each of the Debtors other than Braskem Parent;

(b)  finding that the Petitioner is the duly appointed "foreign representative" of each of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each Chapter 15 Debtor; and

(c)  granting such other and further relief as the Court deems just and proper.

**REQUIRED DISCLOSURES**

50. Appended to the Voluntary Petitions are the following certified disclosures by the Foreign Representative in accordance with Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

(a)  a Corporate Ownership Statement identifying any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of each of the Debtors' equity interests as of the commencement of these Chapter 15 Cases;

(b)  a list of administrators, parties to litigation in the United States to which the Debtors are a party, and entities against whom provisional relief is being sought[12]; and

(c)  a statement pursuant to section 1515(c) of the Bankruptcy Code identifying any other foreign proceedings of the Debtors.

**BASIS FOR RELIEF**

51. The Court should grant the Petition and recognize the Brazilian Proceeding as the

---

[12]  As of the date hereof, there are no parties that fall within the required disclosures of Bankruptcy Rule 1007(a)(4)(B).

23

foreign main proceeding for each of the Debtors. For the reasons stated below, each of the requirements in section 1517(a) of the Bankruptcy Code are satisfied. As an initial matter, each of the Debtors is eligible to be a debtor under the Bankruptcy Code, and this Court is the proper venue for them to administer their Chapter 15 Cases. Additionally, the Petitioner is the duly appointed "foreign representative" of the Brazilian Proceeding with respect to each of the Debtors, and the Brazilian Proceeding satisfies the standard to be considered a "foreign main proceeding" for the purposes of chapter 15 because the center of main interests for each of the Debtors is in Brazil, which aligns with the expectations of the Debtors' creditors. In the alternative, if this Court declines to recognize the Brazilian Proceeding as the foreign main proceeding for any of the Debtors, those Debtors are eligible for non-main recognition and relief to ensure a comprehensive restructuring of the Braskem Group. Lastly, the Petition meets the requirements of section 1515.

I.    **THE DEBTORS ARE ELIGIBLE TO BE DEBTORS UNDER SECTION 109(A) OF THE BANKRUPTCY CODE, AND THIS COURT IS THE PROPER VENUE FOR THE CASES**

52. Each of the Debtors has assets in the United States and is thus eligible to be a debtor under chapter 15 of the Bankruptcy Code in accordance with section 109(a) of the Bankruptcy Code. *See In re Barnet*, 737 F.3d at 250–51. Section 109(a) states that a debtor can be "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality." 11 U.S.C. § 109(a). Here, the Debtors have property located in the United States, including cash held in U.S. accounts and U.S.-based contractual rights.

53. With respect to accounts in the United States, the Debtors hold US$342292 million (R$1.81.5 billion) in cash in U.S. bank accounts as of June 2226, 2026. *See In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) (finding that cash held in bank accounts in the United States satisfied the requirements of § 109(a)).

54. With respect to contractual rights, Braskem Netherlands Finance, as issuer of the

24

Notes other than the 2041 Notes, America Finance, as issuer of the 2041 Notes, and Braskem

Parent, as guarantor of all of the Notes, all have rights under the U.S. dollar-denominated Notes

that are governed by New York law.  The Indentures also contain identical forum selection clauses

that provides that parties to the Indenture have consented to the jurisdiction of courts in New York

and federal courts in Manhattan, New York, with respect to any action related to the Notes or the

Indentures.  Braskem Netherlands and BT&S are also issuers under certain debt instruments that

are governed by New York law and contain New York forum selection provisions.

55.  This Court has previously held that a chapter 15 debtor is able to meet the debtor

eligibility requirement under section 109(a) of the Bankruptcy Code if it has debt instruments that

are governed by New York law and contain New York forum selection provisions.  *See In re Berau

Cap. Res. Pte Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) ("The Court concludes that the

presence of the New York choice of law and forum selection clauses in the Berau indenture

satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re PT

Bakrie Telecom Tbk*, 601 B.R. 707, 715 (Bankr. S.D.N.Y. 2019) ("An indenture subject to New

York governing law and containing New York forum selection clauses constitutes property in the

United States and thereby satisfies Section 109's eligibility requirement."); *In re Cell C

Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017) (holding that presence of "debt

subject to New York governing law and a New York forum selection clause constitutes property in

the United States," thereby satisfying the requirement under section 109(a)); *In re Inversora

Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016)

("[D]ollar-denominated debt subject to New York governing law and a New York forum selection

clause is independently sufficient to form the basis for jurisdiction.").  Thus, even if any of the

Debtors did not have cash in the United States, the Notes, Indentures, and other U.S. law-governed

debt documents are sufficient for each of the Debtors, except BNI, to satisfy section 109(a) of the Bankruptcy Code.

56. Moreover, "[a] case under chapter 15 of title 11 may be commenced in the district court of the United States for the district" (a) "in which the debtor has its principal place of business or principal assets in the United States," (b) "if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court," or (c) "in a case other than those specified in paragraph [(a) or (b)], in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative." 28 U.S.C. § 1410. As discussed above, a majority of the Debtors have their principal assets in the United States in the Southern District of New York, including the primary assets of America Finance, which maintains its only bank account in New York. Additionally, venue in this Court is consistent with the interest of justice and convenience of the parties given the aforementioned connections to New York and that the Debtors' undersigned counsel is in New York and close to this Court. Accordingly, venue in this District is proper. *See* 28 U.S.C. § 1410(3).

## II.    THE REQUIREMENTS OF SECTION 1517(A) OF THE BANKRUPTCY CODE ARE SATISFIED

57. Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if the following three requirements are met: (a) such foreign proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code; (b) the foreign representative applying for recognition is a person or body; and (c) the petition meets the requirements of section 1515. *See* 11 U.S.C. § 1517(a); *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). These foregoing requirements are satisfied with respect to the

26

Brazilian Proceeding, the Petitioner, and the Verified Petition. Therefore, the Brazilian Proceeding should be recognized as the foreign main proceeding of the Debtors.

### A. The Brazilian Proceeding is a "Foreign Proceeding"

58. The Brazilian Proceeding satisfies the general definition of "foreign proceeding" as set forth in section 101(23) of the Bankruptcy Code. Section 101(23) requires that a "foreign proceeding" be (a) either judicial or administrative in character, (b) collective in nature, (c) pending in a foreign country and authorized or conducted under a law related to insolvency or the adjustment of debts, (d) a proceeding in which the debtor's assets and affairs are subject to the control or supervision of a foreign court, and (e) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23); *In re Barnet*, 737 F.3d at 247; *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013). The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3). As described above, the Brazilian Proceeding is initially the Brazilian Mediation and then may (if no fully consensual agreement among all mediation parties is reached) later convert into either the Brazilian EJ or the Brazilian RJ. *See* Brazilian Counsel Decl. ¶¶ 13–14. Courts in this Circuit have long agreed that proceedings commenced under Brazilian Bankruptcy Law satisfy these standards. *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) ("*Constellation I*").

#### 1. The Brazilian Proceeding is a Judicial Process Pending in a Foreign Country, Authorized Under a Law Related to Insolvency, for the Purpose of Reorganizing

59. The Brazilian Mediation is a judicial-supervised process provided for under Brazilian Bankruptcy Law that the Debtors initiated when they requested to commence a mediation process with the Wind Chamber of Mediation (the "Brazilian Mediation Chamber") and a motion for

27

injunctive relief in the Brazilian Court. Brazilian Counsel Decl. ¶ 14. The Mediation Petition has

been granted, and the Brazilian Court has entered an order imposing a sixty-day stay on certain

creditor collection and enforcement actions to allow the Brazilian Debtors time to negotiate a plan

(the "Initial Court Order").[12][13] *Id*., Exs. E–F. The Brazilian Mediation is administered by the

Brazilian Mediation Chamber and is collective in that the Debtors have invited each of their

significant financial creditors to participate. *Id*. ¶ 69. Only the creditors that are invited to the

mediation are subject to the court-imposed stay. *Id*. One of the goals of the Debtors is to reach an

agreement with their creditors on the liabilities owed and the treatment to be provided on account

of such liabilities. *Id*. ¶ 16. If the parties reach a fully consensual agreement in the Brazilian

Mediation, the Brazilian Court will decide whether to confirm the agreement pursuant to Article

20-C of the Brazilian Bankruptcy Law. *Id*. ¶ 19. If a fully consensual agreement is not reached in

the Brazilian Mediation, the Debtors could choose, but are not required, to commence a Brazilian

EJ or Brazilian RJ.[13][14] *Id*. As set forth in the Brazilian Counsel Declaration, the Brazilian

---

[12][13]    A machine translation of the Initial Court Order is attached to the Brazilian Counsel Declaration. The Foreign Representative has requested a certified translation and will file it in these Chapter 15 cases as soon as it is finalized.

[13][14]    Courts in this district have routinely recognized Brazilian EJ and RJ proceedings as "foreign proceedings." *See, e.g.*, Order Granting Recognition of Foreign Proc., *In re Virgolino de Oliveira, S.A. Açúcar e Álcool,* No. 25-10696 (MG) (Bankr. S.D.N.Y. July 18, 2025), ECF No. 25 (recognizing a Brazilian RJ proceeding as foreign main proceedings); Order Granting Recognition & Final Relief in Aid of a Foreign Proc., *In re Odebrecht Engenharia e Construção S.A. – Em Recuperação Judicial*, No. 25-10482 (MG) (Bankr. S.D.N.Y. Apr. 8, 2025), ECF No. 21 (same); *In re InterCement S.A.*, 668 B.R. 802 (Bankr. S.D.N.Y. 2025) (same); Order Granting Recognition of Brazilian RJ Proc. & Certain Related Relief, *In re U.S.J. – Açúcar e Álcool S.A., et al.*, No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022), ECF No. 21 (recognizing as a foreign main proceeding a case filed pursuant to in-court reorganization section of the Brazilian Bankruptcy Law); Order Granting Recognition & Final Relief in Aid of a Foreign Proc., *In re Samarco Mineracão S.A. - Em Recuperação Judicial*, No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 13, 2021), ECF No. 22 (same); Order Recognizing Brazilian Proc. as Foreign Main Proc., *In re Usina de Açúcar Santa Terezinha Ltda.*, No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019), ECF No. 30 (same); Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Novonor S.A. – Em Recuperação Judicial*, No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22 (same); Mem. Op. Recognizing Foreign Debtors' Foreign Main & Foreign Nonmain Proc., *In re Serviços de Petróleo Constellation S.A.*, No. 18-13952 (MG) (Bankr. S.D.N.Y. May 9, 2019), ECF No. 86 (same); Order Granting Recognition of Foreign Main Proc., *In re OAS S.A.*, No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015), ECF No. 85 (same); Order Granting Certain Relief Related to Recognition of Foreign Main Proc., *In re Rede Energia S.A.*, No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014), ECF No. 36 (same); *see also* Order Granting Recognition & Final Relief in Aid of a Foreign Proc., *In re Odebrecht Engenharia e Construção S.A.*, No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020), ECF No. 15 (recognizing

28

Mediation is intended to preserve optionality based on the outcome of the Debtors' discussions with their creditors as well as to protect the Debtors so that they may continue to operate their business and negotiate a value-maximizing resolution for all stakeholders. *Id*. Therefore, the Brazilian Mediation satisfies all elements of a "foreign proceeding."

60. The fact that the Brazilian Mediation is a preliminary proceeding does not require a different result. On the contrary, section 101(23) of the Bankruptcy Code explicitly provides that "interim proceeding[s]" qualify as foreign proceedings. 11 U.S.C. § 101(23). Indeed, courts have emphasized in cases under chapter 15's predecessor, *i.e.*, section 304 of the Bankruptcy Code, that the definition of "foreign proceeding" should be broadly construed and encompasses cases in their preliminary stages that may not result in full-fledged liquidations or restructurings. Courts in this District have held that interim insolvency proceedings are "foreign proceedings." *See* Order Granting Provisional Relief, *In re InterCement Brasil S.A.*, No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024), ECF No. 22 (preliminarily recognizing as a foreign proceeding a jointly-administered protective injunction proceedings in support of a court-supervised interim mediation process in Brazil); *accord In re Netia Holdings, S.A.*, 277 B.R. 571, 582–83 (Bankr. S.D.N.Y. 2002) (holding that Polish insolvency proceedings that were in their "pre-opening phase" still constituted "foreign proceedings"); *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 269–70 (Bankr. D. Del. 2016) (granting recognition of Spanish conciliation procedure under Spanish Insolvency Law); *cf.* Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Oi S.A.*, No. 23-10193 (JPM) (Bankr. S.D.N.Y. Mar. 29, 2023), ECF No. 30 (recognizing as a foreign proceeding a jointly-administered projective injunction proceeding in preparation for a Brazilian RJ); Mem. Op. Recognizing the BVI Proc. as Foreign Main Proc. & Granting Related

---

Brazilian EJ proceeding as a foreign main proceeding).

Relief, *In re Prince Glob. Holdings Ltd.*, No. 26-10769 (MG) (Bankr. S.D.N.Y. June 11, 2026), ECF No. 82 (recognizing a provisional liquidation proceeding as a "foreign proceeding" since it was a proceeding "under a law relating to insolvency"—the BVI Insolvency Act).

### 2.      The Brazilian Proceeding is Collective in Nature

61. In addition to the Brazilian Mediation being collective, as mentioned above, a Brazilian EJ and a Brazilian RJ are "collective" in that they "consider[] the rights and obligations of creditors"[~~14~~15] in a single proceeding. *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009); *see also Constellation I*, 600 B.R. at 263 (holding that courts in the Second Circuit have long agreed that a Brazilian RJ process satisfies the standards for a "foreign proceeding," including being a collective proceeding). Each proceeding involves the treatment of multiple creditors and claims together rather than merely the resolution of a two-party dispute. Brazilian Counsel Decl. ¶ 15. Brazilian Bankruptcy Law provides that both a Brazilian RJ and a Brazilian EJ culminate in a court-sanctioned restructuring plan when the requisite number of creditors accept the proposed plan, although a "cram-down" procedure with lessened voting requirements also exists. *See id.* ¶¶ 24, 53–55.

### 3.      The Debtors' Assets and Affairs Are Subject to the Brazilian Court's Supervision

62. Moreover, the Brazilian Court's oversight of the Debtors' assets and affairs starts when the Brazilian Mediation is commenced (*e.g.*, the Bankruptcy Court has exclusive jurisdiction over matters relating to the Debtor's assets within the scope of the mediation and enforcement attempts or actions by creditors subject to the mediation are stayed, *see id.* ¶ 17), and will continue if the Brazilian Debtors commence a Brazilian EJ or Brazilian RJ. In a Brazilian EJ, creditors may

---

[~~14~~15]      In a Brazilian EJ, the Company can choose what claims are subject to the prepackaged plan. *See* Brazilian Counsel Decl. ¶ 18.

seek court intervention with respect to the Debtors' assets and affairs in certain circumstances. *See id.* ¶ 26. But in a Brazilian RJ, the assets and affairs of the Debtors are subject to the control and supervision of the Brazilian Court throughout the Brazilian RJ. *Id.* ¶ 43.

\*\*\*

63. For the foregoing reasons, the Court should recognize the Brazilian Proceeding as a "foreign proceeding." It is a judicial or judicially supervised process—initiated by the Debtors with the Brazilian Mediation Chamber and their motion for injunctive relief before the Brazilian Court—that is collective in nature, pending in a foreign country under a law related to insolvency, and undertaken for the purpose of reorganizing the Debtors' assets and affairs. To the extent the Brazilian Mediation is in its preliminary stages, this Court should have no difficulty finding it qualifies: Section 101(23) encompasses "interim proceedings," and courts in this District have construed the statutory definition to include early-stage insolvency processes, including Brazilian mediation proceedings substantially similar to the one at issue here. *See, e.g.,* Order Granting Provisional Relief, *In re InterCement Brasil S.A.*, No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024), ECF No. 22; *In re Netia Holdings*, 277 B.R. at 582–83. Moreover, the Brazilian Court's supervisory authority over the Debtors' assets and affairs, including the imposition of a stay on creditor collection and enforcement actions, has been operative since the commencement of the Brazilian Mediation and will continue through any subsequent Brazilian EJ or Brazilian RJ.

**B.** **The Brazilian Proceeding Satisfies the Requirements for Recognition as a "Foreign Main Proceeding"**

64. The Brazilian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code for the Debtors. A "foreign main proceeding" is defined in the Bankruptcy Code as a "foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). Although the Bankruptcy Code does not define

31

center of main interests ("COMI"), section 1516(c) provides that, in the absence of evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *see also In re Olinda Star Ltd.*, 614 B.R. 28, 40–41 (Bankr. S.D.N.Y. 2020) ("Courts have found that a debtor's registered jurisdiction is its COMI where no objection was raised or evidence presented rebutting the section 1516 presumption."). The legislative history indicates that this rebuttable presumption was "designed to make recognition as simple and expedient as possible" in cases where the "COMI" of a debtor is not controversial. H.R. No. 109-31, pt. 1, at 112–13 (2005).

65. In assessing whether the statutory presumption withstands scrutiny, courts in this Circuit have developed a non-exclusive list of factors for determining COMI. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137–38 (2d Cir. 2013) (referring to the COMI factors developed by the court in *In re SPhinX*, 351 B.R. at 117). Those factors include the following: (a) "the location of the debtor's headquarters;" (b) "the location of those who actually manage the debtor" (which, conceivably could be the headquarters of a holding company); (c) "the location of the debtor's primary assets;" (d) "the location of the majority of the debtor's creditors or [] a majority of the creditors who would be affected by the case;" and (e) "the jurisdiction whose law would apply to most disputes." *See In re SPhinX*, 351 B.R. at 117; *In re Fairfield Sentry*, 714 F.3d at 137.

66. Courts may also consider a debtor's "principal place of business" as part of their COMI analysis, which looks at the location of a corporation's "nerve center," *i.e.*, "where a corporation's officers direct, control, and coordinate the corporation's activities." *See In re Fairfield Sentry*, 714 F.3d at 138 n.10 (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 78 (2010)).

32

Given Congress's choice to use "COMI" instead of "principal place of business" in chapter 15, the "nerve center" concept does not control, "[b]ut to the extent that the concepts are similar, a court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI." *Id.* In addition, courts have emphasized the need for the debtor's COMI to be readily ascertainable by third parties. *See id.* at 130.

67. Similarly, some courts also look to the expectations of creditors, which can be "evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Serviços de Petróleo Constellation S.A.*, 613 B.R. 497, 508 (Bankr. S.D.N.Y. 2019) ("*Constellation II*") (citing *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017)); *In re OAS S.A.*, 533 B.R. 83, 101–03 (Bankr. S.D.N.Y. 2015) (reviewing offering memorandum to establish noteholder expectations as part of a COMI analysis); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93–94 (S.D.N.Y. 2012) (same); *In re Suntech Power*, 520 B.R. at 418 (considering terms of indenture to establish creditor expectations regarding likely location of a restructuring as part of a COMI analysis).

### 1. The Debtors are Part of the Economically and Operationally Integrated Braskem Group

68. The Braskem Group is an economically and operationally integrated group, whose main assets are located in Brazil and whose activities are managed, directed, and monitored out of the Company's corporate headquarters in Brazil. Specifically, the Braskem Group's São Paulo headquarters is the nerve center of each of the Debtors, where the Braskem Group's strategic control and business generation functions are centralized. Its most important contracts for the financing and development of the activities of the Company have been negotiated, formalized, and

33

authorized in Brazil.  The co-controllers of the Braskem Group, who collectively hold more than 97% of Braskem Parent's voting capital, are Brazilian: Shine I Fundo de Investimento em Participações Responsabilidade Limitada (the "Shine Fund"), an investment vehicle linked to Brazilian asset management firm IG4 Capital, and Petrobras, a mixed-capital company controlled by the Brazilian federal government.

69.  Strategic decisions regarding the Company are made from Brazil, as Braskem Parent is responsible for providing the Company direction on key matters such as principal business, strategic, legal and financial decisions.  So, for example, the Company's most important contracts for the financing and development of the activities of the Company have been negotiated, formalized, and authorized in Brazil.  In that same vein, the Company's main negotiations with creditors relating to the Debtors' restructuring process have taken place in Brazil, with support from legal and financial advisors located in Brazil.  And, as required under Brazilian law, the Debtors filed the Brazilian Proceeding in the Brazilian Court, which is located in the jurisdiction where the Braskem Group's principal place of business (*principal estabelecimento*) is located.  *See* Brazilian Counsel Decl. ¶ 11.  Courts have found that the location where certain policy decisions are made and main operations of the corporation are conducted is indicative of where the corporation's business was centered.  *See Kelly v. U.S. Steel Corp.*, 284 F.2d 850, 854 (3d Cir. 1960); *see also Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F.Supp.2d. 205, 215 (S.D.N.Y. 2006); *cf. In re Fairfield Sentry*, 714 F.3d at 138 n.10 (courts may consider a debtor's principal place of business in determining the debtor's COMI).  While each of the Debtors maintains managing board structures in compliance with local regulatory and tax requirements, each of the Debtors also receives strategic advice, direction and guidance from Braskem Parent on the Company's long-term interests and priorities.  *See infra* ¶ 71.

34

70. The Braskem Group's production activities are also concentrated in Brazil. Braskem has 28 industrial plants in Brazil, spread across five states, which employ, directly or indirectly, more than six thousand people. Brazil is also home to the largest volume of the customer contracts, suppliers, operators and financiers. Given that, revenue generated in Brazil accounted for approximately 70% of the Braskem Group's consolidated net revenue in 2025.

71. Moreover, all of the Debtors have the following connections to Brazil:

(a)      investor relations for the Braskem Group is also centralized in Brazil, and the investor relations contact information on the Braskem Group's website is an address in São Paulo;

(b)      the domicile of many of the Debtors' directors is in Brazil;

(c)      the Debtors' operations are centrally managed and directed from Brazil;

(d)      strategic and key operating and policy decisions for each of the Debtors are made by management located in São Paulo;

(e)      the Debtors' corporate accounting, accounts payable, insurance procurement, accounts receivable, financial planning, internal auditing, marketing, treasury, research and development, and tax services are largely provided in São Paulo;

(f)      the finance, legal, human resources, payroll, billing, and procurement for the Debtors are carried out mainly in São Paulo;

(g)      key information technology and systems used by the Debtors are provided from Brazil;

(h)      cash management functions are maintained and directed from Brazil;

(i)      management, senior staff, and/or principal decision-makers regularly attend meetings in São Paulo;

(j)      all of the financial statements of the Debtors are consolidated into Braskem Parent; and

(k)      the management of capital expenditure decisions affecting the Debtors is made from São Paulo.

72. Furthermore, now that the Initial Court Order has been entered, creditors will be engaging in a Brazilian Court-supervised process, further underscoring that the COMI of all of the

35

Debtors is Brazil. *See In re Intercement Brasil S.A.*, 668 B.R. 802, 823 (Bankr. S.D.N.Y.) a(finding that restructuring activities occurring in Brazil as part of a mediation and extrajudicial proceeding "establish[ed] conclusively" that the COMI of a Dutch entity was Brazil); *In re Giftcraft Ltd.*, No. 25-11030 (MG), 2025 WL 1583480, at *10 (Bankr. S.D.N.Y. June 4, 2025) (considering pre-filing restructuring efforts in determining a debtor's COMI was in Canada); *In re Mega Newco Ltd.*, No. 24-12031 (MEW), 2025 WL 601463, at *4 (Bankr. S.D.N.Y. Feb. 24, 2025) (granting foreign main recognition, considering that no creditors had objected to recognition of a Scheme demonstrating that creditors had acquiesced in or supported the proposed COMI); *see also In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 783, 789 (Bankr. S.D.N.Y. 2022) ("Cayman court's supervision of the [scheme proceeding], in light of the other factors present here, is enough for the Court to conclude that the Debtor's COMI for the proceeding involving the single class of [existing noteholders] was in the Cayman Islands."); *In re Suntech Power*, 520 B.R. at 417 (finding COMI shifted to Cayman Islands from China as a result of Cayman scheme restructuring proceeding); *In re Culligan Ltd.*, No. 20-12191, 2021 WL 278926, at *11–13 (Bankr. S.D.N.Y. 2021) (finding Bermuda COMI because Bermuda restructuring proceeding made Bermuda law "applicable with respect to any disputes arising with respect to [that proceeding]").

73. Finally, for Braskem Netherlands, BT&S, and America Finance, although their financial statements are prepared and audited in the Netherlands or America, as relevant, they are sent to Brazil for consistency, approval, and consolidation with the Company's financial statements. As a part of the Company's consolidated financial statements, these Debtors' accounts are audited following instructions from the Braskem Group's auditor located in Brazil.[15][16]

---

[15][16]   The financial statements for BNI and Netherlands Finance are prepared and audited in the Netherlands but as part of instructions received from Braskem Parent, are not sent to Brazil for consolidation given that (i) they are less complex in nature as financing entities and (ii) they primarily reflect intercompany transactions, which are eliminated on a consolidated level.

36

### 2.    The COMI for Braskem Parent is Brazil

74. Braskem Parent is incorporated in Brazil and headquartered in Brazil, which makes its COMI presumptively Brazil. 11 U.S.C. § 1516(c); *see also In re Olinda Star Ltd.*, 614 B.R. at 28, 40–41. This presumption cannot be rebutted in light of the deep and material connections that Braskem Parent has with Brazil, as further discussed above, and its lack of material connections to other jurisdictions.

### 3.    The COMI for Each of the Other Debtors is Brazil

75. With respect to Braskem Netherlands, BNI, Netherlands Finance, BT&S, and America Finance,[16][17] though not registered there, each of their COMI is nevertheless squarely in Brazil.

76. <u>First</u>, as an initial matter, the fact that these Debtors' registered offices are not in Brazil does not control the analysis; indeed, numerous Courts in this District have previously found in other chapter 15 cases that a chapter 15 debtor's COMI may be different from the location of its registered offices. *See, e.g.*, Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Raízen S.A.*, No. 26-10528 (LGB) (Bankr. S.D.N.Y. Apr. 8, 2026), ECF No. 36 (finding COMI for entities incorporated in the U.S., Luxembourg and Switzerland was Brazil); *In re InterCement*, 668 B.R. at 825–26 (finding COMI for entities incorporated in the Netherlands and Spain was Brazil); *Constellation I*, 600 B.R. at 237 (finding that the COMI for several entities incorporated outside Brazil was Brazil considering different factors and ties between such entities); *In re OAS*, 533 B.R. at 100–103 (finding that Austrian financing entities' limited Austrian activities, effected to maintain its corporate existence under Austrian law, did not detract

---

[16][17]    Courts in this District have held that U.S. debtors may have their COMI in foreign jurisdictions when granting provisional relief. *See In re Iovate Health Scis. Int'l Inc.*, 673 B.R. 516, 533 (Bankr. S.D.N.Y. 2025); *In re Giftcraft Ltd.*, No. 25-11030 (MG), 2025 WL 1583480, at *9–10 (Bankr. S.D.N.Y. June 4, 2025); *In re Ascot Fund Ltd.*, 603 B.R. 271, 278–83 (Bankr. S.D.N.Y. 2019); *see also* Order Granting Recognition of Foreign Main Proc. & Certain Related Relief, *In re Raízen S.A.*, No. 26-10528 (LGB) (Bankr. S.D.N.Y. Apr. 8, 2026), ECF No. 36 (finding COMI of U.S. debtor in Brazil).

37

from finding of COMI in Brazil); *In re Oi Brasil*, 578 B.R. at 234 (finding COMI for Dutch-incorporated SPV was Brazil notwithstanding its registered office in the Netherlands).

77. <u>Second</u>, wherever their registered offices may be, each of the Debtors exists to support, directly and indirectly, the Brazilian operations of the Braskem Group. BNI, Netherlands Finance, and America Finance (collectively, the "<u>SPV Debtors</u>") provide access to global markets and investors outside of Brazil and facilitate the flow of intercompany transactions, all for the benefit of the Company's Brazilian operations. For example, proceeds of the Notes issued by the SPV Debtors were on-lent to Braskem Parent. Likewise, Braskem Netherlands and BT&S provide services designed to facilitate the global trade of the Company's products to and from Brazil. *See infra* ¶¶ 88–90. These Debtors' critical function in the Braskem Group's Brazilian operations supports finding that the COMI of each is Brazil. *See, e.g.*, *In re Iovate Health Scis. Int'l Inc.*, 673 B.R. 516, 533 (Bankr. S.D.N.Y. 2025) (finding that a U.S. debtor's COMI was likely in Canada given that the debtor's operations were "all highly integrated and shared management, headquarters, and accounting/finance/HR functions," in spite of having eleven employees in the U.S. and its principal assets in the U.S.); *In re OAS S.A.*, 533 B.R. at 101–12 (location of group operations and of parent entity led to finding of COMI in the jurisdiction of the parent, not that of the individual debtor's registered office).

78. <u>Third</u>, where a subsidiary entity is a holding company or a financing SPV "with no operations other than managing relationships with creditors and paying off obligations on behalf of a larger corporate parent, . . . [its COMI] should be determined by the location of the corporate 'nerve center.'" *See, e.g.*, *In re InterCement*, 668 B.R. at 822 (quoting *In re Oi Brasil*, 578 B.R. at 222–30); *In re OAS*, 533 B.R. at 102 (finding COMI of a foreign SPV to be in the jurisdiction of its corporate group largely because the SPV's "principal purpose [was] the financing of the

38

operations of [the ultimate parent], its affiliates and direct and indirect subsidiaries"); *In re Suntech Power*, 520 B.R. at 416–17 (indicating that, at time of foreign filing, a holding company with no tangible assets or operations had its COMI in the functional nerve center of its corporate group, which was ascertainable to creditors); *see also In re SPhinX*, 351 B.R. at 117 (noting that a subsidiary's nerve center could very well sit with its parent company).

79. The SPV Debtors are each limited in purpose, do not own any real estate and designed solely to support the corporate group. *See supra* ¶ 19. Additionally, the SPV Debtors are entirely reliant on their Brazilian affiliates' operations to service their debt obligations (which only exist in the first place to fund the operations of Braskem Group). *See id*. Further, the Notes made clear that an adverse change in the financial condition or results of the operations Braskem Parent and its subsidiaries would result in the failure of Netherlands Finance and America Finance to have funds sufficient to repay the Notes. *See id*.

80. <u>Lastly</u>, the conclusion that Brazil is COMI for each of the Debtors is consistent with creditor expectations. *See In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."). As to the holders of the Notes, the Offering Memoranda made clear that Netherlands Finance, the issuer of each of the Dutch Notes, and America Finance, as issuer of the 2041 Notes, have no operations of their own and as such their ability to pay their obligations was dependent "upon the financial condition and results of operations of Braskem [S.A.] and its subsidiaries." *See, e.g.*, 2028 Notes OM at 14; 2041 Notes OM at 18; *supra* ¶ 25. Additionally, the Offering Memoranda made clear that if the Company was unable to pay amounts due under the guarantees, then it "may become subject to bankruptcy proceedings in Brazil." *See* 2028 Notes OM at 17; 2041 Notes OM at 21; *supra* ¶ 25. Given the more than 240 references throughout each of the Offering Memoranda to

39

Brazil, finding that Brazil is the COMI for Netherlands Finance and America Finance is thus consistent with creditor expectation.

81. For Braskem Netherlands, BT&S and BNI, finding Brazil as COMI for each is consistent with creditor expectation.  These entities have limited creditors that are not affiliated Braskem Group entities.  Furthermore, the Netherlands section of the Company's website refers entirely to information about Braskem Parent and the Company, rather than any information specific to the Dutch entities.  Given that the logistics, shipping and trading activities of Braskem Netherlands and BT&S are so integrally tied to Brazil and the Braskem Group's Brazilian operations, there is nothing inconsistent about finding their COMI is Brazil is COMI.

a.    Netherlands Finance's COMI is in Brazil

82. Netherlands Finance was established as an SPV to issue all of the Notes, except for the 2041 Notes (such Notes, the "Dutch Notes"), all of which are guaranteed by Braskem Parent.  As a financing vehicle, and as disclosed in the offering memoranda for the Dutch Notes, Netherlands Finance is wholly dependent on the Braskem Group's Brazilian operations to repay its financial obligations.  *See supra* ¶ 1925.  It on-lent the proceeds from the Dutch Notes, directly or indirectly, to Braskem Parent to fund, *inter alia*, their Brazilian operations and the Dutch Notes are all guaranteed by Braskem Parent, a Brazilian Debtor, as well as certain other Debtors, resulting in certain intercompany loans in favor of Netherlands Finance.  Netherlands Finance does not own any real estate, any physical assets, and although it has four employees, one of whom is a Brazilian national and all of whom support treasury and tax functions, in the Netherlands, it is reliant on central management and decision-making support from the Braskem Group's São Paulo nerve center.  Netherlands Finance does not maintain its own physical office in Rotterdam separate from its direct parent, Braskem Netherlands.

83. As a matter of compliance with local regulatory and tax authority, Netherlands

40

Finance has two classes of statutory directors, as only Dutch residents can be appointed as managing directors in one of the two classes. Netherlands Finance currently has two managing directors, both of whom are Brazilian citizens (one is a dual citizen of Spain) located in the Netherlands. Pursuant to its Articles of Association, the managing directors of Netherlands Finance owe duties to both Netherlands Finance and the enterprise connected with it (i.e., Braskem Group).

84. As the Offering Memoranda of the Dutch Notes made clear, Netherlands Finance: (i) is subject to the risks associated with the Company's operations in Brazil, (ii) has no means of repaying its obligations other than from revenue generated by the Braskem Group's operations, and (iii) does not have its own investor relations, and directs all investor inquiries to the "principal executive office" of the Braskem Group in Brazil. Courts have found that creditor expectations—as evidenced by disclosures in the Braskem Group's debt documents, including references to risk factors in the parent company's jurisdiction—and financial dependence on the parent entities, as discussed *supra* ¶¶ 78–79, support a finding that, here, Netherlands Finance's COMI is unquestionably in Brazil. *See In re Oi Brasil*, 578 B.R. at 228–230; *see also In re InterCement*, 668 B.R. at 822–23 (granting foreign main recognition of a Brazilian insolvency proceeding for an SPV domiciled outside of Brazil in part given the disclosures in the governing indentures that (i) the SPV had no operations or business other than issuing notes and other indebtedness and (ii) explained the SPV's dependence on the Brazilian parent to repay its obligations); *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 788 (Bankr. S.D.N.Y. 2022) (discussing relevance of disclosures in offering memorandum to creditor expectations); *In re OAS*, 533 B.R. at 102 (discussing, *inter alia*, disclosures in offering memorandum about consolidated financial statements, business operations of group as a whole, and centralized investor relations

41

through parent company in finding that SPV's COMI was in Brazil where parent company was located).

> b.      America Finance's COMI is in Brazil

85. America Finance was established as an SPV to issue the 2041 Notes. As a financing vehicle, it is ~~wholly~~ dependent on the Braskem Group's Brazilian operations to repay its financial obligations. *See supra* ¶ ~~19~~25. Like Netherlands Finance, it on-lent the proceeds from the 2041 Notes ~~to Braskem Parent to fund, *inter alia*, their Brazilian operations~~, directly or indirectly, to other members of the Braskem Group, including Braskem Parent, as well as certain non-Debtor Braskem entities including, without limitation, Braskem America, Inc., resulting in certain intercompany loans in favor of America Finance. Braskem America, Inc. is the direct provider of the cash used to pay interest on the 2041 Notes. The 2041 Notes are also guaranteed by Braskem Parent, a Brazil-based member of the Braskem Group. America Finance does not own any real estate, has no physical assets of its own, and has no employees. It is reliant on central management and decision-making support from the Braskem Group's São Paulo nerve center. America Finance does not maintain a physical office in the U.S.—its registered office address is the Corporation Service Company in Delaware, which is its registered service agent. One of the directors of America Finance is a Brazilian citizen located in Brazil, the other is a dual citizen of Argentina and the U.S. who is located in the U.S.

86. The risk factors in the 2041 Notes included disclosures similar to the Dutch Notes with respect to America Finance's ties to Brazil, including that it had no operations of its own, that its ability to pay its debts is entirely dependent on the Brazilian operations of Braskem Parent, and that it may become subject to bankruptcy proceedings in Brazil. *See supra* ¶ ~~19~~25; *see also In re Oi Brasil*, 578 B.R. at 228–230; *see also In re InterCement*, 668 B.R. at 822–23; *In re Modern Land (China) Co., Ltd.*, 641 B.R. at 788; *In re OAS*, 533 B.R. at 102.

c.      BNI's COMI is in Brazil

87. As an SPV, BNI is a financial services entity with no operations of its own and its primary purpose is to facilitate financial intercompany transactions between the European and Brazilian entities in the corporate structure.  To do so, it has three main functions: (i) obtaining and providing intercompany loans from Braskem Netherlands and Netherlands Finance to Braskem Parent to ensure allocation of cash among Braskem Group entities, and to perform related treasury activities, (ii) to incorporate, participate, manage or otherwise take a financial interest in other companies and undertakings, and (iii) to provide financial support to other entities in the Braskem Group to meet their financing needs.  As an SPV, BNI owns no real estate and has no operations of its own other than providing financial services.  BNI is highly integral to, and a critical part of, the Company's operations in Brazil, and strategic decisions involving BNI are directed from Brazil. *See In re Fairfield Sentry Ltd.*, 714 F.3d at 138 n.10 (citing *Hertz Corp. v. Friend*, 559 U.S. 77 (2010)) ("[A] court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI.").  As required by local regulatory and tax authority, BNI must have at least fifty percent of its statutory board consisting of Dutch residents.  Its two statutory directors are domiciled in the Netherlands, but both are Brazilian citizens (one is a dual Spanish citizen).

d.      Braskem Netherlands's COMI is in Brazil

88. Braskem Netherlands, along with its direct subsidiary BT&S, carries out commercial activities that are purely ancillary to the Company's operations in Brazil.  Its main purpose is to serve as an international holding and trading company of the Braskem Group to support the sales, marketing and distribution of petrochemical products. *See supra* ¶ 19.  As the holding company for the Braskem Group's foreign companies segment, it facilitates the distribution of petrochemical resins produced in Brazil throughout Europe and Asia.  Braskem Netherlands also

43

plays a significant role in raising funds to finance the Braskem Group's activities in Brazil and its ability to repay its creditors is heavily dependent on the Company's Brazilian operations. Braskem Netherlands's management comprises both a Supervisory Board and Managing Board. All three of the directors on the Supervisory Board, which provides oversight and strategic guidance to the Managing Board, are located in Brazil and two are Brazilian citizens. *See In re Serviços de Petróleo Constellation S.A. ("Constellation I"),* 600 B.R. 237, 288 (Bankr. S.D.N.Y. 2019) (location of staff in charge of operations and management relevant factor for COMI analysis); *see also In re OAS*, 533 B.R. at 101-12 (location of group operations and of parent entity led to finding of COMI in the jurisdiction of the group, not that of the individual debtor's registered office). As a matter of compliance with regulations from local regulatory and tax authorities, and like Netherlands Finance and BNI, Braskem Netherlands has two classes of managing directors. The Managing Board, which is subordinate to the Supervisory Board, comprises two Brazilian citizens domiciled in the Netherlands and one Dutch citizen domiciled in the Netherlands. The Supervisory Board provides the Managing Board with oversight, strategic guidance and advice on the Company's affairs and long-term goals.

e.     BT&S's COMI is in Brazil

89. BT&S's main purpose is to support the Braskem Group's international trading and shipping functions in Brazil, as well as Europe and Asia. It also functions as a holding company of several SPVs for contracted bareboat vessels that frequent Brazilian ports. As such, BT&S's operations are heavily intertwined with Brazil in particular because it facilitates the purchase and sale of thermoplastic resins produced by Braskem, particularly in Brazil, worldwide. It also purchases naphtha and other bio-based and circular feedstock products from third-party suppliers in various markets worldwide to supply to Braskem Parent. BT&S undertakes three primary types of intercompany transactions: (i) the sale of naphtha and other feedstock to Braskem Parent in

44

Brazil and its non-Debtor affiliate, Braskem Idesa S.A.P.I. ("Braskem Idesa"), (ii) the purchase of basic chemicals from Braskem Parent for resale to the external market, and (iii) leasing vessels from its subsidiary SPVs and subsequent subleasing to non-Debtor affiliates. BT&S has three statutory directors located in the Netherlands, two of whom are Brazilian nationals.

90. As one of the Company's main conduits to the global markets, at any given time, BT&S's activity may not appear to be focused in any one market around the world, but regardless of the focus of that activity, the strategic direction guiding that activity is always provided by the Company's headquarters in São Paulo. That centralized strategic direction is critical for BT&S to fulfil its purpose of optimizing the Braskem Group's network and maximizing profitability for the Company as an enterprise. As such, given BT&S's function as a for the Brazilian operations in the European and Asian markets, whereby the vast majority of purchase and sale operations are directed to or sourced from Brazil, the facts support a determination that BT&S's COMI is in Brazil.

\*\*\*

91. In sum, the operations and services of the Debtors are highly interdependent and effectively form a single, integrated economic unit where material aspects of the Company's operations, finances, corporate management, employee management, and short-and long-term strategic planning are based in Brazil. *See In re Serviços de Petróleo Constellation S.A.* ("*Constellation I*"), 600 B.R. 237, 288 (Bankr. S.D.N.Y. 2019) (location of staff in charge of operations and management relevant factor for COMI analysis); *see also In re OAS S.A.*, 533 B.R. at 101-12 (location of group operations and of parent entity led to finding of COMI in the jurisdiction of the group, not that of the individual debtor's registered office); *Kelly v. U.S. Steel Corp.*, 284 F.2d 850, 854 (3d Cir. 1960); *see also Phoenix Four, Inc. v. Strategic Res. Corp.*, 446

45

F.Supp.2d. 205, 215 (S.D.N.Y. 2006); *cf. In re Fairfield Sentry*, 714 F.3d at 138 n.10 (courts may consider a debtor's principal place of business in determining the debtor's COMI). For the reasons set forth above, the COMI for each Debtor is in Brazil, and the Brazilian Proceeding should be recognized as the foreign main proceeding for each Debtor pursuant to section 1517(b)(1) of the Bankruptcy Code.

### C.      The Petitioner is a Proper "Foreign Representative"

92. The Petitioner is the proper "foreign representative" of the Brazilian Proceeding, thereby satisfying sections 101(24) and 1517(a)(2) of the Bankruptcy Code. Section 101(24) of the Bankruptcy Code provides that "[t]he term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). The Bankruptcy Code does not require that the foreign representative be appointed by the foreign court. Instead, a debtor may appoint a foreign representative pursuant to corporate authorizations. *See, e.g., In re Agro Santino, OOD*, 653 B.R. 79, 94 (Bankr. S.D.N.Y. 2023) ("[I]n considering whether a person may serve as a foreign representative, the Court does not look to foreign law governing appointments—it looks to section 101(24)."); *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 183 (Bankr. S.D.N.Y. 2022) (holding that the foreign representative duly authorized by the chapter 15 debtors' board was a foreign representative within 11 U.S.C. §101(24) and citing Collier on Bankruptcy ¶ 13.04 (16th ed. 2022.) ("[w]here the debtor remains in charge of its own affairs, the debtor itself might be able to appoint its own representative for this purpose, without express court sanction"); *Constellation I*, 600 B.R. at 270 (recognizing as proper a foreign representative authorized under resolutions to commence a chapter 15 case on behalf of each of the debtors); *In re Oi Brasil*, 578 B.R. at 183 (recognizing appointment of foreign representative "pursuant to resolutions and

46

powers of attorney signed by authorized representatives of" the foreign debtors); *In re OAS*, 533 B.R. at 95 (holding that the "Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative"); *In re Americanas S.A.*, No. 23-10092 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) (appointing a foreign representative that the chapter 15 debtors' governing body authorized).

93. Here, the Petitioner is the person that has been duly appointed by the Debtors to act as the representative of the Brazilian Proceeding in these Chapter 15 Cases in accordance with section 101(24) of the Bankruptcy Code and has been granted authority to commence these Chapter 15 Cases by appropriate corporate approvals under applicable law. *See* Resolutions attached to Voluntary Petition. As explained in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law authorizes the Debtors' management to continue to administer the reorganization of their assets and affairs throughout the Brazilian Proceeding. Brazilian Counsel Decl. ¶ 18. This Court has recognized that the appointment of foreign representatives in similar manners is acceptable for purposes of commencing chapter 15 cases. *See, e.g.*, Order Granting Recognition of Foreign Main Proc., *In re Mina Tucano Ltda.*, No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022), ECF No. 26 (approving the verified petition where the foreign representative was authorized by chapter 15 debtors' corporate resolution); *Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*, 470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates "self-management" during the proceeding similar to that of a debtor in possession, fit within the scope of the definition of "foreign representative," and recognizing the individual as the foreign representative).

**D.      The Petition was Properly Filed Under Sections 1504 and 1509 and Meets the Requirements of Section 1515 and Bankruptcy Rule 1007(a) (4)**

94.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meet the procedural requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(3). Here, all of section 1515's procedural requirements are satisfied.

95.    First, the Petitioner duly and properly commenced these Chapter 15 Cases in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the Petition with all the documents and information required by sections 1515(b) and 1515(c). *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) (*"Bear Stearns I"*) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.").

96.    Second, in accordance with sections 1515(b)(1)–(3) of the Bankruptcy Code, the Petitioner has submitted evidence of the existence of the Brazilian Proceeding and the appointment of the foreign representative. *See* Brazilian Counsel Decl., Exs. E–F; *see also* Voluntary Petitions. *See, e.g.*, *In re Vitro*, 470 B.R. 408; *see also OAS*, 533 B.R. at 93 (*citing In re Vitro*, 701 F.3d at 1046).

97.    Third, in accordance with section 1515(c) of the Bankruptcy Code, the Petitioner filed together with the Petition a statement identifying all the foreign proceedings with respect to the Debtors. As set forth in such statement, the Brazilian Proceeding is currently pending with respect to the Debtors.

98.    Fourth, the Foreign Representative has also satisfied the additional requirements set forth in Rule 1007(a)(4) of the Bankruptcy Rules by including the following in the Petition: (a) a

48

corporate ownership statement containing the information described in Bankruptcy Rule 7007.1, with respect to each of the Debtors; and (b) a list containing the names and addresses of all persons or bodies authorized to administer the foreign proceedings of the Debtors and all parties to litigation pending in the U.S. in which the Debtors are a party at the time of the filing of the Petition.  *See supra* ¶ 50.

## III.   ALTERNATIVELY, THE COURT SHOULD FIND THAT THE BRAZILIAN PROCEEDING IS A FOREIGN NONMAIN PROCEEDING FOR EACH OF THE DEBTORS OTHER THAN BRASKEM PARENT AND GRANT DISCRETIONARY RELIEF

99.    As demonstrated above, the Brazilian Proceeding should be recognized as the "foreign main proceeding" for each of the Debtors.  Should this Court conclude, however, that the Brazilian Proceeding is not qualified as the foreign main proceeding of any of the Debtors, the Foreign Representative submits that, in the alternative, the Brazilian Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) for any such Debtor pursuant to section 1517(b)(2) of the Bankruptcy Code, and that discretionary relief, including the application of a protective stay to the full extent set forth in section 362, should be granted with respect to such debtors and their U.S.-located property.  11 U.S.C. §§ 1517(b)(2), 1521(a).

### A.    The Brazilian Proceeding Satisfies the Requirements for Recognition as a "Foreign Nonmain Proceeding"

100.    A "foreign nonmain proceeding" is defined as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."  11 U.S.C. § 1502(5).  Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a non-transitory economic activity."  11 U.S.C. § 1502(2).  Whether a debtor has an establishment in a particular location is "essentially a factual question," *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 389 B.R. 325, 338 (S.D.N.Y. 2008) ("*Bear Stearns II*"), and the petitioner bears the burden of proof.  *See In re Brit.*

49

*Am. Ins. Co.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010).

101. The Bankruptcy Code does not define "non-transitory economic activity," and, as this Court has noted, "[t]here is relatively little U.S. authority construing the term 'establishment' as it is used in chapter 15." *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 84 (Bankr. S.D. N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012). Indeed, "[n]either Chapter 15 nor its legislative history explain what it means for a debtor to have 'any place of operations' or to have 'been carrying on a non-transitory economic activity' in a location." *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1027 (5th Cir. 2010) (citing H.R. No. 109-31, pt. 1, at 107 (2005)).

102. Accordingly, U.S. courts have interpreted the meaning of "establishment" in the context of the purpose of chapter 15 and the Model Law and by looking to the meaning ascribed to such term by foreign courts. *See, e.g.*, *In re Millennium Glob.*, 458 B.R. at 84 n.49; *Bear Stearns I*, 374 B.R. at 131 n.12. The limited number of U.S. courts to consider the question have determined a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise carries out a non-transitory economic activity in that jurisdiction. *See, e.g.*, *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 92 n.8 (Bankr. S.D.N.Y. 2012); *Bear Stearns I*, 374 B.R. at 131; *In re Creative Fin., Ltd.*, 543 B.R. 498, 520 (Bankr. S.D. N.Y. 2016); *In re Brit. Am.*, 425 B.R. at 916. Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *In re Millennium Glob.*, 458 B.R. at 85; *see In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 784 (Bankr. S.D.N.Y. 2022). A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *In re Creative Fin.*, 543 B.R. at 520; *In re Brit. Am.*, 425 B.R. at 915, evidenced by, among other things, "fees paid to retain local counsel and

50

commitment of capital to local banks." *In re Millennium Glob.*, 458 B.R. at 85.

103.   Courts in this district have emphasized that the threshold for proving an "establishment" is not high. *See In re Mood Media Corp.*, 569 B.R. 556, 563 (Bankr. S.D.N.Y. 2017) (stating that "not much is needed" to demonstrate that an establishment exists); *see also Constellation I*, 600 B.R. at 277  (recognizing an establishment were the debtor maintained at least "a base level of connection").

104.   Here, even if the Court were to find that Brazil is not the COMI for any of the Debtors, the Court should still find that they each have an establishment in Brazil for purposes of chapter 15 recognition as each has a "base level of connection" to Brazil.  All of the Debtors play a critical role in the lifecycle of Braskem's Brazilian petrochemical operations.   Braskem Netherlands and BTS are integral to the sale of feedstock to Braskem Parent, the purchase of basic petrochemicals from Braskem Parent, and the shipping and import/export of both for the benefit of the Braskem Group.  The SPV Debtors play an integral but limited role in the financing of the Brazilian operations as discussed above. *See supra* ¶¶ 19, 78–79, 82–87.

105.   Braskem Netherlands and BT&S are responsible for facilitating Braskem Parent's transactions with the European and Asian marketplace.  To do so, Braskem Netherlands and BT&S buy, sell and/or export in the Brazilian marketplace through Braskem Parent *See supra* ¶¶ 88–90.  Furthermore, certain of the vessels that BT&S's subsidiaries lease (the vessels that transport naphtha) routinely stop in Brazilian ports as part of their operations.

106.   In light of the foregoing, The Petitioner submits that the foregoing evidence in support of finding that the COMI of each of the Debtors is in Brazil also provides sufficient evidence that each of these Debtors has an impact on the Brazilian marketplace and therefore maintains an establishment in that jurisdiction.

51

**B.**    **Discretionary Relief Under Section 1521 of the Bankruptcy Code is Warranted**

107.    Regardless of whether the Court finds that the Brazilian Proceeding is a main proceeding or nonmain proceeding with respect to the non-Brazilian-incorporated Debtors, the Petitioner requests that the Court grant discretionary relief with respect to each Debtor and their U.S.-located property pursuant to section 1521 of the Bankruptcy Code.    Specifically, the Petitioner requests that any protective relief that is the subject of the Provisional Relief Motion be extended pursuant to section 1521(a)(6) of the Bankruptcy Code,[18] including the continued application of the section 362 stay with respect to any such Debtor and its property within the territorial jurisdiction of the United States.[19]    *See* 11 U.S.C. § 1521(a)(6); Provisional Relief Mot. ¶¶ 40–43.    The Petitioner submits that the foregoing evidence concerning the non-Brazilian Debtors and their integral role within the Braskem Group justifies such discretionary relief, which is critical for the maintenance of the status quo and the preservation of the Debtors' going-concern value.

108.    To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."    11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law).    Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably

---

[18]    Section 1521(a) provides that, upon recognition of a foreign main proceeding or nonmain proceeding and at the request of the foreign representative, a court may grant (with exceptions not here relevant) "any appropriate relief" necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors, including "extending relief granted under section 1519(a)."  11 U.S.C. § 1521(a)(6).  Even if this Court does not recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to any of the Debtors, section 1521 relief is available where "the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding." 11 U.S.C. § 1521(c).

[19]    Notably, the Petitioner is entitled to the continued application of the protective stay even if the Court were to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to any of the Debtors because "chapter [15] gives the bankruptcy court the ability to grant substantially the same types of relief in assistance of foreign nonmain proceedings as main proceedings."  *In re SPhinX*, 351 B.R. at 116.

52

injuring United States creditors." H.R. No. 109-31, pt. 1, at 116 (2005). A determination of sufficient protection requires a balancing of the respective parties' interests. *CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *see In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").[~~19~~20]

109.    Here, the balance of interests weighs in favor of granting the relief requested. <u>First</u>, recognition and the application of the stay will allow for the efficient and orderly administration of the Debtors' assets and affairs in a centralized, organized mediation, and potential restructuring process (*i.e.*, the Brazilian Proceeding), thus protecting the interests of all creditors and maximizing the value of assets by preventing certain opportunistic creditors from circumventing the Brazilian Proceeding and commencing self-serving actions in the United States at the expense of the broader process.

110.    As set forth in the Brazilian Counsel Declaration, the Brazilian Proceeding provides creditors and stakeholders with many of the same procedural safeguards present in chapter 11 of the Bankruptcy Code thereby ensuring a fair and equitable process. *See* Brazilian Counsel Decl. ¶¶ 62–65. The stay will not bar or otherwise disenfranchise parties from participating in the Brazilian Proceeding, where each creditor's right to be heard will remain unaffected. Nor will the requested stay preclude a creditor that feels unduly burdened by the

---

[~~19~~20]    The analysis of whether the relief sought provides sufficient protection requires a balancing of the interests of the debtor and other affected parties to ensure that the relief does not "impinge excessively on any one entity's interests" and that "each entity must receive at least some protection." *See Jaffe v. Samsung Elecs. Co*., 737 F.3d 14, 27–28 (4th Cir. 2013) ("The analysis required by § 1522(a) is . . . best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test"). Importantly, courts recognize that interests of the various parties are often at odds with one another and "protection to one side might well come at some expense to the other." *Id*. at 27. A balancing test requires the court to consider "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Artimm, S.r.l.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005).

Court's grant of the requested relief to seek to lift the stay for "cause." *See, generally*, 11 U.S.C. § 362(d).  Instead, the Petitioner merely seeks to prevent creditors from attempting to end-run the Brazilian Proceeding at the expense of all creditors.  Accordingly, any prejudice to creditors caused by the discretionary relief requested is extremely limited.

111.    In contrast, failure to grant the discretionary relief requested will cause tremendous harm to the Debtors and their stakeholders.  As detailed more fully in the Petitioner's Provisional Relief Motion, absent relief, the Debtors are at risk of adverse creditor action that could threaten their ability to continue as a going concern.  Provisional Relief Mot. ¶¶ 28–31.  Accordingly, the balance between the minimal harm to those seeking to bring adverse actions against the Debtors, and the significant harm to the Debtors and the orderly administration of the Debtors' assets that would be caused by such actions, weighs in favor of granting the discretionary relief requested.[20][21]

*         *         *

112.    For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and that the Debtors are entitled to the relief provided by section 1520 of the Bankruptcy Code.  Thus, the Court should enter the Proposed Order attached hereto as **Exhibit A** recognizing the Brazilian Proceeding as the foreign main proceeding.

## NOTICE

113.    Notice of the Verified Petition has been provided to the parties (the "Notice Parties") set forth in **Exhibit B** attached hereto (the "Notice List").  The Petitioner respectfully submits that no other or further notice is required.  *See also Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order Scheduling Hearing and Specifying Form and*

---

[20][21]    Further, the Petitioner demonstrates in the Provisional Relief Motion that all parties in interest will be sufficiently protected by the Court's grant of the discretionary relief requested.  *See* Provisional Relief Motion ¶¶

*Manner of Service of Notice, and Granting Related Relief,* filed contemporaneously herewith.

## NO PRIOR REQUEST

114.    No previous request for the relief requested herein has been made by the Debtors to this or any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that the Court (1) grant the Verified Petition and enter the Proposed Order annexed hereto as **Exhibit A** recognizing the Brazilian Proceeding as the foreign main proceeding for the Debtors and granting the related relief in connection therewith and (2) grant such other and further relief as the Court deems just and proper.

---

59–60.

Dated: June ~~26~~29, 2026
New York, New York

Respectfully submitted,


By: */s/ Thomas S. Kessler*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Richard J. Cooper
Thomas S. Kessler
David Z. Schwartz
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for Antonio Reinaldo Rabelo Filho, as*
*Petitioner and Foreign Representative*

## VERIFICATION OF CHAPTER 15 PETITION

Pursuant to 28 U.S.C. § 1746, I, Antonio Reinaldo Rabelo Filho declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative of the Debtors with respect to the Brazilian Proceeding for purposes of these Chapter 15 Cases. I declare under penalty of perjury that the factual contents of the foregoing Verified Petition as well as the factual contents of each of the attachments and appendices thereto are true and accurate to the best of my knowledge, information, and belief, and I respectfully represent as follows:

I reside at Rua Barão da Torre, 550, Apt. 201, Ipanema, Rio de Janeiro, Brazil. I hold a law degree from the Federal University of Bahia, a post-graduate degree in business law from IBMEC/RJ, and a Master's degree in tax law from Pontifical Catholic University of São Paulo. I began my career at PWC Brasil, from where I left to work for the Oi Group ("Oi") in 2000. In Oi, I held positions in the financial and legal departments and served on the tax legal board from 2007 to 2017. Since 2017, I started my own law firm practice. I am also a member (vice president) of the National and State Commission of Bankruptcy of the Brazilian Bar Association.

In particular, I served as the foreign representative of Oi's chapter 15 proceeding in front of this Court and the judicial reorganization proceeding in front of the United Kingdom court, where I negotiated with various creditors and implemented Oi's restructuring plan internationally in Brazil, USA, Netherlands, and Portugal. I also acted as the foreign representative of the chapter 15 cases for (i) Americanas S.A. and its affiliates and (ii) InterCement Brasil S.A. and its affiliates before this Court, as well as for Light S.A. – Em Recuperação Judicial before the U.S. Bankruptcy Court for the Southern District of Texas.

On June 24, 2026, each of the other Debtors appointed me as their foreign representative and the foreign representative of the Brazilian Proceeding and authorized me to file the Verified

Petition and to act on their behalf in these Chapter 15 Cases.  Accordingly, I am fully authorized and take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon the following: (a) my review of relevant information, data, and documents (including oral information) furnished to me by the Debtors and its legal advisors; (b) information supplied to me by the Debtors' officers, directors, employees, and professionals; or (c) my analyses of the information I have received on the Debtors' operations and financial condition. I have also been kept abreast of major discussions with stakeholders, including the Debtors' primary financial creditors.  I am an individual over the age of 18.  If I am called to testify, I will do so competently and based on the facts set forth herein.

*[Remainder of Page Left Intentionally Blank]*

58

Dated: June 2529, 2026
Respectfully submitted,

_____

Antonio Reinaldo Rabelo Filho

*As Foreign Representative of the Debtors*